1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**LEVI & KORSINSKY, LLP**
Adam M. Apton (SBN 316506)
1160 Battery Street East, Suite 100
San Francisco, CA 94111
Tel: (415) 373-1671
Email: aapton@zlk.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH AVERZA, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>SUPER MICRO COMPUTER, INC., CHARLES LIANG, and DAVID E. WEIGAND,<br><br>Defendants. | Case No.  5:24-cv-06147<br><br>CLASS ACTION<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>DEMAND FOR JURY TRIAL |

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Plaintiff Joseph Averza ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges in this Complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to his own acts, and upon facts obtained through an investigation conducted by his counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by Super Micro Computer, Inc. ("SMCI" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of SMCI's public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of all investors who purchased or otherwise acquired SMCI securities between August 10, 2021 to August 26, 2024, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class").

2. Defendants provided investors with material information concerning SMCI's financial results for the fiscal years 2021 through 2024. Defendants' statements included, among other things, reports of continued significant growth with increasing financial success year after year, a healthy relationship with its related parties, and was in compliance with United States export restrictions.

3. Defendants provided these overwhelmingly positive statements to investors while, at the same time, disseminating materially false and misleading statements and/or concealing material adverse facts concerning the true state of SMCI's accounting; notably, that it was subject to consistent overreporting of sales and underreporting of expenses, that it had re-hired multiple executives who departed in the wake of the Company's prior accounting scandal, that the Company

has a closer relationship to its related parties than disclosed, that SMCI had more related parties than it had disclosed, and that the Company had not ceased exporting products to areas restricted by the United States government as a result of the Russia-Ukraine war, risking government sanction.

4.    On August 27, 2024, Hindenburg Research unveiled a research report concerning SMCI.  The research report detailed several allegations against the Company, including that Hindenburg "found glaring accounting red flags, evidence of undisclosed related party transactions, sanctions and control failures, and customer issues."

5.    Investors and analysts reacted immediately to these revelations. The price of SMCI's common stock declined dramatically. From a closing market price of $562.51 per share on August 26, 2024, SMCI's stock price fell to $443.49 per share on August 28, 2024, a decline of about 21.16% in the span of only two days.

## JURISDICTION AND VENUE

6.    Plaintiff brings this action, on behalf of himself and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

7.    The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

8.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

9.    Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as Defendant SMCI is headquartered in this District and a significant portion of its business, actions, and the subsequent damages to Plaintiff and the Class, took place within this District.

10.    In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

**THE PARTIES**

11.     Plaintiff purchased SMCI common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff's certification evidencing his transaction(s) in SMCI is attached hereto.

12.     Super Micro Computer, Inc. is a California corporation with its principal executive offices located at 980 Rock Avenue, San Jose, CA 95131. During the Class Period, the Company's common stock traded on the NASDAQ Stock Market (the "NASDAQ") under the symbol "SMCI."

13.     Defendant Charles Liang ("Liang") was, at all relevant times, the Founder, Chairman, President, and Chief Executive Officer of SMCI.

14.     Defendant David E. Weigand ("Weigand") was, at all relevant times, the Senior Vice President, Chief Financial Officer, Company Secretary, and Chief Compliance Officer.

15.     Relevant non-party Wally Liaw, Sr. ("Liaw"), a co-founder of SMCI, was formerly the Senior Vice President of International Sales prior to his resignation in January 2018.  He was subsequently re-hired by SMCI as a consultant in May 2021, became the Senior Vice President of Business Development in August 2022, and was further appointed as a Class II Director of SMCI on December 6, 2023.

16.     Defendants Liang and Weigand are sometimes referred to herein as the "Individual Defendants." SMCI together with the Individual Defendants are referred to herein as the "Defendants."

17.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of SMCI's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information n available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

18. SMCI is liable for the acts of the Individual Defendants, and its employees under the doctrine of *respondeat superior* and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

19. The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to SMCI under *respondeat superior* and agency principles.

## SUBSTANTIVE ALLEGATIONS

### A. Company Background

20. SMCI is an international company that develops, manufactures, and provides server and storage systems for various markets, including data centers, cloud computing, AI, 5G, and edge computing.

21. The Company further offers server subsystems and accessories including complete servers, storage systems, modular blade servers, blades, workstations, full rack scale solutions, networking devices, and sub-systems, as well as management and security software.

### B. The Defendants Materially Misled Investors Concerning SMCI's Reported Revenue and Projected Revenue Outlook for Multiple Consecutive Fiscal Years

*August 10, 2021*

22. On August 10, 2021, Defendants issued a press release announcing their financial results for the fourth quarter and full fiscal year 2021. In pertinent regard to the annual results, SMCI provided the following summary:

Net sales for the fiscal year ended June 30, 2021, were $3.56 billion versus $3.34 billion for the fiscal year ended June 30, 2020. Net income for fiscal year 2021 was $112 million, or $2.09 per diluted share, versus $84 million, or $1.60 per diluted share, for fiscal year 2020. Non-GAAP net income for the fiscal year 2021 was $136 million, or $2.48 per diluted share, versus $150 million, or $2.77 per diluted share, for fiscal year 2020. Non-GAAP net income for the fiscal year 2021 adds

back stock-based compensation expense of $28.5 million, special performance bonuses of $5.8 million, executive SEC settlement credit of $2.1 million, and controls remediation costs and other expenses of $1.3 million, less tax effects of $9.0 million.

23.     SMCI further projected an outlook for fiscal year 2022, providing, in pertinent part, the following estimates:

The Company expects net sales of $4.1 billion to $4.5 billion, GAAP net income per diluted share of at least $2.60 and non-GAAP net income per diluted share of at least $3.00 for fiscal year 2022 ending June 30, 2022. The Company's projections for GAAP and non-GAAP net income per diluted share both assume a tax rate of approximately 16% and a fully diluted share count of 55.3 million shares for GAAP and fully diluted share count of 56.5 million shares for non-GAAP. The outlook for fiscal year 2022 GAAP net income per diluted share includes approximately $30 million in expected stock-based compensation expense and other expenses that are excluded from non-GAAP net income per diluted share.

24.     In the Company's associated 10-K for fiscal year 2021, published on August 27, 2021 and signed by the Individual Defendants, SMCI discussed its related party dealings, in pertinent part, as follows:

We use Ablecom, a related party, for contract design and manufacturing coordination support and warehousing, and Compuware, also a related party and an affiliate of Ablecom, for distribution, contract manufacturing and warehousing. We work with Ablecom to optimize modular designs for our chassis and certain of other components. We outsource to Compuware a portion of our design activities and a significant part of our manufacturing of subassemblies, particularly power supplies. Our purchases of products from Ablecom and Compuware represented 7.8%, 10.1% and 9.2% of our cost of sales for fiscal years 2021, 2020 and 2019, respectively. Ablecom and Compuware's sales to us constitute a substantial majority of Ablecom and Compuware's net sales. Ablecom and Compuware are both privately-held Taiwan-based companies. In addition, we have entered into a distribution agreement with Compuware, under which we have appointed Compuware as a nonexclusive distributor of our products in Taiwan, China and Australia.

Steve Liang, Ablecom's Chief Executive Officer and largest shareholder, is the brother of Charles Liang, our President, Chief Executive Officer and Chairman of our Board of Directors ("the Board"). Steve Liang owned no shares of our common stock as of June 30, 2021, 2020 or 2019. Charles Liang and his spouse, Sara Liu, our Co-Founder, Senior Vice President and Director, jointly owned approximately 10.5% of Ablecom's capital stock, while Mr. Steve Liang and other family members owned approximately 28.8% of Ablecom's outstanding common stock as of June 30, 2021. Bill Liang, a brother of both Charles Liang and Steve Liang, is a member of the Board of Directors of Ablecom as well.

In October 2018, our Chief Executive Officer, Charles Liang, personally borrowed approximately $12.9 million from Chien-Tsun Chang, the spouse of Steve Liang. The loan is unsecured, has no maturity date and bore interest at 0.8% per month for the first six months, increased to 0.85% per month through February 28, 2020, and reduced to 0.25% effective March 1, 2020. The loan was originally made at Mr. Liang's request to provide funds to repay margin loans to two financial institutions, which loans had been secured by shares of our common stock that he held. The lenders called the loans in October 2018, following the suspension of our common stock from trading on NASDAQ in August 2018 and the decline in the market price of our common stock in October 2018. As of June 30, 2021, the amount due on the unsecured loan (including principal and accrued interest) was approximately $15.3 million.

Bill Liang is also the Chief Executive Officer of Compuware, a member of Compuware's Board of Directors and a holder of a significant equity interest in Compuware. Steve Liang is also a member of Compuware's Board of Directors and is an equity holder of Compuware.

. . .

The Company has entered into a series of agreements with Ablecom, including multiple product development, production and service agreements, product manufacturing agreements, manufacturing services agreements and lease agreements for warehouse space.

Under these agreements, the Company outsources to Ablecom a portion of its design activities and a significant part of its server chassis manufacturing as well as an immaterial portion of other components. ***Ablecom manufactured approximately 91.8%, 95.5% and 96.3% of the chassis included in the products sold by the Company during fiscal years 2021, 2020 and 2019, respectively***. With respect to design activities, Ablecom generally agrees to design certain agreed-upon products according to the Company's specifications, and further agrees to build the tools needed to manufacture the products. The Company pays Ablecom for the design and engineering services, and further agrees to pay Ablecom for the tooling. The Company retains full ownership of any intellectual property resulting from the design of these products and tooling.

With respect to the manufacturing aspects of the relationship, Ablecom purchases most of materials needed to manufacture the chassis from third parties and ***the Company provides certain components used in the manufacturing process (such as power supplies) to Ablecom through consignment or sales transactions***. ***Ablecom uses these materials and components to manufacture the completed chassis and then sell them back to the Company***. For the components purchased from the Company, Ablecom sells the components back to the Company at a price equal to the price at which the Company sold the components to Ablecom. The Company and Ablecom frequently review and negotiate the prices of the chassis the Company purchases from Ablecom. In addition to inventory purchases, the

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Company also incurs other costs associated with design services, tooling and other miscellaneous costs from Ablecom.

. . .

The Company has entered into a distribution agreement with Compuware, under which the Company appointed Compuware as a non-exclusive distributor of the Company's products in Taiwan, China and Australia. Compuware assumes the responsibility to install the Company's products at the site of the end customer, if required, and administers customer support in exchange for a discount from the Company's standard price for its purchases.

The Company also has entered into a series of agreements with Compuware, including a multiple product development, production and service agreements, product manufacturing agreements, and lease agreements for office space.

Under these agreements, the Company outsources to Compuware a portion of its design activities and a significant part of its power supplies manufacturing as well as an immaterial portion of other components. With respect to design activities, Compuware generally agrees to design certain agreed-upon products according to the Company's specifications, and further agrees to build the tools needed to manufacture the products. The Company pays Compuware for the design and engineering services, and further agrees to pay Compuware for the tooling. The Company retains full ownership of any intellectual property resulting from the design of these products and tooling. With respect to the manufacturing aspects of the relationship, Compuware purchases most of materials needed to manufacture the power supplies from outside markets and uses these materials to manufacture the products and then sell those products to the Company. The Company and Compuware frequently review and negotiate the prices of the power supplies the Company purchases from Compuware.

Compuware also manufactures motherboards, backplanes and other components used on printed circuit boards for the Company. ***The Company sells to Compuware most of the components needed to manufacture the above products. Compuware uses the components to manufacture the products and then sells the products back to the Company at a purchase price equal to the price at which the Company sold the components to Compuware, plus a "manufacturing value added" fee and other miscellaneous material charges and costs.*** The Company and Compuware frequently review and negotiate the amount of the "manufacturing value added" fee that will be included in the price of the products the Company purchases from Compuware. In addition to the inventory purchases, the Company also incurs costs associated with design services, tooling assets, and miscellaneous costs.

. . .

The Company's net sales to Ablecom were not material for the fiscal years ended June 30, 2021, 2020 and 2019.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

. . .

***Ablecom's sales to us comprise a substantial majority of Ablecom's net sales. For fiscal years ended June 30, 2021, 2020 and 2019, we purchased products from Ablecom totaling $122.2 million, $152.5 million and $137.9 million, respectively***. Amounts owed to Ablecom by us as of June 30, 2021 and 2020, were $41.2 million and $40.1 million, respectively. For the fiscal years ended June 30, 2021, 2020 and 2019, we paid Ablecom $8.6 million, $7.6 million and $7.4 million, respectively, for design services, tooling assets and miscellaneous costs.

***Compuware's sales of our products to others comprise a majority of Compuware's net sales. For fiscal years ended June 30, 2021, 2020 and 2019, we sold products to Compuware totaling $27.9 million, $23.9 million and $17.7 million, respectively***. Amounts owed to us by Compuware as of June 30, 2021 and 2020, were $18.4 million and $14.3 million, respectively. The price at which Compuware purchases the products from us is at a discount from our standard price for purchasers who purchase specified volumes from us. In exchange for this discount, Compuware assumes the responsibility to install our products at the site of the end customer and administers first-level customer support. ***For the fiscal years ended June 30, 2021, 2020 and 2019, we purchased products from Compuware totaling $113.4 million, $130.6 million and $138.9 million, respectively***. Amounts we owed to Compuware as of June 30, 2021 and 2020, were $46.4 million and $46.5 million, respectively. For the fiscal years ended June 30, 2021, 2020 and 2019, we paid Compuware $1.8 million, $1.2 million and $0.7 million, respectively, for design services, tooling assets and miscellaneous costs.

(Emphasis added).

<u>*May 6, 2022*</u>

25.    On May 6, 2022, Defendants published their 10-Q filing associated with their third quarter fiscal year 2022 results, published a few days prior.

26.    The 10-Q, which was signed by the Individual Defendants, pertinently provides the Company's reaction to the Russian-Ukraine war and their decision to pause sales to the area, stating, stating in pertinent part that:

The crisis in eastern Europe continues to be a challenge to global companies, including us, which have customers in the impacted regions. The U.S. and other global governments have placed restrictions on how companies may transact with businesses in these regions, particularly Russia, Belarus and restricted areas in Ukraine. ***Because of these restrictions and the growing logistical and other challenges, we have paused sales to Russia, Belarus and the restricted areas in Ukraine***. This decision, which is in line with the approach of other global technology companies, helps us comply with our obligations under the various requirements in the U.S. and around the world.

8

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

. . .

we do not make a material portion of our sales or acquire a material portion of our parts or components directly from impacted regions

. . .

no assurances can be given that additional developments in the impacted regions, and responses thereto from the U.S. and other global governments, would not have a material adverse effect on our business, results of operations and financial condition.

(Emphasis added).

### *August 9, 2022*

27.     On August 9, 2022, Defendants issued a press release announcing their financial results for the fourth quarter and full fiscal year 2022. Prefacing the results, CEO Charles Liang praised the Company's performance, pertinently stating:

The Supermicro team has attained yet another milestone by achieving $5.2 billion in annual revenue . . . The ramp up of recent design wins and top tier customers adopting our plug and play ("PNP") rack-scale solutions have given us momentum going into fiscal year 2023. We are well on our way to becoming the leading global supplier of rack-scale Total IT Solutions, powering the world's digital transformation across diverse applications in key market segments including AI, enterprise, cloud, edge/telco and others.

28.     In pertinent regard to the annual results, SMCI provided the following summary:

Net sales for the fiscal year ended June 30, 2022, were $5.20 billion versus $3.56 billion for the fiscal year ended June 30, 2021. Net income for fiscal year 2022 was $285 million, or $5.32 per diluted share, versus $112 million, or $2.09 per diluted share, for fiscal year 2021. Non-GAAP net income for the fiscal year 2022 was $311 million, or $5.65 per diluted share, versus $136 million, or $2.48 per diluted share, for fiscal year 2021. Non-GAAP net income for the fiscal year 2022 adds back stock-based compensation expense of $32.8 million, litigation expenses of $4.4 million, $2.0 million of litigation settlement costs, and $0.5 million of special performance bonuses, net of the related tax effects.

29.     SMCI further projected an outlook for fiscal year 2023, providing, in pertinent part, the following estimates:

For fiscal year 2023 ending June 30, 2023, the Company expects net sales of $6.2 billion to $7.0 billion, GAAP net income per diluted share of at least $7.27 and non-GAAP net income per diluted share of at least $7.50. The Company's projections for GAAP and non-GAAP net income per diluted share assume a tax rate of

9

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

approximately 20.3% and 21.1%, respectively, and a fully diluted share count of 55.6 million shares for GAAP and fully diluted share count of 57.0 million shares for non-GAAP. The outlook for fiscal year 2023 GAAP net income per diluted share includes approximately $35.4 million in expected stock-based compensation expense and other expenses, net of related tax effects that are excluded from non-GAAP net income per diluted share.

30.     In the Company's associated 10-K for fiscal year 2022, published on August 29, 2022 and signed by the Individual Defendants, SMCI provided updated financial details concerning the Company's related party dealings, in pertinent part, as follows:

Ablecom manufactured approximately 88.2%, 91.8% and 95.5% of the chassis included in the products sold by the Company during fiscal years 2022, 2021 and 2020, respectively.

. . .

Ablecom's sales to us comprise a substantial majority of Ablecom's net sales. *For fiscal years ended June 30, 2022*, 2021 and 2020, *we purchased products from Ablecom totaling $192.4 million*, $122.2 million and $152.5 million, respectively. Amounts owed to Ablecom by us as of June 30, 2022, 2021 and 2020, were $46.0 million, $41.2 million and $40.1 million, respectively. *For the fiscal years ended June 30, 2022*, 2021 and 2020, *we paid Ablecom $8.3 million,* $8.6 million and $7.6 million, respectively, for design services, tooling assets and miscellaneous costs.

Compuware's sales of our products to others comprise a majority of Compuware's net sales. *For fiscal years ended June 30, 2022*, 2021 and 2020, *we sold products to Compuware totaling $26.1 million*, $27.9 million and $23.9 million, respectively. Amounts owed to us by Compuware as of June 30, 2022, 2021 and 2020, were $20.0 million, $18.4 million and $14.3 million, respectively. The price at which Compuware purchases the products from us is at a discount from our standard price for purchasers who purchase specified volumes from us. In exchange for this discount, Compuware assumes the responsibility to install our products at the site of the end customer and administers first-level customer support. *For the fiscal years ended June 30, 2022*, 2021 and 2020, *we purchased products from Compuware totaling $170.3 million*, $113.4 million and $130.6 million, respectively. Amounts we owed to Compuware as of June 30, 2022, 2021 and 2020 were $60.0 million, $46.4 million and $46.5 million, respectively. For the fiscal years ended June 30, 2022, 2021 and 2020, we paid Compuware $1.5 million, $1.8 million and $1.2 million, respectively, for design services, tooling assets and miscellaneous costs.

(Emphasis added).

*August 8, 2023*

31.     On August 8, 2023, Defendants issued a press release announcing their financial results for the fourth quarter and full fiscal year 2023. In pertinent regard to the annual results, SMCI provided the following summary:

> Net sales for the fiscal year ended June 30, 2023, were $7.12 billion versus $5.20 billion for the fiscal year ended June 30, 2022. Net income for fiscal year 2023 was $640 million, or $11.43 per diluted share, versus $285 million, or $5.32 per diluted share, for fiscal year 2022. Non-GAAP net income for fiscal year 2023 was $673 million, or $11.81 per diluted share, versus $311 million, or $5.65 per diluted share, for fiscal year 2022. Non-GAAP net income for fiscal year 2023 adds back stock-based compensation expense of $54 million and litigation recovery of $4 million, net of the related tax effects of $17 million.

32.     Speaking to these results, CEO Charles Liang provided the following commentary, in pertinent part:

> Supermicro's record revenue and 37% year-over-year growth for fiscal year 2023 validates our global leadership position in AI accelerated compute platforms . . . We continue to see unprecedented demand for AI and other advanced applications requiring optimized rack-scale solutions. We are in a great position to continue our growth momentum given our record new design wins, customers, and backlog for our best-in-class rack-scale Total AI & IT Solutions.

33.     SMCI further projected an outlook for fiscal year 2024, the Company provided significantly less detail for its estimate that in prior years, in pertinent part, providing only that "[f]or fiscal year 2024 ending June 30, 2024, the Company expects net sales of $9.5 billion to $10.5 billion."

34.     In the Company's associated 10-K for fiscal year 2023, published on August 28, 2023 and signed by the Individual Defendants, SMCI provided updated financial details concerning the Company's related party dealings, in pertinent part, as follows:

> Ablecom manufactured approximately 91.9%, 88.2% and 91.8% of the chassis included in the products sold by the Company during fiscal years 2023, 2022 and 2021, respectively.
>
> . . .
>
> Ablecom's sales to us comprise a substantial majority of Ablecom's net sales. **For fiscal years ended June 30, 2023**, 2022 and 2021, **we purchased products from Ablecom totaling $167.8 million**, $192.4 million and $122.2 million, respectively. Amounts owed to Ablecom by us as of June 30, 2023, 2022 and 2021, were $36.9

million, $46.0 million and $41.2 million, respectively. For the fiscal years ended June 30, 2023, 2022 and 2021, we paid Ablecom $12.1 million, $8.3 million and $8.6 million, respectively, for design services, tooling assets and miscellaneous costs.

Compuware's sales of our products to others comprise a majority of Compuware's net sales. *For fiscal years ended June 30, 2023*, 2022 and 2021, *we sold products to Compuware totaling $36.3 million*, $26.1 million and $27.9 million, respectively. Amounts owed to us by Compuware as of June 30, 2023, 2022 and 2021, were $24.9 million, $19.6 million and $18.2 million, respectively. The price at which Compuware purchases the products from us is at a discount from our standard price for purchasers who purchase specified volumes from us. In exchange for this discount, Compuware assumes the responsibility to install our products at the site of the end customer and administers first-level customer support. *For the fiscal years ended June 30, 2023*, 2022 and 2021, *we purchased products from Compuware totaling $217.0 million*, $170.3 million and $113.4 million, respectively. Amounts we owed to Compuware as of June 30, 2023, 2022 and 2021 were $66.2 million, $60.0 million and $46.4 million, respectively. For the fiscal years ended June 30, 2023, 2022 and 2021, we paid Compuware $2.0 million, $1.5 million and $1.8 million, respectively, for design services, tooling assets and miscellaneous costs.

35.    SCMI, in the same report, highlighted that "no sales of any products actually occurred in the Russian Federation during fiscal year 2023," and reiterated further that the "Company and its subsidiaries had last recorded revenue from Russia on February 23, 2022."

*December 8, 2023*

36.    On December 8, 2023, Defendants announced that Yih-Shyan (Wally) Liaw was joining the SMCI Board of Directors.   The announcement detailed Liaw's history with the company, his prior resignation and the circumstances surrounding it, and his return to the company, as follows:

Mr. Liaw co-founded the Company in 1993. From the Company's founding until January 2018, Mr. Liaw was an employee and held various executive positions in the Company, including Senior Vice President of Worldwide Sales and Corporate Secretary. He was also a member of the Board of Directors from 1993 until January 2018. *In January 2018, Mr. Liaw resigned from all his positions with the Company, including from the Board of Directors, during a period when the Company was not current in its filings with the Securities and Exchange Commission, and, following completion of an Audit Committee investigation, in connection with a restructuring of the Company's sales organization as part of the Company's remediation of material weaknesses in its internal control over financial reporting*. From February 2018 until June 2020, Mr. Liaw was retired. From June 2020 until April 2021, Mr. Liaw was the president of 2CRSi

12

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Corporation, a company headquartered in Strasbourg, France that develops, produces and sells high-performance customized, environmentally-friendly servers. *Mr. Liaw returned to the Company as a consultant in May 2021*, advising the Company with respect to business development matters. *In August 2022, Mr. Liaw returned to full-time employment with the Company as Senior Vice President, Business Development.*

(Emphasis added).

*August 6, 2024*

37.     On August 6, 2024, Defendants issued a press release announcing their financial results for the fourth quarter and full fiscal year 2024. In pertinent regard to the annual results, SMCI provided the following summary:

Net sales for the fiscal year ended June 30, 2024, were $14.94 billion versus $7.12 billion for the fiscal year ended June 30, 2023. Net income for fiscal year 2024 was $1.21 billion, or $20.09 per diluted share, versus $640 million, or $11.43 per diluted share, for fiscal year 2023. Non-GAAP net income for fiscal year 2024 was $1.34 billion, or $22.09 per diluted share, versus $673 million, or $11.81 per diluted share, for fiscal year 2023. Non-GAAP net income for fiscal year 2024 adds back stock-based compensation expense of $135 million, net of the related tax effects of $93 million.

38.     CEO Charles Liang again provided some commentary on the results, claiming that "Supermicro continues to experience record demand of new AI infrastructures propelling fiscal 2024 revenue up 110% year over year to $14.9 billion and non-GAAP earnings per share up 87% to $22.09." He further addressed the Company's future, stating:

We are well positioned to become the largest IT infrastructure company, driven by our technology leadership including rack-scale DLC liquid cooling and business values of our new Datacenter Building Block Solutions. The investments in Malaysia and Silicon Valley expansions will further strengthen our supply chain, security, and economies of scale necessary for the growing AI revolution.

39.     The above statements in Paragraphs 22 to 38 were false and/or materially misleading. Defendants created the false impression that they possessed reliable information pertaining to the Company's projected revenue outlook and anticipated growth while also minimizing risk from seasonality and macroeconomic fluctuations. In truth, SMCI's optimistic reports of significant growth, earnings potential, a healthy relationship with its related parties, and an assertion of ceasing shipment to wartime zones in compliance with government restrictions fell

short of reality as they failed to incorporate the true circumstances of SMCI's accounting and the true state of SMCI's business dealings in and to the Russia.

### C.    The Truth Emerges during Hindenburg Research's Research Report

*August 27, 2024*

40.    On August 27, 2024, Hindenburg Research ("Hindenburg") unveiled a research report entitled "Super Micro: Fresh Evidence of Accounting Manipulation, Sibling Self-Dealing and Sanctions Evasion at this AI High Flyer" (the "Report").   According to the Report, Hindenburg's "3-month investigation" uncovered "glaring accounting red flags, evidence of undisclosed related party transactions, sanctions and expert control failures, and customer issues."

> All told, we believe Super Micro is a serial recidivist. It benefitted as an early mover but still faces significant accounting, governance and compliance issues and offers an inferior product and service now being eroded away by more credible competition

41.    The Report disclosed additional details surrounding the circumstances of the prior employment and subsequent retention of several key executives who departed the company in a prior "accounting scandal" for which the company was fined $17.5 million by the SEC.   In pertinent part, the report discussed Wally Liaw, Phidias Chou, Salim Fedel, and Howard Hideshima, as follows:

> When we spoke to former Super Micro executives, they told us Wally Liaw presided over the sales teams that were involved in the previous accounting violations: "If you go back to Wally's team, every one of those [people] has their hand in that mess. You can promise yourself that"

> One former executive told us they had questioned the decision to rehire Wally, asking at the time: "***Why are we having this conversation about Wally coming back as a contractor?*** So when I saw him come back I had the same thought, like, wow, that's, uh, that's interesting."

> Normally, leaving amid an accounting scandal would be the end of an executive's association with a form. Yet a recent media report in April 2024 by Asia University, Taiwan, reported that Phidias Chou attended a Super Micro meeting with CEO Charles Liang, where Chou was vaguely identified as "deputy CEO." . . . In another article, describing the same meeting, he was simply referred to as a "consultant."

> . . .

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

A former executive told us [that Salim Fedel was also associated with unlawful activities]: "He was involved with the restatement. He was one of the sloppy salespeople. He got fired because he was so aggressive." . . . Super Micro rehired him as Vice President of Business Development and Strategic Sales in October 2020, per his LinkedIn.

. . .

[Howard] Hideshima was rehired as a consultant in May 2023 to a related party entity of Super Micro called Ablecom Technology, according to his LinkedIn profile. Ablecom is led by Super Micro CEO Charles Liang's brother. Super Micro's CEO and his wife own 10.5%. The entity has hundreds of millions of dollars in transactions with Super Micro per year, per its 10-k.

. . .

Former employees explained how these rehires were borne out of long-standing relationships with CEO Charles Liang, who valued loyalty over all else. Per one former sales director: "I wouldn't take comfort in that. If people were let go because their practices were questionable, to bring them back would give me less comfort. I don't think the behavior of the company in many ways has changed in the 5 years since I started, and I started shortly after the delisting problem.  Another sales director attributed it to nepotism: "They were hired back. And there was a lot of nepotism. I'm speaking freely."

(Emphasis in original).

42.    According to the Report, it was not just the employees returning that risked the company's accounting standards, but rather SMCI had never changed mindset.  In pertinent part the report stated:

"Our interviews with former employees corroborate that Super Micro continued recognizing incomplete sales as revenue after the SEC Settlement in 2020.

Pressure to meet quotas pushed salespeople to stuff the channel with distributors, using "partial shipments," per former sales director

. . .

[Former employees] told us salespeople worked with distributors of Super Micro, including Avnet and Tech Data to over-ship product to boost numbers, in what appeared to be a channel stuffing scheme.  This resulted from sales teams being put under "massive pressure" from Charles Liang each quarter

. . .

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Our interviews also corroborate further revenue recognition issues related to shipping highly defective products around quarter-end

43.     The Report additionally discussed significant potential issues with SMCI's related party dealings, both disclosed and undisclosed.  Beginning with the former, the Report discussed SMCI's relationship with Ablecom and Compuware, stating, in pertinent part, the following:

Ablecom was founded in 1997, per its website. Its CEO and largest shareholder is Steve (Jianfa) Liang, a younger brother of Super Micro's CEO Charles Liang, per the company's 2023 annual report.  Steve Liang owns 28.8% of Ablecom shares along with unnamed "other family members." Super Micro CEO Charles Liang, and his wife, who is also a director at Super Micro, own 10.5% of Ablecom shares. An unnamed sibling of co-founder Wally Liaw owns 11.7%, per filings.

Compuware was founded in 2004, per its website. Its CEO is Bill (Jianda) Liang, also a younger brother of Super Micro's CEO, per the company's 2023 10-K. Brother Steve Liang [of Ablecom] is also a director and shareholder of Compuware.

As of April 2024, Bill Liang and his immediate family owned 15.83% of Compuware while elder brother Steve Liang and his wife and immediate family owned a much larger 37.67% stake, per shareholdings disclosed in filings by one of its investees. Ablecom owned a 15% stake in Compuware.

Both Ablecom and Compuware are collocated with Super Micro's facility in Taiwan

. . .

[B]oth Ablecom and Compuware's global export sales appear highly concentrated on Super Micro and the U.S., based on available import-expert records via Tradesparq, which may not cover all import markets.

Our analysis of those records shows that of Ablecom's exports to the U.S., ~99.8% were to Super Micro between January 1st, 2020 and June 30th, 2024 (the end of Super Micro's fiscal year).

Reflecting a similar pattern, in the same period, 99.7% of Compuware's exports to the U.S. were to Super Micro, based on available Tradesparq data.

In short, these related party suppliers have almost no business in the U.S. – and apparently very little elsewhere in the world – apart from Super Micro, suggesting they were set up as extensions of the public company.

A former engineer at Ablecom confirmed the conclusions we drew from the trade data. They told us via written message: "Ablecom is a very special supplier of chassis and thermal module to SMC [Super Micro]…Ablecom has about 90%

revenue comes from SMC [Super Micro]." The engineer also indicated that Super Micro CEO Charles Liang was the person calling the shots at Ablecom and Compuware: "SMC [Super Micro], Ablecom and Compuware have a regular operation meeting hosted by Charles Liang." They said the operation meeting was held monthly and went on to explain that "Steve [Liang] and Bill [Liang] are in charge of chassis and PSU [power supply unit], respectively."

44.     Furthermore, according to the report, despite SMCI's claims of a "competitive edge" in liquid cooled solutions, the Company purportedly presented Ablecom's liquid cooling solutions as its own during the 2022 SuperComputing Conference in Dallas.  In doing so, the Report cites to "patent and utility model records" which evidence Ablecom has recent water cooling patents, and to "[a] former employee of Ablecom [who] also stated that Super Micro was showcasing Ablecom's liquid cooling solutions at the 2022 SuperComputing Conference, per their LinkedIn."' "In short, Super Micro's related party 'contract manufacturer' to whom it outsources basic component manufacturing and assembly might also be designing its liquid-cooling solutions, which are being touted as proprietary."

45.     Regarding SMCI's undisclosed related party dealings, the Report featured various companies that SMCI has apparent involvement in, but has never disclosed to investors, including: Aeon Lighting Technology ("Aeon Lighting"), Aeon Biotech a/k/a Hongguo Biotechnology Co ("Aeon Biotech"), Abelestnet Technology Limited, Lambda Labs, and Leadtek.

46.     Pertinently, regarding Aeon Lighting and Aeon Biotech, Hindenburg noted both companies are operated by James (Jianguo) Liang, SMCI CEO Charles Liang's "third and youngest brother," and that he owns 85.7% of the shares of Aeon Lighting" and "99% of Aeon Biotech." The Reported noted the following connections to SMCI:

> In addition to producing LED lighting, [Aeon Lighting] also produces computer components and … specifically list chassis manufacturing, rail sliders, cooling systems, power supplies and metal prototyping as its product offering.
>
> Its company brochure prominently displays a Super Micro branded workstation chassis
>
> . . .
>
> Not only is Aeon Lighting in the server business, like Super Micro, Compuware and Ablecom, it also operates from the same location.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Aeon's website also lists a job posting for a production role, located at "No. 306, Chang'an Street, Bade District, Taoyuan City" in Taiwan, the same address as Ablecom and Compuware's manufacturing facility, within the industrial campus it shares with Super Micro.

James Liang's second company Aeon Biotech … seems to have pivoted from sterilization equipment to the server business.

. . .

A profile on leading Taiwanese job listing website states that Aeon Biotech is 'providing the most complete AI server design, research and development, and sales." The profile also states the company is located within the 'Supermicro AI Technology Park"

47.    The Hindenburg Report additionally provided the account of a former sales director of SMCI and media reports who confirmed that Aeon was a supplier of SMCI.

48.    In reference to the other undisclosed, related party dealings, the Report disclosed, in pertinent part, the following information:

Super Micro CEO Charles Liang's other brother, Bill (Jianda) Liang, who runs a disclosed related party, Compuware, named in the previous part, is a shareholder and director of another Hong Kong entity called "Ablestnet Technology Limited"

. . .

Bill Liang is also the Chairman and 17% shareholder of another similarly-named entity in Taiwan called "Ablestnet Computer Inc" – which itself holds a 9.34% stake in Compuware . . .

Both the Ablestnet Taiwan and Hong Kong entities appear to be undisclosed related-party suppliers or resellers for Super Micro

. . .

Despite selling almost identical products, offering OEM services and being located at the site of a related party, Compuware, neither Ablestnet's Taiwanese or Hong Kong Entites are mentioned in Super Micro's filings.

. . .

Lambda seems to have purchased hardware and datacenter space through Super Micro, without disclosure of the potential related party nature of the deal owing to a Super Micro investment.

. . .

Ablecom and Compuware now own 19.85% and 9.93% of Leadtek . . .

Both of Charles Liang's brothers [Bill and Steve Liang] later took board seats at Leadtek on December 27th, 2023, per Leadtek filings.

Super Micro makes no reference to any transactions with Leadtek, despite advertising almost identical products, utilizing Super Micro parts on its website. We reached out to Leadtek's investor relations spokesperson, Michael Yang, to understand more about the relationship. He confirmed that Leadtek was using parts from Super Micro: "We will take their [Super Micro's] motherboard then take Ablecom's case then Compuware's power supply."

. . .

Given the circular nature of their relationship, the indirect ownership by Charles Liang and the close ties to Super Micro, this appears to be a de facto, undisclosed related party.

49.    The Report additionally provided significant detail regarding SMCI's continued shipments to wartime Russia in a purported attempt to circumvent United States export restrictions and risk sanctions and potentially the halt of a significant portion of SMCI's current business.  In pertinent part, the Report concluded:

> ***Super Micro products have been shipped to Russia in larger-than-ever volumes since the invasion of Ukraine***, based on our analysis of more than 45,000 import and export transactions provided by trade aggregator Tradesparq.
>
> . . .
>
> In calendar year 2023, exports of Super Micro products to Russia rose to $126.6 million – 9.6x higher than in 2021 – per Tradesparq data. ***That value was equivalent to 4.9% of Super Micro's total worldwide sales, excluding the U.S., in calendar 2023***, per filings
>
> . . .
>
> We believe that all the common-sense indicators suggest that Super Micro continued to knowingly supply one of its longstanding Russian customers first via a California distributor operated by a key executive of one of its authorized partners and later via a web of Turkish shell companies.
>
> Trade data shows Super Micro exporting goods directly to Niagara until February 24th, 2022, the day Russia invaded Ukraine.

Then between July 12th, 2022 and February 8th, 2023, a California entity named Business Development International took over exports of Super Micro products to Niagara – in apparent contravention of U.S. trade restrictions – per import-export data.

In just a little more than 6 months, Business Development International shipped more than $5.8 million of "computing machine devices", "data processing blocks" and "parts and accessories" solely to Niagara Computers in Russia, per Tradesparq.

. . .

Just as California-based Business Development International's export operations were winding down, three recently-created Turkish companies took over shipping Super Micro products to Niagara.

The largest, Koc Gemicilik Ve Tasimacilik, was incorporated on January 11, 2022 – about five weeks before Russia invaded Ukraine, per the Turkish corporate gazette

. . .

Between March 6, 2023 and December 21, 2023, Koc Gemicilik Ve Tasimacilik exported $32.1 million of Super Micro products solely to Niagara in Russia, per Tradesparq.

In June 2024, Koc Gemicilik Ve Tasimacilik was placed under U.S. sanctions for its role in smuggling restricted items to Russia.

The other two export intermediaries, Alfament Yazilim Teknoloji and AMD Ithalat Ihracat were both incorporated in Turkey within two months of the Russian invasion of Ukraine, per the Turkish corporate gazette.

Neither entity nor their sole shareholders appear to have any significant online presence.

Between January 2023 and October 2023, those two entities shipped a combined $8.3 million of Super Micro components to Niagara, per Tradesparq. The vast majority of those products corresponded to HS trade prefix 8471.50 – items the U.S. says are being diverted for military use.

Newly-created Turkish entities, run by Ukrainian and Russian citizens, with little or no trading history and little or no online presence would have been an unmissable warning sign during even the most rudimentary due diligence and export compliance.

. . .

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Between November 2, 2022 and November 14, 2023, Beiliande [an "Authorized Parnter" of SMCI via its partnership program] exported Super Micro products with a declared customs value of approximately $10.25 million to Russia – via both its Shenzhen and Hong Kong operations, per Tradesparq.

The largest single Russian customer supplied by Beiliande was called Asilan, based in St Petersburg, which received goods with a declared customs value of about $3.6 million, per Tradesparq.

. . .

Asilian states on the website that it is a partner of Super Micro, provides a link to Super Micro in Holland and features photos with Asilan personnel carrying boxes marked with the Super Micro logo. Its website features multiple links to what it says are Super Micro servers and data storage systems.

. . .

Moscow-based IT distributor Vneshekostil received about $29.4 million of Super Micro products following Russia´s 2022 invasion of Ukraine, per Tradesparq. It appears to have had no prior trading relationship with Super Micro and received most of the components via a Hong Kong exporter created seven weeks after the war began.

Vneshekostil was sanctioned by the U.S. in September 2023 after it became "one of the largest importers of dual-use chips into Russia", per the U.S. Treasury.

(Emphasis added).

### *August 28, 2024*

50.    On August 28, 2024, SMCI announced it would "Delay Form 10-K filing for Fiscal Year 2024." The Company provided, in pertinent part, the following explanation for the delay:

SMCI is unable to file its Annual Report within the prescribed time period without unreasonable effort or expense. Additional time is needed for SMCI's management to complete its assessment of the design and operating effectiveness of its internal controls over financial reporting as of June 30, 2024.

51.    The aforementioned disclosures that came to light in the Hindenburg Report and the apparent resulting delay in SMCI filing its fiscal year 2024 reporting are in direct contrast to Defendants fiscal reporting and associated statements and disclosures. On those publications, Defendants continually praised their alleged significant growth and healthy relationship with its related parties, and further firmly indicated they had ceased all dealings with Russia pursuant to

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

the United States export restrictions, obfuscating the risk of potential sanctions on the Company's profitability.

52.     Investors and analysts reacted immediately to these revelations. The price of SMCI's common stock declined dramatically. From a closing market price of $562.51 per share on August 26, 2024, SMCI's stock price fell to $443.49 per share on August 28, 2024, a decline of about 21.16% in the span of only two days.

53.     A number of well-known analysts who had been following SMCI lowered their price targets in response to SMCI's disclosures. For example, CFRA, while dropping their buy rating to hold, noted that they "downgrade SCMI to Hold following Hindenburg Research's recent allegations of accounting manipulation, export control failures, and customer issues."  The analyst further noted multiple sources of concern, stating that "SCMI's delayed 10-K filing and potential reputational damage raises concern," "the unrefuted allegations and risk of customer erosion warrant caution," and "[t]he company's previous encounter with similar issues in 2018 further amplifies our concerns."

54.     The fact that these analysts, and others, discussed SMCI's shortfall and below-expectation projections suggests the public placed significant weight on SMCI's prior revenue and sales estimates. The frequent, in-depth discussion of SMCI's guidance confirms that Defendants' statements during the Class Period were material.

### D.     Loss Causation and Economic Loss

55.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of SMCI's common stock and operated as a fraud or deceit on Class Period purchasers of SMCI's common stock by materially misleading the investing public. Later, Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of SMCI's common stock materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of SMCI's common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

56.     SMCI's stock price fell in response to the corrective events on August 27 and 28, 2024, as alleged *supra*. On August 27 and 28, 2024, information was disclosed that was directly related to the Defendants' prior misrepresentations and material omissions concerning SMCI's accounting principles, forecasting processes, and growth guidance.

57.     In particular, on August 27, 2024, Hindenburg Research published the Report on SMCI detailing allegations of, pertinently, "red flags" concerning the manipulation of reported accounting, significant interplay between the Company and its disclosed related parties, various related parties SMCI has never disclosed, and a consistent export of products to Russia in contravention of United States export restrictions and their own statements to shareholders. Then, on August 28, 2024, SMCI revealed that it would not be able to timely file its annual report, confirming in the eyes of investors that Hindenburg Research's report was credible and actionable.

### E.     Presumption of Reliance; Fraud-On-The-Market

58.     At all relevant times, the market for SMCI's common stock was an efficient market for the following reasons, among others:

(a)     SMCI's common stock met the requirements for listing and was listed and actively traded on the NASDAQ during the Class Period, a highly efficient and automated market;

(b)     SMCI communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c)     SMCI was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d)     Unexpected material news about SMCI was reflected in and incorporated into the Company's stock price during the Class Period.

59.     As a result of the foregoing, the market for SMCI's common stock promptly digested current information regarding the Company from all publicly available sources and

reflected such information in SMCI's stock price. Under these circumstances, all purchasers of SMCI's common stock during the Class Period suffered similar injury through their purchase of SMCI's common stock at artificially inflated prices, and a presumption of reliance applies.

60.     Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

### F.     No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine

61.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they provided investors with revenue projections while at the same time failing to maintain adequate forecasting processes. Defendants provided the public with forecasts that failed to account for this decline in sales and/or adequately disclose the fact that the Company at the current time did not have adequate forecasting processes.

62.     To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

63.     Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of SMCI who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future

economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

64.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired SMCI's common stock during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

65.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, SMCI's common stock were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by SMCI or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of April 30, 2024, there were approximately 58.5 million shares of the Company's common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

66.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

67.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

68.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of SMCI;

(c)     whether the Individual Defendants caused SMCI to issue false and misleading financial statements during the Class Period;

(d)     whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e)     whether the prices of SMCI's common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

69.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### *Against All Defendants for Violations of*

### *Section 10(b) and Rule 10b-5 Promulgated Thereunder*

70.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

71.   This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

72.   During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon. Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of SMCI common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire SMCI's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

73.   Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for SMCI's securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

74.   By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew

1    or recklessly disregarded that material facts were being misrepresented or omitted as described
2    above.

3         75.    Information showing that Defendants acted knowingly or with reckless disregard
4    for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or
5    directors of the Company, the Individual Defendants had knowledge of the details of SMCI's
6    internal affairs.

7         76.    The Individual Defendants are liable both directly and indirectly for the wrongs
8    complained of herein. Because of their positions of control and authority, the Individual
9    Defendants were able to and did, directly or indirectly, control the content of the statements of the
10   Company. As officers and/or directors of a publicly-held company, the Individual Defendants had
11   a duty to disseminate timely, accurate, and truthful information with respect to SMCI's businesses,
12   operations, future financial condition and future prospects. As a result of the dissemination of the
13   aforementioned false and misleading reports, releases and public statements, the market price of
14   SMCI's common stock was artificially inflated throughout the Class Period. In ignorance of the
15   adverse facts concerning the Company which were concealed by Defendants, Plaintiff and the
16   other members of the Class purchased or otherwise acquired SMCI's common stock at artificially
17   inflated prices and relied upon the price of the common stock, the integrity of the market for the
18   common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

19        77.    During the Class Period, SMCI's common stock was traded on an active and
20   efficient market. Plaintiff and the other members of the Class, relying on the materially false and
21   misleading statements described herein, which the defendants made, issued or caused to be
22   disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares
23   of SMCI's common stock at prices artificially inflated by defendants' wrongful conduct. Had
24   Plaintiff and the other members of the Class known the truth, they would not have purchased or
25   otherwise acquired said common stock, or would not have purchased or otherwise acquired them
26   at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff
27   and the Class, the true value of SMCI's common stock was substantially lower than the prices paid
28   by Plaintiff and the other members of the Class. The market price of SMCI's common stock

declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

78.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

79.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### *Against the Individual Defendants*

### *for Violations of Section 20(a) of the Exchange Act*

80.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

81.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about SMCI's misstatements.

82.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by SMCI which had become materially false or misleading.

83.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which SMCI disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause SMCI to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning

of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of SMCI's common stock.

84. Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause SMCI to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

85. By reason of the above conduct, the Individual Defendants and/or SMCI are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demand judgment against defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

//
//
//
//
//
//

30

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1

Dated: August 30, 2024                              Respectfully submitted,

2
                                                     **LEVI & KORSINSKY, LLP**
3
                                                     /s/ Adam Apton
4                                                    Adam M. Apton (SBN 316506)
                                                     1160 Battery Street East, Suite 100
5                                                    San Francisco, CA 94111
                                                     Tel: (415) 373-1671
6                                                    Email: aapton@zlk.com

7                                                    *Attorneys for Plaintiff*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS