1  **BERNSTEIN LITOWITZ BERGER**
    **& GROSSMANN LLP**
2  JONATHAN D. USLANER (Bar No. 256898)
    (jonathanu@blbglaw.com)
3  2121 Avenue of the Stars, Suite 2575
    Los Angeles, CA 90067
4  Tel: (310) 819-3481

5  *Counsel for Proposed Lead Plaintiff*
    *Universal-Investment-Gesellschaft mbH*
6  *and Proposed Lead Counsel for the Class*

7  [Additional counsel appear on signature page.]

8

9                  **UNITED STATES DISTRICT COURT**

10              **NORTHERN DISTRICT OF CALIFORNIA**

11                      **SAN JOSE DIVISION**

12  JOSEPH AVERZA, Individually and on Behalf    Case No. 5:24-cv-06147-EJD
    of All Others Similarly Situated,
13                                              CLASS ACTION
                        Plaintiff,
14                                              **MEMORANDUM OF POINTS AND**
            v.                                  **AUTHORITIES BY UNIVERSAL-**
15                                              **INVESTMENT-GESELLSCHAFT MBH**
    SUPER MICRO COMPUTER, INC.,                 **IN OPPOSITION TO THE COMPETING**
16  CHARLES LIANG, and DAVID WEIGAND,           **MOTIONS FOR APPOINTMENT AS**
                                                **LEAD PLAINTIFF**
17                      Defendants.
                                                Date: December 19, 2024
18                                              Time: 9:00 a.m.
                                                Dept.: Courtroom 4, 5th Floor
19                                              Judge: Hon. Edward J. Davila

20  *Captions continued on next page*

21

22

23

24

25

26

27

28

| | |
|---|---|
| CHRISTOPHER MENDITTO, Individually and on Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br><br>        v.<br><br>SUPER MICRO COMPUTER, INC., CHARLES LIANG, and DAVID WEIGAND,<br><br>    Defendants. | Case No. 3:24-cv-06149-SI<br><br>CLASS ACTION |
| NORFOLK COUNTY RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br><br>        v.<br><br>SUPER MICRO COMPUTER, INC., CHARLES LIANG and DAVID WEIGAND,<br><br>    Defendants. | Case No. 4:24-cv-06980-JST<br><br>CLASS ACTION |
| COVEY FINANCIAL INC., PEMBROKE CAPITAL LTD. CORP., and SOVEREL, INC., Individually and on Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br><br>        v.<br><br>SUPER MICRO COMPUTER, INC., CHARLES LIANG, and DAVID WEIGAND,<br><br>    Defendants. | Case No. 5:24-cv-07274-EJD<br><br>CLASS ACTION |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................... ii

STATEMENT OF ISSUES ........................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES .....................................1

I.      PRELIMINARY STATEMENT ......................................................1

II.     ARGUMENT .............................................................................3

    A.      Crain Walnut Is Not The Presumptive Lead Plaintiff............................3

        1.      Mr. Crain Has Not Established His Adequacy ........................................3

        2.      The Mysterious Ownership And Operations Of Crain Walnut................5

        3.      Crain's Selection Of Counsel Raises Further Questions........................10

    B.      Universal Should Be Appointed Lead Plaintiff ...............................12

        1.      Universal Has The Largest Bona Fide Financial Interest........................12

        2.      Universal Satisfies The Relevant Requirements Of Rule 23..................15

    C.      The Remaining Motions Should Be Denied .......................................17

CONCLUSION..............................................................................17

1

## TABLE OF AUTHORITIES

2

CASES                                                                                  PAGE(S)

3
*Baker v. Arnold*,
   2004 WL 7340186 (N.D. Cal. May 17, 2004) ..............................................................4

4

5
*In re Boeing Co. Aircraft Sec. Litig.*,
   2019 WL 6052399 (N.D. Ill. Nov. 15, 2019) ...........................................3, 4, 6, 17

6

7
*Burns v. UP Fintech Holdings Ltd.*,
   2024 WL 387261 (C.D. Cal. Jan. 30, 2024) ..............................................................7

8
*Camp v. Qualcomm Inc.*,
   2019 WL 277360 (S.D. Cal. Jan. 22, 2019)...............................................................6

9

10
*In re Cavanaugh*,
   306 F.3d 726 (9th Cir. 2002) .......................................................................2, 3, 12

11
*City of Royal Oak Ret.Sys. v. Juniper Networks, Inc.*,
   2012 WL 78780 (N.D. Cal. Jan. 9, 2012) ................................................................12

12

13
*In re Cobalt Int'l Energy, Inc. Sec. Litig.*,
   2017 WL 2608243 (S.D. Tex. June 15, 2017) ..........................................................16

14

15
*Desilvio v. Lion Biotechs., Inc.*,
   2017 U.S. Dist. LEXIS 222274 (N.D. Cal. July 7, 2017).........................................3

16
*Dura Pharms., Inc. v. Broudo*,
   554 U.S. 336 (2005)..............................................................................................12, 13

17

18
*Faris v. Longtop Fin. Techs. Ltd.*,
   2011 WL 4597553 (S.D.N.Y. Oct. 4, 2011) ............................................................17

19

20
*Friedman v. Quest Energy Partners LP*,
   261 F.R.D. 607 (W.D. Okla. 2009)...........................................................................12

21
*Garbowski v. Tokai Pharms., Inc.*,
   302 F. Supp. 3d 441 (D. Mass. 2018) ..........................................................10, 11, 12

22

23
*Kangas v. Illumina, Inc.*,
   2024 WL 1587463 (S.D. Cal. Apr. 11, 2024)...........................................................16

24
*Karp v. Diebold Nixdorf, Inc.*,
   2019 WL 5587148 (S.D.N.Y. Oct. 30, 2019), *adhered to on reconsideration*,
   2019 WL 6619351 (S.D.N.Y. Dec. 5, 2019) .............................................................4

25

26
*Lax v. First Merchs. Acceptance Corp.*,
   1997 WL 461036 (N.D. Ill. Aug. 11, 1997) .............................................................14

27

28

*Lundy v. Selene Fin., LP*,
    2017 WL 2652048 (N.D. Cal. June 20, 2017) ............................................................9

*In re Netflix, Inc., Sec. Litig.*,
    2012 WL 1496171 (N.D. Cal. Apr. 27, 2012) ...........................................................9

*Perez v. HEXO Corp.*,
    2020 WL 905753 (S.D.N.Y. Feb. 25, 2020) ..............................................................4

*Peters v. Twist Bioscience Corp.*,
    2023 WL 4849431 (N.D. Cal. July 28, 2023) ............................................2, 12, 13

*Rao v. Quorum Health Corp.*,
    221 F. Supp. 3d 987 (M.D. Tenn. 2016) ..................................................................10

*Ret. Sys. v. Dollar Gen. Corp.*,
    2024 WL 1468982 (M.D. Tenn. Apr. 4, 2024) ........................................................16

*Richardson v. TVIA, Inc.*,
    2007 WL 1129344 (N.D. Cal. Apr. 16, 2007) ..........................................................14

*Richman v. Goldman Sachs Grp., Inc.*,
    274 F.R.D. 473 (S.D.N.Y. 2011) .............................................................................14

*Rodriguez v. DraftKings Inc.*,
    2021 WL 5282006 (S.D.N.Y. Nov. 12, 2021) ............................................................7

*Smajlaj v. Brocade Commc'ns Sys. Inc.*,
    2006 WL 7348107 (N.D. Cal. Jan. 12, 2006) ............................................................9

*In re Snap Inc. Sec. Litig.*,
    2019 WL 2223800 (C.D. Cal. Apr. 1, 2019) ..............................................................9

*Tomaszewski v. Trevana, Inc.*,
    383 F. Supp. 3d 409 (E.D. Pa. 2019) ........................................................................7

*In re Versata, Inc. Sec. Litig.*,
    2001 WL 34012374 (N.D. Cal. Aug. 20, 2001) ......................................................14

*Wasa Med. Holdings v. Sorrento Therapeutics, Inc.*,
    2021 WL 533518 (S.D. Cal. Feb. 12, 2021) .......................................................4, 10

*Weston v. DocuSign, Inc.*,
    2022 WL 1301770 (N.D. Cal. Apr. 18, 2022) ..........................................................12

**STATUTES**

15 U.S.C. § 78u-4 *et seq.* .............................................................. *passim*

Universal respectfully submits this Memorandum of Points and Authorities in opposition to the competing Lead Plaintiff motions.[1]

## STATEMENT OF ISSUES

1.    Whether Universal is the "most adequate plaintiff" pursuant to 15 U.S.C. § 78u-4(a)(3)(B)(i).

2.    Whether to approve Universal's selection of counsel, Bernstein Litowitz, pursuant to 15 U.S.C. § 78u-4(a)(3)(B)(v).

3.    Whether the Related Actions should be consolidated pursuant to Rule 42(a).

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    PRELIMINARY STATEMENT

The securities class action against Super Micro is a highly significant case, involving serious allegations of corporate misconduct against a recidivist violator of the federal securities laws. The primary purpose of the PSLRA is to ensure that important cases like this are led by sophisticated institutional investors with a vested interest in the litigation, replacing an old regime in which inexperienced investors, often individuals controlled by their lawyers, led major securities actions. *See* H.R. Conf. Rep. No. 104-369, at 32-33 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 731-32. This case deserves to be led by an established, proven Lead Plaintiff that is familiar with the PSLRA process, has experience overseeing counsel in securities class actions, and has a successful track record of vigorously representing the best interest of the classes it is appointed to represent.

Currently pending before the Court are ten motions by investors seeking appointment as Lead Plaintiff. Under the PSLRA, this Court is required to appoint as Lead Plaintiff the movant that "has the largest financial interest in the relief sought by the class" and "otherwise satisfies the

---

[1] Unless otherwise noted, all references to "ECF No. __" are to docket entries in the first-filed *Averza* action, all references to "Ex. __" are to the exhibits accompanying the Declaration of Jonathan D. Uslaner filed herewith, all capitalized terms are as defined in Universal's motion (ECF No. 38), all emphasis is added, and all internal citations and quotation marks are omitted.

requirements of Rule 23." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I); *see also In re Cavanaugh*, 306 F.3d 726, 729-31 (9th Cir. 2002) (discussing the PSLRA's process for selecting a lead plaintiff). Universal, an institutional investor with a history of prosecuting complex securities frauds, is the presumptive Lead Plaintiff, having incurred approximately $12.27 million in losses—the largest financial interest of any movant that has substantiated its financial interest and also satisfies the relevant requirement of Rule 23. Accordingly, Universal is entitled to a strong presumption that it is the most adequate plaintiff. *See Cavanaugh*, 306 F.3d at 730 ("the presumptive lead plaintiff" is "the one who has the largest financial interest in the relief sought by the class and otherwise satisfies the requirements of Rule 23").

The only movant that claims to have incurred a larger loss than Universal—Crain Walnut Shelling, LP ("Crain Walnut"), through Charles R. Crain, Jr. ("Mr. Crain")—cannot be the presumptive Lead Plaintiff. Mr. Crain has not established that he or Crain Walnut have standing to assert the claims at issue in this case, nor has he made a *prima facie* showing of adequacy under Rule 23. The information provided by Mr. Crain in support of his motion is perfunctory, appears to include material misstatements, and raises more questions than it does answers. Critically, it is not clear who controls Crain Walnut and who would be overseeing this litigation if that family business were appointed Lead Plaintiff. The information provided by Mr. Crain provides no explanation of how, or why, over the course of six weeks his walnut processing company invested more than $144 million (representing between nine and nearly 20 times its estimated annual revenue) in the common stock of a Silicon Valley tech company.

The Class should not be burdened by a Lead Plaintiff with such unique and individual issues, particularly when the typicality and adequacy of the movant with the next largest financial interest in these claims, Universal, is beyond reproach. Universal, as the movant with the next largest financial interest in this litigation under the last-in, first-out ("LIFO") calculation methodology—the approach overwhelmingly favored by courts across this country, including this Court—is the presumptive Lead Plaintiff. *See Peters v. Twist Bioscience Corp.*, 2023 WL 4849431, at *4 (N.D. Cal. July 28, 2023) (Davila, J.) (applying LIFO and acknowledging that "most courts in this district use the [LIFO] accounting method to calculate estimated losses").

1    Accordingly, Universal should be appointed Lead Plaintiff and its motion should otherwise be

2    granted.

3    **II.    ARGUMENT**

4         The PSLRA requires the Court to appoint as Lead Plaintiff the movant that the Court

5    "determines to be most capable of adequately representing the interests" of the Class—*i.e.*, the

6    "most adequate plaintiff."  15 U.S.C. § 78u-4(a)(3)(B)(i).  The PSLRA directs further that the

7    Court "shall adopt a presumption that the most adequate plaintiff" is the movant that has the

8    "largest financial interest" in the relief sought by the Class and "otherwise satisfies the [typicality

9    and adequacy] requirements of Rule 23."  15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).  It is the movant's

10    burden to establish its typicality and adequacy in the first instance.  *See, e.g.*, *In re Boeing Co.*

11    *Aircraft Sec. Litig.*, 2019 WL 6052399, at *5 (N.D. Ill. Nov. 15, 2019) ("[T]o make a prima facie

12    showing of adequacy . . . a movant must supply some information about its ability to perform the

13    role of lead plaintiff diligently and effectively.").

14         **A.    Crain Walnut Is Not The Presumptive Lead Plaintiff**

15             **1.    Mr. Crain Has Not Established His Adequacy**

16         Mr. Crain has not demonstrated his adequacy, or that of Crain Walnut, to lead this

17    important case.  This Court has "latitude as to what information it will consider in determining

18    typicality and adequacy."  *Cavanaugh*, 306 F.3d at 732.  Unlike Universal—a sophisticated

19    institutional investor with a robust governance structure that is fully transparent, and which has

20    successfully prosecuted numerous complex securities actions—Mr. Crain has failed to make a

21    *prima facie* showing of adequacy.  Mr. Crain's declaration and certification provide only cursory

22    information, and do not inform the Court of Mr. Crain's educational background, familiarity with

23    this kind of litigation, or the full details regarding the ownership and leadership of Crain Walnut.[2]

24

25    ─────────────────

26    [2] *See, e.g.*, *Desilvio v. Lion Biotechs., Inc.*, 2017 U.S. Dist. LEXIS 222274, at *2-3 (N.D. Cal. July

27    7, 2017) (requiring individual movants to submit responses to questionnaire stating "(i) each

28    individual's city and state of residence; (ii) each individual's occupation; (iii) whether and to what

*See Wasa Med. Holdings v. Sorrento Therapeutics, Inc.*, 2021 WL 533518, at *4 (S.D. Cal. Feb. 12, 2021) (rejecting movant where there was a "dearth of information upon which the Court can determine" adequacy); *Perez v. HEXO Corp.*, 2020 WL 905753, at *3 (S.D.N.Y. Feb. 25, 2020) (rejecting movant who, despite submitting a cursory declaration, failed to establish that he "will meaningfully oversee and control the prosecution of this consolidated class action"); *Boeing*, 2019 WL 6052399, at *5 (rejecting movant where the "complete dearth of information . . . leaves the Court with virtually no basis to assess their adequacy to lead and direct litigation potentially involving thousands of claims for tens, or perhaps hundreds, of millions of dollars"); *Karp v. Diebold Nixdorf, Inc.*, 2019 WL 5587148, at *6 (S.D.N.Y. Oct. 30, 2019) (rejecting movant who left the court "with little to go on with respect to their alleged capacity to manage this litigation"), *adhered to on reconsideration*, 2019 WL 6619351 (S.D.N.Y. Dec. 5, 2019).

There is also no information provided regarding the financial condition of Crain Walnut, particularly following its purported $49 million loss on investments in Super Micro stock, which raises questions about the fate of the Class if that private business is in financial distress, faces insolvency, or changes ownership. *See, e.g.*, *Baker v. Arnold*, 2004 WL 7340186, at *3 (N.D. Cal. May 17, 2004) (refusing to appoint movant based on uncertainty of its financial condition); *Diebold Nixdorf*, 2019 WL 5587148, at *5 (rejecting movant where "risks and uncertainties facing the [movant] raise[d] substantial doubt as to [its] ability to continue as a going concern"). These questions are more than mere speculation, given that this family-run agricultural business claims to have invested $144 million in the stock of a single technology company and incurred a loss that erased between 3 and 6.5 years of Crain Walnut's estimated revenues. If Crain Walnut has similar concentrations of its capital in other stock positions, there is real risk to its ability to continue as a going concern in the event of even a minor market disruption. Apart from the exposure caused by Crain Walnut's other investments, the Class members should not be forced to worry that 2024's small walnut harvest or the nearly 80% decline in the price of walnuts this decade will impact the

---

extent the moving individuals are familiar with one another; and (iv) how each individual came to retain his/her respective lawyer(s)").

1  Lead Plaintiff's supervision of this case.[3]

2      **2.     The Mysterious Ownership And Operations Of Crain Walnut**

3      Charles R. Crain, Jr. signed Crain Walnut's PSLRA certification and a declaration

4  supporting its motion, and in those documents claims to be the "President, Chief Executive Officer,

5  and *sole owner*" of Crain Walnut.  ECF No. 31-3 at 2.  Crain Walnut purports to be a family run

6  company "in the business of processing, packing and shipping English Walnut meats."  ECF No.

7  31-3 ¶ 4.  The information provided by Mr. Crain fails to explain how the processing, packing, and

8  shipping of walnuts led this opaque entity to amass a $144 million position in Super Micro

9  common stock in just six weeks between January and March 2024.  *See* ECF Nos. 31-2 & 31-3.[4]

10  The limited public information about Crain Walnut indicates that its annual revenues do not

11  support the Super Micro investments described in its certification.  Specifically, Dun &

12  Bradstreet—the world's largest database on business data and market intelligence—estimates that

13  Crain Walnut will have annual revenue in 2024 of approximately $7.5 million.  *See* Ex. A.  Growjo,

14  another business data aggregator, estimates Crain Walnut's annual revenue to be approximately

15  $15.3 million.[5]  Mr. Crain fails to explain how, or why, a walnut shelling company with an

16   

17  [3] *See The Sun-Gazette Newspaper*, "California Walnut Industry Cracking Under Pressure,"

18  September 18, 2024 (https://thesungazette.com/article/news/2024/09/18/calif-walnut-industry-

19  cracking-under-pressure/); *Western Farm Press*, "Smaller California walnut crop expected,"

20  September 9, 2024 (https://www.farmprogress.com/tree-nuts/smaller-california-walnut-crop-

21  expected#).

22  [4] Such a large investment made in 2024 by a walnut processing, packing, and shipping company

23  is even more confusing considering the fact that California's walnut crop yields are facing a 19%

24  decline in 2024 as compared to 2023, due to poor weather conditions.  *See* Todd Fitchette, *Smaller*

25  *California Walnut Crop Expected*, Farm Progress, September 9, 2024

26  (https://www.farmprogress.com/tree-nuts/smaller-california-walnut-crop-expected).

27  [5] *See* Grojo, *Crain Walnut Shelling Revenue and Competitors*, Grojo

28  (https://growjo.com/company/Crain_Walnut_Shelling).

estimated annual revenue of between $7.5 million and $15.5 million was investing between nine and 19 times its annual revenue, and many multiples more of its earnings, in the common stock of Super Micro—a technology company that develops and manufactures server and storage systems for data centers and AI computing companies.

While the information about himself and Crain Walnut that Mr. Crain failed to provide is sufficient to preclude the appointment of Crain Walnut, the information Mr. Crain did provide concerning the ownership and control of Crain Walnut is at best incomplete and may be false. For example, Mr. Crain's sworn declaration claims that he is the "sole owner" of Crain Walnut. However, under Delaware law, it is not possible for Crain Walnut, a limited partnership formed under Delaware law, to have a "sole owner." 6 Del. C. § 17-101(11). More concerningly, business records indicate that Crain Walnut has a General Partner, an entity called "Nuez Progresivo, Inc." *See* Ex. B.

The sparse public record regarding Nuez Progresivo, Inc., the General Partner of Crane Walnut, indicates that the entity is an "Investment" company that, according to its Certificate of Incorporation filed with the State of Delaware Secretary of State, is managed by an undisclosed Board of Directors. *See* Exs. C & D.[6] Another member of Mr. Crain's family (Georgia Crain) is a "Partner" and "Director of Sales" in "Crain Ranch/Crain Walnut Shelling." Ex. G. The fact that Nuez Progresivo and other individuals are partners in Crain Walnut refutes Mr. Crain's representation that he is the "sole owner" of that entity. Mr. Crain's failure to disclose the existence of those partners, and the identities of the Board of Directors of Nuez Progresivo (the General Partner of the entity seeking to serve as Lead Plaintiff) raises serious questions about Mr. Crain's candor. *See, e.g., Camp v. Qualcomm Inc.*, 2019 WL 277360, at *3-4 (S.D. Cal. Jan. 22, 2019) (disqualifying a movant whose PSLRA certification was submitted with a misstatement); *see also Boeing*, 2019 WL 6052399, at *8-9 (disqualifying a movant due to an "unwillingness to

---

[6] Mr. Crain appears to have interests in other Crain entities that have a similar limited partner/general partner set up. For example, Crain Farming, LP, is a Delaware Limited Partnership with an entity called Huerto Progresivo, Inc. serving as a General Partner. *See* Exs. E & F.

provide any significant information about themselves" which would have permitted the court "to make an informed judgment as to their adequacy to serve as Lead Plaintiff and as to the bona fides of their claimed investments"); *Burns v. UP Fintech Holdings Ltd.*, 2024 WL 387261, at *5 (C.D. Cal. Jan. 30, 2024) (finding that false statements made regarding a "Certification signed under penalty of perjury raise[d] serious concerns regarding [movant's] ability to adequately represent the class); *Rodriguez v. DraftKings Inc.*, 2021 WL 5282006, at *9 (S.D.N.Y. Nov. 12, 2021) (rejecting a movant who attempted to "correct" a PSLRA certification, finding that the original errors "speak to a level of carelessness that rightly calls into doubt [movant's] adequacy to be lead plaintiff"); *Tomaszewski v. Trevana, Inc.*, 383 F. Supp. 3d 409, 414 (E.D. Pa. 2019) (rejecting movant upon finding that "the errors in [his] sworn statements amount to a substantial degree of carelessness and raise doubt as to whether he will fairly and adequately represent the best interests of the class").

The web of individuals and entities tied to Mr. Crain also raises serious questions about who would actually be supervising this litigation if Crain Walnut were appointed as Lead Plaintiff. Crain Walnut's website deepens the mystery about the ownership of that business. Crain Walnut's own website says that it was founded "as **a division of a large farming business, Crain Orchards, Inc.**"[7] Thus, according to Crain Walnut's own website, it is not wholly owned by Mr. Crain but, rather, is a division of another company whose own ownership is unknown and whose existence was not disclosed to the Court. That same website also implicates additional entities, noting that Mr. Crain's parents, and his brothers "William and Harold own and operate Crain Ranch, dba Crain Marketing Inc" a "walnut processing facility." *Id.* Georgia Crain, who identifies herself as a partner in Crain Walnut, also claims an association with Crain Ranch. *See* Ex. G. Yet another entity, Crain of California, has an undisclosed affiliation with Crain Walnut: the Crain Walnut website directs users who seek to "Shop Online" to the website of Crain of California.[8] Crain of

---

[7] *See* Crain Walnut, *About Us*, CRAIN WALNUT (https://www.crainwalnut.com/about).

[8] *See* Crain Walnut, *Shop "Crain of California" Online Store*, CRAIN OF CALIFORNIA (https://crainofcalifornia.com).

California, in turn, explains that after growing walnuts, the Crain family "brought their business into the walnut packing industry as C.R. Crain & Sons, Inc."[9]  The relationship between Crain Orchards, which purportedly owns Crain Walnut, and C.R. Crain & Sons, the entity through which the Crain family's walnut farming business entered the walnut packing industry, is unknown, as is any ownership stake that C.R. Crain & Sons has in Crain Walnut.  According to publicly available information, it appears that Mr. Crain also has a legal interest in other entities, including Crain Farming, LP and Crain International #2, Inc.  *See* Exs. E & H.



Such a complex, interconnected, and undisclosed web of interests raises a host of questions. Will the unknown Board Members of the secretive General Partner, Nuez Progresivo, be calling the shots?  Who made the outsized investment decision in Super Micro and was it approved by those with the authority to make such a decision?  Did such a concentrated investment meet the investment guidelines for such a family-owned business?  What are the roles of other members of

---

[9]    *See* Crain of California, *About US*, CRAIN OF CALIFORNIA (https://crainofcalifornia.com/pages/about-us#:~:text=The%20Crain%20family%20has%20grown,structure%20with%20low%20overhead%20costs).

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE COMPETING MOTIONS FOR APPOINTMENT AS LEAD PLAINTIFF
CASE NO. 5:24-cv-06147-EJD                                                                                                  8

the Crain family who hold themselves out as partners of Crain Walnut? Is Crain Walnut truly its own, standalone limited partnership? Or is it a subsidiary division of one of the other Crain entities—and, if so, is the true owner Crain Orchards, C.R. Crain & Sons or some other entity? If those other entities own some or all of Crain Walnut, who are the owners of those businesses and who, ultimately, will be supervising this litigation? If Mr. Crain was using Crain Walnut as an investment vehicle, was he making investments in Super Micro through other entities or accounts? How did Crain Walnut amass a position in Super Micro stock that, according to Dun & Bradstreet, could represent nearly 20 years of the business' annual revenues?

These myriad questions not only refute any claim that Mr. Crain has satisfied the adequacy requirements of Rule 23 but, given the information currently before the Court, make is impossible without discovery and given the limited information provided by Crain Walnut to determine whether or not Crain Walnut does in fact have standing to assert these claims. *See Lundy v. Selene Fin., LP*, 2017 WL 2652048, at *4 (N.D. Cal. June 20, 2017) (noting "[t]he plaintiff always bears the burden of proof to establish standing with the manner and degree of evidence required at the successive stages of the litigation"). Were the Super Micro shares actually purchased in the name of Crain Walnut, or are they owned by one of the related entities Crain Walnut failed to disclose in its declaration? And do the other Crain entities or individuals who have a stake in Crain Walnut have their own investments in Super Micro that have not been disclosed? Ultimately, who has the financial interest in the purported loss incurred on Crain Walnut's investments in Super Micro—a loss that appears to have wiped out over five years of the revenues of Crain Walnut? *See Smajlaj v. Brocade Commc'ns Sys. Inc.*, 2006 WL 7348107, at *2-3 (N.D. Cal. Jan. 12, 2006) (rejecting a movant with "too many questions surrounding [its] standing, authority, transparency, and structure that may give rise to unique defenses").

These questions are enough to subject Crain Walnut to unique defenses, which would ultimately prejudice the Class. *See, e.g.*, *In re Netflix, Inc., Sec. Litig.*, 2012 WL 1496171, at *5 (N.D. Cal. Apr. 27, 2012) (rejecting a movant that "could subject the class to the burden of litigation focused on her standing"); *In re Snap Inc. Sec. Litig.*, 2019 WL 2223800, at *3 (C.D. Cal. Apr. 1, 2019) (rejecting a movant that "may face a challenge as to whether it enjoys standing

and statutory authority to bring suit").  At a minimum, the Court should order fulsome discovery of Mr. Crain and his various businesses so that the Class can be assured that its claims will be handled by a responsible, sophisticated representative.  *See* 15 U.S.C. § 78u-4(a)(3)(B)(iv); *see also Rao v. Quorum Health Corp.*, 221 F. Supp. 3d 987, 990 (M.D. Tenn. 2016) (granting limited discovery to determine if a lead plaintiff movant was adequate).

### 3.    Crain's Selection Of Counsel Raises Further Questions

Further questions about Mr. Crain's adequacy are raised by his choice of counsel. Mr. Crain does not explain how he came to select two separate firms to represent the walnut company in this case.  Similarly, there is no explanation of the roles of the proposed "Lead Counsel" and the "Additional Counsel," or how those firms will allocate work and ensure that the case is prosecuted in an efficient manner without duplication of efforts.  Those two law firms published a total of 53 press releases entreating Super Micro investors to contact them about this case.  *See* Exs. I & J.  Of note, each firm was publishing its own press releases, indicating that the firms were not jointly representing clients or otherwise collaborating until Mr. Crain came along. *See id.*  Mr. Crain did not disclose which law firm he actually contacted in response to their many solicitations.  This flood of press releases and the lack of an explanation for the retention of two law firms raise further concerns, including the possibility that Mr. Crain may have been recruited by counsel to seek lead plaintiff status.  Courts in this District have held that this lack of detail can "call[] into question the ability of [a movant] to adequately serve as Lead Plaintiff in a class action."  *Sorrento*, 2021 WL 533518, at *4-5 (finding movant represented by Crain's "Additional Counsel" inadequate).

It is well established that one of a lead plaintiff's most important functions is to select and retain lead counsel.  *See* 15 U.S.C. § 78u-4(a)(3)(B)(v).  Indeed, "one of the best ways for a court to ensure that [a movant] will fairly and adequately represent the interests of the class is to inquire whether the movant has demonstrated a willingness and ability to select competent class counsel and to negotiate a reasonable retainer agreement with that counsel."  *Garbowski v. Tokai Pharms.,*

*Inc.*, 302 F. Supp. 3d 441, 453 (D. Mass. 2018).[10]  This helps to ensure that "the lead plaintiff will choose counsel rather than . . . counsel choosing the plaintiff."  *Id.* (citing H.R. Conf. Rep. No. 104-369, at 35 (1995), *reprinted in* 1995 U.S.C.C.A.N. at 733).

Here, while Mr. Crain states that he "spoke with counsel regarding this case," ECF No. 31-3 ¶ 7, his declaration does not identify the counsel with which he spoke.  Was it his proposed Lead Counsel, Hagens Berman, or his proposed Additional Counsel, the Schall Law Firm?  *See Tokai*, 302 F. Supp. 3d at 455-56 (concluding that, because the proposed lead counsel had never spoken to a movant represented by Schall, or communicated with him directly, "had [he] been appointed, this case would have been conducted by unsupervised plaintiffs' attorneys – a practice the PSLRA was intended to end").  Here, it is not known whether Mr. Crain actually spoke with his proposed Lead Counsel prior to filing his lead plaintiff motion, and the wording of his declaration suggests that he did not.  *See* ECF No. 31-3 ¶ 7 (indicating he spoke with "counsel" rather than "Lead Counsel" as it is defined in his declaration).

A careful reading of Mr. Crain's declaration raises even more questions.  For example, Mr. Crain's declaration (on behalf of an entity of which he claims to be the sole owner) describes speaking "with counsel regarding this case.  *We* discussed . . . *our* oversight of *our* proposed Lead Counsel, Hagens Berman, and additional counsel the Schall Law Firm."  ECF No. 31-3 ¶ 7.  Unless Mr. Crain is also royalty, the references to "we" and "our" beg the question of who will be running this case if Crain Walnut is appointed Lead Plaintiff.  As noted, Mr. Crain claims to be the sole owner of Crain Walnut, but has concealed from the Court a number of entities and individuals that also appear to have control over Crain Walnut.  Are those the others who comprise the "us" and "we" that will oversee this case?  If so, who are they and what are their roles?  Two paragraphs later, Mr. Crain again references Hagens Berman as "*our* chosen counsel" (*id.* ¶ 9), which raises two questions: who else was involved in choosing counsel and why is Schall not included as the

---

[10] Prior to seeking appointment as Lead Plaintiff, Universal and Bernstein Litowitz entered into a competitive retainer agreement.  Universal will provide the Court with that retainer agreement, *in camera*, upon the Court's request.

1    "chosen counsel"?  Crain Walnut has also provided no evidence that it has negotiated a fee

2    agreement with either of its proposed law firms.  *See Tokai*, 302 F. Supp. 3d at 450 (requiring a

3    movant to file additional declarations "addressing whether [the movant] understood and satisfied

4    all of the requirements of a lead plaintiff in a class action under the PSLRA").

5        Taken together, Mr. Crain's submissions to the Court raise serious questions regarding the

6    adequacy of this walnut company to serve as Lead Plaintiff.  Given the "strict time limits set forth

7    in the PSLRA for filing motions for appointment as lead plaintiff" the Court should not permit

8    Mr. Crain to cure any infirmities in his or Crain Walnut's submissions.  *Friedman v. Quest Energy*

9    *Partners LP*, 261 F.R.D. 607, 612 (W.D. Okla. 2009) (refusing to consider an assignment of claims

10   which occurred after the lead plaintiff motions had been filed).  It is the movant's burden to make

11   a showing of adequacy, and the motion of Crain Walnut fails to satisfy that burden.

12       **B.    Universal Should Be Appointed Lead Plaintiff**

13       **1.    Universal Has The Largest Bona Fide Financial Interest**

14       In order to determine which lead plaintiff movant has the largest financial interest,

15   *Cavanaugh* instructs Courts in the Ninth Circuit to use an accounting method that is "both rational

16   and consistently applied."  306 F.3d at 730.  In order to do so, "most courts in this district use the

17   [LIFO] accounting method to calculate estimated losses."  *Twist Bioscience*, 2023 WL 4849431,

18   at *4; *see also Weston v. DocuSign, Inc.*, 2022 WL 1301770 at *2 (N.D. Cal. Apr. 18, 2022)

19   ("[T]he weight of authority puts the most emphasis on the competing movants' estimated losses,

20   using a last in, first out (LIFO) methodology."); *City of Royal Oak Ret.Sys. v. Juniper Networks,*

21   *Inc.*, 2012 WL 78780, at *4 (N.D. Cal. Jan. 9, 2012) (finding LIFO to be "approved as a reasonable

22   accounting method" by courts in the Ninth Circuit).[11]

---

23

24   [11]  The SMCI Investor Group also agrees that the LIFO methodology is proper at this stage.  *See*

25   ECF No. 43 at 8 ("Courts may also rely on the LIFO . . . inventory accounting methodologies,

26   without considering the impact of *Dura*, to determine the movant with the largest financial

27   interest.") (citing *Twist Bioscience*, 2023 WL 4849431, at *4).  As such, the SMCI Investor Group

28   concedes that they do not have the largest financial interest.  *See* ECF No. 82 at 4.

At the lead plaintiff stage, the Court "need only compare and approximate losses between competing movants." *Twist Bioscience*, 2023 WL 4849431, at *5.[12]  Here, Universal incurred a loss of approximately $12.27 million LIFO on its losses due to Defendants' violations of the securities laws, giving it the largest financial interest of any movant that has substantiated its financial interest.  The remaining movants' losses calculated using the prevailing LIFO methodology are reflected below.[13]

| Movant | Loss (LIFO) | ECF No. |
|---|---|---|
| **Universal** | **$12,268,269** | **38-3** |
| Valikhan Kunakbayev ("Kunakbayev") | $12,262,561 | 23-3 |
| Covey Financial Inc., Pembroke Capital Ltd. Corp., Soverel, Inc., David Burdette, and Priti Bhardwaj (collectively, the "SMCI Investor Group") | $10.4 million | 43-5 |
| Super Micro Investor Group | $4,946,041 | 49-4 |
| Erste Asset Management GmbH ("Erste AM") and Christian Mahe de Berdouaré ("Berdouaré") | $4,225,719 | 48-4 |
| Public Employees' Retirement System of Mississippi ("MissPERS") | $3.86 million | 61-1 |
| Theodore C. Gross and Theodore R. Gross ("Gross Family") | $1,178,419 | 20-3 |
| Illinois State Treasurer Michael W. Frerichs, in his official capacity as trustee for the Bright | $617,576 | 27-3 |

---

[12] In its opening brief, the SMCI Investor Group asked the Court to apply a *Dura* analysis at the lead plaintiff stage.  ECF No. 43 at 7.  This Court has rejected such methodologies, that "assume[] that **none** of the depreciation" in the price of a stock before a corrective disclosure "could be attributable to fraud."  *Twist Bioscience*, 2023 WL 4849431, at *5.  Indeed, "given the tangle of factors affecting price," the Court should "decline[] to draw this inference at the lead plaintiff appointment stage."  *Id.* (citing *Dura Pharms., Inc. v. Broudo*, 554 U.S. 336, 343 (2005)).

[13] The Gross Family has withdrawn their motion.  *See* ECF No. 77.  Shah, the Illinois Treasurer, MissPERS, Erste AM and Berdouaré, the Super Micro Investor Group, SMCI Investor Group, and Kunakbayev have all acknowledged that they do not possess the largest financial interest in this action.  *See* ECF Nos. 73-76, 78-79, 82.

| Movant | Loss (LIFO) | ECF No. |
|---|---|---|
| Directions College Savings Program Trust ("Illinois Treasurer") | | |
| Surendra J. Shah, Trustee of the Surendra Shah Declaration of Trust U/A 10/6/92 ("Shah") | $544,675 | 17-4 |

While Mr. Kunakbayev claims to have incurred the loss closest to Universal, his financial interest is far smaller when considering the other factors that courts look to in determining financial interest. For example, in addition to LIFO loss, some courts also look to the number of shares purchased (on both a net and absolute basis) and net funds expended to purchase those shares. *See Lax v. First Merchs. Acceptance Corp.*, 1997 WL 461036, at *5 (N.D. Ill. Aug. 11, 1997); *Richardson v. TVIA, Inc.*, 2007 WL 1129344, at *3 (N.D. Cal. Apr. 16, 2007) ("Courts have typically considered the 'Olsten-Lax' factors to determine who has the largest financial interest: (1) the number of shares purchased during the class period; (2) the number of net shares purchased during the class period; (3) the total net funds expended during the class period; and (4) the approximate losses suffered."). Courts treat these factors in ascending order of importance, with the number of shares purchased as the least important and the size of the loss the most important. *See Richman v. Goldman Sachs Grp., Inc.*, 274 F.R.D. 473, 475-76 (S.D.N.Y. 2011) (finding the "*Lax* factors are properly ordered, so that the number of shares purchased . . . is the least important and the loss suffered . . . is the most important"). Here, Universal also has a greater financial interest than the next two largest movants based on the three most important additional factors, having purchased the most net shares, expended the most net funds, and incurred the largest LIFO loss. *See* Ex. K; *see also* ECF Nos. 38-3, 23-3, 43-5.[14]

In addition, the PSLRA evinces a clear preference for institutional investors like Universal over individuals like Mr. Kunakbayev. *See In re Versata, Inc. Sec. Litig.*, 2001 WL 34012374, at *6 (N.D. Cal. Aug. 20, 2001) (finding a movant's "institutional status is given great weight in assessing its adequacy as a plaintiff"). Like Mr. Crain, Mr. Kunakbayev has not provided any

---

[14] In recognition, the SMCI Investor Group has conceded that they do not have the largest financial interest. *See* ECF No. 82 at 4.

1  information about himself, his education or his litigation experience that would satisfy the
2  adequacy requirements of Rule 23.

3  **2.     Universal Satisfies The Relevant Requirements Of Rule 23**

4  In contrast to Crain Walnut, Universal is the paradigmatic Lead Plaintiff and readily
5  satisfies the typicality and adequacy requirements of Rule 23.   To overcome the strong
6  presumption entitling Universal to appointment as Lead Plaintiff, the PSLRA requires a showing
7  that the presumptive Lead Plaintiff is inadequate.   15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).  No such
8  evidence exists in this case and any arguments to the contrary should be flatly rejected.

9  As demonstrated in its opening brief, Universal is a typical Class representative.  Like all
10  other Class members, Universal (1) invested in Super Micro securities during the Class Period,
11  (2) at prices artificially inflated by Defendants' materially false and misleading statements and/or
12  omissions, and (3) was harmed when the truth was revealed.  *See* ECF No. 38 at 7.  Further, there
13  is no conflict of interest between Universal's interests and those of the other Class members.  To
14  the contrary, the interests of Universal and other Class members are directly aligned because they
15  all suffered damages from their purchases of Super Micro securities, and Universal clearly has a
16  sufficient interest to ensure the vigorous prosecution of this litigation.  *See id.* at 8.  As set forth in
17  its opening brief, Universal also undoubtedly has standing to assert these claims.  *See id.* at 8-10.

18  Universal also satisfies the Rule 23 adequacy requirement because it will "fairly and
19  adequately protect the interests of the class."  15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)(aa).  As set forth
20  in its opening brief, Universal is a sophisticated institutional investor that fully understands its
21  responsibilities under the PSLRA, and has repeatedly demonstrated its ability to successfully
22  prosecute securities class actions as Lead Plaintiff or class representative.  *See* ECF No. 38 at 8-
23  10; *see also In re Conn's, Inc. Sec. Litig.*, No. 14-cv-548 (S.D. Tex.) (Universal serving as lead
24  plaintiff and recovering $22.5 million for investors); *In re Cobalt Int'l Energy, Inc. Sec. Litig.*, No.
25  14-cv-3428 (S.D. Tex.) (Universal certified as class representative and recovering $335.3 million
26  for investors).  Indeed, the Illinois Treasurer "believes the Class would be best represented by an
27  individual institution that has prior experience serving as lead plaintiff."  ECF No. 78 at 2.  In stark
28  contrast to Mr. Crain and Crain Walnut, information regarding Universal's structure and

leadership,[15] the specific fund moving for Lead Plaintiff in this action,[16] and its robust compliance department and procedures for operating in a highly regulated industry are readily available.[17]

Universal's ongoing oversight of Bernstein Litowitz in *In re Seagate Technology Holdings, plc Securities Litigation*, No. 23-cv-3431 (N.D. Cal.), *Washtenaw County Employees' Retirement System v. Dollar General Corporation*, No. 23-cv-1250 (M.D. Tenn.), and *In re Illumina Inc. Securities Litigation*, No. 23-cv-2082 (S.D. Cal.), conclusively establishes its ability to prosecute complex securities class actions and vigorously represent the interests of the Class. *See* ECF No. 38 at 9. Universal's service as a lead plaintiff in those cases not only evidences its experience in managing similar complex litigation, but reflects that several courts have found Universal to be an adequate representative under Rule 23 and empowered it to lead these cases, including in the face of a contested lead plaintiff appointment process. *See Washtenaw Cnty. Emps.' Ret. Sys. v. Dollar Gen. Corp.*, 2024 WL 1468982, at *3 (M.D. Tenn. Apr. 4, 2024) (appointing Universal, "a major institutional investor with a significant, demonstrated familiarity with securities fraud litigation"); *Kangas v. Illumina, Inc.*, 2024 WL 1587463, at *4 (S.D. Cal. Apr. 11, 2024) (appointing Universal as lead plaintiff due to its "sufficient interest in the outcome of the case to ensure vigorous advocacy"). Universal has also been certified as a class representative. *See In re Cobalt Int'l Energy, Inc. Sec. Litig.*, 2017 WL 2608243 at *3, *8 (S.D. Tex. June 15, 2017) (finding Universal to be typical and adequate and certifying Universal as class representative). Universal is also precisely the type of lead plaintiff envisioned by Congress in its enactment of the PSLRA—a sophisticated institutional investor with a substantial interest in the litigation. *See* H.R. Conf. Rep.

---

[15] *See* Universal Investment Group, *Structure and management*, UNIVERSAL INVESTMENT GROUP, https://www.universal-investment.com/en/Corporate/Structure-and-Management.

[16] *See* Universal Investment Group, *Your partner in Germany*, UNIVERSAL INVESTMENT GROUP, https://www.universal-investment.com/en/Corporate/Structure-and-Management/Location-Germany.

[17] *See* Universal Investment Group, *Compliance: Germany*, UNIVERSAL INVESTMENT GROUP, https://www.universal-investment.com/en/Corporate/Compliance/Germany.

No. 104-369, at 34, *reprinted in* 1995 U.S.C.C.A.N. at 733 ("[I]ncreasing the role of institutional investors in class actions will ultimately benefit shareholders and assist courts by improving the quality of representation in securities class actions.").

An important case such as this one against deserves a battle tested and proven Lead Plaintiff, such as Universal, which has already been scrutinized by district courts. *See, e.g.*, *Boeing*, 2019 WL 6052399, at *7 (noting lead plaintiffs are ultimately "required not just to make a prima facie case as to their typicality and adequacy, but to prove as much in the context of a class certification motion").

### C.  The Remaining Motions Should Be Denied

Because Universal has met all the requirements for appointment as Lead Plaintiff, and the remaining movants lack the largest financial interest, their motions should be denied. *See Faris v. Longtop Fin. Techs. Ltd.*, 2011 WL 4597553, at *8 (S.D.N.Y. Oct. 4, 2011) ('[T]he inquiry can stop here, now that the Court has determined [which movant] has the largest financial interest and is otherwise typical and adequate.").

### <u>CONCLUSION</u>

For the reasons discussed above and in its opening motion, Universal respectfully requests that the Court appoint it as Lead Plaintiff and otherwise grant its motion.

Dated:  November 12, 2024                Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**

*/s/ Jonathan D. Uslaner*
JONATHAN D. USLANER (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel:    (310) 819-3470

-and-

GERALD H. SILK
(jerry@blbglaw.com)
AVI JOSEFSON
(avi@blbglaw.com)
SCOTT R. FOGLIETTA
(scott.foglietta@blbglaw.com)
1251 Avenue of the Americas

New York, NY 10020
Tel:    (212) 554-1400
Fax:    (212) 554-1444

*Counsel for Proposed Lead Plaintiff Universal-Investment-Gesellschaft mbH and Proposed Lead Counsel for the Class*