1
2
3
4                          UNITED STATES DISTRICT COURT

5                         NORTHERN DISTRICT OF CALIFORNIA

6                                 SAN JOSE DIVISION

7

8     JOSEPH AVERZA, et al.,                    Case No.   5:24-cv-06147-EJD

              Plaintiffs,
9                                               **ORDER DENYING MOTION TO
                                                APPOINT CRAIN WALNUT
10        v.                                    SHELLING, LP AS LEAD PLAINTIFF**

11    SUPER MICRO COMPUTER, INC., et al.,

12            Defendants.                        Re: ECF No. 30

13            Earlier in this putative securities class action, the Court determined that Crain Walnut

14    Shelling, LP was presumptively the most adequate lead plaintiff under the Private Securities

15    Litigation Reform Act (PSLRA).  At the same time, the Court found that Universal-Investment-

16    Gesellschaft mbH, a competing lead plaintiff candidate, had raised concerns regarding Crain

17    Walnut's adequacy that were substantial enough to warrant discovery into Crain Walnut's

18    suitability for the role of lead plaintiff.  With the benefit of that discovery, the Court now

19    concludes Universal has rebutted the presumption that Crain Walnut is the most adequate lead

20    plaintiff.  Therefore, the Court **DENIES** Crain Walnut's lead plaintiff motion.

21    **I.        PROCEDURAL HISTORY**

22            On August 30, 2024, Joseph Averza became the first plaintiff to file a putative class action

23    complaint alleging federal securities claims against Defendant Super Micro Computer, Inc. and its

24    executives.  ECF No. 1.  Two months later, in accordance with the procedures set forth by the

25    PSLRA, members of the putative class filed ten separate motions for appointment as lead plaintiff.

26    Subsequently, most withdrew their motions or filed statements of non-opposition, leaving Crain

27    Walnut and Universal as the only two parties actively vying for the role of lead plaintiff.  ECF

28    Nos. 73–79, 82.

United States District Court
Northern District of California

To determine which of the two to appoint as lead plaintiff, the Court followed the PSLRA's three-step process. At step one, Averza provided public notice of his suit, giving members of the putative class the opportunity to file motions for appointment as lead plaintiff. *In re Cavanaugh*, 306 F.3d 726, 729 (9th Cir. 2002). This occurred without need for the Court's supervision or input, and it was completed when the ten lead plaintiff motions were filed.

The Court then proceeded to step two, where it selected the "presumptively most adequate plaintiff." *Id.* at 729–30. To do so, the Court identified the lead plaintiff candidate with "the largest financial interest in the relief sought by the class" and that "otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure." *Id.* at 730 (quoting 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)). Crain Walnut's claimed loss ($49,153,069.68) was nearly four times greater than that of the lead plaintiff candidate with the next largest loss. Crain Walnut Opp'n at 4–5, ECF No. 81. Crain Walnut also made a prima facie showing that it satisfied Rule 23. Initial Lead Pl. Order at 4–5, ECF No. 99. Accordingly, the Court found that Crain Walnut was the presumptive lead plaintiff.

That left step three, where Universal would have a chance to rebut the presumption of Crain Walnut's adequacy with evidence. *In re Cavanaugh*, 306 F.3d at 730. However, the Court did not immediately proceed to that step. Instead, because Universal "demonstrate[d] a reasonable basis for a finding that [Crain Walnut] is incapable of adequately representing the class," the Court opened limited discovery into Crain Walnut. 15 U.S.C. § 78u-4(a)(3)(B)(iv). The Court authorized discovery on three issues: (1) Crain Walnut's ownership structure and decision-making process; (2) Crain Walnut's ability to continue as a going concern in light of its claimed losses from Super Micro's alleged securities fraud; and (3) whether Crain Walnut could establish reliance as an element of its securities claims. Initial Lead Pl. Order at 6–9.

Following the close of discovery, Crain Walnut and Universal submitted supplemental briefs, and the Court heard argument from both. After argument, the Court ordered Crain Walnut to produce two final documents and directed both parties to submit one more set of supplemental briefs discussing those documents. With the supplemental briefs in hand, the Court now addresses step three.

United States District Court
Northern District of California

1    **II.    LEGAL STANDARD**

2        **A.    Typicality and Adequacy**

3        Although the PSLRA uses only the word "adequate" when describing the criteria for

4    appointment as lead plaintiff, it actually requires that a lead plaintiff be both adequate *and* typical

5    as defined by Federal Rule of Civil Procedure 23(a).  *In re Cavanaugh*, 306 F.3d at 730; *see also*

6    15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)(aa)–(bb) (mirroring Rule 23 on adequacy and typicality).

7        Adequacy stems from Rule 23(a)(4), which requires class representatives to "fairly and

8    adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  A representative is

9    adequate if (1) it and its counsel do not have any conflicts of interest with the rest of the class and

10   (2) will vigorously prosecute the action on behalf of the class.  *Staton v. Boeing Co.*, 327 F.3d 938,

11   957 (9th Cir. 2003).

12       Typicality stems from Rule 23(a)(3), which requires "the claims or defenses of the

13   representative parties [to be] typical of the claims or defenses of the class."  Fed. R. Civ. P.

14   23(a)(3).  Typicality turns on how similar the class representatives' claims are to those of the

15   putative class.  The represetatives' claims do not need to be identical to class members'; it is

16   enough that they are "reasonably coextensive."  *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1116 (9th

17   Cir. 2017).  Only if "there is a danger that absent class members will suffer [because] their

18   representative is preoccupied with defenses unique to it" should a court find a representative

19   atypical.  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (citation omitted).  In

20   considering typicality, courts consider whether "other [class] members have the same or similar

21   injury, whether the action is based on conduct which is not unique to the [representative], and

22   whether other class members have been injured by the same course of conduct."  *Wolin v. Jaguar*

23   *Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (internal quotations omitted).

24       **B.    Standard of Proof**

25       At step two, Crain Walnut had the burden to secure its position as presumptive lead

26   plaintiff by making a "prima facie showing of typicality and adequacy" through its "pleadings and

27   declarations." *In re Cavanaugh*, 306 F.3d at 730.  Crain Walnut made the required showing, so the

28   burden now shifts to Universal to rebut the presumption.  *In re Mersho*, 6 F.4th 891, 901 (9th Cir.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    2021).  Rebuttal "requires proof" in the form of evidence showing atypicality or inadequacy.  *Id.*

2    at 899, 901; *see also In re Cavanaugh*, 306 F.3d at 730.  However, the PSLRA does not say how

3    much proof is needed.  15 U.S.C. § 78u-4(a)(3)(B)(iii)(II) (providing only that the presumption

4    may be rebutted "upon proof").

5         Since the PSLRA is silent on the applicable standard of proof, courts "must prescribe one."

6    *Herman & MacLean v. Huddleston*, 459 U.S. 375, 389 (1983).  "The usual standard of proof in

7    civil litigation is preponderance of the evidence."  *E.M.D. Sales, Inc. v. Carrera*, 604 U.S. 45, 47

8    (2025).  But in the context of lead plaintiff selection under the PSLRA, the Ninth Circuit has

9    suggested that a lenient standard applies: "genuine and serious doubt."  Although there is no

10   precedent expressly adopting this standard, applying "genuine and serious doubt" is consistent

11   with the principles governing choice of a standard of proof.  The Court therefore adopts it.

12        The Ninth Circuit has twice issued precedential opinions regarding lead plaintiff selection

13   under the PSLRA.[1]  The Circuit first considered the PSLRA's lead plaintiff selection process in *In*

14   *re Cavanaugh*, when it addressed how a presumptive lead plaintiff's choice of counsel and fee

15   arrangements impacted selection.  306 F.3d at 732–33.  The *Cavanaugh* court explained that a lead

16   plaintiff's choice of counsel or fee arrangement is not relevant except to the extent that it "cast[s]

17   *genuine and serious doubt* on that plaintiff's willingness or ability to perform the functions of lead

18   plaintiff."  *Id.* (emphasis added).  The Circuit returned to the PSLRA's lead plaintiff selection

19   process two decades later in *In re Mersho*, when it considered how a competing lead plaintiff

20   candidate could rebut the PSLRA's presumption at step three.  6 F.4th at 900–01.  The *Mersho*

21   court zeroed in on *Cavanaugh*'s "genuine and serious doubt" language, explaining that a district

22   court's misgivings about an investor group's cohesion fall short of casting "genuine and serious

23   doubt on [the] plaintiff's willingness or ability to perform the functions of lead plaintiff."  *Id.*

24   Taken together, these opinions suggest genuine and serious doubts are sufficient to overcome the

25

26   _____

27   [1] In a third opinion, the Ninth Circuit addressed district courts' authority to appoint lead counsel
     under the PSLRA, holding that district courts only have the "limited power to accept or reject the
28   lead plaintiff's selection" of counsel.  *Cohen v. U.S. Dist. Ct. for the N. Dist. of Cal.*, 586 F.3d
     703, 709 (9th Cir. 2009).  That opinion is not relevant here.

1    PSLRA's presumption.  *See also In re Paysafe Ltd. Sec. Litig.*, No. 21-cv-10611, 2024 WL

2    1636415, at *6 (S.D.N.Y. Apr. 16, 2024) (a "colorable risk" of atypicality or inadequacy is

3    sufficient to rebut the presumption) (quoting *Batter v. Hecla Mining Co.*, No. 19-cv-05719, 2020

4    WL 1444934, at *7 (S.D.N.Y. Mar. 25, 2020)).

5         The general principles governing selection of a standard of proof also weigh in favor of

6    applying the "genuine and serious doubt" standard.  The purpose of setting standards of proof is

7    "to allocate the risk of error between the litigants and to indicate the relative importance attached

8    to the ultimate decision."  *Addington v. Texas*, 441 U.S. 418, 423 (1979).  The greater the

9    individual rights at stake, the higher the standard of proof typically must be.  *See Herman &*

10   *MacLean*, 459 U.S. at 389 ("Thus, we have required proof by clear and convincing evidence

11   where particularly important individual interests or rights are at stake."); *see also E.M.D. Sales*,

12   604 U.S. at 51 (recognizing heightened standards for important constitutional rights and other

13   "uncommon[ly]" important individual rights).

14        Here, the rights and interests at stake are narrow, and they are not constitutional in

15   magnitude.  All that Crain Walnut is asking for is the ability to control the putative class action.

16   However, none of Crain Walnut's substantial rights are tied to that control.  If Crain Walnut is not

17   appointed lead plaintiff, it will still benefit from any judgment or settlement as a class member.

18   And if Crain Walnut feels that the chosen lead plaintiff will not properly advocate on behalf of the

19   putative class and Crain Walnut, it can opt out of any certified class and independently pursue its

20   own claims against Super Micro.  Put differently, Crain Walnut retains full control over its claims

21   regardless of its appointment as lead plaintiff.

22        On the other hand, much is at stake for the putative class.  For the vast majority of putative

23   class members, any settlement or judgment that the lead plaintiff secures is all they will receive.

24   Unlike Crain Walnut, which has secured counsel and demonstrated a desire to control its own

25   securities claims, few absent class members will likely be willing or able to opt out and file their

26   own lawsuits.  The relative balance of these stakes means that courts should choose a standard that

27   is more protective of the putative class even if that standard restricts the presumptive lead

28   plaintiff's ability to maintain its lead status.

United States District Court
Northern District of California

The "genuine and serious doubt" standard serves these purposes.  Allowing genuine doubts to overcome the PSLRA's lead plaintiff presumption holds lead plaintiffs to an appropriately high bar.  Even if an argument would not defeat typicality and adequacy at the class certification phase (where a preponderance standard applies), *DZ Rsrv. v. Meta Platforms, Inc.*, 96 F.4th 1223, 1240 (9th Cir. 2024), if that argument is a substantial one, it may still defeat the presumption at lead plaintiff selection.  This protects the putative class, potentially shielding it from the cost and delay that comes from litigating typicality and adequacy under Rule 23.  And it also comports with the PSLRA's text.  After all, the PSLRA instructs courts to "appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be *most* capable of adequately representing the interests of class members."  15 U.S.C. § 78u-4(a)(3)(B)(i) (emphasis added).  It does not direct courts to appoint *minimally* capable lead plaintiffs.  Holding lead plaintiffs to a high standard helps identify the most capable lead plaintiff.

Accordingly, to rebut the presumption that Crain Walnut is the most capable lead plaintiff, Universal need only provide evidence casting doubt Crain Walnut's adequacy or typicality.

## III.    DISCUSSION

Before delving into the parties' substantive disputes, the Court first addresses the parties' disagreement over what grounds Universal may raise to challenge Crain Walnut.  Universal suggests that any ground is fair game while Crain Walnut seeks to limit challenges to the three issues on which the Court granted discovery.  Universal has the better argument.

When a plaintiff sues "not for himself alone, but as representative of a class comprising all who are similarly situated," that plaintiff "assumes a position . . . of a fiduciary character."  *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 549 (1949); *see also In re Oxford Health Plans, Inc. Sec. Litig.*, 182 F.R.D. 42, 46 (S.D.N.Y. 1998) (citing *Cohen* for the same).  Yet, absent class members "have no [] election as to a plaintiff who steps forward to represent them."  *Cohen*, 337 U.S. at 549.  A lead plaintiff is "a self-chosen representative and a volunteer champion."  *Id.*  Accordingly, it is incumbent upon the Court to carefully scrutinize potential class representatives.  *Id.*  That is especially so when it comes to settlement, where the interests of absent class members may be in "tension" with a "defendant's interests in minimizing the cost of the total settlement

United States District Court
Northern District of California

package, and class counsel's interest in fees." *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 895 F.3d 597, 610 (9th Cir. 2018) (citations omitted) (alteration in original).  It is the class representative's role to ensure that the class's interests are not forgotten among the competing voices.

Similar tensions exist when selecting lead plaintiff.  Counsel selected by a lead plaintiff candidate have an interest in fees and therefore have an interest in positioning their client as lead plaintiff even if doing so might not be in the putative class's best interests.  In that situation, purposefully turning a blind eye to potential typicality and adequacy issues would be inconsistent with the Court's own "fiduciary duty to look after the interests of . . . absent class members." *Id.*

To be sure, when granting lead plaintiff discovery, the Court limited the scope of that discovery to mitigate concerns that it could be used to improperly "harass" Crain Walnut as the presumptive lead plaintiff.  *In re Cendant Corp. Litig.*, 264 F.3d 201, 270 n.49 (3d Cir. 2001).  But allowing Universal to challenge Crain Walnut on grounds not clearly contemplated by the Court's discovery authorization does not risk harassment.  The nature of discovery is that it sometimes uncovers unexpected information.  So long as discovery was targeted to the specific issues that the Court authorized (which it was), there is no reason for the Court to ignore previously unanticipated issues that surfaced over the course of discovery.[2]

Therefore, the Court considers each of Universal's arguments in turn, without regard to whether they are directly related to the three issues on which the Court initially granted discovery.[3]

---

[2] To the extent there is any concern that considering Universal's new arguments in this posture would incentivize competing lead plaintiff candidates to push the boundaries of discovery in future cases, the Court observes that no discovery is permitted at all until one candidate "demonstrates a reasonable basis" for discovery. 15 U.S.C. § 78u-4(a)(3)(B)(iv).  The normal discovery process, which allows parties to object that requests are outside the scope of permitted discovery, should also be sufficient to guard against the possibility that lead plaintiff discovery is used to fish for irrelevant information.

[3] Crain Walnut also raises evidentiary objections to certain portions of testimony by its 30(b)(6) representative. ECF No. 117.  The main thrust of its objections is that Universal asked questions beyond the scope of discovery at deposition.  The Court agrees only as to questions and testimony related to Crain Walnut's selection of counsel and decision to serve as lead plaintiff and therefore **SUSTAINS** the objections to that testimony.  The Court expressly excluded that topic from discovery. Initial Lead Pl. Order at 9–10.  The rest of the objected-to testimony falls within the scope of the Court's discovery order, read as a whole.  And Crain Walnut's non-scope objections go to weight, not admissibility.  So, the Court **OVERRULES** the remaining objections.

United States District Court
Northern District of California

1        **A.**    **Lead Plaintiff Presumption**

2        Universal opens with the argument that the Court should revisit its step two determination

3    that Crain Walnut is the presumptive lead plaintiff.  Universal asserts that discovery has shown

4    Crain Walnut's pleadings and declarations, which the Court relied on at step two, were inaccurate.

5    So, says Universal, the Court's step two determination was mistaken.

6        The Court cannot, however, revisit its step two finding after discovery.  Under Ninth

7    Circuit precedent, a competing lead plaintiff cannot rebut the presumption at step three by

8    convincing the Court "merely that [it] was wrong in determining that the prima facie elements of

9    [typicality and] adequacy were met" at step two.  *In re Mersho*, 6 F.4th at 901.  Were the Court to

10   accept such a showing as sufficient at step three, it would fail to "give effect to the presumption"

11   established at step two.  *Id.*  Rather, the Court would be putting the burden back on Crain Walnut

12   to re-establish its adequacy and typicality with evidence.

13       That is not to say evidence about the inaccuracy of filings at step two is irrelevant at step

14   three.  Separate from the question of whether the Court's step two conclusion was correct,

15   evidence showing that Crain Walnut submitted inaccurate filings can undermine Crain Walnut's

16   credibility or demonstrate carelessness.  If those credibility and carelessness concerns are

17   significant enough, Crain Walnut may be inadequate under Rule 23(a).  *Mendez v. R+L Carriers,*

18   *Inc.*, No. C 11-2478 CW, 2012 WL 5868973, at *14 (N.D. Cal. Nov. 19, 2022) (credibility) (citing

19   *Dubin v. Miller*, 132 F.R.D. 269, 272 (D. Colo. 1990)); *Tomaszewski v. Trevena, Inc.*, 383 F.

20   Supp. 3d 409, 414 (E.D. Pa. 2019) (carelessness); *Pirelli Armstrong Tire Corp. Retiree Med.*

21   *Benefits Tr. v. LaBranche & Co.*, 229 F.R.D. 395, 416 (S.D.N.Y. 2004) (examining honesty and

22   trustworthiness when selecting lead plaintiff).  But that is separate from the correctness of the

23   Court's step two decision.  As such, the Court considers Universal's arguments about inaccuracies

24   in Crain Walnut's step two filings as part of its adequacy analysis below.[4]  *Infra* Section III.C.4.

25   

26   [4] The Court does not further address Universal's claims that Mr. Crain failed to review a
     complaint in this matter, or that he failed to disclose trades in Super Micro stock made by his non-

27   Crain Walnut entities.  The record does not bear out Universal's complaint-review allegation.
     Crain Dep. at 12:24–13:1, ECF No. 115-5.  And the PSLRA requires only that the lead plaintiff

28   candidate itself disclose its trades, not all related entities.  15 U.S.C. § 78u-4(a)(2)(A)(iv).

## B.    Typicality

Turning to the Rule 23 requirements, Universal contends that Crain Walnut is subject to unique defenses. Specifically, Universal points to defenses related to standing, reliance, and loss causation that supposedly render Crain Walnut atypical. Addressing each argument in sequence, the Court finds that none is so substantial that it threatens to preoccupy Crain Walnut's attention. *See Hanon*, 976 F.2d at 508.

### 1.    Standing

Universal begins by arguing that there are serious questions about Crain Walnut's standing, ostensibly referring to Article III's injury-in-fact requirement. In Universal's view, a plaintiff is not injured by an alleged securities violation unless "it is the beneficial owner with legal title to [the defendant company's] shares, or qualifies for some other relevant exception to standing." Universal Suppl. Br. at 7–8, ECF No. 113-3 (citing *W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*, 549 F.3d 100, 106 (2d Cir. 2008)). Since Crain Walnut purchased its Super Micro shares on margin—meaning that Crain Walnut took out a loan to purchase those shares, secured by the shares themselves—Crain Walnut lacks legal title and, if Universal is correct, lacks standing.

While legal title can establish injury, it is not a necessary element of injury. *United States v. 5208 Los Franciscos Way*, 385 F.3d 1187, 1191 (9th Cir. 2004). Other types of "colorable interests," such as those that arise from "actual possession, control, [] or financial stake" in a piece of property, can also support Article III injury. *Id.* Universal's own authority confirms this principle, explaining that "the minimum requirement for an injury-in-fact is that the plaintiff have legal title to, *or a proprietary interest in*, the claim." *W.R. Huff*, 549 F.3d at 108 (emphasis added). Therefore, a beneficial owner of shares has standing to sue even if it does not hold legal title to those shares.

Indeed, many investors today do not hold legal title to their shares. "Under common industry practice, most publicly traded stock is held in the 'street name' of brokerage houses for the benefit of their customers. Only brokerage houses or other 'record owners' appear on official corporate transfer records." *Silber v. Mabon*, 957 F.2d 697, 699 (9th Cir. 1992). As the Ninth

1   Circuit has explained, this arrangement "is little more than an administrative convenience that

2   does not deprive the [investors] of equitable and legal rights in the securities." *SEC v. Cap.*

3   *Consultants, LLC*, 397 F.3d 733, 747 (9th Cir. 2005). Such investors are beneficial owners of

4   those shares even if they are not legal title holders, so they retain "[t]he actual interest in the stock

5   (and consequently, the interest in any lawsuit relating to the stock)." *Id.* When share prices rise or

6   fall, the profits or losses fall to the shares' beneficial owners, not the brokers. By extension,

7   injuries related to share value also fall upon the beneficial owners.

8          With this framework in mind, the Court concludes that Universal has failed to show that

9   there are serious standing issues disqualifying Crain Walnut from serving as lead plaintiff. Crain

10  Walnut purchased its Super Micro shares through a broker, so barring unusual circumstances,

11  Crain Walnut is the beneficial owner of those shares. Although Universal suggests that Crain

12  Walnut's decision to purchase its Super Micro shares on margin is such an unusual circumstance,

13  Universal has pointed to nothing in Crain Walnut's margin agreement that calls beneficial

14  ownership into question. *See* Margin Agreement, ECF No. 132-5.

15         For these reasons, standing issues do not present the type of genuine and serious doubt

16  required to rebut the presumption of typicality.

17                      **2.      Reliance**

18         Next, Universal argues reliance. To succeed on Section 10(b) claims like the ones in this

19  case, a plaintiff must prove that it relied on a company's fraudulent statements when transacting in

20  that company's securities. *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 603 (9th

21  Cir. 2014). According to Universal, testimony from Crain Walnut's 30(b)(6) deposition shows

22  that Crain Walnut did not rely on Super Micro's statements, including any alleged

23  misrepresentations or omissions, when deciding to invest in Super Micro.

24         Some of the testimony from Crain Walnut's 30(b)(6) deposition certainly gives the Court

25  pause. For example, Crain Walnut's representative, Charles Crain, Jr., testified that when

26  deciding to invest in Super Micro shares on behalf of Crain Walnut, he did not review Super

27  Micro's "actual quarterly reports." Crain Dep. at 98:20–22. When pressed, Mr. Crain also had

28  difficulty identifying any specific Super Micro statement that informed Crain Walnut's investment

United States District Court
Northern District of California

1    decisions. *Id.* at 102:16–105:12. Mr. Crain further testified that he did not believe false

2    statements were at issue in this case, saying: "I don't believe it has to do anything with what

3    [Super Micro] should have told people. I think it's, you know, how they operated the company."

4    *Id.* at 107:21–108:5. And Mr. Crain further testified that "whether [Super Micro] made false

5    statements or did not does not have any bearing" on this case. *Id.* at 107:1–5.

6          All of this is potential fodder for Defendants. But it is ultimately not disqualifying because

7    typicality does not require the complete absence of unique defenses. A class representative may

8    be subject to a unique defense and still be typical if that unique defense does not threaten to

9    preoccupy its attention. *Hanon*, 976 F.2d at 508. In a securities fraud case like this one, an

10    individual investor's testimony about being unaware of particular misstatements does little to

11    move the needle on reliance since plaintiffs can rely on the presumption of reliance endorsed by

12    the Supreme Court in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988).

13          The *Basic* presumption flows from the fraud-on-the-market theory. This theory posits that

14    "the market price of shares traded on well-developed markets reflects all publicly available

15    information, and, hence, any material misrepresentations." *Basic*, 485 U.S. at 246. So, when an

16    investor "rel[ies] on the market price of a company's security" to purchase or sell that security, the

17    investor also implicitly relies on the company's misrepresentations. *Goldman Sachs Grp., Inc. v.*

18    *Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 117 (2021). Once a plaintiff establishes that the *Basic*

19    presumption applies, there are only two ways for the defense to rebut the presumption. The

20    defense may do so through "[a]ny showing that severs the link between the alleged

21    misrepresentation and either [1] the price received (or paid) by the plaintiff, or [2] his decision to

22    trade at a fair market price." *Id.* at 118 (quoting *Basic*, 485 U.S. at 248); *see also Halliburton Co.*

23    *v. Erica P. John Fund, Inc.*, 573 U.S. 258, 269 (2014).

24          There is no dispute at this stage that the *Basic* presumption applies, so the sole question is

25    whether Mr. Crain's testimony can be used to rebut the presumption. It cannot. The first ground

26    does not apply because Mr. Crain's awareness of Super Micro's statements has no bearing on

27    whether those statements have been incorporated into Super Micro's share price. The market, not

28    Mr. Crain, controls share price. The second ground does not apply either. Nothing that Mr. Crain

*United States District Court*
*Northern District of California*

said suggests that he disregarded the price of Super Micro's shares when he decided to invest on behalf of Crain Walnut.

Thus, potential reliance issues do not create genuine and serious doubt about Crain Walnut's typicality.

### 3.    Loss Causation

Lastly, Universal contends that Mr. Crain's deposition testimony undermines another element of securities fraud: loss causation. This element refers to proximate cause and can be satisfied by simply establishing a "causal connection" between the purported fraud and a subsequent stock price drop. *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753–54 (9th Cir. 2018). Here, Universal takes issue with Mr. Crain's treatment of a September 2024 *Wall Street Journal* article that allegedly supplied the requisite causal connection. Mr. Crain dismissed the article's importance, testifying that the article "doesn't mean diddly." Crain Dep. at 142:19–147:18. He testified this way despite the fact that Crain Walnut's own counsel—albeit in a separate action against Super Micro to which Crain Walnut is not a party—had identified the article as a corrective disclosure supporting loss causation. *Norfolk Cnty. Ret. Sys. v. Super Micro Computer, Inc.*, No. 4:24-cv-6980 (N.D. Cal.), Compl. ¶¶ 9, 74, ECF No. 1.

While the optics of Mr. Crain's testimony are not good, that testimony does not cast serious doubt on Crain Walnut's typicality. Loss causation turns on how "the market" reacts to the alleged fraud. *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 393 (9th Cir. 2010). Mr. Crain, through Crain Walnut, is a large and prolific investor, but he is not the market and cannot control market fluctuations by himself. Nor is Mr. Crain an economist qualified to opine about the causes of market fluctuations. As such, his testimony that the *Wall Street Journal* article was unimportant has little probative value when assessing loss causation and will not become a major issue in this litigation.

Loss causation issues are therefore not an impediment to Crain Walnut's ability to serve as lead plaintiff.

### C.    Adequacy

Universal advances five arguments against about Crain Walnut's adequacy: (1) Crain

Walnut may not be able to properly oversee this litigation due to its ambiguous decision-making structure; (2) Crain Walnut's large losses on its Super Micro shares may threaten its ability to continue as a going concern; (3) Mr. Crain, as Crain Walnut's representative and decision-maker, does not sufficiently understand the claims in this case; (4) Crain Walnut submitted inaccurate filings at step two; and (5) Crain Walnut has demonstrated a reluctance to participate in discovery.[5]  The first three are not disqualifying, but the Court finds that the last two render Crain Walnut inadequate.

### 1.    Litigation Oversight

Earlier, the Court authorized discovery into Crain Walnut's ownership structure because Universal had raised substantial questions about whether Mr. Crain would have ultimate control over this litigation if Crain Walnut were appointed lead plaintiff.  Initial Lead Pl. Order at 6–7. This was a concern because the PSLRA is meant to ensure that investors, not counsel, retain final control over private securities litigation.  *See In re Advanced Tissue Scis. Sec. Litig.*, 184 F.R.D. 346, 352 (S.D. Cal. 1998).  If there is not a clear decision-making hierarchy within a lead plaintiff entity, internal disputes over key litigation decisions within that entity could limit the lead plaintiff's ability to effectively control the litigation.  If that happens, the lead counsel may be able to seize de facto control over the lawsuit.  *See id.*

Following discovery, that concern has been dispelled.  Although control over Crain Walnut's operations runs through multiple legal entities, Mr. Crain ultimately sits at the top.  *See* ECF Nos. 110-5, -11, -12 (ownership documents); ECF No. 128-5 (trust agreement establishing Mr. Crain's control over the trust).  Final decision-making authority for Crain Walnut is concentrated in the hands of a single person (Mr. Crain), so there is little risk of ineffectual decision-making.  The Court has no concerns about litigation oversight.

### 2.    Financial Condition

The Court had also authorized discovery into Crain Walnut's financial condition due to

---

[5] Since the Court sustained Crain Walnut's objections to evidence about selection of lead counsel, the Court does not address Universal's arguments on that issue.

1    questions about Crain Walnut's ability to continue as a going concern.  Having reviewed Crain

2    Walnut's financial statements and other discovery, the Court now concludes that those worries

3    were misplaced.

4         Crain Walnut is in a strong enough financial position that it should be able to persist as a

5    going concern at least through the pendency of this litigation (and most likely much longer).  *See*

6    ECF No. 110-13 (financial statements).  Universal contends that Mr. Crain might transfer assets

7    away from Crain Walnut to other entities, or that Crain Walnut will be subject to a margin call that

8    requires it to deposit additional funds into its margin trading account.  These arguments are too

9    speculative to rebut the presumption.  Nothing in the record suggests that Mr. Crain would

10   unilaterally drain Crain Walnut's assets.  And there is no evidence showing that Crain Walnut has

11   ever faced a margin call.  To the contrary, Mr. Crain has testified that he carefully manages Crain

12   Walnut's margin account to ensure Crain Walnut will never face one.  Crain Dep. at 75:5–8.

13   Universal's speculations do not even rise to the level of "misgivings," and misgivings are not

14   enough to rebut the PSLRA's presumption.  *In re Mersho*, 6 F.4th at 901.  Thus, financial

15   concerns do not rebut Crain Walnut's adequacy.

16             **3.**      **Familiarity with Case**

17        Although the Court did not expressly authorize discovery into Crain Walnut's familiarity

18   with this case, several portions of Mr. Crain's testimony suggest that his understanding of this case

19   is imperfect.  However, adequacy does not require perfect understanding.  To be adequate, class

20   representatives need not "be intimately familiar with every factual and legal issue in the case" so

21   long as they know "the basics of, and understand the gravamen of, their claims."  *Torliatt v.*

22   *Ocwen Loan Servicing, LLC*, 570 F. Supp. 3d 781, 796 (N.D. Cal. 2021) (quoting *In re Static*

23   *Random Access Memory (SRAM) Antitrust Litig.*, 264 F.R.D. 603, 610 (N.D. Cal. 2009)).  Only if

24   a class plaintiff is "startlingly unfamiliar" with its case will that plaintiff be inadequate.  *In re*

25   *SRAM*, 264 F.R.D. at 610 (quoting *Moeller v. Taco Bell Corp.*, 220 F.R.D. 604, 611 (N.D. Cal.

26   2009)).  Mr. Crain's understanding is far from startling.

27        Universal points to the following testimony from Mr. Crain:  "I don't believe it has to do

28   anything with what [Super Micro] should have told people.  I think it's, you know, how they

United States District Court
Northern District of California

1   operated the company." Crain Dep. at 108:2–5. In isolation, this testimony might indicate that

2   Mr. Crain does not understand the claims at issue. In context, it does not create adequacy

3   problems. Shortly after the testimony above, Mr. Crain clarified that he understands the

4   allegations in this case are that "Super Micro [] has, probably, operated outside of generally

5   accepted accounting principles" even though he was not sure "[w]hether the legal term fraud []

6   should be used or not." *Id.* at 110:6–10. This demonstrates that Mr. Crain may have had some

7   semantic confusion about whether accounting violations constituted "misrepresentations" or

8   "fraud" under the law. But Mr. Crain was not confused about the gravamen of the case; he

9   correctly understood that this matter focuses on accounting violations. Therefore, lack of

10  familiarity does not disqualify Crain Walnut on adequacy grounds, either.

### 4.    Filing Inaccuracies

12       Crain Walnut's filing inaccuracies pose more significant obstacles. As noted above, such

13  inaccuracies can call a plaintiff's credibility into question and render that plaintiff inadequate.

14  *Supra* Section III.A. At the class certification stage, it is difficult to disqualify a plaintiff for lack

15  of credibility. For a plaintiff to be inadequate, there must be "evidence so severely undermining

16  plaintiff's credibility that a fact finder might reasonably focus on plaintiff's credibility." *Mendez*,

17  2012 WL 5868973, at *14 (quoting *Dubin*, 132 F.R.D. at 272); *see also In re Solar City Corp. Sec.

18  *Litig.*, No. 16-cv-04686, 2017 WL 363274, at *6 (N.D. Cal. Jan. 25, 2017) (applying a similar rule

19  in the PSLRA lead plaintiff selection context); *Lacy v. Cook Cnty.*, 897 F.3d 847, 866 (7th Cir.

20  2018).

21       At the lead plaintiff selection stage, though, it is easier to disqualify a presumptive lead

22  plaintiff due to credibility concerns. Unlike class certification, which requires a preponderance of

23  the evidence, *DZ Rsrv.*, 96 F.4th at 1240, lead plaintiff selection is governed by the lower

24  "genuine and serious doubt" standard. In accordance with this standard, courts have frequently

25  declined to appoint lead plaintiffs with questionable credibility. *E.g.*, *Burns v. UP Fintech*

26  *Holding Ltd.*, No. 23-cv-4842M-BFMX, 2024 WL 387261, at *5 (C.D. Cal. Jan. 30, 2024)

27  (collecting cases); *Camp v. Qualcomm Inc.*, No. 3:18-cv-1208, 2019 WL 3554798, at *2 (S.D.

28  Cal. Aug. 5, 2019) (a "willingness to make false statements under oath" can rebut the presumption

1    at step three); *In re Boeing Co. Aircraft Sec. Litig.*, No. 19-cv-2394, 2019 WL 6052399, at *5 n.6

2    (N.D. Ill. Nov. 15, 2019).

3          In fact, courts have disqualified lead plaintiff candidates for making incorrect

4    representations due to honest mistakes, even without evidence that those candidates intended to

5    mislead.  *See, e.g.*, *Bousso v. Spire Glob., Inc.*, No. 1:24-cv-01458, 2024 WL 4873311, at *5 (E.D.

6    Va. Nov. 21, 2024); *Rodriguez v. DraftKings Inc.*, No. 21-cv-5739, 2021 WL 5282006, at *9

7    (S.D.N.Y. Nov. 12, 2021) (collecting cases).  That is because "errors in [a lead plaintiff

8    candidate]'s sworn statements amount to a substantial degree of carelessness and raise doubt" as to

9    whether a court can trust that candidate's representations.  *Tomaszewski*, 383 F. Supp. 3d at 414.

10         Of course, not every error bearing on credibility and trustworthiness is fatal to a party's

11   ability to serve as lead plaintiff.  The types of errors factoring most strongly into the adequacy

12   analysis are those that are "directly relevant to the litigation."  *In re Honest Co. Sec. Litig.*, No.

13   2:21-cv-07405, 2023 WL 3190506, at *7 (C.D. Cal. May 1, 2023) (quoting *Kouchi v. Am.

14   Airlines, Inc.*, No. 18-cv-7802, 2021 WL 6104391, at *9 (C.D. Cal. Oct. 27, 2021)); *see also

15   Rocco v. Nam Tai Elecs., Inc.*, 245 F.R.D. 131, 137 (S.D.N.Y. 2007) (similar) (quoting *In re NYSE

16   Specialists Sec. Litig.*, 240 F.R.D. 128, 144 (S.D.N.Y.2007)).  Additionally, while some courts

17   have found inadvertent mistakes to be disqualifying, others have excused such mistakes when they

18   have ultimately been inconsequential.  *In re Solar City Corp.*, 2017 WL 363274, at *6 (collecting

19   cases).  The errors that Crain Walnut made here are not the kind that the Court can overlook,

20   though.

21         Crain Walnut's errors center around its ownership structure.  Discovery shows that there

22   are several entities involved in Crain Walnut's ownership[6]:



23

24

25

26

27

---

28   [6] The arrows represent that the entity on the right has an ownership stake in the entity on the left.

*United States District Court*
*Northern District of California*

1

2    *See* ECF Nos. 110-5, -11, -12; Suppl. Crain Decl. ¶ 4, ECF No. 85-1; Crain Dep. at 26:10–13.

3    However, this is not what Crain Walnut initially told the Court when filing its motion for

4    appointment as lead plaintiff.  Rather, Mr. Crain declared that he was Crain Walnut's "sole

5    owner."  Crain Decl. at 2, ECF No. 31-3.  He did not disclose that Nuez Progresivo and Crain

6    Walnut Shelling, Inc. were the entities owning Crain Walnut.

7         This may have been an honest mistake.  After Universal pointed out the issue, Crain

8    Walnut attempted to correct this error on reply.  The problem is that, even on a second try, Crain

9    Walnut did not get its ownership structure right.  Mr. Crain submitted a second declaration,

10   correctly identifying each of the corporate entities in its ownership structure—Nuez Progresivo,

11   Inc.; Grupo Progresivo, Inc.; and Crain Walnut Shelling, Inc.—and correctly representing that he

12   was the 100% owner of Crain Walnut Shelling, Inc.  Suppl. Crain Decl. ¶ 4.  Yet, Mr. Crain

13   incorrectly told the Court that he was also the 100% owner of Grupo Progresivo when it was

14   actually his trust that owned Grupo Progresivo.  *Id.*; Crain Dep. at 26:10–13.

15        Had Crain Walnut fully corrected the record on reply, this issue likely would have been

16   much ado about nothing.  But it did not, despite the fact that Universal had made its doubts about

17   Crain Walnut's ownership structure a centerpiece of its opposition to Crain Walnut's motion.

18   Universal's opposition put Crain Walnut on notice that its ownership structure was "directly

19   relevant" to lead plaintiff selection.  *In re Honest Co.*, 2023 WL 3190506, at *7.  Yet, even *after*

20   receiving this notice, Crain Walnut failed to disclose the role of Mr. Crain's trust in its ownership.

21        Crain Walnut's efforts to downplay its error are ineffective.  It is certainly true that Mr.

22   Crain holds sole decision-making authority over Crain Walnut even though he is not the "sole

23   owner."  *Supra* Section III.C.1.  There is also little practical difference between Mr. Crain directly

24   owning Grupo Progresivo and his revocable trust owning Grupo Progresivo.  *Id.*  In that sense,

25   Crain Walnut's representations were close enough to the truth that they did not materially affect

26   the Court's understanding of Crain Walnut's operations.  However, close enough is not good

27   enough in this situation.  Crain Walnut was on notice of the need for precision yet failed to

28   provide precise details about its ownership after multiple chances to do so.  The drip-by-drip

United States District Court
Northern District of California

1    nature of these "continuous 'new' revelations" about Crain Walnut's ownership casts serious

2    doubt about Crain Walnut's willingness or ability to meet its obligations of candor to the Court

3    and the putative class.  *Smajlaj v. Brocade Commc'ns Sys. Inc.*, No. 05-cv-02042, 2006 WL

4    7348107, at *2 (N.D. Cal. Jan. 12, 2006).  And Crain Walnut's close-enough mindset is

5    symptomatic of the inattention and carelessness that the lead plaintiff selection process is intended

6    to filter out.  *See Tomaszewski*, 383 F. Supp. 3d at 414.

7         Similar errors in Crain Walnut's Civil Local Rule 3-15 certification only reinforce the

8    Court's doubts.  The certification indicated that there were no persons or entities with "a financial

9    interest of any kind" in Crain Walnut.  ECF No. 32 (Crain Walnut's Rule 3-15 certification); Civil

10   L.R. 3-15(b)(2).  This violates Local Rule 3-15, which requires parties to report any "ownership of

11   a legal or equitable interest, however small."  28 U.S.C. § 455(d)(4) (incorporated into the Local

12   Rules by reference).  At least Crain Walnut's partners—Nuez Progresivo and Crain Walnut

13   Shelling, Inc.—qualify under that definition and should have been reported.

14        Crain Walnut again tries to minimize its mistake by arguing harmlessness.  Crain Walnut

15   observes that Rule 3-15 certifications are meant to inform judicial disqualification decisions, and

16   there is no basis for disqualification here because each of the entities within Crain Walnut's

17   ownership structure are privately held.  Crain Walnut Suppl. Br. at 9–10, ECF No. 110-4 (citing

18   *Anoke v. Twitter, Inc.*, No. 23-cv-2217, 2024 WL 3908108, at *5 (N.D. Cal. Aug. 20, 2024)).

19   Crain Walnut may be right that an accurate certification would not have changed anything in this

20   litigation, but that is not for Crain Walnut to unilaterally decide.  The Court and the other parties

21   needed that information to make their own informed decisions.

22        For these reasons, the Court has significant doubts about whether Crain Walnut is adequate

23   in light of the inaccuracies in its filings.

24                    **5.    Reluctance to Participate in Discovery**

25        Finally, Crain Walnut's reluctance to participate in discovery further weighs against the

26   presumption of adequacy.  "[A]ny failure to comply with reasonable disclosure obligations or

27   discovery requests" supports a finding of inadequacy.  *Kandel v. Brother Int'l Corp.*, 264 F.R.D.

28   630, 634 (C.D. Cal. 2010) (collecting cases); *see also In re Silver Wheaton Corp. Sec. Litig.*, No.

United States District Court
Northern District of California

1    2:15-cv-05146, 2017 WL 2039171, at *10 (C.D. Cal. May 11, 2017) (similar); *Norman v. Arcs*

2    *Equities Corp.*, 72 F.R.D. 502, 506 (S.D.N.Y. 1976) ("One who will not comply wholeheartedly

3    and fully with the discovery requirements of modern federal practice, is not to be regarded by this

4    Court as one to whom the important fiduciary obligation of acting as a class representative should

5    be entrusted."). As with issues of credibility, such discovery issues are disqualifying in the class

6    certification context only when they are "glaring." *In re Silver Wheaton*, 2017 WL 2039171, at

7    *10 (quoting *In re AM Int'l, Inc. Sec. Litig.*, 108 F.R.D. 190, 197 (S.D.N.Y. 1985)). But also as

8    with issues of credibility, the standard for disqualification based on discovery issues is relaxed at

9    the lead plaintiff selection stage. Evidence that "suggests that [a candidate] will be unable or

10   unwilling to carry out the duties of a lead plaintiff, which include responding to discovery and

11   providing deposition testimony," "casts [] doubt on [the candidate's] adequacy." *In re Boeing*

12   *Co.*, 2019 WL 6052399, at *7. And doubt is all that is needed to rebut the PSLRA's presumption.

13           To be clear, simply objecting to or seeking to limit the scope of discovery is not grounds

14   for inadequacy. That is a normal feature of litigation expressly contemplated by the Federal Rules

15   of Civil Procedure. *See* Fed. R. Civ. P. 26(c) (expressly authorizing motions for protective order

16   to limit discovery). A party's discovery behavior does not cross the line unless it implies a

17   reluctance to follow a court's explicit orders on discovery or a penchant for ignoring the standard

18   rules of discovery. Crain Walnut crossed the line here, at least to the extent its actions and

19   testimony expose a deep unwillingness to fully engage in the discovery process.

20           For one, Crain Walnut came close to flouting the Court's explicit orders. At hearing, the

21   Court directed Crain Walnut to produce its margin agreement and the trust agreement for Mr.

22   Crain's trust by March 14, 2025. Hr'g Tr. at 34:24–36:11, ECF No. 126. Yet, Crain Walnut did

23   not produce its margin agreement by the deadline, instead producing another document.

24   Discovery Letter at 1–2, ECF No. 128-6. What is more, when producing the trust agreement,

25   Crain Walnut applied extensive relevance redactions even though unilateral redactions are

26   "generally an inappropriate tool for excluding information that a party considers to be irrelevant or

27   nonresponsive." *Doe v. Trump*, 329 F.R.D. 262, 275 (W.D. Wash. 2018) (collecting cases); *see*

28   *also Shenwick v. Twitter, Inc.*, No. 16-cv-05314, 2018 WL 833085, at *3 (N.D. Cal. Feb. 7, 2018)

United States District Court
Northern District of California

1    (collecting more cases).  True, the Court contemplated some limited redactions when ordering

2    discovery.  Hr'g Tr. at 35:12–36:8.  But Crain Walnut's redactions went far beyond what the

3    Court contemplated when ordering production, especially because the trust agreement was

4    designated Attorney's Eyes Only and unlikely to be disclosed beyond the Court and counsel.

5        Most troubling is the answer that Mr. Crain gave when asked, "If [Crain Walnut] is

6    required to produce your personal financial records, will you produce them?"  Crain Dep. at

7    168:25–169:1.  Mr. Crain responded that he would not.  *Id.* at 169:4.  There is certainly no

8    guarantee that the Court would ever order such production, and Mr. Crain may have strong legal

9    arguments that Crain Walnut cannot be compelled to produce his personal records.  Nonetheless,

10   Mr. Crain testified under oath that *if* the Court were to order that production, he would not obey

11   that order.  That is a wholly inappropriate response to a court order with which Mr. Crain

12   disagrees.

13       Ostensibly, and understandably, Crain Walnut's actions and Mr. Crain's testimony in this

14   matter reflect a desire to maintain Mr. Crain's privacy.  However, plaintiffs do not have the same

15   privacy expectations in litigation that they do in private life.  By choosing to file suit (or in this

16   case to move for appointment as lead plaintiff), a plaintiff puts its affairs at issue in a way that

17   results in its "privacy rights and expectations [being] diminished or extinguished."  *A.C. ex rel.*

18   *Park v. Cortez*, 34 F.4th 783, 788 (9th Cir. 2022).  The decision to accept appointment as lead

19   plaintiff necessarily requires giving up some privacy.

20       Crain Walnut has shown an unwillingness to place this litigation—and by extension, the

21   interests of the putative class—above Mr. Crain's privacy interests.  That is Crain Walnut's

22   prerogative.  But it is inconsistent with serving as lead plaintiff.

23                                 *    *    *

24       Together, the concerns about Crain Walnut's lack of care and unwillingness to participate

25   in discovery leave the Court with genuine and serious doubts that Crain Walnut will adequately

26   meet all the obligations that come with representing the putative class as lead plaintiff.  The Court

27   therefore finds that Universal has rebutted the presumption that Crain Walnut is lead plaintiff.

28

IV.    **CONCLUSION**

The Court **DENIES** Crain Walnut's motion for appointment as lead plaintiff.  But before returning to step two of the PSLRA's lead plaintiff selection process, the Court allows the lead plaintiff candidates who previously withdrew their motions or filed non-oppositions to re-notice their lead plaintiff motions.  The PSLRA tasks the Court with selecting the lead plaintiff that will best serve the class, and the larger the candidate pool, the more effectively the Court is able to do so.  In addition, many lead plaintiff candidates may have withdrawn from contention in response to Crain Walnut's large claimed losses.  Now that the Court has denied Crain Walnut's motion, in fairness, it should offer the withdrawing candidates the opportunity to reevaluate the strength of their lead plaintiff applications.

Any party wishing to re-notice its motion must do so by **June 30, 2025**.  If no party re-notices its motion, the Court will proceed to evaluate Universal's suitability for the lead plaintiff role using the existing briefs and record.  If one or more parties re-notice their motions, those parties and Universal shall submit supplemental oppositions not to exceed **fifteen (15) pages** by **July 10, 2025**.  Those parties and Universal shall then submit supplemental replies not to exceed **eight (8) pages** by **July 17, 2025**.  Unless the Court sets a hearing, the lead plaintiff motions will be deemed under submission following the filing of supplemental replies.

**IT IS SO ORDERED.**

Dated:  June 26, 2025

EDWARD J. DAVILA
United States District Judge

United States District Court
Northern District of California