**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMANN LLP**
John Rizio-Hamilton (*pro hac vice*)
(johnr@blbglaw.com)
Gerald H. Silk (*pro hac vice*)
(jerry@blbglaw.com)
Scott R. Foglietta (*pro hac vice*)
(scott.foglietta@blbglaw.com)
Preethi Krishnamurthy (*pro hac vice*)
(preethi@blbglaw.com)
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444

Jonathan D. Uslaner (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Telephone: (310) 819-3470

*Counsel for Lead Plaintiffs Universal-*
*Investment-Gesellschaft mbH*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| IN RE SUPER MICRO COMPUTER, INC. SECURITIES LITIGATION. | Master File No. 5:24-cv-06147-EJD |
| | Consolidated Case Nos. 5:24-cv-06147-EJD; 4:24-cv-06980-JST; 5:24-cv-07274-EJD |
| | **CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS** |
| | <u>CLASS ACTION</u><br><u>DEMAND FOR JURY TRIAL</u> |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ............................................................................................1

II.    JURISDICTION AND VENUE ......................................................................5

III.   THE PARTIES...............................................................................................6

    A.    Lead Plaintiff ....................................................................................6

    B.    Defendants .........................................................................................6

IV.   FACTUAL BACKGROUND ........................................................................7

    A.    Supermicro Goes Public and Becomes Listed on the Nasdaq ................7

    B.    Nasdaq Suspends and Delists Supermicro for Almost 18 Months
        Following Material Internal Control Deficiencies ...................................8

    C.    Supermicro Is Relisted on Nasdaq and Tells Investors That It Has
        Remediated Its Material Internal Control Deficiencies. .........................11

    D.    Supermicro's Stock Price Soars as Defendants Assure Investors They
        Have Remediated the Company's Internal Controls Deficiencies. .......13

    E.    Unknown to Investors at the Time, Defendants Continued to Engage in the
        Same Material Internal Control Deficiencies and Improper Accounting
        Practices That Led to the Company's Nasdaq Delisting and SEC Fine ....14

    F.    Investors Suffer Losses as the Truth Emerges. .....................................46

        1.    Hindenburg Issues Its Report Detailing "Glaring Accounting Red
            Flags," and the Next Day Supermicro Announces It Will Not
            Timely File its Annual Financial Report ...................................46

        2.    *The Wall Street Journal* Discloses a DOJ Investigation into
            Supermicro's Accounting, and Supermicro Discloses that Its
            Auditor Has Resigned After Concluding That It Could Not Rely on
            Management's Representations ...................................................50

    G.    Post-Class Period Events Further Confirm that Defendants Misled
        Investors ...........................................................................................55

V.    ADDITIONAL ALLEGATIONS OF SCIENTER............................................61

VI.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND
    OMISSIONS ..................................................................................................71

    A.    Liang's and Supermicro's Materially False and Misleading Statements in
        an Earnings Call .................................................................................72

    B.    Defendants' Materially False and Misleading Statements in Annual
        Reports .............................................................................................74

C.    Defendants' Materially False and Misleading Statements in Their "Sustainability Report" ....................................................................80

D.    Defendants' Materially False and Misleading Statements in Quarterly Reports .................................................................................82

E.    Defendants' False and Misleading Statements to News Media..........................90

F.    Defendants' False and Misleading Statements in a Press Release and SEC Report .......................................................................91

VII.    ADDITIONAL LOSS CAUSATION ALLEGATIONS ....................................................93

VIII.    PRESUMPTION OF RELIANCE ................................................................................98

IX.    THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ......................................................................99

X.    CAUSES OF ACTION ................................................................................100

COUNT I – VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT (AGAINST ALL DEFENDANTS) ..........................................................100

COUNT II – VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT (AGAINST DEFENDANTS LIANG AND WEIGAND) ..............................................103

XI.    CLASS ACTION ALLEGATIONS ..............................................................104

XII.    PRAYER FOR RELIEF ..............................................................................105

XIII.    JURY TRIAL DEMAND ..............................................................................105

Lead Plaintiff Universal-Investment-Gesellschaft mbH ("Lead Plaintiff"), by and through its counsel, brings this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of itself and all persons and entities, except Defendants and their affiliates, who purchased or otherwise acquired the securities of Super Micro Computer, Inc. ("Supermicro" or the "Company") between November 3, 2020, and October 30, 2024, inclusive (the "Class Period") and were damaged thereby.

The allegations in this Complaint are based upon Lead Plaintiff's personal knowledge as to itself and its own acts and upon information and belief as to all other matters. Lead Plaintiff's information and belief are based on the independent investigation of Lead Counsel. This investigation included, among other things, a review and analysis of: (i) Supermicro's public filings with the Securities and Exchange Commission ("SEC"); (ii) research reports prepared by securities and financial analysts concerning Supermicro; (iii) transcripts of Supermicro investor conference calls; (iv) Supermicro investor presentations; (v) reports by the financial press concerning Supermicro; (vi) Supermicro securities pricing data; (vii) interviews of former Supermicro employees; (viii) consultations with experts; and (ix) other material and data identified herein. Lead Counsel's investigation into the factual allegations is continuing, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control.

## I.  INTRODUCTION

1.  This case concerns a series of misstatements by Supermicro's most senior officers about an issue of existential importance to the Company and its investors. Prior to the Class Period, Supermicro and its long-time CEO, Charles Liang ("Liang"), orchestrated a multi-year accounting fraud. Once exposed, the SEC and the Company's auditor determined that Supermicro suffered from "material weaknesses in internal controls"—a damning conclusion that raised questions about the accuracy of the Company's accounting and its commitment to integrity. Supermicro's internal controls were so deficient that the Nasdaq exchange delisted the Company for an entire year and a half, and the SEC fined it $17.5 million and ordered Liang to repay over $2.1 million in ill-gotten gains.

2.      Nasdaq's delisting was a devastating blow to the Company. It is of the utmost importance for publicly traded companies with billions of dollars of assets, such as Supermicro, to trade on a national stock exchange. When a stock is "delisted"—and, thus, no longer able to trade on an exchange—institutional investors abandon the stock; trading volume collapses; and the company loses access to the capital markets. That is precisely what happened to Supermicro prior to the Class Period as the result of its internal control deficiencies.

3.      After a year-and-a-half of delisting, Supermicro and its CEO successfully convinced investors and the SEC that the Company had reformed. Once allowed back on the Nasdaq exchange, Supermicro and its CEO repeatedly assured investors in myriad contexts— including investor calls, SEC filings, and more—that the Company had changed its ways and now maintained effective internal controls.

4.      The Class Period begins on November 3, 2020. On that day, Defendant Liang personally assured investors during an earnings call that Supermicro's internal control deficiencies were ***"resolved a few months ago"*** and that "the big challenges in the past three years that badly hurt Supermicro are ***totally behind us now."*** Defendants reiterated this same message to investors in its quarterly and annual SEC filings, which represented over and over that Supermicro's deficient internal controls were a thing of ***"the past"*** and had been ***"remediated."*** They further assured investors that Defendants Liang and David Weigand (the Company's CFO) had personally crafted and reviewed the Company's internal controls, with both certifying their effectiveness. On the back of these representations, Supermicro's stock price soared—increasing by over 5,000% during the Class Period.

5.      Unknown to investors at the time, however, these representations were false and misleading. In reality, by the start of the Class Period, Defendants were back at it again. They were engaged in the ***same*** accounting misconduct and maintained the ***same*** deficient internal controls that led to Supermicro's 18-month Nasdaq delisting and $17.5 million SEC fine. In particular, Defendants would prematurely record "revenues" and delay reporting "costs"—all in violation of the accounting rules. Indeed, on the final days of financial quarters, they would ship out incomplete and non-functional products to customers, so that they could then book the "revenue" from the

sales within the quarter. They would also improperly book revenue from "hardware-and-services contracts" upfront, even though the accounting rules required them to book the revenue over time. Plus, even after receiving bills from subcontractors for money they owed them, they would delay accounting for these costs until the next quarter—all to inflate their quarterly numbers. And they actively perpetuated basic internal control failures, including by allowing Liang to override accounting decisions and processes.

6.      Defendants knew the truth. Former Supermicro employees have recounted how Liang ran the Company with an iron fist: his approval was required for every minute detail of the business. When the Company's prior CFO tried to get in the way of Liang's continued accounting manipulations, Liang fired him and replaced him with Weigand. Together, Liang and Weigand encouraged and instructed their subordinates to misrepresent the Company's quarterly results through their various accounting manipulations. So that they had more "yes" people to perpetuate their scheme, they even *re-hired* the very same executives who were previously engaged in accounting improprieties, and who were fired as part of the Company's "remediation" effort to return to Nasdaq. And Liang and Weigand kept close watch over their efforts during the Class Period, receiving a spreadsheet each quarter that reflected how much revenue had been recognized to date. Supermicro employees have recounted how Liang personally pressured them at weekly all-hands meetings to book revenue by the end of quarters and, when Liang did not like the revenue figures presented on Supermicro's sales spreadsheets, *he personally fudged the numbers*. Liang also repeatedly told Supermicro employees during weekly senior manager meetings that anyone who told employees to write-down the value of equipment—which would have the effect of increasing reportable expenses—should be sent to Human Resources to get disciplined. What's more, when Supermicro employees—including senior executive Bob Luong—questioned the propriety of Liang and the Company's accounting misconduct, *Defendants sidelined and fired them*.

7.      Investors began to learn the truth on August 27, 2024. On that day, Hindenburg Research published a bombshell report detailing how, contrary to Defendants' Class Period representations, Supermicro had *not* remediated its internal controls weaknesses prior to the Class

Period. Hindenburg interviewed dozens of former Supermicro customers and employees, who uniformly recounted how the Company continued—after the Nasdaq delisting and SEC fine—to engage in the *same* accounting malfeasance and maintain the *same* deficient controls. As Hindenburg concluded, ***"Super Micro is a classic case of recidivism"***: the Company "hasn't changed from its checkered past regarding its revenue recognition and accounting practices."

8.    Investors were stunned by the Hindenburg Report and, even more so, when Supermicro announced the next day that it could not timely file its SEC annual report, citing management's need to "assess[]" the Company's internal controls. Securities analysts expressed shock, with several slashing their price targets for Supermicro by as much as 40% and the Company's stock price plummeting by over 20% in just 48 hours.

9.    To stem the tide, Supermicro and Liang issued a press release the same day Hindenburg published its report. In their press release, they doubled down on their Class Period misrepresentations, with a series of sharp denials of the Hindenburg report, which they claimed consisted of "false" and "inaccurate statements" and presented a "misleading" depiction of the Company.

10.    Despite their efforts, Defendants could not hide the truth much longer. Just two months later, on October 30, 2024, Supermicro's auditor, Ernst & Young LLP ("EY"), ***resigned*** effective immediately. The firm's resignation announcement was extraordinarily "noisy," with EY stating that it could not trust Liang's and Weigand's representations or their integrity—a virtually unheard-of condemnation by a major accounting firm. As EY explained, it had grave concerns about Defendants' ***"commitment to integrity and ethical values,"*** as well as whether Supermicro's Board of Directors could and would ***"act as an oversight body that is independent of the CEO."*** The facts uncovered by EY during its audit caused it to conclude that it would "***no longer be able to rely on management's…representations."*** Specifically, EY had concerns about Supermicro's ***"governance, transparency and completeness of communications to EY, and other matters pertaining to the Company's internal control over financial reporting."*** These concerns were so significant that EY was ***"unwilling to be associated with the financial statements prepared by [Supermicro's] management."***

11. Investors and analysts were blindsided by EY's announcement. As one analyst explained, "***It is not often that a Big 4 audit firm fires a client***. It is even more rare that a Big 4 firm resigns stating that it can no longer rely on the representations of management." The same analyst noted that EY's resignation "***raises significant questions about Supermicro's corporate governance and management's commitment to integrity and ethical values.***" Other analysts likewise concluded that EY's resignation announcement indicated "a breakdown in the company's internal oversight mechanisms." *Newsweek* similarly explained that these revelations "sparked concerns over the company's financial practices and corporate governance as EY cited issues of transparency and integrity in financial reporting." And Jim Cramer, the host of CNBC's Mad Money television show, called EY's resignation "***about the most damning statement you will ever see from an accounting firm.***"

12. In response to these revelations, Supermicro's stock price plunged by nearly 33%—the Company's largest single-day stock drop in its 18 years as a public company. The Company itself was then forced to admit that, contrary to Defendants' assurances during the Class Period, its deficient internal controls were ***not*** a thing of "the past" and had ***not*** been "remediated." Rather, as Supermicro has now conceded, its "internal control over financial reporting was ***not*** effective," with the Company suffering "material weaknesses in such controls." To this day, these deficiencies remain "un-remediated," with Supermicro now the subject of an ongoing probe by both the SEC and the Department of Justice ("DOJ").

## II. JURISDICTION AND VENUE

13. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

14. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

15. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). At all relevant times, Defendants have conducted business in this

District and Supermicro has maintained its headquarters in this District. In addition, many of the acts and conduct alleged herein occurred in substantial part in this District.

16.    In connection with the acts and conduct alleged in this Complaint, the Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the U.S. mails and telephonic communications and the facilities of the national securities market.

## III.    THE PARTIES

### A.    Lead Plaintiff

17.    Lead Plaintiff Universal-Investment-Gesellschaft mbH ("Universal") is a German asset manager that manages investment funds. Universal has the exclusive authority to sue in its own name for damages suffered by the funds that it manages. Universal has assets under management of over €400 billion. Universal purchased or otherwise acquired Super Micro securities through U.S. domestic transactions during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged in this Complaint. *See* Ex. A attached hereto.

### B.    Defendants

18.    Defendant Supermicro sells information technology solutions, including computer servers. Supermicro also sells global support and services to its customers to help install, upgrade and maintain their computing infrastructure. During the Class Period, Supermicro's common stock traded on the Nasdaq under the symbol "SMCI." As of January 31, 2025, Supermicro had over 593 million shares of common stock outstanding.

19.    Defendant Liang has always been Supermicro's CEO and President and Chairman of its Board of Directors, including throughout the Class Period. Defendant Liang regularly spoke to investors on behalf of Supermicro during the Class Period, including during calls with investors and securities analysts, and also communicated to investors by way of the Company's SEC filings. As detailed herein, Defendant Liang made a series of false and misleading statements to investors about Supermicro's internal controls, professing to know what he was speaking about.

20.    Defendant Weigand was Supermicro's Senior Vice President and Chief Compliance Officer beginning in May 2018 and became Supermicro's Senior Vice President and

Chief Financial Officer in February 2021. Along with Defendant Liang, Defendant Weigand regularly spoke to investors on behalf of Supermicro during the Class Period, including during calls with investors and securities analysts, and also communicated to investors by way of the Company's SEC filings. As detailed herein, Defendant Weigand made a series of false and misleading statements to investors about Supermicro's internal controls, professing to know what he was speaking about.

## IV.    FACTUAL BACKGROUND

### A.    Supermicro Goes Public and Becomes Listed on the Nasdaq

21.    In March 2007, Supermicro became a public company. In connection with going public, Supermicro applied and was approved to trade its shares on the Nasdaq, a momentous step for the Company. Being listed on the Nasdaq—the second largest stock exchange in the world by total market capitalization—signaled to investors that Supermicro was joining an "exclusive club" that would not "allow just any company to be traded on its exchange," given Nasdaq's listing requirements.[1] Supermicro stressed the importance of its Nasdaq listing, touting to investors shortly after its listing that Liang would "ring the NASDAQ stock market opening bell."[2]

22.    Public companies that are listed on Nasdaq are required to maintain effective internal controls. These "internal controls," which are also required by the securities laws and SEC regulations, include processes and standards to ensure that the information about a public company's business operations and financial results in its public filings is complete and accurate. Internal controls are critical to public companies and their investors because they provide reasonable assurances that: (i) a company's publicly-reported financial results are materially

---

[1] *See* James Royal, *The world's largest stock exchanges: 10 biggest by market capitalization*, Yahoo Finance (July. 31, 2025), *https://finance.yahoo.com/news/world-largest-stock-exchanges-10-181701563.html*; Chip Stapleton, *What Are the Listing Requirements for the NASDAQ?*, Investopedia (Dec. 2, 2024), https://www.investopedia.com/ask/answers/nasdaq-listing-requirements/.

[2] Press Release, Super Micro Computer, Inc., *Super Micro Computer (SMCI) President and Chief Executive Officer to Ring the NASDAQ Stock Market Opening Bell* (May 29, 2007), https://ir.supermicro.com/news/news-details/2007/Super-Micro-Computer-SMCI-President-and-Chief-Executive-Officer-to-Ring-the-NASDAQ-Stock-Market-Opening-Bell/default.aspx.

accurate, reliable, and prepared in accordance with Generally Accepted Accounting Principles ("GAAP"); (ii) practices are in place to reduce the risk of misstatements, and (iii) any material misstatement is detected and disclosed.[3] Internal controls over financial reporting are supposed to be designed by or under the supervision of a company's CEO and CFO to provide these reasonable assurances before a company's financial statements are published to investors. Company management is required to review and evaluate these controls quarterly to determine their effectiveness at preventing or detecting material misstatements of financial statements in a timely manner.

**B.    Nasdaq Suspends and Delists Supermicro for Almost 18 Months Following Material Internal Control Deficiencies**

23.    On August 23, 2018, Nasdaq suspended Supermicro from its exchange.[4] This suspension resulted from Supermicro's significant deficiencies in the Company's internal controls.

24.    As Supermicro and Liang were forced to admit, the Company suffered from internal controls weaknesses, including "***a culture of aggressively focusing on quarterly revenue without sufficient focus on compliance***" and "***an inappropriate tone at the top*** " that was "***inconsistent with a commitment to integrity and ethical values.***"[5] This "culture" and "tone" were not the product of a low-level or rogue employee. To the contrary, the Company's "***[s]enior management*** did not establish and promote a control environment with an appropriate tone of compliance and control consciousness throughout the entire Company."[6] Rather than promote this necessary control environment, the Company's "officers and managers" actively "condoned" the Company's accounting violations. This included "recogniz[ing] revenue from . . . sales transactions in the

---

[3] As Supermicro's auditor has described it, "A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis." *See* Super Micro Computer, Inc., *Form 10-K*, at 122 (Feb. 25, 2025).

[4] Press Release, Super Micro Computer, Inc., *Supermicro® Announces Suspension of Trading of Common Stock on Nasdaq and its Intention to Appeal* (Aug. 23, 2018).

[5] Super Micro Computer, Inc., *Form 10-K*, at 101, 107 (May 17, 2019).

[6] *Id.*

incorrect period," including by (i) "shipping products before manufacturing was completed," and (ii) "failing to disclose or obscuring material facts about sales transactions."[7] As a result, Supermicro and Liang "did not design or operate" internal controls "to sufficiently respond to potential risks of material misstatement" as to "revenue recognition."[8]

25.    The material weaknesses in internal controls leading to Supermicro's Nasdaq delisting also included "deficiencies related to segregation of duties" and a lack of controls "to mitigate the risk of management overriding internal controls."[9] These were "fundamental" internal control failures, as "segregation of duties" are necessary to keep activities from being concentrated in a single person who can then override and circumvent processes related to financial reporting.[10]

26.    Supermicro's resulting material weaknesses in internal controls **increased** the risk of misstatements in Supermicro's financial statements and **decreased** the likelihood that any resulting misstatements would be detected and disclosed. These internal control deficiencies were so severe that Supermicro could not even file its required SEC annual and quarterly filings for **over a year and a half**. As a result, on August 23, 2018, Nasdaq suspended Supermicro from the exchange and ultimately delisted the Company through early January 2020.

27.    Supermicro's Nasdaq suspension and delisting were devastating for its shareholders. When a stock is delisted from Nasdaq and begins trading instead "over-the-counter," as Supermicro's stock did, the stock becomes harder to purchase, liquidity falls, trading costs rise, investors receive less disclosure, and, as a result, investors often flee the stock.[11] Supermicro's Nasdaq suspension and delisting had exactly that catastrophic effect. Supermicro's trading volume

---

[7] *Id.*

[8] *Id.*

[9] *Id.* at 102.

[10] Comm. of Sponsoring Orgs. of the Treadway Comm'n ("COSO"), *Internal Control – Integrated Framework*, 96 (May 2013).

[11] *See What Should Investors Do if Super Micro Stock Is Delisted?*, Trefis (Nov. 18, 2024), https://www.nasdaq.com/articles/what-should-investors-do-if-super-micro-stock-be-delisted; Gordon Scott, *Delisting Stocks: Process, Implications, and Investor Tips*, Investopedia (Aug. 8, 2025), https://www.investopedia.com/terms/d/delisting.asp; Nehal Chokshi, *Super Micro Computer, Inc. Raising PT to $37, from $36 on Nasdaq Relist Approval and Increased Revenue Guidance from F2Q20 – Reiterate Buy Rating* (Maxim Group Equity Research, Jan. 10, 2020).

plummeted following its trading suspension, and institutional investors—the backbone of the securities markets—sold their shares. On the day the suspension took effect, the stock's trading volume plunged by over 67% from the day before, and, because of the suspension and delisting, institutional investor ownership of the stock dropped by nearly 40%.[12] Additionally, within months of the delisting, many of the analysts covering the stock entirely stopped their research coverage of Supermicro.

28.    The SEC also punished Supermicro for its failure to maintain necessary internal controls and for prematurely recognizing revenue.[13] The SEC found that Defendants had "engaged in improper accounting—prematurely recognizing revenue and understating expenses from at least fiscal year 2015 through 2017."[14] In its announcement of its findings, the SEC highlighted Supermicro's "numerous material weaknesses in its Internal Control over Financial Reporting," including "[a]ggressively focusing on quarterly revenue without sufficient focus on compliance," "[a] failure by senior management to establish and promote a control environment with an appropriate tone of compliance and control consciousness throughout the entire company," and "[a]n inappropriate tone at the top."[15] As the SEC explained, "Super Micro's executives pushed employees to maximize end-of-quarter revenue and minimize expenses, without devising and maintaining sufficient internal accounting controls to record revenue and expenses in conformity

---

[12] Nehal Chokshi, *Super Micro Computer, Inc. Raising PT to $37, from $36 on Nasdaq Relist Approval and Increased Revenue Guidance from F2Q20 – Reiterate Buy Rating* (Maxim Group Equity Research, Jan. 10, 2020).

[13] Notably, this Court previously dismissed a class action complaint alleging securities fraud against Supermicro and Liang but, unbeknownst to the Court at the time and as the SEC later found, Supermicro and Liang were in fact committing accounting fraud during the class period alleged in that complaint. *See Wanca v. Super Micro Computer, Inc.*, Case No. 5:15-cv-04049-EJD, 2018 WL 3145649 (N.D. Cal. Jun. 27, 2018) (Davila, J.).

[14] *In re Super Micro Computer, Inc.*, Order Instituting Cease-and-Desist Proceedings, Securities Act Release No. 10822, Securities Exchange Act Release No. 89656, at *2 (Aug. 25, 2020), https://www.sec.gov/files/litigation/admin/2020/33-10822.pdf. Supermicro's fiscal year ran from July 1 through June 30 of the following year. For example, its fiscal year 2015 began on July 1, 2014.

[15] *Id.* at 9.

with [GAAP]."[16] The SEC found that Supermicro "improperly accelerated revenue recognition and reporting," which included: (i) "recognizing revenue before delivering the goods to customers"; (ii) "sending incomplete or mis-assembled goods to customers at the end of quarters"; (iii) "recognizing certain extended warranty revenue at the time of sale, rather than amortizing the revenue over the length of the warranty"; and (iv) "over-valu[ing] inventory and under-stat[ing] expenses by failing to reduce inventory and record an associated expense in instances where Super Micro no longer held the inventory for sale."[17]

29.    In addition to publicly reprimanding Supermicro for its failure to maintain the required internal controls, the SEC fined the Company $17.5 million.[18] The SEC also ordered Liang to reimburse Supermicro by over $2.1 million for profits from stock sales he made after the Company issued its false financial statements.[19]

## C.    Supermicro Is Relisted on Nasdaq and Tells Investors That It Has Remediated Its Material Internal Control Deficiencies.

30.    On January 9, 2020, after finally filing its required SEC reports, Supermicro announced that Nasdaq had allowed the Company to return to the exchange. To try to show that it had put the delisting behind it, Defendants told Nasdaq, the SEC, and the Company's investors that it had "remediated" its internal control deficiencies.

31.    Supermicro and Liang touted Nasdaq's relisting of Supermicro. In a press release issued that day, Defendant Liang highlighted the importance of Nasdaq's "relisting [of] our common stock."[20] Liang stressed that "[t]his marks our successful comeback and is the

---

[16] *Id.* at 2.

[17] *Id.* at 2-3.

[18] *Id.* at 12.

[19] *In re Charles Liang*, Order Instituting Cease-and-Desist Proceedings, Securities Exchange Act Release No. 89658, at *6 (Aug. 25, 2020), https://www.sec.gov/files/litigation/admin/2020/34-89658.pdf.

[20] Press Release, Super Micro Computer, Inc., *Supermicro Announces Approval to Relist on NASDAQ and Provides Business Update* (Jan. 9, 2020), https://www.supermicro.com/en/pressreleases/supermicro-announces-approval-relist-nasdaq-and-provides-business-update.

culmination of our efforts to become current with our SEC filings." Liang assured investors that Supermicro had begun "*a new chapter . . . that is based on improved internal controls*."[21] And Liang added that "we have implemented numerous remedial actions and internal control enhancements to prevent such errors from recurring."[22]

32.    In its SEC filings, Supermicro similarly told investors that the Company had remediated the deficiencies that led to Nasdaq's delisting and the SEC's fines. Indeed, on August 31, 2020, the Company filed an annual report with the SEC, signed and certified by Defendant Liang, representing that Supermicro had purportedly "remediated the material weaknesses related to each of the five COSO components of internal control (Control Environment; Risk Assessment; Control Activities; Information & Communication; Monitoring of Controls) and revenue recognition accounting controls"[23] that had plagued the Company.[24]

33.    Investors and analysts took note. Following Nasdaq's relisting of Supermicro shares, analysts issued positive research reports explaining how Nasdaq's "[re]-listing will enable multiple institutional investors to (re)-initiate positions in the shares."[25] Analysts stressed that, with the relisting, "[w]e expect the stock to benefit from renewed interest from institutional investors, given that the percentage of institution investor ownership has fallen by ~40% since July 2015."[26] Analysts added, however, that they would remain laser-focused on the Company's internal controls, explaining that "[i]f the internal controls are not fully remediated, investors' trust in reported financials will likely deteriorate, potentially leading to a declining share price."[27]

---

[21] *Id.*

[22] Super Micro Computer, Inc., *Form 8-K* (Aug. 25, 2020).

[23] Super Micro Computer, Inc., *Form 10-K*, at 92 (Aug. 31, 2020).

[24] COSO developed a framework and principles for internal controls.

[25] *Raising PT to $37, from $36 on Nasdaq Relist Approval and Increased Revenue Guidance from F2Q20 – Reiterate Buy Rating*, at 1 (Maxim Group Equity Research, Jan. 10, 2020).

[26] *Id.*

[27] *Estimate Changes – Super Micro Computer, Inc. (SMCI) Management Call Fortifies our Bullish View on SMCI*, at 6 (Northlands Capital Markets, June 18, 2020).

1

2

**D.    Supermicro's Stock Price Soars as Defendants Assure Investors They Have Remediated the Company's Internal Controls Deficiencies.**

3    34.    Defendant Liang repeated to investors during the Class Period that Supermicro had,

4    indeed, remediated its material deficiencies in internal controls, which were a thing of "the past."

5    35.    The Class Period begins on November 3, 2020. On that day, Defendant Liang spoke

6    to analysts and investors on a quarterly earnings call. During his remarks, he assured investors that

7    the Company's deficiencies in internal controls were ***"resolved a few months ago"*** and that "the

8    big challenges in the past three years that badly hurt Supermicro are ***totally behind us now***."

9    36.    To further comfort investors that Supermicro's deficiencies were "totally behind"

10    them, Defendants told investors in ***every*** annual report that they filed with the SEC during the

11    Class Period that the Company's deficient internal controls were a thing of ***"the past"*** and had

12    been ***"remediated."*** While acknowledging that a failure to "maintain" internal controls would

13    cause "the market price of [their] common stock [to] decrease," Defendants assured investors that

14    there was no cause for concern. According to Defendants, they maintained "effective internal

15    control over financial reporting."[28] Defendants Liang and Weigand, in fact, personally signed

16    formal certifications with each annual report averring that the Company supposedly had no

17    material weaknesses in internal controls, adding that they had both purportedly designed adequate

18    and effective internal controls over financial reporting.[29]

19    37.    These representations were important to Supermicro's investors. They reassured

20    investors that Supermicro had remediated the serious internal control deficiencies that had led to

21    the Company's catastrophic Nasdaq delisting and SEC fine.

22

23

24

25

---

26    [28] Super Micro Computer, Inc., *Form 10-K*, at 24 (Aug. 27, 2021); Super Micro Computer, Inc., *Form 10-K*, at 28 (Aug. 29, 2022); Super Micro Computer, Inc., *Form 10-K*, at 27 (Aug. 28, 2023).

27    [29] In its SEC filings at the start of the Class Period, Defendants also specifically assured investors that Supermicro had none of the control weaknesses identified by the SEC and that its sole weakness related to employee access to information technology ("IT") systems.

28

38.     And these representations had their intended effect, enabling Supermicro's stock price to skyrocket during the Class Period by over 5000% from a closing price of $2.32 on November 3, 2020, to an all-time high closing price of $118.81 on March 13, 2024.[30]

**E.     Unknown to Investors at the Time, Defendants Continued to Engage in the Same Material Internal Control Deficiencies and Improper Accounting Practices That Led to the Company's Nasdaq Delisting and SEC Fine.**

39.     Contrary to their assurances to investors during the Class Period, Defendants had *not* remediated their internal control weaknesses. Just the opposite: Defendants continued to engage in the *same* improper accounting practices and to perpetuate the *same* material weaknesses in internal controls that led to Nasdaq's delisting and the SEC's fine. As discussed later in this Complaint, these deficiencies have once again led to investigations of Supermicro by the SEC. They have also led to the resignation of the Company's auditor, EY, which concluded that it was unable to trust Liang's and Weigand's representations.

40.     Lead Counsel has conducted an extensive investigation, which included interviewing Bob Luong ("Luong"). From 2015 until at least October 14, 2022, Luong served as Supermicro's General Manager, Service and Strategic Solutions. In that role, Luong was responsible for providing thought leadership and strategic guidance for Supermicro's Global Service team, which provides post-sale maintenance and other support services to purchasers of Supermicro's equipment and technology solutions. Luong had a number of people reporting to him, including directors and senior managers. Through his direct reports, Luong managed a team of over eighty people, in addition to many more outside contractors who performed service work for Supermicro. Luong effectively reported directly to Liang from 2015 until approximately mid-2022. During the approximately seven-year period Luong reported to Liang, Liang often met with Luong by calling Luong into Liang's office. At times, Liang assigned Luong tasks that were not necessarily within Luong's job scope, and Luong did the tasks that Liang assigned him. As discussed further below, Supermicro placed Luong on involuntary administrative leave on October

---

[30] On October 1, 2024, Supermicro implemented a 10-to-1 stock split, such that for each share an investor held, the investor would own ten shares, reducing the price of each share by a factor of ten. All stock prices and trading volume data herein have been adjusted to reflect that split, unless otherwise noted.

14, 2022, and later terminated him in retaliation, including for raising accounting issues at the Company.

41.     Luong and numerous other former Supermicro employees have detailed how, during the Class Period, Defendants engaged in practices constituting material weaknesses in internal controls. These included an inappropriate tone at the top, including an aggressive focus on quarterly revenue coupled with improper revenue recognition practices, and a failure to segregate duties among employees to prevent one person from overriding or circumventing internal controls. Defendants' improper accounting practices with respect to revenue recognition, as well as to inventory and cost of sales, often accelerated recognition of revenue and delayed accounting for costs in the proper quarter, further demonstrating material internal control weaknesses. Supermicro's internal "control" practices, such as they were—far from mitigating the risk of material misstatements in financial statements, as internal controls are supposed to do—*increased* the risk of such misstatements in Supermicro's financial statements and *decreased* the likelihood that any such misstatements, including ones resulting from fraud, would be detected and disclosed.

42.     ***Inappropriate Tone at the Top.*** Unknown to investors during the Class Period, Liang continued to demonstrate an inappropriate "tone at the top" during the Class Period—in which he encouraged employees to engage in improper accounting practices, threatened employees with disciplinary action when they refused to go along with improper accounting practices, and even altered revenue figures himself in meetings. Liang pressured employees to recognize revenue before the end of quarters to improperly accelerate revenue recognition and decelerate costs on a quarterly basis, as Luong and other former employees have described. To reduce interference with his goals, Liang re-hired during the Class Period the same senior sales employees Supermicro had terminated in "remediating" its control deficiencies during its Nasdaq delisting. Liang also threatened employees with disciplinary action if they tried to properly write down the value of equipment inventory that was overstated on Supermicro's books.

43.     This inappropriate tone at the top was the same material weakness in internal controls that led to the Company's Nasdaq delisting and SEC fine. An appropriate tone at the top— when "management . . . demonstrate[s] through their directives, actions and behavior the

importance of integrity and ethical values to support the functioning of the system of internal control"—is critical to the internal control principle that a company demonstrate a "commitment to integrity and ethical values."[31] Supermicro and Liang admitted during the Company's Nasdaq delisting that *"senior management did not establish and promote a control environment with an appropriate tone of compliance and control consciousness throughout the entire Company"* and that *"[i]n the pursuit of quarterly revenue . . . officers and managers[ ] were aware of, condoned or were involved in actions that reflected an inappropriate tone at the top"* and that *"were inconsistent with a commitment to integrity and ethical values."*[32] The SEC similarly found that the Company's material weaknesses in internal controls included "[a]n inappropriate tone at the top" and "[a]ggressively focusing on quarterly revenue without sufficient focus on compliance."[33]

44.     While Defendants claimed to have remediated these internal controls weaknesses during the Class Period, a former senior Supermicro sales director told Hindenburg Research, *"I don't think the behavior of the company in many ways has changed in the 5 years since I started, and I started shortly after that [Nasdaq] delisting problem."*[34] Indeed, EY pointed to the same internal controls weaknesses when it resigned at the end of the Class Period, questioning *"whether the Company demonstrates a commitment to integrity and ethical values"* and concluding that it could *"no longer . . . rely on management's . . . representations"* and was *"unwilling to be associated with the financial statements prepared by management."*[35]

45.     Instead of creating an appropriate tone at the top, Liang perpetuated the opposite during the Class Period: a culture in which he pressured employees to engage in improper

---

[31] COSO, *Internal Control – Integrated Framework*, at 33.

[32] Super Micro Computer, Inc., *Form 10-K*, at 101 (May 17, 2019).

[33] *In re Super Micro Computer, Inc.*, Securities Act Release No. 10822, at *9.

[34] *Super Micro: Fresh Evidence of Accounting Manipulation, Sibling Self-Dealing and Sanctions Evasion at This AI High Flyer*, Hindenburg Research (Aug. 27, 2024), https://hindenburgresearch.com/smci/ (hereinafter "Hindenburg Report"); Senad Karaahmetovic, *Super Micro (SMCI) Stock Slides After Short Seller Hindenburg Attack*, Investing.com (Aug. 27, 2024), https://www.investing.com/news/stock-market-news/super-micro-smci-stock-slides-after-short-seller-hindenburg-attack-3588794.

[35] Super Micro Computer, Inc., *Form 8-K* (Oct. 30, 2024).

accounting practices, engaged in such practices himself, and threatened employees who refused to succumb to his pressure.

46.    Luong described how, to overstate the value of its inventory, Liang threatened employees who sought to correct the improper accounting. Luong explained how Supermicro overvalued inventory that should have been written down. *See* ¶ 61. He described that Liang repeatedly told senior managers and executives in engineering meetings that anyone who told an employee to write down the value of equipment in inventory should be sent to Human Resources to be disciplined. *See* ¶ 93. Liang knew the threat would be effective, including because, as a former senior human resources employee described, Liang's wife, Sara Liu ("Liu"), ran Supermicro's human resources department. *See* ¶ 94. A former senior employee in Supermicro's engineering department corroborated Luong's account of Liang's threats to employees who sought to write down or write off inventory. *See* ¶ 95.

47.    Another former employee ("FE") described how Liang altered numbers himself in Supermicro's sales spreadsheet. FE 1, who worked at Supermicro from March 2024 through July 2025 as a Senior Human Resources Business Partner, was responsible for supporting the Company's U.S. sales organization with anything related to human resources, including hiring, employee investigations, disciplinary actions, and terminations. FE 1 recounted that, in approximately the spring of 2025, an employee who had been with Supermicro for eight years in its sales operations group decided to retire.[36] The sales operations employee was responsible for inputting Supermicro's sales revenue manually into an Excel spreadsheet, and FE 1 explained that there was nobody else at the Company who did the job of running and keeping the sales numbers. The sales operations employee met with FE 1 in the context of discussions about transitioning his responsibilities upon retirement and an exit interview. FE 1 further explained that senior management did not want the employee to leave. In FE 1's meetings with him, the sales operations employee told FE 1 that the employee had weekly meetings with Liang and that the sales operations employee had been in meetings with Liang where Liang would change the sales revenue

---

[36] FE 1 was the Senior Director, Sales Operations, at Supermicro.

numbers in the Excel spreadsheet. The sales operations employee explained to FE 1 that there was no real sales system at the Company, that everything was manual, and that Liang did not want systems because doing things on an Excel spreadsheet allows one to change things—that is, as FE 1 described it, fudge the numbers. FE 1 understood from his conversations with the sales operations employee that Liang's practice of changing revenue numbers had been a recurring issue during the employee's tenure at Supermicro.

48.    Based on the culture he saw at the Company, FE 1 described Supermicro as the most unethical company, said it was run like the Wild West, and explained that he had never seen anything like it in his career.

49.    Finally, Liang pressured employees to recognize revenue before the end of quarters to improperly accelerate revenue recognition and to decelerate costs on a quarterly basis. As Luong described and as detailed further below in paragraphs 65-79, 89-103, 107-110, 113-119, Defendants violated GAAP by orchestrating several accounting practices that prematurely recognized revenue in a quarter or pushed costs to a later quarter to maximize quarterly results. For example, Defendants pushed to improperly recognize revenue from hardware-and-services contracts **before** the equipment was installed and functional to **"*to help our own quarter end shipment/rev[enue],*"** as a Supermicro employee put it in an email to Liang and Weigand. *See* ¶ 72. Similarly, with Liang's express approval, Supermicro intentionally shipped incomplete products to customers around the end of fiscal quarters and then improperly recognized revenue for the shipments in the quarter when the products were delivered. *See* ¶¶ 61, 74-86. Defendants further improperly accounted for costs around the end of quarters. Among other things, Liang delayed approving invoices Supermicro received from subcontractors around the end of quarters so that it could receive the benefit for revenue from customer sales in those quarters without recognizing associated expenses for those sales in the same quarters. *See* ¶¶ 99-102.

50.    To accomplish these and other improper quarterly accounting practices, Liang relentlessly pressured salespeople to recognize revenue before the end of quarters, as former employees have described, further creating an inappropriate tone at the top. FE 2 explained that Liang was obsessed with recognizing revenue and that he was pushing salespeople to get revenue

by the end of the quarter, which FE 2 said was a common discussion in weekly, company-wide meetings Liang held on Mondays.[37] Similarly, FE 3 described how salespeople were pushed to recognize revenue before the end of the quarter and believed that Liang pushed the sales directors, who in turn pushed the sales team. FE 3, an Inside Sales Representative at Supermicro from August 2019 to November 2021, also described how he did not see any change in this revenue pressure during his tenure at Supermicro; the pressure was always there.[38]

51.     To ensure that they could continue their aggressive accounting practices without interference during the Class Period, Supermicro and Liang also **re-hired** many sales employees they had terminated as a remedial action in the wake of the Company's Nasdaq delisting and SEC fine. As a former Supermicro salesperson told Hindenburg, **"Almost all of them are back. Almost all of the people that were let go that were the cause of this malfeasance."**[39]

52.     For example, when Supermicro admitted to material weaknesses in internal controls during its Nasdaq delisting, the Company announced that, as a "remedial action," it had reorganized its sales department, resulting in the departure of the Vice President of Strategic Accounts, Gloria Sun ("Sun").[40] FE 4—who worked at Supermicro for over 21 years, including as a Director of Sales from June 2015 through July 2024—explained that Sun was walked out the Company's door by security, and he understood that Sun had been fired, as did Luong. Yet, unknown to investors, Sun **returned** to Supermicro during the Class Period. FE 4 explained that Sun returned to Supermicro in approximately 2021 or 2022 as a team leader in the sales department, with a team of sales representatives reporting to her, and that Sun had an office a couple of doors down from FE 4.

---

[37] FE 2 worked at Supermicro within its sales department from August 2020 to September 2021 and again from January 2023 to November 2024 as, respectively, a Senior Federal System Integrator Account Manager and Senior Account Manager/Artificial Intelligence Specialist.

[38] FE 3 was responsible for handling customer orders, including to try to ensure the order arrived to the customer on time, once an Outside Sales Representative had made the sale to a customer.

[39] Hindenburg Report; Senad Karaahmetovic, *Super Micro (SMCI) Stock Slides After Short Seller Hindenburg Attack*, Investing.com (Aug. 27, 2024), https://www.investing.com/news/stock-market-news/super-micro-smci-stock-slides-after-short-seller-hindenburg-attack-3588794.

[40] Super Micro Computer, Inc., *Form 10-K*, at 103 (May 17, 2019).

CONSOLIDATED AMENDED COMPLAINT
CASE NO. 5:24-CV-06147-EJD

19

53.     Former employees also explained that other Supermicro employees who had been terminated in connection with the Company's Nasdaq delisting and SEC settlement returned to the Company during or just before the Class Period. For example, Luong understood that (i) Tau Leng ("Leng") was removed from his position as the Senior Vice President of Marketing but continued working at Supermicro as a consultant after that; (ii) Nelson Wang ("Wang") was terminated when he was a senior director of sales, but he returned as a vice president; and (iii) Peggy Lin ("Lin") was terminated, but was brought back to the Company in approximately early 2021 and later became its Chief Administrative Officer. Similarly, Luong and FE 4 also recounted how Salim Fedel ("Fedel") had been terminated, but FE 4 worked for Fedel for a period after Fedel returned to the Company as a vice president.

54.     FE 5 also described that almost everyone who was let go during the initial SEC investigation around 2018 was later brought back to Supermicro. FE 5 worked at Supermicro from November 2010 through February 2022, including from approximately 2017 or 2018 until his departure as the Director of Sales for a sales team, and was primarily focused on banks and media companies. In that role, FE 5 mostly reported to Don Clegg ("Clegg"), the Senior Vice President of Sales who in turn reported directly to Liang. FE 5 explained that employees in Supermicro's legal and finance department told him that these employees were not allowed to be in sales again. He recounted that, nevertheless, some of these rehired employees did come back in a sales role but simply without the sales title, including Wang, who returned to work in sales but was given a nebulous title. When Wang returned to Supermicro, there was pressure put on FE 5 to work with him, but FE 5 refused.

55.     Supermicro's re-hiring of these and other "yes" people allowed it to continue its improper accounting practices, including through pressure to recognize revenue before quarter-ends. FE 1, the senior human resources employee, described that Liang surrounded himself with "yes" people and that those were the type of people he hired. And Luong explained that, when Supermicro rehired these and other employees, the re-hired employees began to ask to resume the practices that had taken place when they had worked at the Company before. Luong described that

Supermicro and Liang then engaged in conduct that Luong reasonably believed violated a number of SEC rules, as detailed below in paragraphs 62-119.

56.     ***Failure to Segregate Duties and Mitigate the Risk of Management Overriding Internal Controls.*** Throughout the Class Period, Defendant Liang ruled the Company with an iron fist, allowing him to override accounting decisions primarily so that Supermicro could improperly accelerate revenue recognition and decelerate costs on a quarterly basis. Liang's iron-fist rule required employees to obtain his approval on virtually every business and accounting decision, including hiring, customer discounts, sales, and accounting approvals. Employees were forced to stand in line outside Liang's office to obtain his signature and approval on these matters. Liang's absolute control over Supermicro included access to its revenue-tracking spreadsheets—where Liang fudged revenue numbers—and access to, and approval authority in, the Company's internal systems.

57.     Liang's iron-fist rule resulted in material weaknesses in internal control that eliminated the necessary "segregation of duties" and failed to "mitigate the risk of management overriding internal controls"—which are fundamental internal controls that keep activities from being concentrated with a single person who can then override processes related to financial reporting.[41] These were the same "segregation of duties" deficiencies and related lack of controls to "mitigate the risk of management overriding internal controls" that Supermicro and Liang had previously acknowledged and that led to the Company's Nasdaq delisting and SEC fine.[42] While Defendants claimed to have remediated these internal controls weaknesses during the Class Period, EY pointed to the same weaknesses when it resigned at the end of the period: EY had ***"concerns"*** about corporate ***"governance,"*** questioned "the ability" of the Company's Board of Directors and Audit Committee ***"to demonstrate and act as an oversight body that is independent of the CEO [Liang],"*** and concluded that it could not ***"rely on management's…representations"*** and was ***"unwilling to be associated with the financial statements prepared by management***."[43] Indeed,

---

[41] COSO, *Internal Control – Integrated Framework*, at 96, 161.

[42] Super Micro Computer, Inc., *Form 10-K*, at 102, 107 (May 17, 2019).

[43] Super Micro Computer, Inc., *Form 8-K* (Oct. 30, 2024); Super Micro Computer, Inc., *Form 10-*

Defendants later admitted after the Class Period that Supermicro once again had material weaknesses in internal controls for its failures to observe "segregation of duties" and to appropriately design and implement "controls and documentation" "over the review and approval" of accounting entries "to prevent unauthorized access" during the Class Period.[44]

58.     Luong described Liang's iron-fist rule in detail. As Luong explained it, throughout his approximately seven years reporting to Liang, Liang's management system was one where there was no delegation of authority by Liang. Throughout that time, almost everything at Luong's level required Liang's signature, including paperwork for hiring, pricing decisions for sales, customer discounts, business trips, business dinners, and expense reports, even for amounts as small as $200. When Luong needed Liang's approval, he stood in a line of other employees in front of Liang's office and waited to have Liang physically sign the piece of paper Luong had brought with him. Additionally, Luong was involved in almost all sales deals for direct customers who bought equipment that required service; indeed, for those deals, the senior salesperson on the deal and Luong or his direct report had to meet with Liang to discuss the deal with him. Only once Liang signed off on the required piece of paper for such a sale could the sales team proceed with the sales process and make sure production followed the timeline, among other steps.

59.     Other former employees similarly described needing Liang's approval, including his ink signature, for even miniscule revenue-related matters. For example, FE 6, a Sales Account Manager at Supermicro from September 2019 to August 2023, recalled that in approximately July or August 2022 he had to get Liang's approval for a deal he was involved in, including his ink signature, for a discount of $25 on a deal comprising $12 to $15 *million* dollars.[45] Likewise, FE 2 described a deal with one of his clients, a major Supermicro client, in the spring of 2024, in which he had to personally obtain approval from Liang, with a permission sheet Liang had to sign, to give the client a discount of just several thousand dollars.

*K*, at 121 (Feb. 25, 2025).

[44] Super Micro Computer, Inc., *Form 10-K*, at 122 (Feb. 25, 2025).

[45] For ease of comprehension and readability, the Complaint uses the pronoun "he" and the possessive "his" in connection with the Former Employees. However, this convention is not meant to identify the actual gender of any Former Employee.

60.     FE 1 also described needing Liang's approval for virtually everything in FE 1's human resources role. FE 1 explained that Liang would approve any level of employee hire, including employees like administrative staff. He explained that Liang signed off on a hard-copy document on making hiring offers, among other things. He further confirmed that Supermicro employees would line up outside Liang's office, step up to his window, explain their situation, and provide their paperwork for Liang's signature. FE 1 further described how Liang's tight control over Supermicro enabled Liang to improperly modify revenue numbers in the Company's sales revenue spreadsheets. *See* ¶¶ 42, 47, 56.

61.     Finally, Liang's iron-fist rule extended not only to Supermicro's revenue spreadsheets but also to accounting systems and decisions, and his control enabled Supermicro to perpetuate improper accounting practices during the Class Period. For example, Liang approved shipments to customers of incomplete equipment and of products without testing. Liang's approvals allowed Supermicro to prematurely recognize revenue for non-functional products delivered to customers with missing parts around the end of quarters. *See* ¶¶ 74-84. Similarly, Liang held the authority to approve or reject write-offs for overvalued inventory, and he personally threatened employees who sought such write-offs with disciplinary action, again around the end of quarters. *See* ¶¶ 46, 93, 95. Liang further held the authority to approve, and thus delay approving, invoices received from subcontractors. This allowed Supermicro to improperly delay recognizing these invoices as expenses around the end of quarters. *See* ¶¶ 98-102. Finally, Liang exercised his authority over accounting decisions to declare by fiat that Supermicro would only recognize a tiny percentage of certain hardware-and-services contracts as service revenue. He did so despite the accounting department's determination that this percentage was too low. This allowed Supermicro to improperly accelerate the recognition of revenue for these contracts from "hardware," which could be recognized upfront, rather than from "services," which had to be recognized over time. *See* ¶¶ 112-121.

62.     ***Improper revenue recognition practices for yet-to-be-installed hardware.*** During the Class Period and unknown to investors, Supermicro improperly recognized revenue for certain hardware-and-services contracts before the Company had installed the hardware for its customers

and made it functional. This revenue recognition practice was similar to an improper, premature revenue recognition practice that led to Supermicro's Nasdaq delisting and SEC fine—a practice Defendants claimed to have remediated by the start of the Class Period. As the SEC described it, "Super Micro engaged in a number of transactions where it recognized revenue prior to customer delivery in order to maximize revenue at the end of quarters."[46] And Supermicro and Liang described a resulting failure to "design or operate" internal controls "to sufficiently respond to potential risks of material misstatement" as to "revenue recognition."[47] While Defendants claimed to have remediated this revenue recognition practice and internal controls deficiency by the start of the Class Period, Supermicro's auditor found, and Defendants later admitted, that the material weaknesses in internal controls resulting from this improper revenue recognition practice continued during the Class Period.

63.    Defendants violated GAAP by recognizing revenue during the Class Period for hardware-and-services contracts ***before*** Supermicro had installed the hardware for its customers and made it functional. Financial statements are the main way public companies communicate financial information to investors. The accounting profession and the SEC recognize GAAP as the uniform rules, conventions, and procedures to define and reflect accepted accounting practices at a particular time for publicly-traded companies. SEC Regulation S-X states that financial statements filed with the SEC that are not prepared and presented in accordance with GAAP "will be presumed to be misleading or inaccurate, despite footnotes or other disclosures." 17 C.F.R. § 210.4-01(a)(1). Violations of GAAP, therefore, bear on whether SEC regulations for publicly-traded companies like Supermicro have been properly followed and satisfied.

64.    GAAP, mainly promulgated by the Financial Accounting Standards Board ("FASB"), are codified into a system that the SEC has accepted as the framework by which public companies must report their financial position and the results of their operations. Beginning in 2009, the FASB codified its accounting standards into a system that organizes and references

---

[46] *In re Super Micro Computer, Inc.*, Securities Act Release No. 10822, at *4 (Aug. 25, 2020).

[47] Super Micro Computer, Inc., *Form 10-K*, at 102 (May 17, 2019).

sections by the acronym ASC ("Accounting Standards Codification"). These ASCs represent the source of authoritative GAAP for public companies, including Supermicro.[48] The framework underlying the accounting standards that make up the ASCs within GAAP explain the common-sense principle that "[t]o be useful, financial information not only must represent relevant [economic] phenomena, but it also must faithfully represent the phenomena it purports to represent."[49]

65.    As Luong explained with respect to Supermicro's revenue practices for yet-to-be-installed hardware, certain customers ordered Supermicro hardware with a services contract that included a requirement that Supermicro provide on-site installation of the equipment. This included many of Supermicro's largest customers by revenue. In those cases, the customer required the Company—specifically, Luong's team—to install the equipment for it to be functional before the customer would accept the equipment.

66.    Under GAAP, Supermicro only could recognize revenue on these sales *after* the hardware had been installed and the products had thus been made functional to the customers. GAAP provides that a company can recognize revenue on goods and services under a contract only when the company's "performance obligation" under the contract has been satisfied.[50] When a company promises to provide a bundle of goods and services to a customer—such as hardware and installation—the "performance obligation" occurs only when the customer can benefit from the goods or services on their own or with other resources the customer has available (when the goods or services are "distinct"). The "performance obligation" has not been satisfied when the goods or services must be combined with other goods or services the company provides before the customer can benefit from them (when they are not "distinct"), and the company has not yet provided those other goods or services.[51] Therefore, when a company contracts to provide hardware and installation to a customer and the hardware is not functional to the customer until

---

[48] FASB ACS, 105 § 10-05-1.

[49] FASB, *Conceptual Framework for Financial Reporting Statement No. 8*, 41 (Sep. 2024).

[50] FASB ACS, 606 § 10-25-15; FASB ACS 606 §§ 10-25-24, -25.

[51] FASB ACS, 606 § 10-25-21.

installed, the company cannot recognize revenue under the contract until it has installed the hardware, made it functional to the customer, and thus has been accepted by the customer. That is when the company has satisfied its "performance obligation."

67.     As a result, under GAAP, Supermicro could not recognize revenue for yet-to-be-installed hardware from customers who had contracted with Supermicro for on-site installation of the equipment. In those cases, as Luong described, the customer required the Company to install the equipment for it to be functional. Supermicro therefore did not satisfy its "performance obligation" to the customer until the Company had installed the equipment, and Supermicro accordingly could not recognize revenue until that time.

68.     During the Class Period, Supermicro returned to its prior practices which had led to its Nasdaq delisting and SEC fine and began improperly recognizing revenue for such hardware before Supermicro had installed it and made it functional to its customers, thus violating GAAP.

69.     As part of the Company's "remediation actions" in the wake of the Company's Nasdaq delisting, Supermicro appointed Kevin Bauer as the Company's CFO.[52] Luong explained that, under CFO Bauer, Supermicro's practice was not to recognize revenue for such hardware-and-services contracts until Luong's team had completed installing the equipment for the customer. However, on February 2, 2021, less than six months after Supermicro was relisted and reached a settlement with the SEC, Liang announced that Bauer was leaving the Company at the end of that month and that Supermicro had appointed Defendant Weigand as the CFO.[53] FE 1, the senior human resources employee, explained that Bauer was let go because he would not say yes to everything Liang wanted, something FE 1 knew based on conversations with more senior employees in the human resources department, among others. FE 1 described that David Weigand, on the other hand, did say yes to Liang's requests.

---

[54] Chen was Supermicro's Senior Vice President Sales, Strategic Accounts, from May 2021 to August 2024. *See* https://www.linkedin.com/in/cenly-chen-5430987 (last visited Sept. 22, 2025).

[54] Chen was Supermicro's Senior Vice President Sales, Strategic Accounts, from May 2021 to August 2024. *See* https://www.linkedin.com/in/cenly-chen-5430987 (last visited Sept. 22, 2025).

70.    As Luong explained, after Bauer left Supermicro and Weigand became CFO, Supermicro began recognizing revenue on hardware-and-services contracts as soon as the parts were shipped, even though the customer required Supermicro to install the equipment. Luong understood that such equipment could not be recognized as revenue until all the equipment had been installed, as had been the practice under Bauer (and as GAAP requires).

71.    Luong knew when Supermicro recognized revenue because, every quarter during his seven years reporting to Liang, Luong received a report by email, which he recalled Liang and Weigand (at least once he became CFO) also received, that showed the revenue Supermicro was recognizing for that quarter (the "Quarterly Revenue Recognition Report"). The Quarterly Revenue Recognition Report was an Excel file with multiple tabs for multiple quarters and showed, for specific equipment, which revenue was being recognized, which revenue was being deferred, and the services associated with any listed equipment.

72.    A February 18, 2022 email sent by a Supermicro sales employee to Liang, Weigand, and Luong further corroborates Luong's account of premature revenue recognition. The email demonstrates Supermicro's practice of recognizing revenue from hardware-and-services sales *before* the equipment was installed. In the email, Cenly Chen ("Chen") explained to Liang, Weigand, and Luong how Supermicro had recognized revenue for a hardware sale **"*to help our own quarter end shipment/rev[enue]*"** even though the customer had ordered "a completed system" and "[t]he onsite installation [wa]s ***still needed***."[54]

73.    Defendants' improper practices of prematurely recognizing revenue before installing hardware for certain customers demonstrated at least four of the material weaknesses in internal controls over financial reporting later admitted by Defendants. As Supermicro's auditor later identified and as Defendants admitted, Defendants failed to appropriately design or implement controls over "segregation of duties," failed to appropriately design and implement "controls and documentation" "over the review and approval" of accounting entries, failed to properly "document" controls "over the completeness and accuracy of information" Supermicro

---

[54] Chen was Supermicro's Senior Vice President Sales, Strategic Accounts, from May 2021 to August 2024. *See* https://www.linkedin.com/in/cenly-chen-5430987 (last visited Sept. 22, 2025).

produced impacting "financial statement areas," and failed to "design," "implement," and "document[ ]" "control procedures" for "complete and accurate recording and disclosures" in "financial statement areas."[55] Defendants' improper revenue recognition practices for yet-to-be-installed hardware showed material weaknesses in all four of these internal control areas. Defendants improperly recognized revenue under GAAP with Liang's and Weigand's approval, demonstrating ineffective controls over segregation of duties, over the approval of accounting entries, over the accuracy of information impacting the Company's financial statements, and over procedures to achieve complete and accurate disclosures in financial statements.

74.    *Improper revenue recognition practices for hardware with incomplete parts.* Shortly before the end of fiscal quarters during the Class Period, Supermicro intentionally delivered incomplete products to customers—hardware that was missing parts customers had specified—and then improperly recognized revenue for such hardware in the quarter when the hardware was delivered, despite the incomplete, and thus not functional, equipment. Liang personally approved these incomplete shipments.

75.    This revenue recognition practice violated GAAP for the same reasons as Supermicro's revenue recognition for yet-to-be-installed hardware: the incomplete hardware was not functional to customers. This practice of recognizing revenue for hardware with incomplete parts was also virtually identical to one of the Company's improper, premature revenue recognition practices leading to Supermicro's Nasdaq delisting and SEC fine. As the SEC described the practice, Supermicro "improperly recognized revenue for products that it sold where employees knew the goods were incomplete or mis-assembled at the time of shipment. The goods were shipped to customers at the end of quarters and Super Micro improperly recognized the revenue before quarter-end."[56] And Supermicro and Liang described a resulting failure to "design or operate" internal controls "to sufficiently respond to potential risks of material misstatement" as to "revenue recognition."[57] While Defendants claimed to have remediated this revenue recognition

---

[55] Super Micro Computer, Inc., *Form 10-K*, at 122 (Feb. 25, 2025).

[56] *In re Super Micro Computer, Inc.*, Securities Act Release No. 10822, at *6.

[57] Super Micro Computer, Inc., *Form 10-K*, at 102 (May 17, 2019).

practice and internal controls deficiency during the Class Period, former employees have described, and Hindenburg later discovered based on its own interviews with former employees and customers of Supermicro, this practice continued during the Class Period. One former Supermicro salesperson described to Hindenburg Supermicro's continued practice of "completing a partial shipment, then later coming up with an excuse for why the rest didn't happen," and Supermicro customers similarly described receiving defective products that were "not ready for use."[58] Indeed, Supermicro's auditor later found, and Defendants later admitted, material weaknesses in internal controls as a result of this premature revenue recognition practice.

76.    Luong observed these issues firsthand. From at least October 2020 through October 14, 2022, Luong observed many instances in which, around the end of fiscal quarters, Supermicro delivered incomplete hardware to customers—hardware that did not include the parts specified by the customer—and therefore was not functional. Nevertheless, Supermicro booked revenue for the incomplete hardware in the quarters in which it was delivered. As described above, Luong explained that, when a customer ordered hardware with a services contract that required on-site installation, the customer required Supermicro—specifically, Luong's team—to install the equipment. Luong further explained that, before Supermicro equipment could be sent to a customer, it was supposed to be properly tested to make sure it worked. However, Liang would approve exceptions to that requirement and allow equipment to be sent without proper testing.

77.    From at least October 2020 through October 14, 2022, Luong's team encountered many instances in which they found that, for hardware-and-services sales for which Supermicro had already recognized revenue, the equipment was missing one or more parts, the shipments were incomplete, and therefore the equipment was not functional. Many times, Luong encountered customers who were upset that the delivered equipment was not working and, when Luong went to check Supermicro's records, he saw that Liang had approved a testing exception for that customer's equipment, typically around the end of a quarter. In other words, Liang had approved

---

[58] Hindenburg Report; Senad Karaahmetovic, *Super Micro (SMCI) Stock Slides After Short Seller Hindenburg Attack*, Investing.com (Aug. 27, 2024), https://www.investing.com/news/stock-market-news/super-micro-smci-stock-slides-after-short-seller-hindenburg-attack-3588794.

the shipment of equipment to the customer without proper testing around the end of a quarter, which triggered accelerated and improper revenue recognition.

78.    Luong also received multiple emails asking his team to go out to a customer site and install equipment even though one of the parts had not yet been shipped. Luong further received multiple emails in which Supermicro kept delaying installation of equipment for a customer after the equipment had been shipped to the customer, and the customer kept asking when Supermicro was coming out to install the equipment. From these emails, Luong understood that the shipments were not complete and were missing key equipment components for them to be functional to the customer, even though Supermicro had already recognized revenue for those sales.

79.    Luong knew that the incomplete, non-functional equipment shipments had been improperly booked as revenue in the quarter they were delivered because he saw them reflected in the Quarterly Revenue Recognition Reports, which he recalled Defendants Liang and Weigand also received. These reports showed the revenue Supermicro had recognized for that quarter, as described above. And even after Luong brought the issues of incomplete equipment shipments to the attention of supervisors, Supermicro did not adjust the timing of the revenue recognition for these incomplete shipments.

80.    A former senior engineering employee who worked with Supermicro's sales teams similarly described Supermicro's revenue recognition for shipments of incomplete systems to customers. FE 7, a Director of Business Development in Supermicro's engineering department from approximately early 2020 until November 2024, was on the team responsible for Supermicro's Internet of Things embedded product group. His team was an overlay for the product team for all of Supermicro's sales worldwide, and FE 7's main function included the Company's largest distributors by revenue. He reported to a Supermicro vice president, who reported to a Supermicro senior vice president, who in turn reported directly to Liang. FE 7 explained that, when Supermicro was missing component parts for a complete order, Supermicro would ship the order and then ship the customer the component parts at a later date. He described that it was standard practice at Supermicro that, if an employee had a shipment that was shippable, aside from it not

having the computer memory, for instance, they would ship it, and then they would follow with a second shipment later with the missing component. FE 7 explained that the system was not functional to the customer without the component parts. He further recounted that this practice of shipping systems without component parts always happened at the end of a quarter, when there was pressure to ship as much as they could.

81.     FE 7, who attended meetings with Liang every day, also described how senior management told salespeople in open meetings that, if they were missing a component part that would hold up a shipment, they should ship the system and then ship the component part as soon as it came in. He explained that it was almost always at the end of the quarter when senior managers told salespeople to ship orders that were missing parts; employees were told to do whatever they could to hit revenue targets. This instruction from senior management was usually given in Friday sales meetings, which Clegg ran and Liang sometimes attended, and also at the all-hands Monday meetings that Liang and Weigand attended. FE 7 described that senior management's instruction to salespeople at the end of quarters to ship systems with missing parts occurred throughout his tenure at Supermicro and did not change during his time there. The messaging was always to get the product out the door.

82.     FE 7's understanding was that Supermicro was recognizing the revenue for the incomplete order and just taking the revenue for the missing part out of it. He explained that salespeople were told to put the revenue down when the product was shipped, even if it was missing component parts. The same internal system for the shipments also reflected the revenue, and FE 7 had access to that system. He recalled the system was for profit and loss, i.e., P&L.

83.     FE 7 also described that Liang had to approve the shipments that went out with missing components. He recounted how, even if it was just a cable that was missing from an order, Liang would have to approve it, and salespeople had to get Liang's signature if they wanted to ship out an order missing a component. Employees would line up outside Liang's office to get his signature; there was a line there every day.

84.     FE 3 also witnessed many instances in which Supermicro sales directors pushed to send orders out with missing parts and in which angry customers would say they still needed a

part. FE 3 explained that many times Supermicro knew an order was incomplete, that the customer did not know or approve that Supermicro was sending an incomplete order, but that Supermicro would send it anyway. FE 3 experienced this himself when customers contacted his team, including through emails he received, to complain about incomplete parts. He described how the pressure to get products out the door did not change during his tenure at the company from August 2019 to November 2021—the pressure was always there—and estimated that he saw customers complain about incomplete parts approximately 50% of the time on the orders he dealt with at Supermicro.

85.    Defendants' improper practices of recognizing revenue for hardware sales with incomplete parts, described above, violated GAAP. As explained above, GAAP provides that revenue recognition may occur on goods or services only when the company has satisfied its "performance obligation" to the customer by providing a distinct product that is functional to the customer. Because hardware with incomplete parts is not functional to customers, Supermicro did not satisfy its performance obligations when delivering such hardware. Therefore, Supermicro could not recognize revenue for such incomplete hardware shipments under GAAP.

86.    Defendants' improper revenue recognition practices for incomplete hardware demonstrated at least four of the material weaknesses in internal controls over financial reporting later admitted by Defendants. As Supermicro's auditor later identified and as Defendants admitted, Defendants failed to appropriately design or implement controls over "segregation of duties," failed to appropriately design and implement "controls and documentation" "over the review and approval" of accounting entries, failed to properly "document" controls "over the completeness and accuracy of information" Supermicro produced impacting "financial statement areas," and failed to "design," "implement," and "document[ ]" "control procedures" for "complete and accurate recording and disclosures" in "financial statement areas."[59] Defendants' improper revenue recognition practices for incomplete hardware showed material weaknesses in all four of these internal control areas. Defendants improperly recognized revenue under GAAP with Liang's

---

[59] Super Micro Computer, Inc., *Form 10-K*, at 122 (Feb. 25, 2025).

express approval to ship incomplete equipment and products without testing, which demonstrated ineffective controls over segregation of duties, over the approval of accounting entries, over the accuracy of information impacting the Company's financial statements, and over procedures to achieve complete and accurate disclosures in financial statements.

87.    ***Improper accounting practices for inventory.*** During the Class Period, Supermicro also improperly kept on its books (i.e., its balance sheet) inventory that was missing, when the inventory should have been written off. This improper practice violated GAAP by overstating assets and understating expenses and was virtually identical to improper practices that led to Supermicro's Nasdaq delisting and SEC fine. As the SEC put it, Supermicro "systemically overstated inventory and understated expenses in Super Micro's books and records and publicly reported financial statements," through practices that resulted "in an understatement of cost of sales and overstatement of gross profit."[60]

88.    While Defendants claimed to have remediated these practices by the start of the Class Period, Supermicro's auditor later confirmed, and Defendants later admitted, that the Company continued to have material weaknesses in internal controls as a result of these improper accounting practices. Defendants further admitted after the Class Period that Supermicro continued to improperly overstate inventory and understate cost of sales during the Class Period. Indeed, for the fourth quarter of the Company's fiscal year 2024, which ended on June 30, 2024, the Company's preliminary financial results had understated its cost of sales by approximately $96 million, which included a charge to increase inventory reserves of approximately $45 million—meaning that Supermicro reduced the value of its inventory by that amount.[61]

89.    Luong explained that, starting around the time CFO Bauer left Supermicro in February 2021, Luong observed practices that he understood overstated the value of the Company's inventory and that these practices continued at least until Luong was placed on

---

[60] *In re Super Micro Computer, Inc.*, Securities Act Release No. 10822, at *9.

[61] Super Micro Computer, Inc., *Form 8-K* (Feb. 11, 2025).

administrative leave in October 2022. He described two types of situations in which he observed such practices.

90.    First, Luong's team sent equipment needed for customer repairs to an off-site vendor to be held in Supermicro's inventory until his team needed the equipment. From time to time, at the accounting department's request, Luong's team conducted an inventory audit of such equipment with the vendor who held the inventory off-site. In those situations, the vendor provided Luong's team with a list of the inventory the vendor had, and the team then compared the vendor's list to an inventory list that Accounting had given Luong and his team. Also comparing those lists, the vendor then told Luong's team that certain items were missing. In those situations, a manager who worked under Luong sought approval to write off the missing inventory—that is, no longer carry the inventory on Supermicro's books—through the Company's electronic approval queue. These requests should have been approved by Henry Kung, the Senior Vice President of Server Integration, before the requests would have to be approved by Liang. At least twice for write-offs involving particularly large dollar amounts, Luong asked the manager whether the write-offs had been approved, and the manager told Luong that the write-offs had not been approved.

91.    Second, a large customer bought equipment from Supermicro and, as part of the contract, Supermicro agreed to place certain equipment for repairs or spare parts on the customer's premises, even though the parts still belonged to Supermicro and were part of the Company's inventory. When Luong's team conducted audits of the inventory the customer was holding for Supermicro, his team discovered that parts were missing. Luong's team tried to write off the missing inventory by making requests in the Company's electronic approval queue. Normally, when an inventory write-off was approved, Luong's team would receive a system notification saying the write-off was approved. However, on multiple occasions when Supermicro inventory was missing at this customer's premises, Luong's team did not receive a notification that the write-off had been approved, and the system still showed that the customer had the missing part.

92.    Luong explained that Bauer established a structure during his tenure to adjust inventory based on its value and obsolescence. After Bauer's departure, however, some of that

process was bypassed, as Luong described it. For example, when Luong sought approval for inventory write-offs, he submitted a form, but his requests would often not be approved.

93.    Luong also described that he repeatedly heard Liang say at weekly engineering meetings attended primarily by senior managers, including Luong, that anyone who told an employee to write equipment down should be sent to Human Resources to get disciplined. Liang usually said this around the end of quarters and also when Liang saw a large excess and obsolescence figure for inventory. Luong explained that, when Bauer attended these meetings, Luong never heard Liang deliver this message. After Bauer left, Liang repeatedly delivered this message at the weekly engineering meetings. Luong further explained that Liang had ultimate approval for inventory.

94.    Liang and the Supermicro senior managers who attended these weekly engineering meetings knew that Liang's disciplinary threat was no empty one. As FE 1 explained, Liang's wife Liu ran the human resources department, and FE 1 understood that Liu had done so for years before FE 1 joined the Company.

95.    Like Luong, FE 7 also attended engineering meetings at Supermicro and heard Liang make threats about inventory. FE 7 described, as Luong did, that senior executives and officers typically attended these engineering meetings. FE 7 heard Liang at these meetings effectively threaten people who were trying to write down or write off inventory. FE 7 usually heard Liang make those comments about writing down inventory at the end of quarters. FE 7 understood that, if an employee wanted to keep his job, he was not asking for inventory write-downs or write-offs.

96.    The improper practices in accounting for inventory described above violated GAAP. Under GAAP, a company cannot include an item as an asset in inventory (i.e., on its balance sheet) that it does not own or have a right to. Defendants' inventory practices violated GAAP because they failed to write off the value of items that were missing from Supermicro's inventory. These inventory practices therefore overstated the carrying value of these assets on the Company's balance sheet and avoided write-offs that would have required the Company to recognize expenses in those periods.

97.     The same practices also demonstrated at least four of the material weaknesses in internal controls over financial reporting later admitted by Defendants. As Supermicro's auditor later identified and as Defendants admitted, Defendants failed to appropriately design or implement controls over "segregation of duties," failed to appropriately design and implement "controls and documentation" "over the review and approval" of accounting entries, failed to properly "document" controls "over the completeness and accuracy of information" Supermicro produced impacting "financial statement areas," and failed to "design," "implement," and "document[ ]" "control procedures" for "complete and accurate recording and disclosures" in "financial statement areas."[62] Defendants' improper accounting for inventory under GAAP demonstrated material weaknesses in all three of these internal control areas. Defendants' improper accounting for inventory under GAAP—with Liang threatening employees who tried to write off inventory and maintaining ultimate authority to reject such write-offs—also demonstrated ineffective controls over segregation of duties, over the approval of accounting entries, over the accuracy of information impacting the Company's financial statements, and over procedures to achieve complete and accurate disclosures in financial statements.

98.     ***Improper accounting practices related to costs of sales.*** During the Class Period, Defendants also delayed the approval of invoices they received from subcontractors shortly before the end of quarters so that Supermicro could recognize revenue from customer sales without recognizing expenses corresponding to the same sales (i.e., the cost of sales) in the same quarter. This practice violated GAAP, including the accounting framework underlying GAAP, and was virtually identical to improper accounting practices that led to Supermicro's Nasdaq delisting and SEC fine. As the SEC had previously explained, Supermicro "[a]ggressively focus[ed] on quarterly revenue without sufficient focus on compliance" and "under-reported certain expenses."[63] Supermicro later admitted that it had improperly accounted for cost of sales during the Class Period, too: it adjusted amounts it had recorded for these costs by increasing its cost of

---

[62] Super Micro Computer, Inc., *Form 10-K*, at 122 (Feb. 25, 2025).

[63] *In re Super Micro Computer, Inc.*, Securities Act Release No. 10822, at *3.

sales, which decreased the Company's net income.[64] While Defendants had told investors that they had remediated these practices during the Class Period, Supermicro's auditor later found, and Defendants later admitted, that the Company's material weaknesses in internal controls resulting from these improper accounting practices continued.

99.   For example, starting in approximately 2021, Luong saw that Supermicro began delaying approval of invoices it had received from Compuware, a subcontractor run by Liang's brother, so that the invoices would not be timely booked as expenses (i.e., accounts payable) in the same quarter as the revenue related to the same expense.

100.   Luong explained that Supermicro had multiple business relationships with Compuware. Luong's team was involved with one of those relationships: Supermicro used Compuware as a subcontractor for a particular Supermicro customer, TSMC. Supermicro sold TSMC hardware and services, and Compuware provided local service support to TSMC as a subcontractor to Supermicro.

101.   Luong explained that, before 2021, when Supermicro received invoices from Compuware relating to services for TSMC, Luong and his team reviewed the invoices and sent them to Accounting, a process Luong and his team managed themselves. In 2021, Luong noticed that Liang's wife, her brother, and Supermicro's Chief Accounting Officer Lin became involved with the Compuware invoices, which raised red flags for Luong.

102.   Luong described that, from at least 2021 through October 14, 2022, Supermicro had an electronic system for approving invoices it received that required payment from Supermicro, and both Luong and Defendant Liang had access to that system. These invoices would be placed in the system for review and approval, and Liang's approval was required for these invoices. Starting in approximately 2021, when Luong's team input invoices into the system to obtain approval to pay Compuware, the approvals on the invoices would be delayed by weeks; however, the invoices would sit unapproved in the electronic system all the while. This occurred

---

[64] Super Micro Computer, Inc., *Form 8-K* (Feb. 11, 2025).

around the end of quarters, such that revenue from Supermicro's sales to TSMC was recognized in one quarter, but the invoices from Compuware for providing services to TSMC—i.e., expenses that should have offset the revenue from TSMC—were not approved until the following quarter. Luong explained that the total dollar amounts for these Compuware invoices ranged from approximately $250,000 to $500,000 every month or two.

103.    Defendants' improper accounting practices relating to costs of sales were inconsistent with GAAP and the accounting framework underlying it. Accrual accounting includes using certain procedures—"accrual, deferral, and allocation procedures"—that result in recognizing "revenues, expenses, gains, and losses" in "periods that depict" a company's performance, rather than just "listing" the company's receipt or outlays of cash in the periods in which the money was received or spent.[65] Under this accrual accounting principle, FASB explains that a company's cost of goods sold should be recognized in the same period in which the company's revenue from the corresponding goods is recognized.[66] Costs that "relate directly to a contract"—the cost of goods sold—include costs "incurred only because" the company "entered into the contract," such as "payments to subcontractors."[67] Defendants' practices related to costs of sales violated GAAP. These practices failed to timely reflect the change in the Company's assets and liabilities resulting from the subcontractors' invoices (and the services provided and reflected in the invoices)—i.e., Supermicro failed to timely and properly record its costs of sales in the proper periods.

104.    These same practices also demonstrated at least four of the material weaknesses in internal controls over financial reporting that Defendants later admitted. As Supermicro's auditor later identified and Defendants admitted, Defendants failed to appropriately design or implement

---

[65] FASB, *Conceptual Framework for Financial Reporting Statement No. 8*, 41 (Sep. 2024); *see also Statement No.* 8, 85 ("Expenses and losses are generally recognized when an entity's economic benefits are used up in delivering or producing goods, rendering services, or other activities that constitute its ongoing major or central operations.").

[66] *Id.* at 86 ("Some expenses, such as cost of goods sold, are matched with revenues-they are recognized upon recognition of revenues that result directly and jointly from the same transactions or other events as the expenses.").

[67] FASB ACS, 340 § 40-25.

controls over "segregation of duties," failed to appropriately design and implement "controls and documentation" "over the review and approval" of accounting entries, failed to properly "document" controls "over the completeness and accuracy of information" Supermicro produced impacting "financial statement areas," and failed to "design," "implement," and "document[ ]" "control procedures" for "complete and accurate recording and disclosures" in "financial statement areas."[68] Defendants' improper accounting practices under GAAP relating to cost of sales, including Liang's failure to approve invoices from subcontractors at the end of fiscal quarters so that they would not be recognized as expenses in those quarters, demonstrated ineffective controls over segregation of duties, over the approval of accounting entries, over the accuracy of information impacting the Company's financial statements, and over procedures to achieve complete and accurate disclosures in financial statements.

105.    ***Improper shifting and acceleration of services revenue.*** During the Class Period, Supermicro allocated revenue from certain hardware-and-services contracts to only the hardware component of the transactions, without booking any portion as services, in order to recognize all contract revenue upfront. This circumvented the GAAP requirement that the services portion of the revenue from such contracts must be recognized over the period Supermicro had contracted to provide services for the customer—i.e., ***not*** all upfront, but rather over a period of time.

106.    Supermicro's practice of recognizing all revenue upfront on these contracts violated GAAP and was virtually identical to one of Supermicro's improper revenue recognition practices leading to Supermicro's Nasdaq delisting and SEC fine. As the SEC explained it, "[w]ith respect to certain types of products sold by Super Micro . . . customers received an extended warranty," which provided services to customers, "covering periods ranging from one to five years beyond the standard warranty, the cost for which was built into the price of the hardware products purchased." The SEC further explained that "[u]nder GAAP, companies must account for revenue as earned, which for extended warranties is ratably over the duration of the warranty term," yet Supermicro "recognized all of the extended warranty revenue upfront" and therefore "prematurely

---

[68] Super Micro Computer Inc., *Form 10-K*, at 122 (Feb. 25, 2025).

recognized all revenue from embedded extended warranties at the time of sale."[69] Supermicro and Liang described a resulting failure to "design or operate" internal controls "to sufficiently respond to potential risks of material misstatement" as to "revenue recognition."[70] While Defendants claimed to have remediated this revenue recognition practice and internal controls deficiency during the Class Period, Supermicro's auditor later found, and Defendants later admitted to, material weaknesses in internal controls as a result of the same improper accounting practice during the Class Period.

107.    As an example of this practice during the Class Period, Luong recounted how Supermicro improperly booked $10 million of revenue from IBM as only hardware without services. Prior to that time, Supermicro had a contract with IBM for approximately one or two quarters that correctly included both a hardware and services component. Those were coded in Supermicro's internal system as hardware and services. However, from at least approximately October 2020 through December 2020, IBM called Supermicro and said they needed equipment serviced but, when Luong looked into the contract and asked Accounting about it, Accounting told him that over $10 million of equipment Supermicro had sold to IBM did not contain a service component or code at all. Luong understood that the internal service code had been removed from the invoices because he knew that shipping equipment without including services to IBM violated Supermicro's contract with IBM and that IBM believed service was included in the contract, so IBM continued to call Luong's team for services.

108.    Luong understood that, to book revenue from a hardware-and-services combined contract, Supermicro could not book the entire amount of revenue attributable to the services when the customer purchased the equipment; rather, Supermicro had to recognize the revenue over the entire term of the service contract. In other words, Luong understood that, for a hardware-and-services contract with a customer that included three years of services, Supermicro could only

---

[69] *In re Super Micro Computer, Inc.*, Securities Act Release No. 10822, at *8.

[70] Super Micro Computer, Inc., *Form 10-K*, at 102 (May 17, 2019).

recognize one-third of the revenue attributable to services in the first year, whereas it could recognize the entire amount of revenue from hardware upon delivery and installation.[71]

109.    In December 2020, Luong reported the improper treatment of the IBM contract to Kenneth Cheung, Supermicro's controller overseeing revenue recognition. Luong told him that Jenny Lau, who reported to Cheung, had incorrectly allocated more than $10 million of revenue to hardware sales rather than service, which Luong understood misleadingly overstated revenue for the period (and the profitability margin associated with the hardware sales).

110.    Defendants' practice of failing to properly recognize revenue for services in hardware-and-services contracts violated GAAP. GAAP requires that a company must determine at "contract inception" whether the company satisfies its performance obligation to a customer "over time," such as services a company agrees to provide over three years, or at a particular "point in time," such as the sale of goods like hardware.[72] By artificially altering the identified performance obligation on pre-existing contracts, Defendants improperly increased the amount of revenue that was recognized at a point in time (i.e., hardware revenue recognized nearer to the upfront delivery and installation of the goods) while decreasing the amount of revenue recognized over time (i.e., the services revenue recognized over a period of several years). The effect of Defendants' practices was to improperly accelerate revenue recognition to earlier periods.

111.    The same practices also demonstrated at least three of the material weaknesses in internal controls over financial reporting that Defendants later admitted. As Supermicro's auditor later identified and Defendants admitted, Defendants failed to appropriately design and implement "controls and documentation" "over the review and approval" of accounting entries, failed to properly "document" controls "over the completeness and accuracy of information" Supermicro produced impacting "financial statement areas," and failed to "design," "implement," and "document[ ]" "control procedures" for "complete and accurate recording and disclosures" in

---

[71] Luong explained that, while the length of the services contracts varied, the standard Supermicro services contract lasted three years, and three years was the minimum period for which Supermicro provided services to customers with hardware-and-service contracts.

[72] FASB ACS, 606 § 10-25-24.

"financial statement areas."[73] Defendants' practices of failing to properly recognize revenue for services in hardware-and-services contracts in violation of GAAP—particularly after the Company's accounting department and senior management acknowledged the accounting violation—demonstrated ineffective controls over the approval of accounting entries, over the accuracy of information impacting the Company's financial statements, and over procedures to achieve complete and accurate disclosures in financial statements.

112. ***Improper accounting practices for allocating revenue to services.*** Defendants also employed other tactics to intentionally allocate less revenue to "services," so that they could then improperly book more revenue to "hardware" and therefore recognize such revenue earlier than appropriate under GAAP. As discussed further below, Supermicro determined that the cost of services was 7% or, at minimum, 3.4% of hardware-and-services contracts. Yet, at Liang's insistence, Supermicro allocated only 1.4% of revenue from hardware-and-services contracts to "services"—thereby increasing the percentage of revenue that was recognized upfront as "hardware," rather than being allocated to services, and thus recognized over the term of the service agreement. This revenue recognition practice violated GAAP and was virtually identical to an improper revenue recognition practice leading to Supermicro's Nasdaq delisting and SEC fine. As the SEC described it and as explained above, Supermicro "prematurely recognized all revenue from embedded extended warranties," contracts that required services to be provided over time, "at the time of sale."[74] And Supermicro and Liang themselves admitted to a resulting failure to "design or operate" internal controls "to sufficiently respond to potential risks of material misstatement" as to "revenue recognition."[75] While Defendants claimed to have remediated this revenue recognition practice and internal controls deficiency during the Class Period, Supermicro's auditor later found, and Defendants later admitted, material weaknesses in internal controls as a result of this improper revenue recognition practice during the Class Period.

---

[73] Super Micro Computer, Inc., *Form 10-K*, at 122 (Feb. 25, 2025).

[74] *In re Super Micro Computer, Inc.*, Securities Act Release No. 10822, at *8.

[75] Super Micro Computer, Inc., *Form 10-K*, at 122 (May 17, 2019).

113.    Luong explained that, under CFO Bauer, Supermicro had allocated 7% of revenue from hardware-and-services contracts to services. As Luong understood and as explained above, to book revenue from a sale of hardware and services in a combined contract, Supermicro could not book the entire amount of revenue attributable to the services when the customer purchased the equipment, but rather had to recognize the service component of revenue over the entire term of the service contract. In other words, Luong understood that, for a hardware-and-services contract with a customer that included three years of services, Supermicro could recognize only one-third of the revenue attributable to services in the first year, whereas it could recognize the entire amount of revenue attributable to hardware upon installation.

114.    However, in approximately December 2020, Luong saw from the Quarterly Revenue Recognition Report he received that the revenue attributed to the service component of hardware-and-services contracts had dropped by half, from 7% to 3.5%, for both new customers and existing customers. Luong thought the number—3.5%—was too low for existing customers and raised the issue with Defendant Liang, who told him to speak to Bauer. Bauer agreed with Luong that the percentage should not change for existing customers—i.e., that it should remain 7%—and told Luong that Bauer would speak to Liang. However, Bauer was let go in February 2021 because he would not say "yes" to everything Liang wanted, as described in paragraph 69.

115.    Luong explained that, in approximately February 2021, Liang said that he wanted Accounting, including Liang's wife Liu, and Luong's team to figure out what the actual cost associated with services was for four of Supermicro's largest existing customers by revenue. Around that time, 7% of combined hardware-and-services revenue for these four customers totaled $20 to $30 million or possibly more.

116.    Luong recounted how, in approximately February or March 2021, Accounting came back and said the cost of services was approximately 3.4%. Without basis, and despite Accounting's determination, Defendant Liang said that he wanted to recognize only 1.4% of the total amount of the hardware-and-services revenue for these four large customers as services revenue. Luong understood that Liang just wanted to dictate what the revenue recognition was for services, even though there was no data to back it up. Weigand attended these discussions.

117.    Luong explained that, beginning on January 1, 2022, Supermicro made an accounting change to recognize revenue attributable to services at just 1.4% of the total amount of its hardware-and-services contracts with these four large customers. Luong recounted that this revenue recognition practice continued at least until October 14, 2022, when he was placed on involuntary administrative leave.

118.    Luong was asked to sign off on this change by falsely acknowledging that the cost of services for these customers was 1.4%, but Luong refused. Luong was also asked to create a separate service code in Supermicro's system that would reflect this change for these four customers—the code would differentiate the 1.4% attributable to services for these four customers from the higher percentages used for other customers. Luong refused to do that, as well. In refusing to take these actions, Luong conveyed that he did not think the change to 1.4% was proper. After Luong refused, his staff was asked to make the same two changes, and they also refused.

119.    Luong recounted that, in 2022, after he refused to take these actions, Supermicro started excluding Luong from meetings on this issue. By early to mid-2022, Liang directed Luong to effectively report to Phidias Chou ("Chou"), who was a consultant at the time, instead of Liang. Then, on October 14, 2022, Supermicro placed Luong on involuntary administrative leave and, on April 12, 2023, Supermicro terminated Luong. As Luong explained, Supermicro and Liang did so to retaliate against Luong, including for his refusal to go along with their improper accounting practices. Luong has since filed a retaliation claim against Supermicro, and a court in this District sustained his claim following a motion to dismiss—with the case now in discovery.[76]

120.    Defendants' accounting practices of misallocating revenue from "services" to "hardware" violated GAAP. As described above, GAAP requires that a company must determine at "contract inception" whether the company satisfies its performance obligation to a customer "over time," such as services a company agrees to provide over three years, or at a particular "point

---

[76] Order Denying Motion to Dismiss, *Luong v. Super Micro Computer, Inc.*, No. 24-cv-02440 (BLF) (N.D. Cal. June 17, 2025) (ECF No. 66); Case Management and Trial Setting Order, *Luong v. Super Micro Computer, Inc.*, No. 24-cv-02440 (BLF) (N.D. Cal. Aug. 21, 2015) (ECF No. 72).

in time," such as the sale (marked by the delivery and, if necessary, installation) of hardware.[77] By artificially altering the proportion of revenue on contracts that came from "hardware" versus "services," Defendants improperly increased the amount of revenue that was recognized at a point in time (i.e., "hardware" revenue recognized nearer to the upfront delivery and installation of goods) while decreasing the amount of revenue recognized over time (i.e., the services revenue provided over a period of several years). The effect of Defendants' practices was to improperly accelerate revenue recognition.

121.    The same practices also demonstrated at least four of the material weaknesses in internal controls over financial reporting that Defendants later admitted. As Supermicro's auditor later identified and Defendants admitted, Defendants failed to appropriately design or implement controls over "segregation of duties," failed to appropriately design and implement "controls and documentation" "over the review and approval" of accounting entries, failed to properly "document" controls "over the completeness and accuracy of information" Supermicro produced impacting "financial statement areas," and failed to "design," "implement," and "document[ ]" "control procedures" for "complete and accurate recording and disclosures" in "financial statement areas."[78] Defendants' accounting practices for improperly allocating revenue to "hardware" in violation of GAAP—including Liang's insistence that Supermicro recognize as services revenue only 1.4% of revenue from hardware-and-services contracts even after receiving contrary information from the Company's accounting department—demonstrated each of these internal controls weaknesses. Specifically, these improper accounting practices demonstrated ineffective controls over segregation of duties, over the approval of accounting entries, over the accuracy of information impacting the Company's financial statements, and over procedures to achieve complete and accurate disclosures in financial statements.

---

[77] FASB ACS, 606 § 10-25-24.

[78] Super Micro Computer, Inc., *Form 10-K*, at 122 (Feb. 25, 2025).

**F.    Investors Suffer Losses as the Truth Emerges.**

122.    Defendants could not conceal forever the truth about Supermicro's refusal to reform its practices and its continued material weaknesses in internal controls over financial reporting. As investors would learn, Supermicro's improper practices and deficient internal controls that led to its Nasdaq delisting and SEC fine were *not* a thing of "the past" and had *not* been *"remediated"* during the Class Period. The truth came out through a series of disclosures, each of which revealed new information related to Defendants' false statements.

1.    **Hindenburg Issues Its Report Detailing "Glaring Accounting Red Flags," and the Next Day Supermicro Announces It Will Not Timely File its Annual Financial Report**

123.    On August 27, 2024, before the Nasdaq opened that day, the investment research firm Hindenburg issued a scathing investigative report raising concerns about the deficiencies in Supermicro's internal controls.[79] The Hindenburg Report followed a three-month investigation, which "included interviews with former senior employees and industry experts." In the report, Hindenburg stated that former Supermicro employees had told it that the Company's "business culture ha[d] *not* improved" following the Nasdaq delisting and SEC fine. The Hindenburg Report specifically quoted a former Supermicro senior sales director as saying, ***"'I don't think the behavior of the company in many ways has changed in the 5 years since I started, and I started shortly after that [Nasdaq] delisting problem.'"*** And the Hindenburg Report concluded, ***"All told, we believe Super Micro is a classic case of recidivism. Its actions suggest that it hasn't changed from its checkered past regarding its revenue recognition and accounting practices."***

124.    The Hindenburg Report detailed how multiple former Supermicro employees observed the same improper accounting practices and internal control deficiencies at the Company after the SEC fine as the SEC had found before. For example, the report revealed that, "[e]ven after the SEC settlement, pressure to meet quotas pushed salespeople to stuff the channel with distributors using 'partial shipments' or by shipping defective products around quarter-end." The

---

[79] Hindenburg Report; Senad Karaahmetovic, *Super Micro (SMCI) Stock Slides After Short Seller Hindenburg Attack*, Investing.com (Aug. 27, 2024), https://www.investing.com/news/stock-market-news/super-micro-smci-stock-slides-after-short-seller-hindenburg-attack-3588794.

Hindenburg Report also quoted a former Supermicro salesperson who described "completing a partial shipment, then later coming up with an excuse for why the rest didn't happen" and explaining how "now you have a problem."

125.    The Hindenburg Report further revealed that employees of Supermicro customers "corroborate[d] further revenue recognition issues related to shipping highly defective products around quarter-end"—an improper revenue recognition practice that had led to Supermicro's Nasdaq delisting and SEC fine. The report quoted an employee at Genesis Cloud, a Supermicro customer, who "highlighted a specific example that resembled [the SEC's] past channel stuffing allegations." As Hindenburg described it, "[i]n June 2023, closing in on Super Micro's financial year end, Genesis was shipped 'pre-production' servers that were not ready for use." The Hindenburg Report further described its interview with an employee of another Supermicro customer, Crusoe AI, who similarly explained how its order for servers, comprising 1,000 graphics processing units, was shipped at quarter end in March 2024, but that the graphics processing units had a 40% failure rate.

126.    The Hindenburg Report also detailed how, shortly after Supermicro's $17.5-million settlement with the SEC, the Company "began re-hiring top executives that were directly involved in the accounting scandal." As a former Supermicro salesperson told Hindenburg, ***"Almost all of them are back. Almost all of the people that were let go that were the cause of this malfeasance."***

127.    To try to stem the market reaction, Supermicro immediately denied the Hindenburg Report's accuracy. Starting on August 27, 2024, Supermicro began emailing media outlets that were writing articles on the Hindenburg Report and claimed that the Hindenburg Report was just "rumors and speculation."[80] Despite Defendants' false denials, Supermicro's stock price dropped

---

[80] Will Daniel, *Wall Street's AI darling Super Micro postponed earnings while under short-seller's microscope*, Fortune (Aug. 28, 2024), https://fortune.com/2024/08/28/super-micro-wall-street-ai-earnings-short-seller-hindenburg/; Emily Dattilo, *Super Micro Stock Falls as August Selloff Steepens. A Short-Seller Rep. Is the Latest Bad News*, Barron's (Aug. 27, 2024), https://www.barrons.com/articles/super-micro-stock-price-hindenburg-short-seller-news-da46e616; Matt Ott, *Super Micro Computer tumbles 25% on 10k reporting delay, accusations of accounting irregularities*, Associated Press (Aug. 28, 2024), https://apnews.com/article/super-micro-computer-accounting-hindenburg-short-seller-51a31837170cab6175d1179dbf297014; William Gavin & Rocio Fabbro, *Super Micro Computer stock tanks 22% after a short seller's*

2.64% on August 27, 2024, to close at $54.76 per share from the previous day's closing price of $56.25.

128.    The very next day, on August 28, 2024, Supermicro stunned investors when it announced in a press release that Supermicro would not timely file its annual report on Form 10-K for the fiscal year ended June 30, 2024, but instead expected to file a Notification of Late Filing on Form 12b-25 with respect to the annual report on August 30, 2024. Specifically, Supermicro told investors it was "unable to file its Annual Report within the prescribed time period without unreasonable effort or expense" and that it needed "[a]dditional time" for its "management to complete its assessment of the design and operating effectiveness of its internal controls over financial reporting as of June 30, 2024."[81]

129.    Supermicro's stock price plummeted following its press release. That day, Supermicro stock dropped another 19%, to close at $44.35 per share on August 28, 2024.

130.    These disclosures blindsided investors and analysts, as Defendants had repeatedly assured the market that Supermicro had remediated its accounting and internal controls deficiencies. Analysts at Wells Fargo noted on August 28, 2024, the day of Supermicro's press release, that Supermicro shares were "under significant pressure this morning following the announcement that it will not file its F2024 (June '24) 10-K filing on time."[82] Wells Fargo reported that it had spoken to Defendant Weigand "this morning" and highlighted his point that "[t]his is about internal controls."[83] Wells Fargo cut its price target for Supermicro by over 42%, from $650 per share to $375 per share, "[g]iven this uncertainty/concern over revenue recognition, and SMCI's [Supermicro's] history."[84] Similarly, in describing its decision to downgrade its

---

*scathing report*, Quartz (Aug. 28, 2024), https://qz.com/super-micro-computer-stock-fall-filing-delay-hindenburg-1851634005; Hope King, *Charted: Super sink* (Aug. 28, 2024), https://www.axios.com/2024/08/28/charted-super-sink-closer.

[81] Super Micro Computer, Inc., *Form 8-K* (Aug. 28, 2024).

[82] Aaron Rakers et al., *Super Micro Computer, Inc. (SMCI), SMCI Announces Delayed 10-K Filing—Extent of Internal Control Issues; Timing of Resolution Unclear* (Wells Fargo Securities, LLC, Aug. 28, 2024) (emphasis in original).

[83] *Id.*

[84] *Id.* These target prices pre-date Supermicro's 10:1 stock split on October 1, 2024.

recommendation on Supermicro stock to "neutral" from "overweight" (meaning it no longer expected the stock to outperform its peers) following these disclosures, JPMorgan Chase & Co. referenced Supermicro's prior issues leading to its Nasdaq delisting and SEC fine.[85] JPMorgan explained that it "expected" that a "lack of visibility" as to "the timing of the company returning to compliance" with its financial reports "will create challenges to near-term [investor] sentiment in . . . comparison to the 2017-2020 time period." Barclays Bank PLC also downgraded its recommendation on Supermicro stock.[86] Its reasons included that "[t]he 10-k filing delay" "raises some red flags" and explained that investors may want to "derisk" until there were "definitive findings from the internal control review, particularly given SMCI's [Supermicro's] past history of getting delisted from Nasdaq in 2018 and the SEC charges in 2020."

131.    But the August 27 and 28, 2024, disclosures did not reveal the full extent of Defendants' misrepresentations, which Defendants continued to downplay and deny. Numerous news outlets published articles on August 28 that repeated Supermicro's false denial: that the Hindenburg Report was just "rumors and speculation."[87] And, just days later, on September 3, 2024, Supermicro filed a Form 8-K, which Liang signed and which attached a letter from him. In the letter, Liang falsely stated that the Hindenburg Report contained "false or inaccurate statements about our company" and consisted of "misleading presentations of information"[88]

---

[85] *Super Micro: Downgrade to Neutral as Uncertainty of 10K Delay and Follow-up Response Will Drive Overhang* (JPMorgan Chase & Co., Sep. 6, 2024).

[86] *Super Micro: Downgrade to EW; Uncertainty Around AI Margins and Internal Controls* (Barclays Bank PLC, Sep. 4, 2024).

[87] Will Daniel, *Wall Street's AI darling Super Micro postponed earnings while under short-seller's microscope*, Fortune (Aug. 28, 2024), https://fortune.com/2024/08/28/super-micro-wall-street-ai-earnings-short-seller-hindenburg/; Matt Ott, *Super Micro Computer tumbles 25% on 10k reporting delay, accusations of accounting irregularities*, Associated Press (Aug. 28, 2024), https://apnews.com/article/super-micro-computer-accounting-hindenburg-short-seller-51a31837170cab6175d1179dbf297014; William Gavin & Rocio Fabbro, *Super Micro Computer stock tanks 22% after a short seller's scathing rep.*, Quartz (Aug. 28, 2024), https://qz.com/super-micro-computer-stock-fall-filing-delay-hindenburg-1851634005; Hope King, *Charted: Super sink* (Aug. 28, 2024), https://www.axios.com/2024/08/28/charted-super-sink-closer.

[88] Super Micro Computer, Inc., *Form 8-K* (Sep. 3, 2024).

132.    As the financial press reported, Supermicro stock "jumped" 2% in intra-day trading following Defendants' denial letter.[89] The stock ended the day up 1%, even though major stock indices (including the Nasdaq Composite and the S&P 500) all fell that day.

133.    Tellingly, when Supermicro and Liang made these steadfast (and false) denials, they knew—but investors did not—that Supermicro's new auditor, EY, had *already* communicated to Supermicro's Audit Committee in July 2024 that EY had "concerns about several matters relating to [Supermicro's] governance, transparency and completeness of communications to EY, and other matters pertaining to the Company's internal control over financial reporting."[90]

### 2.    *The Wall Street Journal* Discloses a DOJ Investigation into Supermicro's Accounting, and Supermicro Discloses that Its Auditor Has Resigned After Concluding That It Could Not Rely on Management's Representations

134.    Notwithstanding Defendants' false denials, news worsened for investors. On September 26, 2024, *The Wall Street Journal* revealed that the DOJ had initiated an accounting-related investigation into Supermicro.[91]

135.    In response to this news, Supermicro stock fell another 12%, to close at $40.24 per share on September 26, 2024, after closing at $45.81 per share the day before. Media outlets reported on the stock price drop. Headlines in Investopedia, CNBC, and MarketWatch alerted that Supermicro's stock "plunge[d]" on the report of a "[f]ederal accounting probe," "tumble[d] 12% after DOJ reportedly opens probe into company," and "plummet[ed] on reported Justice Department probe," respectively.[92] Research firm CFRA, in its report on Supermicro stock a few

---

[89] *See Super Micro Denies Accusations After Hindenburg Research Rep.*, Finimize (2024) *https://finimize.com/content/super-micro-denies-accusations-after-hindenburg-research-report*.

[90] Super Micro Computer, Inc., *Form 8-K* (Oct. 30, 2024).

[91] Jonathan Weil, *Justice Department Probes Server Maker Super Micro Computer*, Wall St. J. (Sep. 26, 2024), https://www.wsj.com/tech/justice-department-probes-server-maker-super-micro-computer-2ca6a4d3?st=ETVQqV&reflink=desktopwebshare_permalink.

[92] Bill McColl, *Super Micro Computer Stock Plunges on Rep. Federal Accounting Probe*, Investopedia (Sep. 26, 2024), https://www.investopedia.com/super-micro-computer-stock-plunges-on-report-of-federal-accounting-probe-8718902; Ashley Capoot, *Super Micro Shares Tumble 12% After DOJ Reportedly Opens Probe Into Company*, CNBC (Sep. 26, 2024), https://www.cnbc.com/2024/09/26/super-micro-shares-tumble-12percent-after-doj-reportedly-

days later, pointed to "near-term margin headwinds and ongoing uncertainties surrounding [DOJ] investigations" and "concerns stem[ming] from recent allegations of 'accounting manipulation' by short-seller Hindenburg Research."[93]

136.    Next, on the morning of October 30, 2024, Supermicro further stunned investors when it announced in a Form 8-K filing with the SEC that EY, Supermicro's auditor, had **resigned**. The announcement revealed that EY resigned over concerns about the Company's internal controls over financial reporting, with the auditor concluding that it could no longer rely on the representations of Supermicro's management and Audit Committee.[94] Specifically, the Form 8-K filing revealed that in late July 2024—during EY's first audit of Supermicro and less than a month after the end of Supermicro's fiscal year—EY communicated ***"concerns about several matters relating to governance, transparency and completeness of communications to EY, and other matters pertaining to the Company's internal control over financial reporting***."

137.    Supermicro also revealed that, after EY had first raised concerns with the Company in July 2024, a Special Committee of Supermicro's Board of Directors investigated the matter and that, after EY received information from that investigation, the information—far from alleviating EY's concerns—only raised ***more*** serious questions for EY. Supermicro admitted that, "[a]fter receiving [this] additional information through the [Special Committee] Review process, EY informed the Special Committee that ***the additional information EY received raised questions, including about whether the Company demonstrates a commitment to integrity and ethical values*** consistent with Principle 1 of the COSO Framework," principles for establishing and maintaining effective internal controls, and "***about the ability and willingness of the Audit Committee and overall Board to demonstrate and act as an oversight body that is independent***

---

opens-probe-into-company.html; Tomi Kilgore, *Super Micro's Stock Plummets on Reported Justice Department Probe*, MarketWatch (Sep. 26, 2024), https://www.marketwatch.com/story/super-micros-stock-takes-a-dive-after-wsj-report-of-doj-probe-7fce3a3e.

[93] *Super Micro Computer, Inc., Research Note, CFRA Maintains Hold Opinion on Shares of Super Micro Computer, Inc.*, (CFRA, Oct. 2, 2024).

[94] Super Micro Computer, Inc., *Form 8-K* (Oct. 30, 2024).

*of the CEO and other members of management* in accordance with Principle 2 of the COSO Framework, *and whether EY could rely on representations from certain members of management and from the Audit Committee*."[95]

138.    Supermicro's October 30 disclosure further revealed that EY resigned because it then concluded that it could no longer rely on management's and the Audit Committee's representations. As EY explained in its resignation letter: *"[W]e are resigning due to information that has recently come to our attention which has led us to no longer be able to rely on management's and the Audit Committee's representations and to be unwilling to be associated with the financial statements prepared by management*, and after concluding *we can no longer provide the Audit Services in accordance with applicable law or professional obligations*."[96]

139.    Defendants Liang and Weigand were the "management" whose representations EY was "no longer . . . able to rely on." Audit Standard 2805 of the Public Company Accounting Oversight Board ("PCAOB") requires audit firms to obtain written representations from the management of public companies as part of each audit of the companies' financial statements conducted under PCAOB standards.[97] These written management representations typically take the form of a letter from a company's management to the audit firm.[98] Such management representation letters "should be signed by those members of management with overall responsibility for financial and operating matters," which "normally include the chief executive officer and chief financial officer."[99] As the CEO and CFO, respectively, who would have signed management representation letters to EY, Defendants Liang and Weigand were the officers whose representations EY concluded it was "no longer . . . able to rely on."

---

[95] *Id.*

[96] *Id.*

[97]  PCAOB Auditing Standard No. 2805, Management Representations, *available at* https://pcaobus.org/oversight/standards/auditing-standards/details/AS2805.

[98] *See id.*

[99] *Id.*

140.    Finally, Supermicro's October 30 disclosure about EY's resignation, including its reasons and timing, revealed to investors that the issues leading to EY's resignation pre-dated its fiscal year 2024 because they were the types of corporate governance and transparency issues that could not have suddenly cropped up in a single year. As a former Director of Financial Accounting and Advisory Services at EY confirmed, "if EY is identifying governance issues and the questions on the ICFR [Internal Control over Financial Reporting], those issues are of the type that cannot come in a year. That means that they were there even in the previous years."

141.    Investors and analysts were shocked by the October 30, 2024 disclosure. As Baptista Research explained, "EY's resignation letter cited an inability to rely on representations from SMCI's management and audit committee, *suggesting a breakdown in the company's internal oversight mechanisms*."[100] Likewise, Needham & Co. explained in a research report issued that day: "Ernst and Young's resignation . . . raises *significant questions about Supermicro's corporate governance and management's commitment to integrity and ethical values*." The Needham analysts added: "It is not often that a Big 4 audit firm fires a client. It is even more rare that a Big 4 firm resigns stating that it can no longer rely on the representations of management and the Audit Committee of the Board of Directors." As the Needham analysts concluded, *"[W]e have to ask 'if Ernst & Young is not willing to rely on management's representations, why should investors?'"*[101] Media and commentators further described how exceptionally rare resignations like EY's were and the red flags its resignation raised. *Fortune* quoted Georgetown University associate professor and governance expert Jason Schloetzer. He described EY's resignation as Supermicro's auditor as an *"unusual," "noisy withdrawal"* and explained that "[a]n auditor resignation is already in red flag territory," but that EY's "*will certainly get close scrutiny from capital markets participants* and regulatory agencies."[102]

---

[100] *Super Micro Computer (SMCI) in Crisis? Auditor Resignation Sparks Major Concerns!*, (Baptista Research, Oct. 31, 2024).

[101] N. Quinn Bolton, et al., *E&Y's Resignation Raises Reputational and Restatement Risks; Suspend Rating*, (Needham & Co., LLC, Oct. 30, 2024).

[102] "Amanda Gerut, Sharon Goldman, *Super Micro's Stock Rose 3000% in the AI Wave – Then Its Auditor Quit, Saying It Doesn't Trust the Management*, Fortune (Oct. 31, 2024),

*Fortune* also quoted accounting expert Francine McKenna, who explained, ***"There are noisy resignations and then there are resignations that bang a big giant gong—and this is as bad as it can get."***[103] *MarketWatch* separately quoted McKenna as saying that, following EY's resignation, Supermicro was a "***problematic, recidivist, high-profile company***."[104]

142.    Similarly, Bloomberg Radio's hosts called EY's resignation "a big deal" and noted, "[t]his isn't Joe's CPAs resigning, this is Ernst & Young resigning, and ***this does not happen often at all***."[105] In the same segment, Woo Jin Ho, Bloomberg Intelligence's Senior Technology Analyst, described the language in EY's resignation letter and said, "[Q]uite frankly, ***it's the first time I've ever seen language like that***." In a news article, *Bloomberg* similarly quoted accounting analyst Olga Usvyatsky, who explained that this type of "public criticism by an auditor" was ***"extremely rare and a huge red flag."***[106] Her research showed only two instances between January 1, 2024, and October 24, 2024, where audit firms resigned because auditors could not trust the management

---

https://finance.yahoo.com/news/inside-super-micro-wake-call-081100601.html.

[103] *Id.* Francine McKenna is a Lecturer at The Wharton School of the University of Pennsylvania, who spent more than 20 years in public accounting and consulting before becoming an acclaimed investigative journalist. Her writing on accounting, audit, internal audit and corporate governance issues at public companies has been cited in testimony before the U.S. Congress and in academic research on the foregoing topics. *Executive Summary*, Wharton Faculty Platform, https://faculty.wharton.upenn.edu/wp-content/uploads/2016/11/CV-McKenna-20220624-CV-1.pdf.

[104] Therese Poletti, *Super Micro needs a new CEO before its AI advantage erodes*, MarketWatch (Nov. 5, 2024), https://www.marketwatch.com/story/super-micro-needs-a-new-ceo-before-its-ai-advantage-erodes-4c774c14.

[105] *See* Bloomberg Television, *Super Micro Auditor Resigns Citing 'Integrity' Concerns* (Oct. 30, 2024), *https://www.youtube.com/watch?v=TYEHsM_XWpc*.

[106] Brody Ford, Dana Wollman & Nicola M. White, *Super Micro Auditor EY Resigns, Citing 'Integrity' Concerns*, Bloomberg (Oct. 30, 2024), https://news.bloombergtax.com/financial-accounting/super-micro-computer-auditor-ernst-young-quits-amid-doj-probe. Olga Usvyatsky is the former Vice President of Research of Audit Analytics, where she led the development of new data sets used by investors, regulators, and academics. Her work is frequently cited in major news publications such as the *The Wall Street Journal*, *Bloomberg*, and *MarketWatch*. *See Olga Usvyatsky*, Deep Quarry Substack, https://substack.com/@deepquarry.

of a public company.[107] She noted that these cases "underscore that when an auditor explicitly questions the integrity of a company's financials, it likely points to deeper, systemic problems."[108]

143.    In describing the red flags, media and commentators highlighted the internal controls failures that EY's resignation had revealed. For example, a correspondent for Schwab Network noted that EY was "firing SMCI [Supermicro] here when it comes to being their auditor and/or their accountant, and *this is because of . . . misrepresentation as well as lack of internal controls.*"[109] Similarly, Jim Cramer, the host of CNBC's *Mad Money* television show, called EY's resignation *"about the most damning statement you will ever see from an accounting firm"* and advised investors to sell their Supermicro stock: "[W]hen an accounting firm—frankly a fantastic accounting firm—*accuses a client of irregularities,* that's enough for me."[110] *Newsweek* also reported on October 30, 2024, that EY's "resignation, announced in a regulatory filing, has *sparked concerns over the company's financial practices and corporate governance as EY cited issues of transparency and integrity in financial reporting.*"[111]

144.    Following the October 30, 2024 disclosures, Supermicro stock dropped again by nearly *33%*—from $49.12 per share on October 29 to $33.07 per share on October 30. Stunned investors traded over 236 million Supermicro shares that day, a volume higher than the previous seven trading days combined.

### G.    Post-Class Period Events Further Confirm that Defendants Misled Investors

145.    Even after the Hindenburg Report, the Company's decision to delay filing its annual report to "assess[ ]" its internal controls, the DOJ investigation of Supermicro, and EY's "noisy

---

[107] *See* Olga Usvytatsky, *When Auditors Walk: Red Flags and What They Signal*, Deep Quarry (Oct. 24, 2024), *https://deepquarry.substack.com/p/when-auditors-walk-red-flags-and*.

[108] *Id.*

[109] *See* Schwab Network, *The Bigger Picture for SMCI After Auditor Resigns* (Oct. 30, 2024), *https://www.youtube.com/watch?v=956kTat0s8M*.

[110] *See* CNBC Television, *I don't know if Super Micro is guilty or innocent, says Jim Cramer* (Oct. 30, 2024) *https://www.youtube.com/watch?v=RR0ztMfS68M*.

[111] Amir Daftari, *Super Micro Shares Plunge 30 Percent After Ernst & Young Resigns as Auditor*, Newsweek (Oct. 30, 2024), https://www.newsweek.com/super-micro-shares-plunge-after-ey-resigns-auditor-1977356.

withdrawal" describing internal control weaknesses and concluding it could not rely on management's representations, Liang brazenly **continued** perpetuating internal control weaknesses. Among other things, Liang supported Defendants' improper revenue recognition practices by overriding senior executives' decision to terminate a sales employee whom they had found to have improperly recognized revenue.

146.    FE 1, the senior human resources employee, explained that, in the fall of 2024, Supermicro employees brought to his attention the fact that a sales employee named Rachel Lee ("Lee") had recognized revenue for a product sale before Supermicro had shipped the product out in approximately May 2024. In his human resources role, FE 1, who had joined Supermicro earlier that year, conducted an investigation in the fall of 2024. He obtained documents, spoke to Lee and her manager, and met with employees in the Company's sales operations group. The sales at issue involved a San Jose, California-based customer called Ma Labs, and FE 1 described that Lee's revenue recognition involved a significant dollar amount. FE 1 explained that, based on his investigation, he concluded that Lee had improperly recognized revenue. FE 1 then set up a meeting with the Sales Committee, which consisted of Weigand, Chen, Clegg, and Wally Liaw— not Liang or his wife Liu. At the meeting, which FE 1 attended, the Sales Committee concluded that Lee had improperly recognized revenue on products before they were shipped out and decided to terminate Lee. FE 1 explained, however, that Lee was not terminated. FE 1 described that, in late 2024 or early 2025, when the vice president for Lee's team, Ray Bahar, learned of the decision to terminate Lee, he went to Liang and his wife Liu and got the termination decision overturned. Indeed, Lee was still working at Supermicro when FE 1 left the Company in July 2025.

147.    FE 1's description of these events is corroborated by an email he sent on October 24, 2024, to Chen, Clegg, and others, attaching documentation for "two issues that will need to be presented to the Sales Committee for review." His email explained that the documents "pertain[ ] to potential violations involving Rachel Lee," including "Revenue Recognition – issue identified by the accounting team."

148.    Meanwhile, FE 1 was disciplined for bringing the information from his investigation of Lee to the Sales Committee. FE 1 described that his boss's boss—Jenny Chan

("Chan"), a vice president of human resources—yelled at FE 1 for bringing the improper revenue recognition issue to the Sales Committee, asking who FE 1 thought he was for taking it to the Sales Committee. Human resources responsibility for Lee's sales team was then transferred from FE 1 to another human resources employee.

149. FE 1 also described that, in human resources meetings where employees talked about the matters they were working on, any time FE 1 said a matter was being investigated for a revenue recognition issue, Chan would fly off the handle and tell FE 1 he was not allowed to say that. FE 1 understood that Chan did not want to create a paper trail with the term "revenue recognition."

150. While Defendants continued to perpetuate these internal control weaknesses, including an inappropriate tone at the top and a failure to observe segregation of duties, Nasdaq announced on December 13, 2024, that it was dropping Supermicro from the Nasdaq-100 Index.[112]

151. Then, on February 11, 2025, Supermicro issued a press release admitting that, in late 2024, it had received subpoenas from the DOJ and the SEC seeking documents.[113] In the same press release, Supermicro announced that it had understated its cost of sales for its fourth quarter of 2024, ended on June 30, 2024, in part because of "an unanticipated decline in the market value of certain components that were held in the Company's inventory."[114] The understated cost of sales and overstated inventory valuation were two of the same improper accounting practices that Supermicro had engaged in leading to its earlier Nasdaq delisting and SEC fine and that Defendants engaged in again during the Class Period, as described above.[115]

152. Remarkably, Defendants *still* tried to falsely deny that the internal controls issues revealed in the Hindenburg Report, Supermicro's August 28, 2024 press release, the *Wall Street Journal* article, and the Company's disclosure of EY's "noisy withdrawal" were intentional. In

---

[112] *Annual Changes to the Nasdaq-100 Index®*, Nasdaq, Inc. (Dec. 13, 2024), https://www.nasdaq.com/press-release/annual-changes-nasdaq-100-indexr-2024-12-13.

[113] Super Micro Computer, Inc., *Form 8-K* (Feb. 11, 2025).

[114] *Id.*

[115] *Id.*

their February 11, 2025 press release, Defendants falsely claimed that Supermicro's after-the-fact charge for inventory reserves resulted at least in part "from an ***unanticipated*** decline" in the value of inventory—falsely denying that Defendants knew about the overvalued inventory during the Class Period and actively continued overstating the value.[116] In truth, as discussed above in paragraphs 39-121, Liang knew full well about this very control deficiency and accounting violation during the Class Period; indeed, he personally threatened managers who tried to write off overvalued inventory with disciplinary action.

153.    On February 25, 2025, Supermicro filed its annual report for the year ended on June 30, 2024, on Form 10-K.[117] Attached to the Form 10-K was an opinion letter from Supermicro's new auditor, BDO, concluding that, contrary to Defendants' Class Period statements, Supermicro "***did not maintain, in all material respects, effective internal control over financial reporting*** as of June 30, 2024."[118] BDO's opinion letter identified the critical categories of material weaknesses in the Company's internal controls, which included (i) "controls to address segregation of duties conflicts were not properly designed and appropriately implemented"; (ii) "controls and documentation thereof, over the review and approval of manual journal entries were not properly designed and appropriately implemented to prevent unauthorized access to post journal entries"; (iii) "controls over the completeness and accuracy of information produced by the entity impacting multiple financial statement areas were not properly documented"; and (iv) "management did not design, implement and retain appropriate documentation of control procedures to achieve timely, complete and accurate recording and disclosures across multiple financial statement areas."[119]

154.    In Supermicro's Form 10-K, Defendants themselves were also forced to admit to material weaknesses in the Company's internal controls.[120] Defendants admitted that Supermicro's

---

[116] *Id.*

[117] Super Micro Computer, Inc., *Form 10-K* (Feb. 25, 2025).

[118] *Id.* at 124.

[119] The Form 10-K attached another opinion letter from BDO in which the firm made clear that it had been engaged to audit the Company's financial statements only for fiscal year 2024 (other than as to adjustments for a stock split) and had not audited or reviewed fiscal years 2022 or 2023.

[120] *Id.*

"*internal control over financial reporting was not effective as of June 30, 2024 due to the existence of material weaknesses in such controls*" and that Supermicro's "disclosure controls and procedures were not effective" because of material weaknesses in internal controls over financial reporting.[121] Defendants listed the same categories of material weaknesses in the Company's internal controls over financial reporting that BDO had identified in its opinion letter accompanying the Form 10-K, and Defendants noted that, as of June 30, 2024, Supermicro had "*not remediated any of those material weaknesses*."[122]

155.    Tellingly, even after these admissions, Liang again falsely claimed that the matters leading to EY's resignation were "all fixed" when asked by business media focused on Supermicro's internal controls issues, just as he had during the Class Period. Specifically, on March 10, 2025, less than two weeks after Supermicro filed its annual report for its fiscal year 2024, Liang gave his first media interview since EY's resignation.[123] Liang spoke to Fox Business, whose host asked Liang, "[L]ast October . . . Ernst & Young, your auditor, quit, in essence they basically said they were unwilling to be associated with management's financial statements. You hired a new accountant, BDO. Last month you were able to file your full-year results from 2024 so that you would avoid a delisting on the Nasdaq. *This is a lot. Tell me, are the troubles behind Supermicro now?*"[124] Remarkably, in response, Liang falsely replied, "After E&Y, we hired BDO . . . . *[T]hey found everything is good,* so they filed our financials '24 and also Q1 [and] Q2 '25 *so everything is behind. We have the matter all fixed and indeed nothing really wrong*."[125]

156.    Yet, just months later, contrary to Liang's representations, Defendants were forced to admit that BDO did *not* find "everything is good" and Supermicro did *not* "have the matter fixed." Rather, Supermicro's internal control deficiencies *remained* un-remediated. Indeed, on

---

[121] *Id.* at 122.

[122] *Id.*

[123] *See* The Calman Countdown, *Super Micro CEO: Accounting issues are behind us* (Mar. 10, 2025), *https://www.foxbusiness.com/video/6369856994112*.

[124] *Id.*

[125] *Id.*

August 28, 2025, after the market closed, Supermicro filed its Form 10-K for the year ended June 30, 2025, and explained that there remain four "***unremediated*** material weaknesses in internal control over financial reporting as of June 30, 2025," that are virtually identical to the ones Defendants had identified in the Form 10-K filed six months before.[126] These include material weaknesses in "controls to address segregation of duties conflicts were not properly designed and appropriately implemented," "controls over the completeness and accuracy of information [the Company] produce[s], impacting multiple financial statement areas were not properly implemented or documented," and management "did not design, implement and retain appropriate documentation of control procedures to achieve timely, complete and accurate recording and disclosures across multiple financial statement areas."[127]

157.    Investors continue to take note of the Company's persistent, material internal control weaknesses and its failure to remediate them. The day after Supermicro filed its Form 10-K disclosing these continuing internal control weaknesses, *Reuters* reported that "Super Micro Computer's shares fell nearly 5% [in intraday trading] on Friday after" it "reiterated weaknesses in internal control over financial reporting."[128] The same day, Sherwood Media reported that "Super Micro's accounting issues aren't fully behind it."[129] The article described how "[s]hares of the [Supermicro] cratered last year and early into 2025 amid concerns over how it compiles its financials" and how "[t]he inability to deliver filings in a timely fashion nearly saw the stock delisted from the Nasdaq."[130] And Jim Cramer,, when asked on a segment of *Mad Money* whether

---

[126] Super Micro Computer, Inc., *Form 10-K*, at 120 (Aug. 28, 2025).

[127] *Id.*

[128] *Super Micro shares dip after AI server maker flags financial control concerns*, Reuters (Aug. 29, 2025), https://www.reuters.com/business/super-micro-shares-dip-after-ai-server-maker-flags-financial-control-concerns-2025-08-29/.

[129] Luke Kawa, *Super Micro falls after warning it still hasn't fixed its accounting problems*, Sherwood News (Aug. 29, 2025), https://sherwood.news/markets/super-micro-falls-after-warning-it-still-hasnt-fixed-its-accounting-problems/.

[130] *Id.*

he might "warm[] up" to buying Supermicro stock, said, ***"No, I can't, because it's still got those accounting issues, and I think accounting [irregularities] equal sell."***[131]

## V.    ADDITIONAL ALLEGATIONS OF SCIENTER

158.    A host of additional facts, in addition to those discussed above, collectively support a strong inference that the Defendants knew, or at least were deliberately reckless in not knowing, the true and omitted facts.

159.    ***First***, Defendants were on notice of the Company's internal control deficiencies. Just before the Class Period, Defendants were forced to admit that the Company had material weaknesses in internal controls. These deficiencies were so significant that they led to Nasdaq's delisting of Supermicro for over a year and a half and a $17.5 million SEC fine. Notwithstanding Defendants' representations that these deficiencies were "remediated" by the start of the Class Period, Supermicro engaged in the ***same*** accounting malfeasance—including the same GAAP violations explained in the SEC's settlement order—and the ***same*** internal control weaknesses during the Class Period. *See* ¶¶ 56-121. That Defendants had ***already*** engaged in the same misconduct strengthens the scienter inference: they either knew or, at minimum, were deliberately reckless in not knowing that the Company continued to engage in it.

160.    ***Second***, Defendants personally orchestrated and authorized Supermicro's material weaknesses in internal controls, including through improper accounting practices, during the Class Period, as described below.

161.    *Inappropriate tone at the top.* Defendants perpetuated Liang's continued, inappropriate "tone at the top" during the Class Period. Liang encouraged employees to engage in improper accounting practices, threatened employees with disciplinary action when they refused to go along with improper accounting practices, and engaged in improper practices himself, including fudging the revenue amounts in Supermicro's sales spreadsheet during meetings. *See* ¶¶ 24, 41-50, 61, 94. Liang also pressured employees to recognize revenue before the end of quarters to improperly accelerate revenue recognition and decelerate costs on a quarterly basis. *See* ¶¶ 49-

---

[131] *See* CNBC Television, *Lightning Round: I'd be a buyer of Dell, not Super Micro, says Jim Cramer* (Sep. 9, 2025), https://www.youtube.com/watch?app=desktop&v=Bf55HTwsFgs.

50, 70-79 99-102. This included reducing interference with Liang's improper revenue goals by re-hiring during the Class Period the same senior sales employees Supermicro had terminated during its Nasdaq delisting to purportedly "remediate" its controls weaknesses. *See* Section IV.E.

162.    *Failure to segregate duties and mitigate the risk of management overriding internal controls.* Defendants perpetuated Liang's iron-fist control over Supermicro during the Class Period. Liang required employees to obtain his approval on virtually every business decision, including hiring, miniscule customer pricing discounts, sales, business trips, and expense reports of even a few hundred dollars. *See* ¶¶ 56-61. Liang also had access to the Company's spreadsheets with revenue figures—in which he was able to and in fact did alter revenue numbers, thereby overriding internal controls—and Liang had access and approval authority in internal Supermicro systems. *See* ¶¶ 42, 47, 56.

163.    *Improper revenue recognition practices for sales of yet-to-be-installed hardware.* Defendants personally orchestrated and authorized Supermicro's improper accounting practice for recognizing revenue for sales of uninstalled hardware around the end of fiscal quarters. Under Weigand's predecessor CFO, Supermicro did not recognize revenue for sales of hardware-and-services contracts until the servicing team completed installing the systems for customers. Supermicro did so because the equipment Supermicro sold under these contracts was not functional to the customer until it had been installed at the customer site. In violation of GAAP, Weigand changed this policy when he became CFO, and Supermicro began recognizing revenue even before Supermicro installed hardware for clients under these contracts and the hardware therefore became functional, particularly around the end of quarters. *See* ¶¶ 62-72. Consistent with Defendants' orchestration and authorization of this practice, Liang and Weigand each received an email on February 18, 2022, about Supermicro having recognized revenue improperly to help the Company's "quarter end" revenue—specifically for a hardware system that the customer had ordered with installation but that Supermicro had not yet installed. In an email that day, Chen, a senior vice president in Supermicro's sales department, confirmed Supermicro's practice of recognizing revenue for sales of a "completed system" to a customer "to help our own quarter end

shipment/rev[enue]," even though the system's "onsite installation" was still "needed." *See* Section IV.E, *supra*.

164. *Improper revenue recognition practices for hardware with incomplete parts.* Defendants personally orchestrated and authorized Supermicro's improper accounting practices related to recognizing revenue for shipments of hardware with incomplete parts. Senior management instructed employees at the end of quarters to ship products to customers even when parts were missing, and they gave these instructions at meetings both Liang and Weigand attended, demonstrating that Defendants authorized these instructions. *See* ¶¶ 79, 81-83. In addition, Liang personally approved the shipment of every order with missing parts and, even though products were supposed to be tested before being sent to customers, personally authorized exceptions to the testing requirements around the end of quarters, further allowing incomplete shipments. *See* ¶¶ 61, 76, 83, 86. Meanwhile, Liang and Weigand knew Supermicro recognized revenue for these incomplete shipments, because each received the Quarterly Revenue Recognition Report, showing, for specific equipment, which revenue was being recognized or deferred on a quarterly basis. *See* Section IV.E, *supra*.

165. *Improper inventory accounting practices.* Defendants personally orchestrated and authorized Supermicro's improper inventory accounting practices during the Class Period. Liang was ultimately responsible for the Company's inventory valuation. When Bauer was CFO, he tried to implement a process for appropriately writing off equipment in inventory, and Defendants simply bypassed that process once Weigand became CFO. As a result, when Luong sought approval from senior management to write down inventory that was missing, certain requests, particularly for large write-offs, were not approved. Liang personally had the authority to reject inventory write-offs (which had to be approved by him) and further threatened senior managers with disciplinary action if they told employees to write equipment down. *See* Section IV.E, *supra*.

166. *Improper accounting practices related to costs of sales.* Defendants personally orchestrated and authorized Supermicro's improper accounting practices related to cost of sales. For example, starting in approximately 2021, Supermicro began delaying approval of invoices it had received from Compuware, a subcontractor run by Liang's brother, so that the invoices would

not be timely booked as expenses (i.e., "accounts payable") in the same quarter as the revenue related to the subcontracting expense. Liang's authorization was required for these invoices to be approved and therefore booked as "accounts payable." Liang delayed approving these invoices to delay recognition of the expenses associated with these invoices. *See* Section IV.E, *supra*.

167.    *Improper shifting and acceleration of services revenue.* Defendants personally orchestrated and authorized Supermicro's improper accounting practice for allocating service revenue to "hardware." Liang demanded in February 2021 that Supermicro's accounting department and Luong's servicing team determine the actual cost for providing services under hardware-and-services contracts to four of the Company's top customers. Dissatisfied with the number provided, Liang decided by fiat that Supermicro would allocate only 1.4% of revenue from these customers' contracts to services, despite the significantly higher cost of providing such services, and Weigand attended these discussions. *See* ¶¶ 112, 116-118. This enabled Supermicro to improperly recognize the resulting difference immediately as "hardware" revenue, rather than ratably as services revenue over the term of the multi-year services contracts for these customers— for example, one-third of the services revenue for each year of a three-year services contract—as GAAP requires. As Luong explained, Defendants had no data to support Liang's pronouncement that only 1.4% of revenue from these contracts should be allocated to services. *See* ¶¶ 61, 116. As a result, starting in January 2022, Supermicro began improperly recognizing only 1.4% of the revenue from hardware-and-services contracts as services revenue. *See* Section IV.E, *supra*.

168.    **Third**, EY's resignation strengthens the scienter inference. During its first audit of Supermicro and less than a month after the end of the fiscal year it was retained to audit, EY identified "concerns about several matters relating to governance, transparency and completeness of communications to EY, and other matters pertaining to the Company's internal control over financial reporting." *See* ¶¶ 133, 136. Shortly after receiving more information from the Board's Special Committee, EY concluded that the information "raised questions, including about whether the Company demonstrates a commitment to integrity and ethical values," "about the ability and willingness of the Audit Committee and overall Board to demonstrate and act as an oversight body that is independent of the CEO and other members of management," and "whether EY could rely

on representations from certain members of management and from the Audit Committee." EY then resigned because it was "no longer be able to rely on management's and the Audit Committee's representations" and was "unwilling to be associated with the financial statements prepared by management." *See* ¶¶ 44, 57, 138. As detailed above, this type of resignation by a "Big Four" accounting firm is exceptionally rare. EY's conclusions about the inability to trust Liang and Weigand strengthen the inference that Defendants knew about the persistent internal controls issues facing the Company.

169. **Fourth**, Defendants' retaliatory firing of Luong—who had reported directly to Liang for approximately seven years—further strengthens the scienter inference. As described above, Liang decided by fiat that Supermicro would allocate only 1.4% of revenue from four large customers' hardware-and-services contracts to services, with Weigand's attendance at the discussions and without any data to support this decision. *See* ¶¶ 112, 116-118, 121. To effectuate this change, Luong was asked to falsely acknowledge that the cost of services for these customers was 1.4%, but Luong refused. Luong was also asked to create a separate service code in Supermicro's system that would reflect this change for these four customers. Luong refused to do that, as well. In refusing to take these actions, Luong made clear to Supermicro that he did not think the change to 1.4% was accurate. Yet, in 2022, after Luong refused to take these actions, Luong began to be excluded from meetings on this issue and then, by early to mid-2022, Liang directed Luong to effectively report to Chou (instead of Liang), and Luong was later placed on involuntary administrative leave and terminated. *See* ¶ 119. Defendants did so to retaliate against Luong for his refusal to go along with their improper accounting practices and to conceal Defendants' false and misleading statements.

170. **Fifth**, Defendants knew when Supermicro recognized revenue prematurely or otherwise improperly during the Class Period. As detailed above, each quarter, Liang and Weigand both received by email the Quarterly Revenue Recognition Report. *See* ¶¶ 71, 79, 114. The report included an Excel file with multiple tabs for multiple quarters showing, for specific equipment, which revenue was being recognized or deferred and the services associated with any listed

equipment. *See* Section IV.E, *supra*. As a result, they knew—or were, at minimum, severely reckless in not knowing—when Supermicro improperly recognized revenue and why.

171.   **Sixth**, Defendants fired Bauer because he was not a "yes" man. Less than six months after Supermicro was relisted and reached a settlement with the SEC, Liang announced that Bauer was leaving the Company. *See* ¶¶ 69. In fact, Liang fired Bauer because he tried to get in the way of Liang's accounting manipulations, and Liang replaced Bauer with Weigand. *See id.* ¶¶ 69, 144.

172.   **Seventh**, Defendants issued false denials of the Hindenburg Report. In statements to news media, Supermicro called the report merely "rumors and speculation." *See* ¶¶ 127, 131. And in an SEC filing and attached letter, Liang claimed that the report contained "false or inaccurate statements" and "misleading presentations of information." *See* Section IV.F, *supra*. That Defendants issued false exculpatory statements in direct response to reports about Supermicro's internal control deficiencies and accounting misconduct further strengthens the strong inference of scienter.

173.   **Eighth**, Defendant Liang knew everything that occurred at Supermicro, including the improper accounting practices and other material internal control weaknesses, because Liang's approval, usually his ink signature on paper, was required for virtually every business decision. *See* ¶¶ 56, 59-60. Liang's management system was one where there was no delegation of authority by Liang, as Luong and other former Supermicro employees have explained. *See* Section IV.E, *supra*. As a result, Liang knew of Supermicro's internal control deficiencies—including the absence of any segregation of duties—during the Class Period.

174.   **Ninth**, Liang was personally involved in Supermicro's relationships with suppliers and customers. *See* ¶¶ 99-104. He therefore knew of Supermicro's improper accounting practices with respect to recognizing revenue from customers whose hardware had not yet been installed, recognizing revenue from customers whose shipments were incomplete, delaying approval of invoices received from subcontracting service providers, and failing to recognize revenue properly for services rendered to customers in combined hardware-and-services contracts. *See* Section IV.E. Moreover, Defendants affirmed in each of Supermicro's annual reports on Form 10-K during the

Class Period that Liang had "personal involvement in key relationships with suppliers, customers and strategic partners" which were "extremely valuable."[132]

175.    **Tenth**, Defendants re-hired many of the same individuals who were originally terminated as part of Supermicro's "remediation" efforts following its first Nasdaq delisting and SEC fine. These employees included Sun, Fedel, Wang, Leng, and Lin. *See* ¶¶ 41, 51-55. Furthermore, Liang approved these re-hires, because he had to approve hiring employees at every level of the Company, from administrative staff on up. *See* ¶ 60. And after these employees were re-hired, the material weaknesses in internal controls and improper accounting that Supermicro and Liang had perpetuated before and during its Nasdaq delisting continued. *See* Section IV.E, *supra*.

176.    **Eleventh**, Supermicro's executive compensation structure and bonus targets motivated Defendants to make false and misleading statements, as described below.

177.    *Liang's bonus tied to internal controls remediation.* Liang's bonus compensation was directly tied to whether Supermicro claimed that it had remediated the material weaknesses in internal controls. In March 2020, Supermicro's Board of Directors approved an aggregate cash bonus for Liang of up to $8.1 million, payable in two tranches, on September 30, 2021, and June 30, 2022. However, these payments were reduceable at the Board's discretion to the extent Supermicro had not made adequate progress in remediating its material weaknesses in its internal control over financial reporting. As a result, Liang had an incentive to make false and misleading statements about having remediated Supermicro's internal control weaknesses. Indeed, on September 21, 2021, the Board's Audit Committee advised the Board of its view that Supermicro *had* made adequate progress in remediating the material weaknesses in its internal controls—after Defendants' false and misleading statements that they had remediated their internal control

---

[132] Super Micro Computer, Inc., *Form 10-K*, at 23 (Aug. 31, 2020); Super Micro Computer, Inc., *Form 10-K*, at 17 (Aug. 27, 2021); Super Micro Computer, Inc., *Form 10-K*, at 20 (Aug. 29, 2022); Super Micro Computer, Inc., *Form 10-K*, at 19 (Aug. 28, 2023)

weaknesses, alleged herein.[133] On September 30, 2021, the Board therefore approved a payment of $2 million to Liang as a first tranche of the bonus described above.[134]

178.    *Liang's bonus tied to stock price.* Liang's compensation was also directly tied to Supermicro's stock price throughout the Class Period. Shortly after the March 2020 bonus, Liang began to draw a $1 per year salary via the 2021 and 2023 CEO Performance Awards. These compensation plans tied nearly all of Liang's compensation to aggressive revenue targets and stock price targets, both of which had to be achieved for a tranche of shares to be awarded to Liang. Under the 2021 compensation plan, after the Company's stock price rose as a result of Defendants' materially false and misleading statements, Liang received stock options worth at least $11.6 million. Thus, under the 2021 Compensation Plan and the 2023 Compensation Plan, Liang had an incentive to make false and misleading statements to inflate Supermicro's share price.

179.    **Twelfth**, the internal control issues were the most important challenge facing the company in the lead up to the Class Period. While Supermicro's stock was delisted from Nasdaq, Liang repeatedly emphasized the importance of correcting internal control issues in communications with the investing public. For example, when Supermicro completed its filings for fiscal year 2019, Liang wrote a letter to customers and investors stating that "[t]hese filings reflect the extensive and continuous enhancement of our . . . internal controls."[135] Similarly, when the Company announced on January 9, 2020, that it would soon be relisted on Nasdaq, Liang personally called the news "our successful comeback . . . based on improved internal controls."[136] Defendants' stated focus on these internal control issues strengthens the inference of scienter.

---

[133]    Super Micro Computer, Inc., *Form 10-Q*, at 12 (Nov. 5, 2021), https://www.sec.gov/ix?doc=/Archives/edgar/data/0001375365/000137536521000083/smci-20210930.htm.

[134] *Id.*

[135] Super Micro Computer, Inc., *Form 8-K* (Dec. 19, 2019).

[136] Press Release, Super Micro Computer, Inc., *Supermicro Announces Approval to Relist on NASDAQ and Provides Business Update* (Jan. 9, 2020), https://www.supermicro.com/en/pressreleases/supermicro-announces-approval-relist-nasdaq-and-provides-business-update.

180.   **Thirteenth**, Defendants repeatedly sought to focus the market's attention on the Company's "remediated" internal controls through their false and misleading public statements. For example, in an earnings call with analysts and investors on November 3, 2020, Liang claimed that Supermicro's deficiencies in internal controls were ***"resolved a few months ago"*** and that "the big challenges in the past three years that badly hurt Supermicro are ***totally behind us now***." Similarly, in each of Supermicro's annual reports on Form 10-K during the Class Period, which Liang and Weigand signed and certified, Defendants claimed: "***In the past,*** we have had one or more material weaknesses [in our internal control over financial reporting], ***which we have remediated***."

181.   **Fourteenth**, Defendants have a history of making material misrepresentations about their internal controls before and after the Class Period—showing their motive, opportunity and intent to make misrepresentations concerning internal controls and their knowledge of the misrepresentations. For example, in Supermicro's Form 10-K for its fiscal year 2016, which Liang signed and certified, the Company and Liang claimed that Supermicro's "internal control over financial reporting was effective as of June 30, 2016 to provide reasonable assurance regarding the reliability of financial reporting and preparation of consolidated financial statements" in accordance with GAAP.[137] Yet the SEC found that Defendants had "engaged in improper accounting—prematurely recognizing revenue and understating expenses from at least fiscal year 2015 through 2017," pointing to GAAP violations, and highlighted Supermicro's "numerous material weaknesses in its Internal Control over Financial Reporting."[138] After the Class Period, Liang again falsely claimed that the matters leading to EY's resignation were "all fixed" when asked by Fox Business on March 10, 2025. In particular, when Fox's host asked Liang whether "the troubles" leading to EY's resignation were "behind Supermicro now," Liang falsely replied that BDO "***found everything is good, …so everything is behind. We have the matter all fixed and indeed nothing [is] really wrong***." These misrepresentations were false, as Defendants'

---

[137] Super Micro Computer, Inc., *Form 10-K*, at 76 (Aug. 26, 2016).

[138] *In re Super Micro Computer, Inc.*, Securities Act Release No. 10822, at *2, *9.

admissions just six months later showed. In Supermicro's Form 10-K filed on August 28, 2025, Defendants admitted that four "*unremediated* material weaknesses in internal control over financial reporting as of June 30, 2025" remain that are virtually identical to the ones Defendants had identified in the Form 10-K filed six months earlier in February 2025. *See* Section IV.B-G, *supra*.

182. **Fifteenth**, Defendants perpetuated their internal controls weaknesses even after the Class Period. Despite the Hindenburg Report, Supermicro's announcement that it would delay filing its annual report to "assess[ ]" its internal controls, the DOJ investigation of the Company, and EY's "noisy withdrawal" describing internal controls weaknesses and concluding that it could not rely on management's representations, Liang **continued** perpetuating internal control weaknesses—notably, his inappropriate tone at the top and failure to observe segregation of duties. Liang continued to support Supermicro's improper revenue recognition practices by overriding senior executives' decision to terminate a sales employee whom they had found to have improperly recognized revenue. *See* Section IV.E, *supra*.

183. **Sixteenth**, even after the Class Period, Defendants falsely denied that they had intentionally overstated the value of their inventory during the Class Period. In Supermicro's February 11, 2025, press release, Defendants claimed that their overvaluation of inventory resulted at least in part "from an *unanticipated* decline" in the value of inventory—denying that Defendants knew about the overvalued inventory during the Class Period and actively continued overstating the value.[139] In reality, Luong requested inventory write-offs for missing equipment that were denied, Liang had to approve (and therefore could reject) all inventory write-offs, and Liang threatened managers who tried to write off overvalued inventory with disciplinary action. *See* Section IV.E, *supra*.

184. **Seventeenth**, Defendants Liang and Weigand had personal responsibility for designing and maintaining effective internal controls. During the Class Period, Defendants certified that they were responsible for establishing and maintaining internal controls over

---

[139] Super Micro Computer, Inc., *Form 8-K* (Feb. 11, 2025).

financial reporting and had evaluated the effectiveness of Supermicro's disclosure controls. *See* Section VI.B, D, *infra*. In its public filings, Defendants recognized that "[i]nternal control over financial reporting is a process designed by, or under the supervision of, our CEO and CFO[.]"[140] These representations—in which Liang and Weigand took responsibility for the Company's internal controls over financial reporting—further support a strong inference of scienter.

185.    ***Finally***, Defendants Liang and Weigand were directly responsible for Supermicro's false assurances to the investing public regarding Supermicro's remediation of prior material internal control weaknesses and effective internal controls over financial reporting. Throughout the Class Period, Defendant Liang was Supermicro's CEO, President and Chairman of the Board, and Defendant Weigand was Supermicro's CFO from February 2021 through the end of the Class Period. These top executives were directly charged with controlling the Company's financial reporting. Liang and Weigand signed each of the Company's false and misleading annual SEC filings on Form 10-K during the Class Period; Liang signed each of the Company's false and misleading quarterly SEC filings on Form 10-Q during the Class Period; Weigand signed each of the Company's false and misleading quarterly SEC filings on Form 10-Q during the Class Period starting on May 7, 2021; and each of them signed certifications, under Sections 302 and Section 906 of the Sarbanes-Oxley Act of 2002 ("SOX"), as to the accuracy and completeness of each of the quarterly and annual filings they signed.

186.    The foregoing facts, particularly when considered collectively (as they must be), support a strong inference of scienter.

## VI.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

187.    Defendants made materially false and misleading statements and omissions during the Class Period in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Among other things:

- Defendants misrepresented to investors that Supermicro had remediated the material internal control weaknesses and improper accounting practices that it had engaged in

---

[140] *See* Super Micro Computer, Inc., *Form 10-K*, at 91 (Aug. 31, 2020); Super Micro Computer, Inc., *Form 10-K*, at 91 (Aug. 27, 2021); Super Micro Computer, Inc., *Form 10-K*, at 100 (Aug. 29, 2022); Super Micro Computer, Inc., *Form 10-K*, at 99 (Aug. 28, 2023).

leading up to its Nasdaq delisting and SEC fine without disclosing that, in reality, (a) they perpetuated many of the same material control weaknesses and improper accounting practices during the Class Period as they had leading up to and during the Company's Nasdaq delisting and SEC fine (*see* ¶¶ 56-57, 62-63, 74-75, 87-88, 98, 105-106, 112, 124); (b) Supermicro had not remediated its material internal control weaknesses following its Nasdaq delisting and SEC fine (see ¶¶ 39, 44, 57, 106, 122); and (c) Defendants perpetuated Supermicro's ineffective internal controls over financial reporting, including disclosure controls, which showed many material weaknesses (*see* ¶¶ 75, 122, 140, 153-54).

- Defendants misrepresented to investors that Supermicro maintained effective internal controls over financial reporting and effective disclosure controls without disclosing that, in reality, (a) Defendants perpetuated Supermicro's ineffective internal controls over financial reporting, including disclosure controls, which showed many material weaknesses (*see* ¶¶ 5, 39); (b) Defendants perpetuated many of the same material control weaknesses and improper accounting practices during the Class Period as they had leading up to and during the Company's Nasdaq delisting and SEC fine (*see* ¶¶ 61-62, 88, 112, 124); and (c) Supermicro had not remediated its material internal control weaknesses following its Nasdaq delisting and SEC fine (*see* ¶¶ 39, 145, 151, 157).

- Defendants Liang and Weigand misrepresented to investors that they had designed internal controls over financial reporting to provide reasonable assurance regarding the reliability of Supermicro's financial reporting and the preparation of Supermicro's financial statements in accordance with GAAP and had designed effective disclosure controls and procedures without disclosing that, in reality, (a) Defendants perpetuated many of the same material control weaknesses and improper accounting practices during the Class Period as they had leading up to and during the Company's Nasdaq delisting and SEC fine (*see* ¶¶ 56-57, 62-63, 74-75, 87-88, 98, 105-106, 112, 124); (b) Supermicro had not remediated its material internal control weaknesses following its Nasdaq delisting and SEC fine (*see* ¶¶ 39, 44, 57, 106, 122); and (c) Defendants perpetuated Supermicro's ineffective internal controls over financial reporting, including disclosure controls, which showed many material weaknesses (*see* ¶¶ 75, 122, 140, 153-54).

- Defendants mispresented to investors that the Hindenburg Report—which described how Defendants continued to engage in the same control deficiencies and accounting misconduct during the Class Period as they had leading up to Supermicro's Nasdaq delisting and SEC fine—was "false" and "misleading" when, in reality, (a) Defendants perpetuated many of the same material control weaknesses and improper accounting practices during the Class Period as they had leading up to and during the Company's Nasdaq delisting and SEC fine (*see* ¶¶ 56-57, 62-63, 74-75, 87-88, 98, 105-106, 112, 124); (b) Supermicro had not remediated its material internal control weaknesses following its Nasdaq delisting and SEC fine (see ¶¶ 39, 44, 57, 106, 122); and (c) Defendants perpetuated Supermicro's ineffective internal controls over financial reporting, including disclosure controls, which showed many material weaknesses (*see* ¶¶ 75, 122, 140, 153-54).

### A.    Liang's and Supermicro's Materially False and Misleading Statements in an Earnings Call

188.    On November 3, 2020, Supermicro held a quarterly earnings call attended by analysts and investors. On this call, Liang claimed that Supermicro had resolved all the internal

controls weaknesses and accounting problems resulting in the Company's Nasdaq delisting. Specifically, he stated that: "[O]ur 10-K delay in June 2017 followed by our delisting was a significant distraction to management and employees for over three years. Although ***all the concern and issue were resolved a few months ago***, this disruption had a lasting effect on our business and employee morale. However, we are recovering quickly now. We believe that the big challenges in the past three years that badly hurt Supermicro are ***totally behind us now***."

189.    The statements highlighted in paragraph 188 were materially false and misleading and omitted material facts. Contrary to these statements, Supermicro had ***not*** resolved or remediated the issues or concerns leading to its Nasdaq delisting. Indeed, Supermicro engaged in many of the same severely deficient internal controls practices, including from accounting practices that violated GAAP, during the Class Period as Supermicro had done leading up to its Nasdaq delisting and SEC fine. *See* Section IV.E, *supra*. These included material weaknesses in internal controls arising from (i) an inappropriate tone at the top, including aggressive pressure to recognize revenue before the end of quarters (*see* ¶¶ 42-55); (ii) a failure to segregate duties and mitigate the risk of management overriding internal controls (*id*. ¶¶ 56-61); (iii) improperly recognizing revenue for yet-to-be-installed hardware that was not functional to customers (*id*. ¶¶ 62-73); (iv) prematurely recognizing revenue for hardware with incomplete parts (*id*. ¶¶ 74-86); (v) systematically overstating inventory and understating expenses (*id*. ¶¶ 87-97); (vi) failing to reasonably allocate revenue for services in a combined hardware-and-services contract (*id*. ¶¶ 112-121); (vii) failing to recognize revenue for services ratably over the term of a services or warranty contract (*id*. ¶¶ 105-111); and (viii) improperly delaying recognition of the cost of sales by delaying accounting for invoices from subcontractors in accounts payable, rather than recognizing these costs in the same quarter as the revenue associated with the subcontractors' work (*id*. ¶¶ 98-104).

190.    In fact, at the end of the Class Period, EY resigned as Supermicro's auditor upon concluding that it could "no longer . . . rely on management's . . . representations" and was "unwilling to be associated with the financial statements prepared by [Supermicro's]

management";[141] Supermicro's new auditor, BDO, then concluded when it audited Supermicro that the Company "did not maintain, in all material respects, effective internal control over financial reporting";[142] and Defendants later admitted that Supermicro's "internal control over financial reporting was not effective . . . due to the existence of material weaknesses in such controls."[143] *See* Section IV.G, *supra*.

### B.    Defendants' Materially False and Misleading Statements in Annual Reports

191.    During the Class Period, Supermicro filed three Annual Reports on Form 10-K, each signed and certified by Liang and Weigand. These Annual Reports were filed on August 27, 2021; August 29, 2022; and August 28, 2023. In each of these Annual Reports, Defendants represented in a sub-section concerning the Company's internal control over financial reporting: "***In the past*, we have had one or more material weaknesses, *which we have remediated*.**"[144]

192.    The statements identified in paragraph 191 were materially false and misleading and omitted material facts. Contrary to these statements, Supermicro's material weaknesses that led to its Nasdaq delisting were ***not*** a thing of "the past" and had ***not*** been "remediated." To the contrary, Supermicro engaged in many of the same severely deficient internal controls practices, including from accounting practices that violated GAAP, during the Class Period as Supermicro had done leading up to its Nasdaq delisting and SEC fine. *See* Section IV.E, *supra*. These included material weaknesses in internal controls arising from (i) an inappropriate tone at the top, including aggressive pressure to recognize revenue before the end of quarters (*see* ¶¶ 42-55); (ii) a failure to segregate duties and mitigate the risk of management overriding internal controls (*id.* ¶¶ 56-61); (iii) improperly recognizing revenue for yet-to-be-installed hardware that was not functional to customers (*id.* ¶¶ 62-73); (iv) prematurely recognizing revenue for hardware with incomplete parts (*id.* ¶¶ 74-86); (v) systematically overstating inventory and understating expenses (*id.* ¶¶ 87-97);

---

[141] Super Micro Computer, Inc., *Form 8-K* (Oct. 30, 2024).

[142] Super Micro Computer, Inc., *Form 10-K*, at 124 (Feb. 25, 2025).

[143] *Id.* at 15, 122.

[144] Super Micro Computer, Inc., *Form 10-K*, at 24 (Aug. 27, 2021); Super Micro Computer, Inc., *Form 10-K*, at 28 (Aug. 29, 2022); Super Micro Computer, Inc., *Form 10-K*, at 27 (Aug. 28, 2023).

(vi) failing to reasonably allocate revenue for services in a combined hardware-and-services contract (*id*. ¶¶ 112-121); (vii) failing to recognize revenue for services ratably over the term of a services or warranty contract (*id*. ¶¶ 105-111); and (viii) improperly delaying recognition of the cost of sales by delaying accounting for invoices from subcontractors in accounts payable, rather than recognizing these costs in the same quarter as the revenue associated with the subcontractors' work (*id*. ¶¶ 98-104).

193. In fact, at the end of the Class Period, EY resigned as Supermicro's auditor upon concluding that it could "no longer . . . rely on management's . . . representations" and was "unwilling to be associated with the financial statements prepared by [Supermicro's] management";[145] Supermicro's new auditor, BDO, then concluded when it audited Supermicro that the Company "did not maintain, in all material respects, effective internal control over financial reporting";[146] and Defendants later admitted that Supermicro's "internal control over financial reporting was not effective . . . due to the existence of material weaknesses in such controls."[147] *See* Section IV.G, *supra*.

194. Each of the three Annual Reports Supermicro filed on Form 10-K during the Class Period also contained purported "risk" warnings concerning Supermicro's internal controls over financial reporting. In each Annual Report, Defendants identified as a mere, hypothetical "risk" that Supermicro ***in the future*** may not "maintain…effective internal control over financial reporting."[148] Specifically, Defendants claimed: "***If we are unable to maintain . . . effective internal control over financial reporting***, investors may lose confidence in the accuracy and completeness of our financial reports and the market price of our common stock may decrease."[149]

---

[145] Super Micro Computer, Inc., *Form 8-K* (Oct. 30, 2024).

[146] Super Micro Computer, Inc., *Form 10-K*, at 124 (Feb. 25, 2025).

[147] *Id.* at 15, 122.

[148] Super Micro Computer, Inc., *Form 10-K*, at 24 (Aug. 27, 2021); Super Micro Computer, Inc., *Form 10-K*, at 28 (Aug. 29, 2022); Super Micro Computer, Inc., *Form 10-K*, at 27 (Aug. 28, 2023).

[149] *Id.*

195.   Defendants' statements identified in paragraph 194 were materially false and misleading and omitted material facts. Contrary to Defendants' representations, it was not a hypothetical possibility that Supermicro would be "unable to maintain…effective internal control over financial reporting." In truth, Supermicro did ***not*** maintain effective internal controls, including disclosure controls and procedures. Supermicro engaged in many of the same severely deficient internal controls practices, including from accounting practices that violated GAAP, during the Class Period as Supermicro had done leading up to its Nasdaq delisting and SEC fine. *See* Section IV.E, *supra*. These included material weaknesses in internal controls arising from (i) an inappropriate tone at the top, including aggressive pressure to recognize revenue before the end of quarters (*see* ¶¶ 42-55); (ii) a failure to segregate duties and mitigate the risk of management overriding internal controls (*id*. ¶¶ 56-61); (iii) improperly recognizing revenue for yet-to-be-installed hardware that was not functional to customers (*id*. ¶¶ 62-73); (iv) prematurely recognizing revenue for hardware with incomplete parts (*id*. ¶¶ 74-86); (v) systematically overstating inventory and understating expenses (*id*. ¶¶ 87-97); (vi) failing to reasonably allocate revenue for services in a combined hardware-and-services contract (*id*. ¶¶ 112-121); (vii) failing to recognize revenue for services ratably over the term of a services or warranty contract (*id*. ¶¶ 105-111); and (viii) improperly delaying recognition of the cost of sales by delaying accounting for invoices from subcontractors in accounts payable, rather than recognizing these costs in the same quarter as the revenue associated with the subcontractors' work (*id*. ¶¶ 98-104).

196.   In fact, at the end of the Class Period, EY resigned as Supermicro's auditor upon concluding that it could "no longer . . . rely on management's . . . representations" and was "unwilling to be associated with the financial statements prepared by [Supermicro's] management";[150] Supermicro's new auditor, BDO, then concluded when it audited Supermicro that the Company "did not maintain, in all material respects, effective internal control over financial reporting";[151] and Defendants later admitted that Supermicro's "internal control over

---

[150] Super Micro Computer, Inc., *Form 8-K* (Oct. 30, 2024).

[151] Super Micro Computer, Inc., *Form 10-K*, at 124 (Feb. 25, 2025).

financial reporting was not effective . . . due to the existence of material weaknesses in such controls."[152] *See* Section IV.G, *supra*.

197.    In each of their three Annual Reports during the Class Period, Defendants further represented:

> Under the supervision, and with the participation, of our management, including our Chief Executive Officer ('CEO') and Chief Financial Officer ('CFO'), we evaluated the effectiveness of our disclosure controls and procedures as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), as of [year end]. Based on this evaluation, ***our CEO and CFO have concluded that our disclosure controls and procedures were effective at a reasonable assurance level*** as of [year end]. [153]

In each of these Annual Reports, Defendants also stated:

> Management, including our CEO and CFO, assessed our internal control over financial reporting as of [year end]. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in its Internal Control - Integrated Framework (2013) (the 'COSO Framework'). ***Based on this assessment, management has concluded that our internal control over financial reporting was effective*** as of [year end] ***to provide reasonable assurance regarding the reliability of financial reporting and preparation of consolidated financial statements in accordance with U.S. GAAP.***[154]

198.    Likewise, in Exhibits 31.1, 31.2, 32.1, and 32.2 of each of the Annual Reports, Defendants Liang and Weigand certified under SOX Sections 302 and 902 that the Annual Reports were accurate and complete, and that Liang and Weigand had established appropriate internal controls, stating that they: (i) were responsible for establishing and maintaining internal control over financial reporting, and (ii) had designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under their supervision, to provide reasonable assurance regarding the reliability of Supermicro's financial reporting and the

---

[152] *Id.* at 15, 122.

[153] Super Micro Computer, Inc., *Form 10-K*, at 91 (Aug. 27, 2021); Super Micro Computer, Inc., *Form 10-K*, at 100 (Aug. 29, 2022); Super Micro Computer, Inc., *Form 10-K*, at 99 (Aug. 28, 2023).

[154] *Id.*

preparation of Supermicro's financial statements in accordance with GAAP during the Class Period.[155]

199.    Additionally, in each of the SOX certifications they signed accompanying each of the Annual Reports, Defendants Liang and Weigand made positive representations to investors that they had: (i) evaluated the "effectiveness of [Supermicro]'s disclosure controls and procedures"; and (ii) designed "disclosure controls and procedures" or "caused such disclosure controls and procedures to be designed under their supervision" to "ensure" that material information about Supermicro was made known to them.[156]

200.    The Defendants' statements identified in paragraphs 197-199 were materially false and misleading and omitted material facts for the following reasons.

201.    *First*, it was false and misleading and omitted material facts to state and certify that Supermicro maintained effective internal controls, including disclosure controls and procedures. Contrary to these statements, Supermicro did ***not*** maintain effective internal controls and had ***not*** resolved or remediated the material internal control weaknesses leading to its Nasdaq delisting and SEC fine. Indeed, Supermicro engaged in many of the same severely deficient internal controls practices, including from accounting practices that violated GAAP, during the Class Period as Supermicro had done leading up to its Nasdaq delisting and SEC fine. *See* Section IV.E, *supra*. These included material weaknesses in internal controls arising from (i) an inappropriate tone at the top, including aggressive pressure to recognize revenue before the end of quarters (*see* ¶¶ 42-55); (ii) a failure to segregate duties and mitigate the risk of management overriding internal controls (*id*. ¶¶ 56-61); (iii) improperly recognizing revenue for yet-to-be-installed hardware that was not functional to customers (*id*. ¶¶ 62-73); (iv) prematurely recognizing revenue for hardware with incomplete parts (*id*. ¶¶ 74-86); (v) systematically overstating inventory and understating expenses (*id*. ¶¶ 87-97); (vi) failing to reasonably allocate revenue for services in a combined

---

[155] Super Micro Computer, Inc., *Form 10-K*, Exs. 31.1, 31.2, 32.1, and 32.2 (Aug. 27, 2021); Super Micro Computer, Inc., *Form 10-K*, Exs. 31.1, 31.2, 32.1, and 32.2 (Aug. 29, 2022); Super Micro Computer, Inc., *Form 10-K*, Exs. 31.1, 31.2, 32.1, and 32.2 (Aug. 28, 2023).

[156] *Id.*

hardware-and-services contract (*id*. ¶¶ 112-121); (vii) failing to recognize revenue for services ratably over the term of a services or warranty contract (*id*. ¶¶ 105-111); and (viii) improperly delaying recognition of the cost of sales by delaying accounting for invoices from subcontractors in accounts payable, rather than recognizing these costs in the same quarter as the revenue associated with the subcontractors' work (*id*. ¶¶ 98-104).

202.    In fact, at the end of the Class Period, EY resigned as Supermicro's auditor upon concluding that it could "no longer . . . rely on management's . . . representations" and was "unwilling to be associated with the financial statements prepared by [Supermicro's] management";[157] Supermicro's new auditor, BDO, then concluded when it audited Supermicro that the Company "did not maintain, in all material respects, effective internal control over financial reporting";[158] and Defendants later admitted that Supermicro's "internal control over financial reporting was not effective . . . due to the existence of material weaknesses in such controls."[159] *See* Section IV.G, *supra*.

203.    ***Second***, it was false and misleading to state and certify that Defendants had designed internal controls over financial reporting to provide reasonable assurance regarding the reliability of Supermicro's financial reporting and that Defendants had designed disclosure controls to ensure that material information was known to them. Contrary to these statements, Defendants had not designed internal controls, including disclosure controls and procedures, to provide reasonable assurance regarding the reliability of Supermicro's financial reporting. Indeed, Supermicro engaged in many of the same severely deficient internal controls practices and improper accounting practices during the Class Period as Supermicro had leading up to its Nasdaq delisting and SEC fine. *See* Section IV.E, *supra*. These accounting practices did not provide reasonable assurance regarding Supermicro's financial reporting, because they violated GAAP. *See id.* These GAAP violations included (i) improperly recognizing revenue for yet-to-be-installed hardware that was not functional to customers (*id*. ¶¶ 62-73); (ii) prematurely recognizing revenue

---

[157] Super Micro Computer, Inc., *Form 8-K* (Oct. 30, 2024).

[158] Super Micro Computer, Inc., *Form 10-K*, at 124 (Feb. 25, 2025).

[159] *Id.* at 15, 122.

for hardware with incomplete parts (*id*. ¶¶ 74-86); (iii) systematically overstating inventory and understating expenses (*id*. ¶¶ 87-97); (iv) failing to reasonably allocate revenue for services in a combined hardware-and-services contract (*id*. ¶¶ 112-121); (v) failing to recognize revenue for services ratably over the term of a services or warranty contract (*id*. ¶¶ 105-111); and (vi) improperly delaying recognition of the cost of sales by delaying accounting for invoices from subcontractors in accounts payable, rather than recognizing these costs in the same quarter as the revenue associated with the subcontractors' work (*id*. ¶¶ 98-104).

204.    In fact, at the end of the Class Period, EY resigned as Supermicro's auditor upon concluding that it could "no longer . . . rely on management's . . . representations" and was "unwilling to be associated with the financial statements prepared by [Supermicro's] management";[160] Supermicro's new auditor, BDO, then concluded when it audited Supermicro that the Company "did not maintain, in all material respects, effective internal control over financial reporting";[161] and Defendants later admitted that Supermicro's "internal control over financial reporting was not effective . . . due to the existence of material weaknesses in such controls."[162] *See* Section IV.G, *supra*.

### C.    Defendants' Materially False and Misleading Statements in Their "Sustainability Report"

205.    On approximately May 31, 2024, Supermicro issued a Sustainability Report for 2023, which the Company published on its website.[163] The report began with a letter from Liang stating, "I am proud to present Supermicro's 2023 Sustainability Report." In a section titled "Governance," the Report claimed, "We maintain effective Internal Controls over Financial Reporting (ICFR) processes for reporting and disclosures."[164]

---

[160] Super Micro Computer, Inc., *Form 8-K* (Oct. 30, 2024).

[161] Super Micro Computer, Inc., *Form 10-K*, at 124 (Feb. 25, 2025).

[162] *Id.* at 15, 122.

[163] *Supermicro 2023 Sustainability Rep.*, Super Micro Computer, Inc. (May 31, 2024), https://www.supermicro.com/GreenComputing/Supermicro-ESG-Report-2023.pdf.

[164] *Id.* at 21.

206.    Defendants' statement identified in paragraph 205 was materially false and misleading and omitted material facts. Contrary to this statement, Supermicro did ***not*** maintain effective internal controls, including disclosure controls and had ***not*** resolved or remediated the material internal control weaknesses leading to its Nasdaq delisting and SEC fine. Indeed, Supermicro engaged in many of the same severely deficient internal controls practices, including from accounting practices that violated GAAP, during the Class Period as Supermicro had done leading up to its Nasdaq delisting and SEC fine. *See* Section IV.E, *supra*. These included material weaknesses in internal controls arising from (i) an inappropriate tone at the top, including aggressive pressure to recognize revenue before the end of quarters (*see* ¶¶ 42-55); (ii) a failure to segregate duties and mitigate the risk of management overriding internal controls (*id*. ¶¶ 56-61); (iii) improperly recognizing revenue for yet-to-be-installed hardware that was not functional to customers (*id*. ¶¶ 62-73); (iv) prematurely recognizing revenue for hardware with incomplete parts (*id*. ¶¶ 74-86); (v) systematically overstating inventory and understating expenses (*id*. ¶¶ 87-97); (vi) failing to reasonably allocate revenue for services in a combined hardware-and-services contract (*id*. ¶¶ 112-121); (vii) failing to recognize revenue for services ratably over the term of a services or warranty contract (*id*. ¶¶ 105-111); and (viii) improperly delaying recognition of the cost of sales by delaying accounting for invoices from subcontractors in accounts payable, rather than recognizing these costs in the same quarter as the revenue associated with the subcontractors' work (*id*. ¶¶ 98-104).

207.    In fact, at the end of the Class Period, EY resigned as Supermicro's auditor upon concluding that it could "no longer . . . rely on management's . . . representations" and was "unwilling to be associated with the financial statements prepared by [Supermicro's] management";[165] Supermicro's new auditor, BDO, then concluded when it audited Supermicro that the Company "did not maintain, in all material respects, effective internal control over financial reporting";[166] and Defendants later admitted that Supermicro's "internal control over

---

[165] Super Micro Computer, Inc., *Form 8-K* (Oct. 30, 2024).

[166] Super Micro Computer, Inc., *Form 10-K*, at 124 (Feb. 25, 2025).

financial reporting was not effective . . . due to the existence of material weaknesses in such controls."[167] *See* Section IV.G, *supra*.

### D. Defendants' Materially False and Misleading Statements in Quarterly Reports

208.    In Supermicro's quarterly reports on Form 10-Q for the quarters ended September 30, 2020, filed on November 6, 2020, and for the quarter ended December 31, 2020, filed on February 5, 2021—each signed and certified by Liang—Defendants Supermicro and Liang represented that, under Liang's supervision and with his participation, Supermicro's management evaluated the effectiveness of the Company's disclosure controls and procedures and, based on that evaluation, the disclosure controls and procedures were effective as of the end of those quarters, with the exception of a single, isolated weakness in internal controls relating to IT systems.[168] Specifically, these quarterly reports described this material weakness as the "IT General Control (ITGC) material weakness in our internal control over financial reporting" relating to "IT privileged access for our primary accounting system and boundary systems."[169]

209.    In Exhibits 31.1 and 32.1 to each of these quarterly reports, Defendant Liang further certified under SOX Sections 302 and 902 that the quarterly reports were accurate and complete and stated that he: (i) was responsible for establishing and maintaining internal control over financial reporting, and (ii) had designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under his supervision, to provide reasonable assurance regarding the reliability of Supermicro's financial reporting and the preparation of Supermicro's financial statements in accordance with GAAP during the Class Period.[170]

210.    Additionally, in each of the SOX Certifications he signed for these quarterly Reports, Liang further made positive representations to investors that he had: (i) evaluated the

---

[167] *Id.* at 15, 122.

[168] Super Micro Computer, Inc., *Form 10-Q*, at 39 (Nov. 6, 2020); Super Micro Computer, Inc., *Form 10-Q*, at 43 (Feb. 5, 2021).

[169] *Id.*

[170] Super Micro Computer, Inc., *Form 10-Q*, Exs. 31.1, 32.1 (Nov. 6, 2020); Super Micro Computer, Inc., *Form 10-Q*, Exs. 31.1, 32.1 (Feb. 5, 2021).

"effectiveness of [Supermicro]'s disclosure controls and procedures"; and (ii) designed "disclosure controls and procedures" or "caused such disclosure controls and procedures to be designed under [his] supervision" to "ensure" that material information about Supermicro was made known to him.[171]

211.    Similarly, in Supermicro's quarterly report on Form 10-Q for the quarter ended March 31, 2021, filed on May 7, 2021, and signed and certified by Liang and Weigand, Defendants further represented that Supermicro had only a single, isolated internal control weakness arising from an IT systems issue involving employee access. Defendants represented that under Liang's and Weigand's supervision and with their participation Supermicro's management evaluated the effectiveness of the Company's disclosure controls and procedures and, based on that evaluation, the disclosure controls and procedures were effective as of the end of those quarters, with the exception of this single, isolated material weakness in internal controls.[172] Specifically, the Form 10-Q represented that the single material weakness was related to access to IT systems, that the Company had undertaken remedial procedures to address the issue, and that the Company was testing the re-designed IT access controls. The May 7, 2021 quarterly report described this material weakness as the "IT General Control (ITGC) material weakness in our internal control over financial reporting" relating to "IT privileged access for our primary accounting system and boundary systems."[173]

212.    In Exhibits 31.1 and 31.2 to this quarterly report, Defendants Liang and Weigand again certified under SOX Sections 302 and 902 that the Quarterly Reports was accurate and complete and stated that they: (i) were responsible for establishing and maintaining internal control over financial reporting, and (ii) had designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under their supervision, to provide reasonable assurance regarding the reliability of Supermicro's financial reporting and the

---

[171] *Id.*

[172] Super Micro Computer, Inc., *Form 10-Q*, at 46 (May 7, 2021).

[173] *Id.*

preparation of Supermicro's financial statements in accordance with GAAP during the Class Period.[174]

213.    Additionally, in the SOX certifications they signed for this quarterly report, Liang and Weigand further made positive representations to investors that they had: (i) evaluated the "effectiveness of [Supermicro]'s disclosure controls and procedures"; and (ii) designed "disclosure controls and procedures" or "caused such disclosure controls and procedures to be designed under their supervision" to "ensure" that material information about Supermicro was made known to them.[175]

214.    The Defendants' statements identified in paragraphs 208-213 were materially false and misleading and omitted material facts for the following reasons.

215.    ***First***, it was false and misleading to state and certify that Supermicro had a single, isolated material internal controls weakness relating to IT systems. Contrary to these statements, Supermicro engaged in many of the same severely deficient internal controls practices, including from accounting practices that violated GAAP, during the Class Period as Supermicro had done leading up to its Nasdaq delisting and SEC fine. These practices were unrelated to the IT system weakness Defendants identified in their statements in paragraphs 208-213. *See* Section IV.E, *supra*. Indeed, Supermicro's material internal control weaknesses during the Class Period included material weaknesses in internal controls arising from (i) an inappropriate tone at the top, including aggressive pressure to recognize revenue before the end of quarters (*see* ¶¶ 42-55); (ii) a failure to segregate duties and mitigate the risk of management overriding internal controls (*id*. ¶¶ 56-61); (iii) improperly recognizing revenue for yet-to-be-installed hardware that was not functional to customers (*id*. ¶¶ 62-73); (iv) prematurely recognizing revenue for hardware with incomplete parts (*id*. ¶¶ 74-86); (v) systematically overstating inventory and understating expenses (*id*. ¶¶ 87-97); (vi) failing to reasonably allocate revenue for services in a combined hardware-and-services contract (*id*. ¶¶ 112-121); (vii) failing to recognize revenue for services ratably over the term of a

---

[174] Super Micro Computer, Inc., *Form 10-Q*, Exs. 31.1, 32.1 (May 7, 2021).

[175] *Id.* Exs. 31.1, 31.2.

services or warranty contract (*id*. ¶¶ 105-111); and (viii) improperly delaying recognition of the cost of sales by delaying accounting for invoices from subcontractors in accounts payable, rather than recognizing these costs in the same quarter as the revenue associated with the subcontractors' work (*id*. ¶¶ 98-104). *See id*.

216.    In fact, at the end of the Class Period, EY resigned as Supermicro's auditor upon concluding that it could "no longer . . . rely on management's . . . representations" and was "unwilling to be associated with the financial statements prepared by [Supermicro's] management";[176] Supermicro's new auditor, BDO, then concluded when it audited Supermicro that the Company "did not maintain, in all material respects, effective internal control over financial reporting";[177] and Defendants later admitted that Supermicro's "internal control over financial reporting was not effective…due to the existence of material weaknesses in such controls."[178] *See* Section IV.G, *supra*. In reaching these conclusions, BDO and Defendants pointed to four material internal controls weaknesses that were unrelated to the IT systems weakness Defendants identified in their statements in paragraphs 208-213. *See id.*

217.    ***Second***, it was false and misleading to state and certify that Defendants had designed internal controls over financial reporting to provide reasonable assurance regarding the reliability of Supermicro's financial reporting and that Defendants had designed disclosure controls to ensure that material information was known to them. Contrary to these statements, Defendants had not designed internal controls, including disclosure controls and procedures, to provide reasonable assurance regarding the reliability of Supermicro's financial reporting. Indeed, Supermicro engaged in many of the same severely deficient internal controls practice and improper accounting practices during the Class Period as Supermicro had leading up to its Nasdaq delisting and SEC fine. *See* Section IV.E, *supra*. These accounting practices did not provide reasonable assurance regarding Supermicro's financial reporting, because they violated GAAP. *See id.* These GAAP violations included (i) improperly recognizing revenue for yet-to-be-installed hardware that

---

[176] Super Micro Computer, Inc., *Form 8-K* (Oct. 30, 2024).

[177] Super Micro Computer, Inc., *Form 10-K*, at 124 (Feb. 25, 2025).

[178] *Id.* at 15, 122.

was not functional to customers (*id.* ¶¶ 62-73); (ii) prematurely recognizing revenue for hardware with incomplete parts (*id.* ¶¶ 74-86); (iii) systematically overstating inventory and understating expenses (*id.* ¶¶ 87-97); (iv) failing to reasonably allocate revenue for services in a combined hardware-and-services contract (*id.* ¶¶ 112-121); (v) failing to recognize revenue for services ratably over the term of a services or warranty contract (*id.* ¶¶ 105-111); and (vi) improperly delaying recognition of the cost of sales by delaying accounting for invoices from subcontractors in accounts payable, rather than recognizing these costs in the same quarter as the revenue associated with the subcontractors' work (*id.* ¶¶ 98-104).

218.    In fact, at the end of the Class Period, EY resigned as Supermicro's auditor upon concluding that it could "no longer . . . rely on management's . . . representations" and was "unwilling to be associated with the financial statements prepared by [Supermicro's] management";[179] Supermicro's new auditor, BDO, then concluded when it audited Supermicro that the Company "did not maintain, in all material respects, effective internal control over financial reporting";[180] and Defendants later admitted that Supermicro's "internal control over financial reporting was not effective . . . due to the existence of material weaknesses in such controls."[181] *See* Section IV.G, *supra*.

219.    In each of Supermicro's nine other quarterly reports filed on Form 10-Q between November 5, 2021, and the end of the Class Period, each of which Liang and Weigand signed and certified, Defendants represented that under Liang's and Weigand's supervision and with their participation, Supermicro's management evaluated the effectiveness of the Company's disclosure controls and procedures and, based on that evaluation, concluded that the disclosure controls and procedures were effective as of the end of the quarter. Supermicro filed these quarterly reports on November 5, 2021, February 4, 2022, May 6, 2022, November 4, 2022, February 3, 2023, May 5, 2023, November 3, 2023, February 2, 2024, and May 6, 2024.[182]

---

[179] Super Micro Computer, Inc., *Form 8-K* (Oct. 30, 2024).

[180] Super Micro Computer, Inc., *Form 10-K*, at 124 (Feb. 25, 2025).

[181] *Id.* at 15, 122.

[182] Super Micro, Inc., *Form 10-Q*, at 44 (Nov. 5, 2021); Super Micro, Inc., *Form 10-Q*, at 49 (Feb. 4, 2022); Super Micro, Inc., *Form 10-Q*, at 50 (May 6, 2022); Super Micro, Inc., *Form 10-Q*, at

220.    Likewise, in Exhibits 31.1, 31.2, 32.1, and 32.2 to these quarterly reports, Defendants Liang and Weigand further certified under SOX Sections 302 and 902 that the quarterly reports were accurate and complete and stated that they: (i) were responsible for establishing and maintaining internal control over financial reporting, and (ii) had designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under their supervision, to provide reasonable assurance regarding the reliability of Supermicro's financial reporting and the preparation of Supermicro's financial statements in accordance with GAAP during the Class Period.[183]

221.    Additionally, in the SOX certifications they signed for these quarterly reports, Liang and Weigand further made positive representations to investors that they had: (i) evaluated the "effectiveness of [Supermicro]'s disclosure controls and procedures"; and (ii) designed "disclosure controls and procedures" or "caused such disclosure controls and procedures to be designed under their supervision" to "ensure" that material information about Supermicro was made known to them.[184]

222.    The Defendants' statements identified in paragraphs 219-221 were materially false and misleading and omitted material facts for the following reasons.

223.    **First**, it was false and misleading to state and certify that Supermicro maintained effective internal controls over financial reporting, including disclosure controls and procedures. Contrary to these statements, Supermicro did **not** maintain effective internal controls, including disclosure controls and procedures, and had **not** resolved or remediated the material internal

---

41 (Nov. 4, 2022); Super Micro, Inc., *Form 10-Q*, at 45 (Feb. 3, 2023); Super Micro, Inc., *Form 10-Q*, at 45 (May 5, 2023); Super Micro, Inc., *Form 10-Q*, at 36 (Nov. 3, 2023); Super Micro, Inc., *Form 10-Q*, at 44 (Feb. 2, 2024); Super Micro, Inc., *Form 10-Q*, at 45 (May 6, 2024).

[183] Super Micro, Inc., *Form 10-Q*, Exs. 31.1, 31.2, 32.1, 32.2 (Nov. 5, 2021); Super Micro, Inc., *Form 10-Q*, Exs. 31.1, 31.2, 32.1, 32.2 (Feb. 4, 2022); Super Micro, Inc., *Form 10-Q*, Exs. 31.1, 31.2, 32.1, 32.2 (May 6, 2022); Super Micro, Inc., *Form 10-Q*, Exs. 31.1, 31.2, 32.1, 32.2 (Nov. 4, 2022); Super Micro, Inc., *Form 10-Q*, Exs. 31.1, 31.2, 32.1, 32.2 (Feb. 3, 2023); Super Micro, Inc., *Form 10-Q*, Exs. 31.1, 31.2, 32.1, 32.2 (May 5, 2023); Super Micro, Inc., *Form 10-Q*, Exs. 31.1, 31.2, 32.1, 32.2 (Nov. 3, 2023); Super Micro, Inc., *Form 10-Q*, Exs. 31.1, 31.2, 32.1, 32.2 (Feb. 2, 2024); Super Micro, Inc., *Form 10-Q*, Exs. 31.1, 31.2, 32.1, 32.2 (May 6, 2024).

[184] *Id.*

control weaknesses leading to its Nasdaq delisting and SEC fine. Supermicro engaged in many of the same severely deficient internal controls practices, including from accounting practices that violated GAAP, during the Class Period as Supermicro had done leading up to its Nasdaq delisting and SEC fine. *See* Section IV.E, *supra*. These included material weaknesses in internal controls arising from (i) an inappropriate tone at the top, including aggressive pressure to recognize revenue before the end of quarters (*see* ¶¶ 42-55); (ii) a failure to segregate duties and mitigate the risk of management overriding internal controls (*id*. ¶¶ 56-61); (iii) improperly recognizing revenue for yet-to-be-installed hardware that was not functional to customers (*id*. ¶¶ 62-73); (iv) prematurely recognizing revenue for hardware with incomplete parts (*id*. ¶¶ 74-86); (v) systematically overstating inventory and understating expenses (*id*. ¶¶ 87-97); (vi) failing to reasonably allocate revenue for services in a combined hardware-and-services contract (*id*. ¶¶ 112-121); (vii) failing to recognize revenue for services ratably over the term of a services or warranty contract (*id*. ¶¶ 105-111); and (viii) improperly delaying recognition of the cost of sales by delaying accounting for invoices from subcontractors in accounts payable, rather than recognizing these costs in the same quarter as the revenue associated with the subcontractors' work (*id*. ¶¶ 98-104). *See id*.

224.    In fact, at the end of the Class Period, EY resigned as Supermicro's auditor upon concluding that it could "no longer . . . rely on management's . . . representations" and was "unwilling to be associated with the financial statements prepared by [Supermicro's] management";[185] Supermicro's new auditor, BDO, then concluded when it audited Supermicro that the Company "did not maintain, in all material respects, effective internal control over financial reporting";[186] and Defendants later admitted that Supermicro's "internal control over financial reporting was not effective…due to the existence of material weaknesses in such controls."[187] *See* Section IV.G, *supra*.

225.    ***Second***, it was false and misleading to state and certify that Defendants had designed internal controls over financial reporting to provide reasonable assurance regarding the

---

[185] Super Micro Computer, Inc., *Form 8-K* (Oct. 30, 2024).

[186] Super Micro Computer, Inc., *Form 10-K*, at 124 (Feb. 25, 2025).

[187] *Id.* at 15, 122.

reliability of Supermicro's financial reporting and that Defendants had designed disclosure controls to ensure that material information was known to them. Contrary to these statements, Defendants had not designed internal controls, including disclosure controls and procedures, to provide reasonable assurance regarding the reliability of Supermicro's financial reporting. Supermicro engaged in many of the same severely deficient internal controls practices and improper accounting practices during the Class Period as Supermicro had leading up to its Nasdaq delisting and SEC fine. *See* Section IV.E, *supra*. These accounting practices did not provide reasonable assurance regarding Supermicro's financial reporting, because they violated GAAP. *See id*. These GAAP violations included (i) improperly recognizing revenue for yet-to-be-installed hardware that was not functional to customers (*id*. ¶¶ 62-73); (ii) prematurely recognizing revenue for hardware with incomplete parts (*id*. ¶¶ 74-86); (iii) systematically overstating inventory and understating expenses (*id*. ¶¶ 87-97); (iv) failing to reasonably allocate revenue for services in a combined hardware-and-services contract (*id*. ¶¶ 112-121); (v) failing to recognize revenue for services ratably over the term of a services or warranty contract (*id*. ¶¶ 105-111); and (vi) improperly delaying recognition of the cost of sales by delaying accounting for invoices from subcontractors in accounts payable, rather than recognizing these costs in the same quarter as the revenue associated with the subcontractors' work (*id*. ¶¶ 98-104).

226.    In fact, at the end of the Class Period, EY resigned as Supermicro's auditor upon concluding that it could "no longer . . . rely on management's . . . representations" and was "unwilling to be associated with the financial statements prepared by [Supermicro's] management";[188] Supermicro's new auditor, BDO, then concluded when it audited Supermicro that the Company "did not maintain, in all material respects, effective internal control over financial reporting";[189] and Defendants later admitted that Supermicro's "internal control over financial reporting was not effective . . . due to the existence of material weaknesses in such controls."[190] *See* Section IV.G, *supra*.

---

[188] Super Micro Computer, Inc., *Form 8-K* (Oct. 30, 2024).

[189] Super Micro Computer, Inc., *Form 10-K*, at 124 (Feb. 25, 2025).

[190] *Id.* at 15, 122.

### E. Defendants' False and Misleading Statements to News Media

227. On approximately August 28, 2024, Supermicro issued statements to numerous media outlets that asked the Company to comment on the Hindenburg Report. These included *Fortune*, *Barrons*, Axios, and the Associated Press. In the statements, Supermicro represented that the Hindenburg Report was merely "rumors and speculation." Specifically, Supermicro claimed in each of its statements that it "does not comment on rumors and speculation."[191]

228. The statements identified in paragraph 227 were materially false and misleading and omitted material facts. Contrary to these statements, the Hindenburg Report did ***not*** contain "rumor and speculation" about Supermicro's continued internal controls weaknesses and improper accounting practices following the Company's Nasdaq delisting and SEC fine. Indeed, Supermicro engaged in many of the same severely deficient internal controls practices, including from accounting practices that violated GAAP, during the Class Period as Supermicro had done leading up to its Nasdaq delisting and SEC fine. *See* Section IV.E, *supra*. These included material weaknesses in internal controls arising from (i) an inappropriate tone at the top, including aggressive pressure to recognize revenue before the end of quarters (*see* ¶¶ 42-55); (ii) a failure to segregate duties and mitigate the risk of management overriding internal controls (*id*. ¶¶ 56-61); (iii) improperly recognizing revenue for yet-to-be-installed hardware that was not functional to customers (*id*. ¶¶ 62-73); (iv) prematurely recognizing revenue for hardware with incomplete parts (*id*. ¶¶ 74-86); (v) systematically overstating inventory and understating expenses (*id*. ¶¶ 87-97); (vi) failing to reasonably allocate revenue for services in a combined hardware-and-services

---

[191] *See* Will Daniel, *Wall Street's AI darling Super Micro postponed earnings while under short-seller's microscope*, Fortune (Aug. 28, 2024), https://fortune.com/2024/08/28/super-micro-wall-street-ai-earnings-short-seller-hindenburg/; Emily Dattilo, *Super Micro Stock Falls as August Selloff Steepens. A Short-Seller Report Is the Latest Bad News*, Barron's (Aug. 27, 2024), https://www.barrons.com/articles/super-micro-stock-price-hindenburg-short-seller-news-da46e616; Matt Ott, *Super Micro Computer tumbles 25% on 10k reporting delay, accusations of accounting irregularities*, Associated Press (Aug. 28, 2024), https://apnews.com/article/super-micro-computer-accounting-hindenburg-short-seller-51a31837170cab6175d1179dbf297014; William Gavin & Rocio Fabbro, *Super Micro Computer stock tanks 22% after a short seller's scathing report*, Quartz (Aug. 28, 2024), https://qz.com/super-micro-computer-stock-fall-filing-delay-hindenburg-1851634005; Hope King, *Charted: Super sink*, Axios (Aug. 28, 2024) https://www.axios.com/2024/08/28/charted-super-sink-closer.

1  contract (*id*. ¶¶ 112-121); (vii) failing to recognize revenue for services ratably over the term of a

2  services or warranty contract (*id*. ¶¶ 105-111); and (viii) improperly delaying recognition of the

3  cost of sales by delaying accounting for invoices from subcontractors in accounts payable, rather

4  than recognizing these costs in the same quarter as the revenue associated with the subcontractors'

5  work (*id*. ¶¶ 98-104).

6      229.    In fact, at the end of the Class Period, EY resigned as Supermicro's auditor upon

7  concluding that it could "no longer . . . rely on management's . . . representations" and was

8  "unwilling to be associated with the financial statements prepared by [Supermicro's]

9  management";[192] Supermicro's new auditor, BDO, then concluded when it audited Supermicro

10  that the Company "did not maintain, in all material respects, effective internal control over

11  financial reporting";[193] and Defendants later admitted that Supermicro's "internal control over

12  financial reporting was not effective . . . due to the existence of material weaknesses in such

13  controls."[194] *See* Section IV.G, *supra*.

## F.    Defendants' False and Misleading Statements in a Press Release and SEC Report

16      230.    On September 3, 2024, Supermicro filed a Current Report with the SEC on Form

17  8-K, which Defendant Liang signed. The report attached a letter from Liang, also signed by him

18  and addressed to "Valued Customers and Partners."[195] In the letter, Defendant Liang falsely

19  claimed that the Hindenburg Report contained false and misleading statements. Specifically, Liang

20  began, "You may have seen our recent announcement that Supermicro will be delayed in filing its

21  Annual Report for the fiscal year ended June 30, 2024, and separately, a report published by a

22  short seller. I wanted you to hear from me directly about what they mean."[196] Liang then claimed:

23  "[Y]ou may have . . . heard about a recent report from a short-seller hedge fund that **contains false**

---

[192] Super Micro Computer, Inc., *Form 8-K* (Oct. 30, 2024).

[193] Super Micro Computer, Inc., *Form 10-K*, at 124 (Feb. 25, 2025).

[194] *Id.* at 15, 122.

[195] Super Micro Computer, Inc., *Form 8-K* (Sept. 3, 2024).

[196] *Id.*

*or inaccurate statements* about our company *including misleading presentations of information* that we have previously shared publicly."[197]

231.    The statements highlighted in paragraph 230 were materially false and misleading and omitted material facts. Contrary to these statements, the Hindenburg Report did ***not*** contain false and misleading statements about Supermicro's continued internal controls weaknesses and improper accounting practices following the Company's Nasdaq delisting and SEC fine. Indeed, Supermicro engaged in many of the same severely deficient internal controls practices, including from accounting practices that violated GAAP, during the Class Period as Supermicro had done leading up to its Nasdaq delisting and SEC fine. *See* Section IV.E, *supra*. These included material weaknesses in internal controls arising from (i) an inappropriate tone at the top, including aggressive pressure to recognize revenue before the end of quarters (*see* ¶¶ 42-55); (ii) a failure to segregate duties and mitigate the risk of management overriding internal controls (*id*. ¶¶ 56-61); (iii) improperly recognizing revenue for yet-to-be-installed hardware that was not functional to customers (*id*. ¶¶ 62-73); (iv) prematurely recognizing revenue for hardware with incomplete parts (*id*. ¶¶ 74-86); (v) systematically overstating inventory and understating expenses (*id*. ¶¶ 87-97); (vi) failing to reasonably allocate revenue for services in a combined hardware-and-services contract (*id*. ¶¶ 112-121); (vii) failing to recognize revenue for services ratably over the term of a services or warranty contract (*id*. ¶¶ 105-111); and (viii) improperly delaying recognition of the cost of sales by delaying accounting for invoices from subcontractors in accounts payable, rather than recognizing these costs in the same quarter as the revenue associated with the subcontractors' work (*id*. ¶¶ 98-104).

232.    In fact, at the end of the Class Period, EY resigned as Supermicro's auditor upon concluding that it could "no longer . . . rely on management's . . . representations" and was "unwilling to be associated with the financial statements prepared by [Supermicro's] management";[198] Supermicro's new auditor, BDO, then concluded when it audited Supermicro

---

[197] *Id.*

[198] Super Micro Computer, Inc., *Form 8-K* (Oct. 30, 2024).

that the Company "did not maintain, in all material respects, effective internal control over financial reporting";[199] and Defendants later admitted that Supermicro's "internal control over financial reporting was not effective . . . due to the existence of material weaknesses in such controls."[200] *See* Section IV.G, *supra*.

## VII.    ADDITIONAL LOSS CAUSATION ALLEGATIONS

233.    The market for Supermicro common stock was open, well-developed, and efficient at all relevant times. Throughout the Class Period, Lead Plaintiff and Class members purchased or otherwise acquired Supermicro securities at artificially inflated prices and were damaged thereby when the price of Supermicro securities declined in response to the disclosures described above in Section IV.F. Throughout the Class Period, the price of Supermicro securities was artificially inflated and/or maintained as a result of Defendants' materially false and misleading statements and omissions. Lead Plaintiff and other Class members purchased or otherwise acquired Supermicro securities relying upon the integrity of the market price for Supermicro securities and market information relating to the adequacy of Supermicro's internal controls over financial reporting.

234.    The fraud alleged herein was the proximate cause of the economic loss suffered by Lead Plaintiff and the Class. There was a causal connection between the alleged fraud and the loss (i.e., stock price declines) described herein. *See, e.g.*, *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750 (9th Cir. 2018).

235.    Defendants' misrepresentations and fraudulent conduct became apparent to the market through four separate disclosures. In each instance, the price of Supermicro's common stock immediately declined as the artificial inflation was removed from the market price of the securities, causing substantial damage to Lead Plaintiff and the Class. The price of Supermicro's common stock immediately declined as the artificial inflation was removed from the market price of the securities, causing substantial damage to Lead Plaintiff and the Class.

---

[199] Super Micro Computer, Inc., *Form 10-K*, at 124 (Feb. 25, 2025).

[200] *Id.* at 15, 122.

236.    Before the market opened on August 27, 2024, Hindenburg released its report detailing how, contrary to Defendants' Class Period representations, Supermicro had not remediated its internal controls weaknesses and accounting problems. Hindenburg interviewed former employees of Supermicro and its customers' employees, who recounted how the Company continued—after the Nasdaq delisting and SEC fine—to engage in the *same* accounting manipulations and perpetuate the *same* internal controls weaknesses. For instance, a former Supermicro senior sales director told Hindenburg, "'I don't think the behavior of the company in many ways has changed in the 5 years since I started, and I started shortly after that [Nasdaq] delisting problem.'"[201] The Hindenburg Report also quoted a former Supermicro salesperson who described "completing a partial shipment, then later coming up with an excuse for why the rest didn't happen" and explaining how "now you have a problem." The report further described Hindenburg's interview with an employee at Genesis Cloud, a Supermicro customer, who "highlighted a specific example that resembled [the SEC's] past channel stuffing allegations." As Hindenburg described it, "[i]n June 2023, closing in on Super Micro's financial year end, Genesis was shipped 'pre-production' servers that were not ready for use." The Hindenburg Report further recounted its interview with an employee of another Supermicro customer, Crusoe AI, who similarly explained how its order for servers, comprising 1,000 graphics processing units, was shipped at quarter end in March 2024, but that the graphics processing units had a 40% failure rate. Finally, the Hindenburg Report detailed how, shortly after Supermicro's SEC fine, the Company "began re-hiring top executives that were directly involved in the accounting scandal" and quoted a former Supermicro salesperson, who told Hindenburg, "Almost all of them are back. Almost all of the people that were let go that were the cause of this malfeasance." These and other accounts led Hindenburg to conclude that "Super Micro is a classic case of recidivism" and that the Company "hasn't changed from its checkered past regarding its revenue recognition and accounting practices."

---

[201] *Super Micro: Fresh Evidence of Accounting Manipulation, Sibling Self-Dealing and Sanctions Evasion at This AI High Flyer*, Hindenburg Research (Aug. 27, 2024), https://hindenburgresearch.com/smci/.

237. Investors quickly responded to the Hindenburg Report's revelations. That day, Supermicro's stock price declined 8.7% from the previous day's close of $56.25 to an intraday low price of $51.35 on August 27, 2024. Supermicro's public relations team quickly got to work: the same day, Supermicro emailed many media outlets, including *Fortune*, *Barron's*, and the Associated Press, and claimed that the Hindenburg Report was just "rumors and speculation."[202]

238. Supermicro's media campaign had its intended effect. The Company's shares rallied from the intraday low to close at $54.76 on August 27, 2024, a drop of 2.64% from the previous day's close. In contrast, that same day the S&P 500 Index rose 0.15%, and the Nasdaq Composite Index similarly rose 0.16%. That day, Supermicro stock experienced its highest daily trading volume of the prior three weeks.

239. The success of Supermicro's efforts to falsely reassure the investing public was short-lived. The very next day, on August 28, 2024, before the market opened, Supermicro announced that it would delay filing its annual report on Form 10-K, that it could not timely file the report without "unreasonable effort or expense," and that Supermicro's management needed "to complete its assessment of the design and operating effectiveness of its internal controls over financial reporting."[203]

---

[202] *See* Will Daniel, *Wall Street's AI darling Super Micro postponed earnings while under short-seller's microscope*, Fortune (Aug. 28, 2024), https://fortune.com/2024/08/28/super-micro-wall-street-ai-earnings-short-seller-hindenburg/; Emily Dattilo, *Super Micro Stock Falls as August Selloff Steepens. A Short-Seller Report Is the Latest Bad News*, Barron's (Aug. 27, 2024), https://www.barrons.com/articles/super-micro-stock-price-hindenburg-short-seller-news-da46e616; Matt Ott, *Super Micro Computer tumbles 25% on 10k reporting delay, accusations of accounting irregularities*, Associated Press (Aug. 28, 2024), https://apnews.com/article/super-micro-computer-accounting-hindenburg-short-seller-51a31837170cab6175d1179dbf297014; William Gavin & Rocio Fabbro, *Super Micro Computer stock tanks 22% after a short seller's scathing report*, Quartz (Aug. 28, 2024), https://qz.com/super-micro-computer-stock-fall-filing-delay-hindenburg-1851634005; Hope King, *Charted: Super sink*, Axios (Aug. 28, 2024) https://www.axios.com/2024/08/28/charted-super-sink-closer.

[203] *See* Press Release, Super Micro Computer, Inc., *Super Micro Computer, Inc. to Delay Form 10-K Filing for Fiscal Year 2024* (Aug. 28, 2024), https://ir.supermicro.com/news/news-details/2024/Super-Micro-Computer-Inc.-to-Delay-Form-10-K-Filing-for-Fiscal-Year-2024/default.aspx.

240.    In response to this news, Supermicro stock fell 19% the same day to close at $44.35 on trading volume over three times higher than the day before. By contrast, that day the S&P 500 Index and the Nasdaq Composite Index declined by only 0.6% and 1.1%, respectively.

241.    Despite these two partial disclosures, the price of Supermicro common stock remained artificially inflated, including because Defendants continued to make materially false and misleading statements concealing the depth of the Company's internal control problems. In a letter Supermicro and Liang released before the market opened on September 3, 2024, Liang claimed that the Hindenburg Report contained "false or inaccurate statements" about Supermicro and "misleading presentations of information." That day, Supermicro's stock price rose 8% in intraday trading from the opening price that morning and ended the day up 0.94% from the previous day's closing price. In contrast, major stock indices like the Nasdaq Composite and the S&P 500 fell.

242.    Yet the truth continued to emerge. On September 26, 2024, at 10:47 a.m. ET, the *Wall Street Journal* reported that the DOJ was investigating Supermicro over "accounting violations."[204] In response to this news, Supermicro's stock closed at $40.24 that day, sinking 12.17% from the previous day's close on trading volume higher than on any day since August 28, 2024, when the Company announced its delayed Form 10-K filing. By contrast, the S&P 500 and the Nasdaq Composite rose by 0.4% and 0.6%, respectively, that day.

243.    Analysts digested these partial disclosures with unease. On September 4, 2024, Barclays analysts noted that they "would like to see more transparency in financial disclosures" and "believe the current risk/reward is balanced" for Supermicro, while downgrading the stock from a buy to a hold and slashing their price target from $693 to $438.[205] Similarly, on October 2, 2024, CFRA released a Research Note stating it had a "cautious stance" on Supermicro given

---

[204] Jonathan Weil & Ben Foldy, *Justice Department Probes Server Maker Super Micro Computer,* Wall St. J. (Sep. 26, 2024), https://www.wsj.com/tech/justice-department-probes-server-maker-super-micro-computer-2ca6a4d3?st=ETVQqV&reflink=desktopwebshare_permalink.

[205] George Wang & Tim Long, *Super Micro Equity Research, Downgrade to EW; Uncertainty Around AI Margins and Internal Controls* (Barclays, Sep. 4, 2024). The prices used in this report reflect Supermicro's stock price prior to the October 1, 2024 10:1 stock split.

"headwinds and ongoing uncertainty surrounding U.S. Department of Justice investigations" related to "accounting manipulation."[206]

244.    Finally, on the morning of October 30, 2024, Supermicro stunned investors when it announced in a Form 8-K filing with the SEC that EY, Supermicro's auditor, had resigned. Supermicro disclosed that EY had received information from the Company that "raised questions, including about whether the Company demonstrates a commitment to integrity and ethical values" consistent with principles for establishing and maintaining effective internal controls, "about the ability and willingness of the Audit Committee and overall Board to demonstrate and act as an oversight body that is independent of the CEO and other members of management," and "whether EY could rely on representations from certain members of management and from the Audit Committee." Supermicro further revealed that EY resigned because it concluded that it could "no longer . . . rely on management's . . . representations" and was "unwilling to be associated with the financial statements prepared by management."[207]

245.    Investors were shocked. That day, Supermicro's stock price plummeted nearly 33%—from a closing price of $49.12 on October 29, 2024, to a closing price of $33.07 on October 30, 2024. Stunned investors traded over 236 million Supermicro shares that day, a volume higher than the previous seven trading days combined. By contrast, the S&P 500 and the Nasdaq Composite traded downward by only 0.33% and 0.6%, respectively, that day.

246.    Analysts and the media mirrored investors' shock. The same day, Needham & Co. explained in its research report: "Ernst and Young's resignation . . . raises significant questions about Supermicro's corporate governance and management's commitment to integrity and ethical values. . . . It is not often that a Big 4 audit firm fires a client. It is even more rare that a Big 4 firm resigns stating that it can no longer rely on the representations of management and the Audit Committee of the Board of Directors. . . . [W]e have to ask 'if Ernst & Young is not willing to rely

---

[206] *Super Micro Computer, Inc., Research Note, CFRA Maintains Hold Opinion on Shares of Super Micro Computer, Inc.*, (CFRA, Oct. 2, 2024).

[207] Super Micro Computer, Inc., *Form 8-K* (Oct. 30, 2024).

on management's representations, why should investors?'"[208] The next day, Baptista Research similarly explained: "EY's resignation letter cited an inability to rely on representations from [Supermicro's] management and audit committee, suggesting a breakdown in the company's internal oversight mechanisms."[209] Similarly, Jim Cramer, the host of *Mad Money*, called EY's resignation "about the most damning statement you will ever see from an accounting firm" and advised investors to sell their Supermicro stock: "[W]hen an accounting firm—frankly a fantastic accounting firm—accuses a client of irregularities, that's enough for me."[210]

247.    In sum, each of the four corrective disclosures listed above served to remove the artificial inflation from the price of Supermicro's common stock and were the direct and foreseeable consequences of the disclosure of the relevant truth concealed by Defendants. Thus, the price declines described above were directly and proximately caused by Defendants' materially false and misleading statements and omissions.

## VIII.    PRESUMPTION OF RELIANCE

248.    Lead Plaintiff is entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because, during the Class Period:

(a)    Supermicro's common stock was actively traded in an efficient market on the Nasdaq;

(b)    Supermicro's common stock traded at high weekly volumes;

(c)    as a regulated issuer, Supermicro filed periodic public reports with the SEC;

(d)    Supermicro regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases and

---

[208] N. Quinn Bolton et al., *E&Y's Resignation Raises Reputational and Restatement Risks; Suspend Rating* (Needham & Co., LLC, Oct. 30, 2024).

[209] *Super Micro Computer (SMCI) in Crisis? Auditor Resignation Sparks Major Concerns!* (Baptista Research, Oct. 31, 2024).

[210] *See* CNBC Television, *I don't know if Super Micro is guilty or innocent, says Jim Cramer* (Oct. 30, 2024), *https://www.youtube.com/watch?v=RR0ztMfS68M*.

through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(e)    the market reacted promptly to public information disseminated by Supermicro; and

(f)    Supermicro securities were covered by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective firms. Each of these reports was publicly available and entered the public marketplace.

(g)    Accordingly, Lead Plaintiff and other members of the Class relied, and are entitled to have relied, upon the integrity of the market prices for Supermicro securities and are entitled to a presumption of reliance on Defendants' materially false and misleading statements and omissions during the Class Period.

(h)    A class-wide presumption of reliance is also appropriate in this action under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there is a duty to disclose.

## IX.    THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

249.    The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this Complaint. The statements complained of herein: (i) were historical statements or statements of purportedly current facts and conditions at the time the statements were made; (ii) were mixed statements of present and/or historical facts and future intent; and/or (iii) omitted to state material current or historical facts necessary to make the statements not misleading.

250.    Further, to the extent that any of the false or misleading statements alleged herein could be construed as forward-looking, the statements were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. Given the then-existing facts contradicting Defendants' statements,

any generalized risk disclosures made by Defendants were not sufficient to insulate them from liability for their materially false and misleading statements.

251.    Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, Defendants are liable for those false and misleading forward-looking statements because at the time each of those statements was made, the speaker knew the statement was false or misleading, did not actually believe the statements, had no reasonable basis for the statements, and was aware of undisclosed facts tending to seriously undermine the statements' accuracy.

## X.    CAUSES OF ACTION

### COUNT I – VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT
### (AGAINST ALL DEFENDANTS)

252.    Lead Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

253.    This count is asserted on behalf of Lead Plaintiff and all members of the Class against all Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

254.    During the Class Period, Defendants disseminated, furnished information for inclusion in, or approved the false statements specified above, which they knew or, at minimum, were severely reckless in not knowing, were misleading in that they contained misrepresentations and omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

255.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of Supermicro securities during the Class Period, which were intended to, and did: (a) deceive the investing public, including Lead Plaintiff

and the Class regarding, among other things, Supermicro's failure to disclose that Defendants perpetuated and had not remediated material internal controls deficiencies, including improper accounting practices in violation of GAAP; (b) artificially inflate and maintain the market price of Supermicro securities; and (c) cause Lead Plaintiff and other members of the Class to purchase Supermicro securities at artificially inflated prices and suffer losses when the true facts became known. These devices, schemes, and artifices to defraud and acts, practices, and courses of business that operated as a fraud or deceit included the following deceptive acts by Defendants, all unknown to investors: (i) an inappropriate tone at the top, including aggressive pressure to recognize revenue before the end of quarters and threats to employees who refused to go along with Liang's accounting manipulations; (ii) Liang's control over every detail of Supermicro's business, including his alteration of revenue numbers on the Company's sales spreadsheet; (iii) improper recognition of revenue for yet-to-be-installed hardware that was not functional to customers; (iv) premature recognition of revenue for hardware with incomplete parts; (v) systematic overstatement of inventory and understatement of expenses; (vi) failure to reasonably allocate revenue for services in a combined hardware-and-services contract; (vii) failure to recognize revenue for services ratably over the term of a services or warranty contract; and (viii) delaying recognition of the cost of sales by delaying accounting for invoices from subcontractors in accounts payable, rather than recognizing these costs in the same quarter as the revenue associated with the subcontractors' work.

256.    Defendants, individually and in concert, directly and indirectly, used the means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiff and the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with severe recklessness; and employed devices and artifices to defraud in connection with the purchase and sale of Supermicro securities.

257.    Defendants are liable for all materially false or misleading statements made during the Class Period, all devices, schemes, and artifices to defraud during the Class Period, and all acts, practices, and courses of businesses that operated as a fraud or deceit during the Class Period, as alleged above.

258.    As described above, Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness. The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of Supermicro securities, were either known to Defendants or were so obvious that Defendants should have been aware of them.

259.    Lead Plaintiff and the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Supermicro securities, which inflation was removed from their price when the true facts became known.

260.    Defendants' wrongful conduct, as alleged above, directly and proximately caused the damages suffered by Lead Plaintiff and other Class members. Had Defendants disclosed complete, accurate, and truthful information concerning these matters during the Class Period, Lead Plaintiff and other Class members would not have purchased or otherwise acquired Supermicro securities or would not have purchased or otherwise acquired these securities at the artificially inflated prices that they paid. It was also foreseeable to Defendants that misrepresenting and concealing these material facts from the public would artificially inflate the price of Supermicro's securities and that the ultimate disclosure of this information would cause the price of Supermicro securities to decline.

261.    Accordingly, as a result of their purchases of Supermicro securities during the Class Period, Lead Plaintiff and the Class suffered economic loss and damages under the federal securities laws.

262.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

263.    This claim is timely within the applicable statute of limitations and repose.

**COUNT II – VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT**
**(AGAINST DEFENDANTS LIANG AND WEIGAND)**

264.    Lead Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

265.    This count is asserted on behalf of all members of the Class against Defendants Liang and Weigand for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

266.    Defendants Liang and Weigand acted as controlling persons of Supermicro within the meaning of Section 20(a) of the Exchange Act, as alleged herein.

267.    By reason of their high-level positions of control and authority as Supermicro's most senior officers, Defendants Liang and Weigand had the authority to influence and control, and did influence and control, the decision-making and activities of Supermicro and its employees, and to cause Supermicro to engage in the wrongful conduct complained of herein. Defendants Liang and Weigand were able to influence and control, and did influence and control, directly and indirectly, the content and dissemination of the public statements made by Supermicro during the Class Period, thereby causing the dissemination of the materially false and misleading statements and omissions of material facts as alleged herein.

268.    Defendants Liang and Weigand communicated with investors or the public on behalf of Supermicro during the Class Period. Defendants Liang and Weigand were provided with, or had unlimited access to, copies of the Company's press releases, public filings, and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were made and had the ability to prevent the issuance of the statements or to cause the statements to be corrected. Therefore, Defendants Liang and Weigand were able to influence and control, and did influence and control, directly and indirectly, the content and dissemination of the public statements made by Supermicro during the Class Period, thereby causing the dissemination of the materially false and misleading statements and omissions of material facts as alleged herein.

269.    Supermicro violated Section 10(b) of the Exchange Act by virtue of the acts and omissions of its top executives, including Defendants Liang and Weigand, as alleged in this Complaint.

270.     By virtue of their positions as controlling persons of Supermicro and as a result of their own aforementioned conduct, Defendants Liang and Weigand are liable pursuant to Section 20(a) of the Exchange Act to Lead Plaintiff and the other members of the Class who purchased or otherwise acquired Supermicro securities during the Class Period. As detailed above, during all relevant times, Defendant Liang was the CEO of Supermicro, and Defendant Weigand has been the CFO of Supermicro since February 2021.

271.     As a direct and proximate result of Defendants' conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases or acquisitions of Supermicro securities.

272.     This claim is timely within the applicable statutes of limitations and repose.

## XI.     CLASS ACTION ALLEGATIONS

273.     Lead Plaintiff brings this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of all persons or entities that purchased or otherwise acquired Supermicro securities between November 3, 2020, and October 30, 2024, inclusive, and who were damaged thereby. Excluded from the Class are Defendants, directors and officers of Supermicro, and their families and affiliates.

274.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the class members. During the Class Period, Supermicro had more than 50 million shares of common stock outstanding, owned by many thousands of investors.

275.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions that may affect individual Class members include: (a) whether Defendants violated the federal securities laws; (b) whether Defendants omitted and misrepresented material facts; (c) whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; (d) whether the price of Supermicro's securities was artificially inflated; (e)

whether Defendants' conduct caused the members of the Class to sustain damages; and (f) the extent of damages sustained by Class members and the appropriate measure of damages.

276.    Lead Plaintiff's claims are typical of those of the Class because Lead Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

277.    Lead Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class-action securities litigation. Lead Plaintiff has no interests that conflict with those of the Class.

278.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## XII.    PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

A.    determining that this Action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    awarding compensatory damages in favor of Lead Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest;

C.    awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.    awarding any equitable, injunctive, or other further relief that the Court may deem just and proper.

## XIII.   JURY TRIAL DEMAND

Lead Plaintiff demands a trial by jury.

Dated: September 22, 2025                    Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP**

John Rizio-Hamilton (*pro hac vice*)
(johnr@blbglaw.com)

Gerald H. Silk (*pro hac vice*)
(jerry@blbglaw.com)
Scott R. Foglietta (*pro hac vice*)
(scott.foglietta@blbglaw.com)
Preethi Krishnamurthy (*pro hac vice*)
(preethi@blbglaw.com)
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444

-and-

Jonathan D. Uslaner (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3472

*Counsel for Lead Plaintiffs Universal-
Investment-Gesellschaft mbH*