BORIS FELDMAN, State Bar No. 128838
boris.feldman@freshfields.com
DORU GAVRIL, State Bar No. 282309
doru.gavril@freshfields.com
ELENA HADJIMICHAEL, State Bar No. 355715
elena.hadjimichael@freshfields.com
CARL HUDSON, State Bar No. 317201
carl.hudson@freshfields.com
FRESHFIELDS US LLP
855 Main Street
Redwood City, CA 94063
Telephone: (650) 618-9250

*Attorneys for Defendants Super Micro
Computer, Inc., Charles Liang, and
David Weigand*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE SUPER MICRO COMPUTER, INC. SECURITIES LITIGATION | Case No.: 5:24-cv-06147-EJD **DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT** Date: March 12, 2026 Time: 9:00 a.m. Location: Courtroom 4 – 5th Floor Judge: Hon. Edward J. Davila |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES.................................................................................................... *ii*

TABLE OF ABBREVIATIONS............................................................................................... *vii*

NOTICE OF MOTION AND MOTION.................................................................................... 1

STATEMENT OF ISSUES........................................................................................................ 1

INTRODUCTION....................................................................................................................... 1

BACKGROUND......................................................................................................................... 2

    A.  Supermicro Builds the Infrastructure of the AI Economic Boom............................2

    B.  Supermicro Overcomes Past Challenges to Achieve Significant Success................2

    C.  Supermicro Is Criticized Again Despite Further Success.........................................3

    D.  Plaintiff's Lawyers Race This Lawsuit to Court......................................................4

ARGUMENT............................................................................................................................... 4

    I.  PLAINTIFF FAILS TO ALLEGE A MATERIAL FALSE STATEMENT.............................. 5

       A. No Particularized Facts Contradicting the Challenged Statements.....................5

          1.  Unreliable FE Allegations Fail to Show Falsity...................................... 5

          2.  EY's Departure Fails to Show Falsity.....................................................7

          3.  Non–Class Period Allegations Fail to Show Falsity...............................8

       B. No False Statements Concerning Internal Controls.............................................9

          1.  Defendants Disclosed Internal Control Weaknesses...............................9

          2.  No Material False Statements in Boilerplate Certifications...................10

       C. No False Statements Rebutting Hindenburg Blogpost.......................................10

       D. No Actionable Opinion Statements....................................................................11

    II. PLAINTIFF FAILS TO PLEAD SCIENTER.....................................................................12

       A. The FE Allegations Fail to Create a Compelling Inference of Scienter.............. 12

          1.  The FEs Lack Personal Knowledge...................................................... 12

          2.  The FE Allegations Are Not Indicative of Scienter..............................15

       B. Plaintiff's Generic Core Operations Theory Fails to Plead Scienter.................21

       C. Plaintiff's Remaining Scienter Allegations Also Fail.......................................21

    III. PLAINTIFF FAILS TO PLEAD LOSS CAUSATION....................................................... 24

CONCLUSION..........................................................................................................................25

## TABLE OF AUTHORITIES

**Cases**                                                                      **Page**

*Alger Dynamic Opportunities Fund v. Acadia Pharms. Inc.*,
    756 F. Supp. 3d 852 (S.D. Cal. 2024) ............................................................ 10

*In re Am. Apparel, Inc. S'holder Litig.*,
    855 F. Supp. 2d 1043 (C.D. Cal. 2012) ........................................................ 7, 11

*Applestein v. Medivation, Inc.*,
    861 F. Supp. 2d 1030 (N.D. Cal. 2012) .......................................................... 13

*In re Atlas Mining Co. Sec. Litig.*,
    670 F. Supp. 2d 1128 (D. Idaho 2009) ........................................................... 19

*Bajjuri v. Raytheon Techs. Corp.*,
    641 F. Supp. 3d 735 (D. Ariz. 2022) .............................................................. 18

*Bond v. Clover Health Invs., Corp.*,
    587 F. Supp. 3d 641 (M.D. Tenn. 2022) ......................................................... 14

*Borteanu v. Nikola Corp.*,
    2023 WL 1472852 (D. Ariz. Feb. 2, 2023) .................................................. 11, 14

*Browning v. Amyris, Inc.*,
    2014 WL 1285175 (N.D. Cal. Mar. 24, 2014) ................................................. 21

*Bruce v. Suntech Power Holdings Co.*,
    2013 WL 6843610 (N.D. Cal. Dec. 26, 2013) ................................................. 10

*Buttonwood Tree Value Partners, LP v. Sweeney*,
    2012 WL 2086607 (C.D. Cal. June 7, 2012) ................................................... 19

*Cats v. Protection One, Inc.*,
    2001 WL 34070630 (C.D. Cal. June 4, 2001) ................................................... 9

*In re Chinese-Mfr. Drywall Prods. Liab. Litig.*,
    2017 WL 1476595 (E.D. La. Apr. 21, 2017) ................................................... 15

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
    856 F.3d 605 (9th Cir. 2017) ................................................................. 11–12, 15

*City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp.*,
    47 F. Supp. 3d 1205 (E.D. Wash. 2014) .......................................................... 11

*City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp.*,
    963 F. Supp. 2d 1092 (E.D. Wash. 2013) .......................................................... 8

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
    880 F. Supp. 2d 1045 (N.D. Cal. 2012) ........................................................... 23

*In re Countrywide Fin. Corp. Deriv. Litig.*,
    554 F. Supp. 2d 1044 (C.D. Cal. 2008) ........................................................... 19

*Curry v. Yelp Inc.*,
    875 F.3d 1219 (9th Cir. 2017) ........................................................................ 25

| Cases | Page |
|---|---|

*Das v. Unify Software Inc.*,
2024 WL 1141733 (N.D. Cal. Mar 15, 2024)................................................................8

*Diaz v. N. Dynasty Mins. Ltd.*,
2019 WL 1873291 (C.D. Cal. Feb. 22, 2019)..............................................................14

*Dolly v. GitLab Inc.*,
2025 WL 2372965 (N.D. Cal. Aug. 14, 2025)...............................................................5

*In re Downey Sec. Litig.*,
2009 WL 736802 (C.D. Cal. Mar. 18, 2009)................................................................13

*In re Downey Sec. Litig.*,
2009 WL 2767670 (C.D. Cal Aug. 21, 2009)..........................................................6, 19

*In re DraftKings Inc. Sec. Litig.*,
650 F. Supp. 3d 120 (S.D.N.Y. 2023)..........................................................................14

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)......................................................................................................24

*Emps. Ret. Sys. of City of Providence v. Embraer S.A.*,
2018 WL 1725574 (S.D.N.Y. Mar. 30, 2018)................................................................9

*Eng v. Edison Int'l*,
2018 WL 1367419 (S.D. Cal. Mar. 16, 2018)..............................................................24

*In re Eventbrite, Inc. Sec. Litig.*,
2020 WL 2042078 (N.D. Cal. Apr. 28, 2020)...............................................................5

*Ferreira v. Funko*,
2021 WL 880400 (C.D. Cal. Feb. 25, 2021)................................................................19

*Garcia v. J2 Glob., Inc.*,
2022 WL 22717936 (C.D. Cal. Aug. 8, 2022)............................................................16

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
63 F.4th 747 (9th Cir. 2023)........................................................................................22

*Hampton v. Aqua Metals, Inc.*,
2020 WL 6710096 (N.D. Cal. Nov. 16, 2020)............................................................13

*In re Intel Corp. Sec. Litig.*,
2023 WL 2767779 (N.D. Cal. Mar. 31, 2023)............................................................13

*In re Intrexon Corp. Sec. Litig.*,
2017 WL 732952 (N.D. Cal. Feb. 24, 2017)...............................................................11

*Irving Firemen's Relief & Ret. Fund. v. Uber Techs., Inc.*,
998 F.3d 397 (9th Cir. 2021)....................................................................................4, 24

*Jedrzejczyk v. Skillz Inc.*,
2022 WL 2441563 (N.D. Cal. July 5, 2022)..................................................................5

| Cases | Page |
|---|---|

*Joyce v. Amazon.com, Inc.*,
  2023 WL 8370101 (W.D. Wash. Dec. 4, 2023)................................................................23

*Kelley v. Rambus, Inc.*,
  2008 WL 1766942 (N.D. Cal. Apr. 17, 2008)................................................................16

*Lamontagne v. Tesla, Inc.*,
  2024 WL 4353010 (N.D. Cal. Sept. 30, 2024)................................................................9

*Limantour v. Cray Inc.*,
  432 F. Supp. 2d 1129 (W.D. Wash. 2006)................................................................13, 16

*Loos v. Immersion Corp.*,
  762 F.3d 880 (9th Cir. 2014)................................................................25

*Luna v. Marvell Tech. Grp. Ltd.*,
  2016 WL 5930655 (N.D. Cal. Oct. 12, 2016)................................................................15

*In re Maxim Integrated Prods., Inc., Sec. Litig.*,
  639 F. Supp. 2d 1038 (N.D. Cal. 2009)................................................................25

*In re Maxwell Techs., Inc. Sec. Litig.*,
  18 F. Supp. 3d 1023 (S.D. Cal. 2014)................................................................22, 23

*In re Mellanox Techs Ltd. Sec. Litig.*,
  2014 WL 12650991 (N.D. Cal. Mar. 31, 2014)................................................................12

*In re Mellanox Techs Ltd. Sec. Litig.*,
  2014 WL 7204864 (N.D. Cal. Dec. 17, 2014)................................................................25

*In re Mercury Interactive Corp. Sec. Litig.*,
  2007 WL 2209278 (N.D. Cal. July 30, 2007)................................................................24

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
  540 F.3d 1049 (9th Cir. 2008)................................................................12, 17

*In re MINISO Grp. Holding Ltd. Sec. Litig.*,
  2024 WL 759246 (S.D.N.Y. Feb. 23, 2024)................................................................11

*In re Nektar Therapeutics Sec. Litig.*,
  34 F.4th 828 (9th Cir. 2022)................................................................4

*Ng v. Berkeley Lights, Inc.*,
  2024 WL 695699 (N.D. Cal. Feb. 20, 2024)................................................................14, 24

*Nguyen v. Endologix, Inc.*,
  962 F.3d 405 (9th Cir. 2020)................................................................17

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015)................................................................11

*Peterson v. Stem, Inc.*,
  2024 WL 4602710 (N.D. Cal. Aug. 30, 2024)................................................................12

| Cases | Page |
|---|---|

*Plichta v. SunPower Corp.*,
   790 F. Supp. 2d 1012 (N.D. Cal. Mar. 1, 2011)....................................................................23

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
   759 F.3d 1051 (9th Cir. 2014)..........................................................................................21

*In re Rackable Sys.*,
   2010 WL 199703 (N.D. Cal. Jan. 13, 2010)......................................................................24

*In re Ramp Networks, Inc. Sec. Litig.*,
   201 F. Supp. 2d 1051 (N.D. Cal. 2002)..............................................................................17

*In re REMEC Inc. Sec. Litig.*,
   388 F. Supp. 2d 1170 (S.D. Cal. 2005)........................................................................17, 20

*In re REMEC Inc. Sec. Litig.*,
   702 F. Supp. 2d 1202 (S.D. Cal. 2010)................................................................................7

*In re Rigel Pharms., Inc. Sec. Litig.*,
   697 F.3d 869 (9th Cir. 2012)..........................................................................................5, 24

*Rok v. Identiv, Inc.*,
   2016 WL 4205684 (N.D. Cal. Aug. 10, 2016)....................................................................25

*Rok v. Identiv, Inc.*,
   2017 WL 35496 (N.D. Cal. Jan. 4, 2017).....................................................................7, 8, 22

*Sakkal v. Anaplan Inc.*,
   557 F. Supp. 3d 988 (N.D. Cal. Aug. 31, 2021)....................................................13, 15, 21

*Sanders v. RealReal, Inc.*,
   2021 WL 1222625 (N.D. Cal. Mar. 31, 2021).....................................................................10

*Scandlon v. Blue Coat Sys., Inc.*,
   2013 WL 5313168 (N.D. Cal. Sept. 23, 2013)......................................................,.................5

*In re SentinelOne, Inc. Sec. Litig.*,
   2025 WL 2807321 (N.D. Cal. Oct. 2, 2025)........................................................................23

*Sgarlata v. PayPal Holdings, Inc.*,
   409 F. Supp. 3d 846 (N.D. Cal. 2019)................................................................................16

*In re Silicon Storage Tech., Inc. Sec. Litig.*,
   2006 WL 648683 (N.D. Cal Mar. 10, 2006)........................................................................10

*In re Silicon Storage Tech., Inc. Sec. Litig.*,
   2007 WL 760535 (N.D. Cal. Mar. 9, 2007)....................................................................6, 10

*In re SunPower Corp. Sec. Litig.*,
   769 F. Supp. 3d 1042 (N.D. Cal. 2025).........................................................................7, 22

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007)........................................................................................................12, 15

**Cases**                                                                                                    **Page**

*In re U.S. Aggregates, Inc. Sec. Litig.*,
    235 F. Supp. 2d 1063 (N.D. Cal. 2002)................................................................13

*In re Vantive Corp. Sec. Litig.*,
    110 F. Supp. 2d 1209 (N.D. Cal. 2000).................................................................9

*Veal v. LendingClub Corp.*,
    423 F. Supp. 3d 785 (N.D. Cal. 2019)..............................................................6, 13

*In re Verifone Sec. Litig.*,
    2016 WL 1213666 (N.D. Cal. Mar. 29, 2016)....................................................16

*Weston Fam. P'ship LLLP v. Twitter, Inc.*,
    29 F.4th 611 (9th Cir. 2022)..........................................................................5–6

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009)............................................................................12

**Statutes and Rules**

15 U.S.C. § 78j(b).........................................................................................1, 25

15 U.S.C. § 78t(a).........................................................................................1, 25

Fed. R. Civ. P. 8(a)............................................................................................1

Fed. R. Civ. P. 9(b).......................................................................................1, 4

Fed. R. Civ. P. 12(b)(6)......................................................................................1

Private Securities Litigation Reform Act, Pub. L. 104–167, 109 Stat. 737 (1995)....................1, 4, 5, 9

**Other Authorities**

Complaint, *Luong v. Super Micro Computer, Inc.*,
    No. 24-cv-02440 (N.D. Cal. Apr. 24, 2024).....................................................6, 13

H.R. Rep. No. 104-369 (1995)...........................................................................1

Notice of Voluntary Dismissal, *Menditto v. Super Micro Computer, Inc.*,
    No. 3:24-cv-06149 (N.D. Cal. Aug 30, 2024), ECF No. 10...............................4

## TABLE OF ABBREVIATIONS

| Abbreviation | Meaning |
|---|---|
| ¶ or Complaint | Consolidated Amended Complaint for Violations of Federal Securities Laws, *In re Super Micro Computer, Inc. Sec. Litig.* (N.D. Cal. Sep. 22, 2025), ECF No. 176 |
| Board | Supermicro's Board of Directors |
| Class Period | November 3, 2020 to October 30, 2024 |
| CEO | Chief Executive Officer |
| CFO | Chief Financial Officer |
| Cooley | Cooley LLP |
| DOJ | U.S. Department of Justice |
| Ex. | Exhibits included in the Declaration of Elena Hadjimichael, filed concurrently with this brief |
| EY | Ernst & Young LLP |
| FE | Former employee |
| GAAP | Generally Accepted Accounting Principles |
| Hindenburg | Hindenburg Research |
| Hindenburg Blogpost | *Super Micro: Fresh Evidence of Accounting Manipulation, Sibling Self-Dealing and Sanctions Evasion at this AI High Flyer*, Hindenburg Research (Aug. 27, 2024) |
| Individual Defendants | Charles Liang and David Weigand |
| *Luong* Compl. | Complaint, *Luong v. Super Micro Computer, Inc.*, No. 24-cv-02440 (N.D. Cal. Apr. 24, 2024) |
| Nasdaq | The Nasdaq Stock Market based in New York City |
| PSLRA | Private Securities Litigation Reform Act, Pub. L. 104–167, 109 Stat. 737 (1995) |
| SEC | U.S. Securities and Exchange Commission |
| Secretariat | Secretariat Advisors, LLC |
| Special Committee | A Special Committee of the Board formed in August 2024 in response to information that was brought to the attention of the Audit Committee |
| Supermicro or the Company | Super Micro Computer, Inc. |
| WSJ | *The Wall Street Journal* |

Emphasis is added unless otherwise noted. Certain quotation marks, alteration marks, citations, and emphases have been omitted. All page references refer to internal pagination as it appears in the original cited materials

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that at the time and place noted above, Defendants will and hereby do move to dismiss Plaintiff's Complaint pursuant to Rules 12(b)(6), 8(a), and 9(b).

**STATEMENT OF ISSUES**

Does Plaintiff state claims under §§10(b) and 20(a) of the Securities Exchange Act of 1934?

**INTRODUCTION**

Pleading securities fraud is hard. It should be. Congress has repeatedly highlighted the abuses in private securities litigation: almost every stock drop is followed by a flurry of press releases from lawyers shopping for plaintiffs, a familiar rush to the courthouse, and a spirited contest over who should be lead plaintiff.[1] This also happened here. A short seller attacked Supermicro's stock. Afraid of missing out on a potentially lucrative lawsuit, plaintiffs swarmed this Court, Santa Clara Superior, and Delaware Chancery. Their instincts appeared to be validated when, a few months after the first lawsuit, Supermicro's auditor quit over a disagreement with management.

And that is all that happened. Supermicro's Board had already started an independent Board investigation into the auditor's concerns. The Special Committee tasked with the inquiry was assisted by independent counsel at Cooley and independent forensic accountants. It concluded that none of the concerns was founded. None of the Company's financials had to be restated, something that both the departing auditors and the new ones concurred on. The short seller fared no better: Supermicro stock barely moved following the short attack. A few months later, the short seller went out of business.

The reasons for this lawsuit to exist vanished. The lawsuit has not. The latest Complaint tries to supplement the allegations of the discredited short-seller attack. To plead ***falsity***, it reaches several years before the putative Class Period to a long-closed SEC investigation. It relies on a few former employees that sound awfully similar to those allegedly consulted by the short seller to make amorphous, temporally unspecific assertions about unnamed internal controls at the Company. These do not add up to a coherent theory of falsity, much less a plausible one, much less a particularized one. ***Scienter*** is no better pleaded: Plaintiff's allegations are the frequently rejected tropes of

---

[1] Congress enacted the PSLRA in response to "significant evidence of abuse . . . by those who seek to line their own pockets by bringing abusive and meritless suits" and who "race to the courthouse to be the first to file a securities class action." H.R. Rep. No. 104-369 at 31, 33 (1995).

1

hands-on-CEO and so-important-they-must-have-known-about-it. Courts routinely dismiss such allegations because they are nearly universally applicable to any company. Finally, Plaintiff cannot plead *loss causation*: the market did not react to any revelations of fraud, but simply to a potential risk. When the risk did not materialize, the stock largely rebounded by February 2025.

This lawsuit should be dismissed, with prejudice. It has been reduced to a tempest in a teapot.

## BACKGROUND

### A.  Supermicro Builds the Infrastructure of the AI Economic Boom

Supermicro's servers are the backbone of AI development, one of the largest drivers of America's economy. *See* Ex. 28 at 1 (AI contributed 1.1% of U.S. GDP growth in early 2025, outpacing consumer spending). These servers support NVIDIA chips, among others, making Supermicro an important partner of another main driver of AI development. Ex. 21. NVIDIA CEO Jensen Huang once noted he is Supermicro's "best sales guy," and predicted significant demand for Supermicro's products. Ex. 27 at 1–2.

Supermicro was co-founded by Charles Liang, who has led the Company as its CEO, President, and Chairman of the Board since 1993. Ex. 4 at 126. Supermicro employs over 6,000 people, with nearly 3,000 at its headquarters in San Jose, California. *Id*. at 8.

### B.  Supermicro Overcomes Past Challenges to Achieve Significant Success

The Complaint addresses certain events that Supermicro has long since resolved. On August 29, 2017, Supermicro announced that it would be late in filing its Form 10-K annual report for fiscal year 2017. Ex. 15. As later disclosed, that filing and Supermicro's later quarterly disclosures were delayed due to an investigation by Supermicro's Audit Committee, which had been concluded by February 9, 2018. Ex. 16. Those delays persisted, such that on August 23, 2018, Supermicro announced that trading of its stock would be suspended on Nasdaq due to the late filings. Ex. 9. Supermicro's stock was later delisted on Nasdaq on March 12, 2019. Exs. 10, 17. Through significant effort, the Company resolved the issue and brought itself current with its SEC filings on December 20, 2019. Ex. 5. Supermicro began trading again on Nasdaq on January 14, 2020. Ex. 6 at 31.

On August 25, 2020, the SEC announced the settlement of a related investigation with Supermicro and its former CFO, Howard Hideshima. Ex. 22. The SEC alleged Mr. Hideshima and

certain other Supermicro employees sought to maximize end-of-quarter sales revenues, without sufficient internal controls. *Id*. Mr. Hideshima agreed to cease and desist from future violations of the securities laws, and paid disgorgement and pre-judgment interest to resolve the matter. *Id*. Mr. Liang was not subject to any enforcement action. *Id*. He nonetheless agreed to reimburse the Company for $2.1 million in stock compensation during the period covered by the SEC order. *Id*.

With those issues behind it, Supermicro flourished. Between the relisting on January 14, 2020, and its all-time high on March 13, 2024, Supermicro's stock price rose by over 4,200%. *Compare* Ex. 29; Ex. 30. It did so based on stunning increases in net sales figures, among other impressive financial results: from $3.6 billion in 2021, to $5.2 billion in 2022, to $7.1 billion in 2023. Ex. 3 at 54.

### C. Supermicro Is Criticized Again Despite Further Success

A few unfortunate events have generated criticism of Supermicro. First, in July 2024, Supermicro's new auditor, Ernst & Young ("EY"), raised concerns to Supermicro's Audit Committee in late July 2024, pertaining to Company controls and policies. Ex. 13; Ex. 20 at 2. While appropriately reserving judgment, the Board took these concerns seriously, and in early August 2024 established an independent Special Committee to investigate. Ex. 20 at 2–3. That Committee engaged independent counsel Cooley and the forensic accounting firm Secretariat to assist. *Id*. EY was routinely engaged and updated as part of the investigation. *Id*. at 1–5. Despite that, and despite the fact that the investigation was still ongoing, EY resigned as Supermicro's auditor on October 24, 2024, as announced October 30, 2024. Ex. 13.

Second, separately but during the same time frame, Supermicro faced an attack by the now-defunct short seller Hindenburg. *See* ¶¶ 123–126. On August 27, 2024, Hindenburg alleged that Supermicro had rehired certain sales employees who left after the settlement with the SEC, and aired speculation about the Company's accounting practices purportedly sourced from anonymous former employees. Ex. 25 at 1. Hindenburg made clear that "all information . . . [had] been obtained from public sources" but still made "no representation . . . as to [its] accuracy, timeliness, or completeness." *Id.* at 52. The market was not fazed; the Company's stock price barely changed, as even the Complaint concedes. ¶ 127. Hindenburg disbanded a few months later on January 15, 2025.

Ex. 26.

On December 2, 2024, Supermicro disclosed that the Special Committee's investigation had concluded. Ex.14; Ex. 20 at 1. That disclosure detailed the Committee's extensive three-month investigation, specific factual findings, and recommendations for strengthening the Company's governance and operations. Ex. 20 at 1–7. The investigation specifically found that "the conclusions EY stated in its resignation letter were not supported." *Id*. at 1. It also found no truth to the allegations in the Hindenburg Blogpost. *Id*. at 5–6. No financial disclosures were restated. *Id.* at 8.

With these issues in the rear view, Supermicro's value proposition was no less attractive to investors. After its low following EY's resignation on November 14, 2024, Supermicro's stock rebounded and increased by as much as 237%, while fluctuating with the global economic uncertainty inherent to 2025. *See generally* Ex. 32.

### D. Plaintiff's Lawyers Race This Lawsuit to Court

This lawsuit was filed only days after the Hindenburg Blogpost was published, on August 30, 2024. ECF No. 1. Two additional securities class action lawsuits followed, and this Court consolidated them on July 14, 2025. ECF No. 152. A third such case was brought but then voluntarily dismissed. Notice of Voluntary Dismissal, *Menditto v. Super Micro Computer, Inc.*, No. 3:24-cv-06149 (N.D. Cal. Aug 30, 2024).

The current Complaint, filed a year after the Hindenburg attack, parrots the Blogpost's allegations. ¶¶ 7, 123–126. It lacks the particular facts required by the federal securities laws.

### ARGUMENT

Plaintiff fails to plead with requisite particularity multiple elements of a claim for securities fraud: "a material misrepresentation or omission," "scienter," and "loss causation." *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 835 (9th Cir. 2022); *Irving Firemen's Relief & Ret. Fund. v. Uber Techs., Inc.*, 998 F.3d 397, 404 (9th Cir. 2021) ("Rule 9(b)['s particularity requirement] applies to all elements of a securities fraud action.").

In passing the PSLRA, Congress sought to prevent plaintiffs "from skirting dismissal by filing a complaint laden with vague allegations of deception unaccompanied by a particularized explanation stating why the defendant's alleged statements or omissions are deceitful." *Nektar*, 34 F.4th at 835.

Under the PSLRA, plaintiffs must "specify each statement alleged to have been misleading, the reason or reasons why [each such] statement is misleading, and, if an allegation . . . is made on information and belief . . . all [particularized] facts on which that belief is formed." *Jedrzejczyk v. Skillz Inc.*, 2022 WL 2441563, at *4 (N.D. Cal. July 5, 2022). They must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* at *6. This showing is made "only if . . . the inference of scienter [is] cogent and at least as compelling as any opposing inference." *Id.*

Plaintiff comes nowhere close to satisfying this rigorous pleading standard.

## I.    PLAINTIFF FAILS TO ALLEGE A MATERIAL FALSE STATEMENT

Plaintiff challenges statements (1) concerning the effectiveness of Supermicro's internal controls, and (2) denying false allegations in the Hindenburg Report. ¶¶ 188–232.

Plaintiff's falsity allegations fail for two main reasons. First, Plaintiff fails to identify the "reasons why the statement[s] [are] misleading, and . . . state with particularity all facts on which that belief is formed." *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 877 (9th Cir. 2012) (affirming dismissal). Second, the challenged statements are "inactionable opinions" or expressions of "corporate optimism . . . too general to give rise to any particular impression." *Dolly v. GitLab Inc.*, 2025 WL 2372965, at *6, *9 (N.D. Cal. Aug. 14, 2025).

### A.  No Particularized Facts Contradicting the Challenged Statements

#### 1.   Unreliable FE Allegations Fail to Show Falsity

Plaintiff's falsity allegations rely on statements credited to anonymous former Supermicro employees. *E.g.*, ¶¶ 40, 47, 50, 52, 54, 59, 80. These FEs lack adequate indicia of reliability. *Infra* § II.A.1. But even assuming they were credible, the FEs would still fail to allege "contemporaneous statements or conditions" contradicting any challenged statement. *In re Eventbrite, Inc. Sec. Litig.*, 2020 WL 2042078, at *9 (N.D. Cal. Apr. 28, 2020) (Davila, J.).

The FEs frequently allege conduct detached from any specific timeframe. These "generalized reports of various issues within [Supermicro] at certain points in time are insufficient to show that any positive statements were false when made." *Scandlon v. Blue Coat Sys., Inc.*, 2013 WL 5313168, at *3 n.3 (N.D. Cal. Sept. 23, 2013); *see also Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611,

619 (9th Cir. 2022) (plaintiffs must plead the "who, what, *when*, where, and how" of alleged fraud).

For example, the Complaint relies on allegations by Bob Luong, a former employee who is at present litigating an employment action against Supermicro.[2] *See, e.g.*, ¶¶ 40–42, 46, 49, 53. Mr. Luong's account spans a seven-year period, "from 2015 until approximately mid-2022," but only two of those years coincide with the Class Period. *See* ¶¶ 4, 40. Plaintiff attempts to use Mr. Luong's account to allege what occurred "[t]hroughout [these] approximately seven years." ¶¶ 40, 58. Elsewhere, Mr. Luong alleges that discrete events took place "at times," "many times," or "from time to time"  but does not specify at *which* times, or how frequently these events occurred. *E.g.*, ¶¶ 40, 77, 90–91. Temporally ambiguous FE allegations are not exclusive to Mr. Luong. *See, e.g.*, ¶ 84 (FE 3 alludes to "many instances" of an event occurring without identifying any of those instances).

That Plaintiff struggles to tether the FE allegations to specific time periods is unsurprising. Only *one* FE was employed at Supermicro for the duration of the Class Period. *See* ¶ 80. Because the FEs' tenures only partially overlap with the Class Period, it is not reasonable to infer falsity based on "facts or information regarding events during the proposed class period which are attributed to the informants who were not present at [Supermicro] during the proposed class period." *In re Silicon Storage Tech., Inc. Sec. Litig.*, 2007 WL 760535, at *7 (N.D. Cal. Mar. 9, 2007); *In re Downey Sec. Litig.*, 2009 WL 2767670, at *10 (C.D. Cal Aug. 21, 2009) (rejecting confidential witness allegations that occurred outside of the class period).

References to various indistinct interactions, "reports," and "monthly and quarterly" events also do not suffice to plead falsity—Plaintiff must instead "cite to . . . specific report[s]" and "dates or contents" of those meetings, reports, and interactions. *Silicon Storage*, 2007 WL 760535, at *7. Without clarity about whether the conduct alleged by FEs took place during the Class Period, the FEs' allegations have no bearing on the falsity of Defendants' statements. *See Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 806 (N.D. Cal. 2019) (dismissing where plaintiffs "fail[ed] to allege . . . when" the underlying problems occurred).[3]

---

[2] ¶ 119 ("Luong . . . filed a retaliation claim against Supermicro."); *see* Complaint, *Luong v. Super Micro Computer, Inc.*, No. 24-cv-02440 (N.D. Cal. Apr. 24, 2024) ("*Luong* Compl.").
[3] To avoid repetition, the FEs allegations are discussed at greater length below. *Infra* § II.A. They fail to plead falsity for the same reasons that they fail to plead a strong inference of scienter. *See id.*

### 2. EY's Departure Fails to Show Falsity

Plaintiff claims that the resignation of EY, Supermicro's former auditor, somehow invalidates each of Defendants' statements regarding the Company's internal controls. *See* ¶¶ 136–143. This theory fails to allege a material false statement on two fronts: (1) the resignation, without more, does not contradict any challenged statement; (2) EY's concerns were investigated and found baseless.

***Not indicative of control failures.*** In its resignation letter, EY alluded only to generalized concerns regarding "management's and the Audit Committee's representations." ¶¶ 44, 138, 168; Ex. 13.[4] Despite Plaintiff's insinuation, nothing in this statement indicates that EY actually identified any "internal controls weaknesses," ¶ 44—much less a material weakness. Absent that, the announcement of EY's resignation in no way contradicts Defendants' assurances that Supermicro "established and maintained" "effective" and "reliab[le]" controls. *E.g.*, ¶¶ 197–198, 208, 212, 220. All that EY's banal statement reveals is a disagreement between EY and the Company about the best way for Supermicro to manage its own business. This is not tantamount to fraud. *See In re Am. Apparel, Inc. S'holder Litig.*, 855 F. Supp. 2d 1043, 1084 (C.D. Cal. 2012) ("that an auditor resigns because it feels it cannot rely on management's representations, by itself, does not demonstrate that management was intentionally, recklessly, or deliberately withholding information").

Further undermining Plaintiff's theory is the fact that EY's departure triggered no restatement. *Compare, e.g.*, *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1255 (S.D. Cal. 2010) (rejecting theory that EY "resigned because the auditor recognized the potential for fraud" where the company "did not issue a restatement"), *with In re SunPower Corp. Sec. Litig.*, 769 F. Supp. 3d 1042, 1050–51 (N.D. Cal. 2025) (EY "resigned as . . . auditor" after two restatements and SEC investigation), *and Rok v. Identiv, Inc.*, 2017 WL 35496, at *10 (N.D. Cal. Jan. 4, 2017) ("BDO's 'noisy' resignation" led to a "restatement of . . . compensation figures"). Even in the event of multiple restatements, "the circumstances surrounding EY's eventual resignation" did not show that the company "was not in fact working diligently" to file its financials in *SunPower*. 769 F. Supp. 3d at 1057–59 (dismissing Section 10(b) claim in part). And in *Rok*, the vague nature of the auditor's resignation did not "enable

---

[4] Media and analysts also characterized EY's resignation in anodyne terms, reporting that it had "questions about . . . corporate governance" and "concerns over . . . financial practices," ¶¶ 141–143.

[plaintiff] to adequately plead that [the auditor] confirmed the presence of" a weakness that went undisclosed. 2017 WL 35496, at *6 (dismissing Section 10(b) claim in whole).

*No support for EY's concerns.* Any specific concerns about internal controls that EY communicated to Supermicro prior to its resignation were investigated by an independent Special Committee of the Board. Ex. 20 at 1. The Special Committee's comprehensive review of corporate governance and internal controls matters—aided by independent advisors Cooley and Secretariat— was still underway when EY decided to resign. *Id.* at 2–3; Ex. 13. The Special Committee's final report expressly found that EY's concerns "were not supported" and discredited allegations of accounting improprieties, including those in the Hindenburg Blogpost. Ex. 20 at 1–6. The Complaint wholly omits to mention this crucial fact. Plaintiff cannot simply ignore the Special Committee's findings and manufacture falsity from EY's initial, unverified concerns. *See City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d 1092, 1113 (E.D. Wash. 2013) ("mere speculation" cannot plead falsity in place of "actual facts").

### 3. Non–Class Period Allegations Fail to Show Falsity

Recognizing that its Class Period–era allegations do not show that the challenged statements were materially false when made, Plaintiff pivots to pre– and post–Class Period events. These allegations also fail.

The Complaint relies heavily on SEC orders dated August 25, 2020, which describe conduct that occurred between 2014 and 2017—three to six years before the Class Period began. ¶¶ 28 & n.14, 29 & n.19.[5] Plaintiff tries to use these historical allegations as a proxy for particularized allegations of falsity during the Class Period. ¶¶ 43, 62, 75, 87, 98, 106, 112. Plaintiff also reaches beyond the end of the Class Period, ¶¶ 145–157, in an attempt to show that the challenged statements—made months and years earlier—were false when made. This strategy is meritless.

Plaintiff's inclusion of "pre-Class Period allegations do[es] not establish the falsity of the statements made *during* the Class Period." *Das v. Unify Software Inc.*, 2024 WL 1141733, at *9 (N.D. Cal. Mar 15, 2024). References to "accounting manipulation" that "occurr[ed] *prior to the Class*

---

[5] Supermicro and Mr. Liang did not "admit[] or deny[]" the SEC's findings, and their consent to the SEC's findings was "[s]olely for the purpose of th[ose] proceedings." Ex. 24 at 2; Ex. 23 at 1.

*Period* cannot meet the heightened pleading standards of the PSLRA in the absence of specific facts showing that the practice continued *during the Class Period*." *Cats v. Protection One, Inc.*, 2001 WL 34070630, at *15 (C.D. Cal. June 4, 2001). Nor does it suffice that certain Supermicro employees were rehired by the Company. *E.g.*, ¶¶ 51–55. The fact that some employees who left around the time of the SEC settlements came back to Supermicro "ha[s] nothing to do with *Class Period* internal controls or demonstrating that [Supermicro]'s internal controls were deficient." *See Emps. Ret. Sys. of City of Providence v. Embraer S.A.*, 2018 WL 1725574, at *11 (S.D.N.Y. Mar. 30, 2018).

The same reasoning applies to post–Class Period allegations: none reflects "contemporaneous reports or data showing that the statement was false or misleading when made." *Lamontagne v. Tesla, Inc.*, 2024 WL 4353010, at *12 (N.D. Cal. Sept. 30, 2024) (dismissing); *accord In re Vantive Corp. Sec. Litig.*, 110 F. Supp. 2d 1209, 1217 n.14 (N.D. Cal. 2000) (holding that "events occurring after the alleged class period do not show that the representations made during the class period were false when made" absent "particular contemporaneous facts that establish . . . falsity").

Plaintiff's objective is to improperly expand the alleged Class Period by asking this Court to examine the SEC's 2020 findings and statements and reports from long after the challenged statements and, in doing so, excuse Plaintiff's failure to plead particularized, contemporaneous allegations showing "the [issues] continued during the Class Period." *Protection One*, 2001 WL 34070630, at *15. This approach is an impermissible attempt to bootstrap deficient Class Period allegations to unrelated, non-Class Period events. This Court should reject it.

### B.  No False Statements Concerning Internal Controls

#### 1.  Defendants Disclosed Internal Control Weaknesses

All that Plaintiff's falsity allegations indicate is that Supermicro faced internal controls–related challenges. It has never hidden this fact. The Company disclosed both that (1) it had (and was in the process of remediating) an "IT General Control (ITGC) material weakness" in its "internal control over financial reporting," and (2) its procedures were "subject to inherent limitations, including the exercise of judgment in designing, implementing, operating, and evaluating the controls and procedures, and the inability to eliminate misconduct completely." Ex. 7 at 39; Ex. 8 at 43; ¶ 208. This was not a forward-looking warning concealing an actualized risk. On the contrary, "the

statement includes present-tense language from which a reasonable investor would conclude that the risk [was] ongoing." *Sanders v. RealReal, Inc.*, 2021 WL 1222625, at *20 (N.D. Cal. Mar. 31, 2021) (dismissing Section 10(b) claim). Even assuming that there were pervasive internal control weaknesses—which Plaintiff fails to allege—"potential investors would have been wary of the risk of [such weaknesses] after reading the passage in its entirety." *Id.*

### 2. No Material False Statements in Boilerplate Certifications

Plaintiff challenges routine Sarbanes-Oxley certifications in Supermicro's filings. ¶¶ 198–199, 209–213, 220–221. But Plaintiff does not allege facts showing how these general boilerplate statements were false. *See Alger Dynamic Opportunities Fund v. Acadia Pharms. Inc.*, 756 F. Supp. 3d 852, 873 (S.D. Cal. 2024) (dismissing where "Sarbanes-Oxley certifications" were "untethered to" plaintiffs' "reasons for falsity").

Plaintiff ignores that these certifications are "boilerplate language [that] is used in internal control review reports filed by numerous other . . . companies." *In re Silicon Storage Tech., Inc. Sec. Litig.*, 2006 WL 648683, at *8 (N.D. Cal Mar. 10, 2006). Indeed, courts in this District have held that Sarbanes-Oxley certifications do not form the basis of a Section 10(b) claim at all. *See, e.g.*, *Bruce v. Suntech Power Holdings Co.*, 2013 WL 6843610, at *4 (N.D. Cal. Dec. 26, 2013) (certifications "not actionable as the failure to detect fraud does not itself render false standard certifications about the adequacy of internal controls"); *Silicon Storage*, 2007 WL 760535, at *17 ("[T]here is nothing in either the 1934 . . . Act or the Sarbanes-Oxley Act . . . that authorizes plaintiffs to base a claim for securities fraud on an alleged misstatement in a Sarbanes-Oxley certification."). Regardless, absent "contemporaneous fact[s]" showing "statements about" the existence and function of Supermicro's controls were false, this "standard phrasing" is both inactionable and immaterial. *Silicon Storage*, 2006 WL 648683, at *8.

### C. No False Statements Rebutting Hindenburg Blogpost

The Complaint concludes—rather than plead with particularized facts—that Defendants' refutation of the Hindenburg Blogpost must be false. ¶¶ 127, 230. The sole basis for this assertion appears to be Plaintiff's own reliance on the short-seller attack. But this does not allege falsity. "It is not inherently unreasonable for a company acting in the regular course of business to respond to or

even deny allegations made in a short-seller report, especially where those allegations could have an impact on the company's value." *Borteanu v. Nikola Corp.*, 2023 WL 1472852, at *25 (D. Ariz. Feb. 2, 2023) (no scheme liability for statements refuting Hindenburg attack). Indeed, Supermicro followed standard procedure for public companies: it denied *and also investigated* the short seller's allegations. *Compare* ¶¶ 127, 230 *and* Ex. 20 at 1–7 *with In re MINISO Grp. Holding Ltd. Sec. Litig.*, 2024 WL 759246, at *5–6, *21 (S.D.N.Y. Feb. 23, 2024) (dismissing where the company formed an "independent committee of its board of directors [to] investigate the allegations in the" short report, denied the allegations a day later, then "determined that key allegations . . . were not substantiated").

### D.  No Actionable Opinion Statements

Defendants' statements are inactionable for an independent reason: they are opinions "too general to cause a reasonable investor to rely upon them." *City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp.*, 47 F. Supp. 3d 1205, 1220 (E.D. Wash. 2014).

"An opinion is a belief, a view, or a sentiment" that is distinguishable from "a statement of fact" in that it "rest[s] on grounds insufficient for complete demonstration." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 183 (2015). Because they reflect Defendants' inherently subjective views, the challenged statements are expressions of opinion. *See, e.g.*, ¶ 188 ("*We believe* that the big challenges in the past three years that badly hurt Supermicro are totally behind us now."); *see also Am. Apparel*, 855 F. Supp. 2d at 1072–73 ("[S]tatements that the company was 'on track' to 'making significant progress in [its] remediation of deficiencies by year-end,' . . . can hardly be construed as a guarantee"). Defendants' "general characterizations or opinions" of the effectiveness of Supermicro's controls—*see, e.g.*, ¶ 197 ("*Based on this assessment*, management has concluded that our internal control over financial reporting was effective"); ¶ 208 ("Supermicro's management evaluated the effectiveness of . . . disclosure controls and procedures and, *based on that evaluation*, the disclosure controls and procedures were effective")—amount to immaterial, "mildly optimistic, subjective assessment[s]," on which "investors do not rely." *In re Intrexon Corp. Sec. Litig.*, 2017 WL 732952, at *3 (N.D. Cal. Feb. 24, 2017) (dismissing complaint).

"Misstatements of opinion can give rise to a claim" only if they "[a]re both objectively and subjectively false or misleading." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align*

*Tech., Inc.*, 856 F.3d 605, 614 (9th Cir. 2017). Plaintiff fails to allege that any of Defendants' opinions were either objectively false when made, *supra* §§ I.A–I.D, or not genuinely held. *See In re Mellanox Techs Ltd. Sec. Litig.*, 2014 WL 12650991, at *16 (N.D. Cal. Mar. 31, 2014) (plaintiff failed to "plead[] subjective falsity—that [the defendant] actually disbelieved his own" opinion).[6]

## II.    PLAINTIFF FAILS TO PLEAD SCIENTER

To plead the state of mind required for securities fraud, the "inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 309 (2007). The "complaint must [therefore] contain allegations of specific contemporaneous statements or conditions that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made." *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1066 (9th Cir. 2008). Plaintiff relies on: (1) FEs who lack personal knowledge, (2) a generic core operations theory, and (3) a medley of circular scienter allegations. Each falls short.

### A.  The FE Allegations Fail to Create a Compelling Inference of Scienter

Plaintiff tries to bolster its deficient scienter allegations with commentary attributed to eight uninformed former employees. But the FEs' purported recollections must be discounted for two reasons, each independently sufficient. "First, the [FEs] whose statements are introduced to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009). "Second, those statements which are reported by [FEs] with sufficient reliability and personal knowledge must themselves be indicative of scienter." *Id.* The FEs meet neither requirement.

#### 1.  The FEs Lack Personal Knowledge

*FEs lack detail and reliability. Zucco* instructs courts to look to "the level of detail provided by the confidential sources" and "the reliability of the sources." *Zucco*, 552 F.3d at 995. FEs must be "positioned to know the information alleged" and not "report only unreliable hearsay, and . . . allege conclusory assertions of scienter." *Id.* at 996. In *Zucco*, one of the FEs reported directly to a

---

[6] Plaintiff makes cursory reference to a purported "scheme" that Defendants "orchestrated." ¶¶ 6, 160, 255. A scheme claim that merely repackages a "failed section 10(b) misstatements" claim cannot proceed. *Peterson v. Stem, Inc.*, 2024 WL 4602710, at *12 (N.D. Cal. Aug. 30, 2024).

defendant, but even that was not enough for the court to find the allegations reliable.

The FEs here are far more deficient, given that they lack "contact with any of the Individual Defendants and therefore cannot provide reliable insight into the Defendants' state of mind." *Veal*, 423 F. Supp. 3d at 814. The most that Plaintiff musters is a vague allegation that Mr. Luong "*effectively* reported directly to" Mr. Liang—suggesting that the person to whom Mr. Luong *actually* directed reported was someone other than Mr. Liang.[7] Meanwhile, FE 5 and FE 7 are at, at best, two degrees removed from Mr. Liang.[8] *See Limantour v. Cray Inc.*, 432 F. Supp. 2d 1129, 1155 (W.D. Wash. 2006) (discrediting FE allegations where "none . . . reported directly to any of the Defendants"). Plaintiff does not allege clear reporting structures for FEs 1–4, or FE 6.[9] *See Hampton v. Aqua Metals, Inc.*, 2020 WL 6710096, at *14 (N.D. Cal. Nov. 16, 2020) (complaint failed to "identify . . . who" an FE "reported to, and what the relationship was to" the defendants).

Absent "any significant contact with" Defendants, these FEs lack firsthand knowledge of "what [any Defendant] actually knew." *Sakkal v. Anaplan Inc.*, 557 F. Supp. 3d 988, 999 (N.D. Cal. Aug. 31, 2021). Instead, the FEs based their allegations on hearsay. For instance, FE 1 claims he "knew" details about former CFO Kevin Bauer's resignation only "based on conversations with more senior employees . . . among" unidentified "others." ¶ 69; *see also, e.g.*, ¶ 54 (FE 5, a salesperson, relays information about other personnel that he heard from "employees in the legal and finance department"). But FE "statements . . . are disregarded if lacking in specificity or based on hearsay." *In re Downey Sec. Litig.*, 2009 WL 736802, at *12 (C.D. Cal. Mar. 18, 2009)*; In re Intel Corp. Sec. Litig.*, 2023 WL 2767779, at *23 (N.D. Cal. Mar. 31, 2023) (declined to credit FE scienter allegations based on a "chain of hearsay"). For this reason, Plaintiff's FE statements are not "sufficiently reliable, plausible, or coherent to warrant further consideration." *Applestein v. Medivation, Inc.*, 861 F. Supp. 2d 1030, 1039 (N.D. Cal. 2012), *aff'd*, 561 F. App'x 598 (9th Cir. 2014).

**FEs are uncorroborated.** FE statements are not corroborated where, as here, "none of the confidential witnesses have any first-hand knowledge of [Defendants'] decisions." *In re U.S. Aggregates, Inc. Sec. Litig.*, 235 F. Supp. 2d 1063, 1074 (N.D. Cal. 2002).

---

[7] Mr. Luong is an especially unreliable source given he is currently litigating an employment action against Supermicro based on the same allegations he makes here. *See generally Luong* Compl.
[8] *See* ¶¶ 54, 80.
[9] *See* ¶¶ 47–48, 50, 52–53, 55, 59–60, 69, 84, 94, 146–149.

Nor is the biased Hindenburg Blogpost a reliable corroborative source, as Plaintiff implies. *See* ¶¶ 51–52, 75. Given short sellers' "obvious self-interest in" causing a company's "stock price" to "declin[e]," courts will discredit short seller reports that "lack . . . sufficient indicia plausibly demonstrating the[ir] . . . reliability." *Ng v. Berkeley Lights, Inc.*, 2024 WL 695699, at *10 (N.D. Cal. Feb. 20, 2024). And short-seller attacks by Hindenburg in particular were deemed unreliable in several cases. *See, e.g.*, *Nikola*, 2023 WL 1472852, at *25 (Hindenburg post targeting defendants failed to show "any materially misleading or false statements"); *In re DraftKings Inc. Sec. Litig.*, 650 F. Supp. 3d 120, 158–59 (S.D.N.Y. 2023) (discrediting Hindenburg post).[10] The same is true here.

The Hindenburg Blogpost relies on the accounts of various anonymous purported FEs, Ex. 25 at 1, which the Complaint parrots, *e.g.*, ¶¶ 44, 51, 75, 123 (citing "Hindenburg['s] . . . own interviews with former employees"). "[W]hen a complaint's factual attributions to unidentified sources derive not from interviews by plaintiffs' counsel, but from a short-seller report's attributions to such sources—there is still greater need for care." *Ng*, 2024 WL 695699, at *10. Yet neither Hindenburg nor Plaintiff allege "an adequate basis for determining that" these FEs had "personal knowledge of the events they report." *Diaz v. N. Dynasty Mins. Ltd.*, 2019 WL 1873291, at *4 (C.D. Cal. Feb. 22, 2019) (discrediting FE allegations lifted from short seller report). Despite these deficiencies, the Complaint suggests that the Hindenburg Blogpost corroborates the accounts of Plaintiff's own FEs. There is a considerable overlap in roles between the FEs here and those interviewed by Hindenburg. Indeed, they may very well be the same individuals:

- FE 1, a "Senior Director [in] Sales Operations," ¶ 47, and the "senior sales director" referenced by Hindenburg, Ex. 25 at 1, 14, 19, 36;

- FE 2, a "Senior Account Manager" in Supermicro's "sales department," ¶ 50 & n.37, and the "senior salesperson" referenced by Hindenburg, Ex. 25 at 9, 33;

- FE 3, an "Inside Sales Representative," ¶ 50; FE 6, a "Sales Account Manager," ¶ 59; and the "salesperson" referenced by Hindenburg, Ex. 25 at 1, 15–16; and

- FE 4 and FE 5, each a "Director of Sales," ¶¶ 52, 54, and the "sales director" referenced by Hindenburg, Ex. 25 at 2, 9, 13–15, 19, 25, 32, 36.[11]

---

[10] Were the Hindenburg Blogpost a reliable source, the market would have "react[ed] negatively . . . in a way that would not make sense" had it "lacked credibility in the eyes of reasonable, knowledgeable investors." *Bond v. Clover Health Invs., Corp.*, 587 F. Supp. 3d 641, 668 (M.D. Tenn. 2022). Instead, the market had a muted reaction: on the date of the Blogpost's publication, "Supermicro's stock price dropped" only "2.64%." ¶ 127; Ex. 31.

[11] Like the Complaint, the Hindenburg Blogpost relies on allegations by Mr. Luong. Ex. 25 at 14–15.

It is little wonder that one person would repeat to Plaintiff's counsel the same account that they gave to the Hindenburg authors. This is of no corroborative value.

### 2. The FE Allegations Are Not Indicative of Scienter

The FEs' allegations fail to show what the Individual Defendants knew that negated their statements when made. This alone warrants dismissal. *Align Tech.*, 856 F.3d at 620 (affirming dismissal where plaintiff did not allege "that the confidential informants personally disclosed Cadent's channel stuffing to" the defendants). Plaintiff claims that the FE accounts allege six internal control weaknesses or improper accounting practices, but none is indicative of scienter.

*(i) Tone at the top.* Mr. Luong and FEs 1 and 7 describe Mr. Liang as a hands-on CEO who required Supermicro employees to "obtain his signature and approval" on a variety of decisions. ¶¶ 6, 45–47, 55–61, 83, 86, 90. Characterizing Mr. Liang's management style as an "iron-fist rule," Plaintiff alleges that Mr. Liang fostered an "inappropriate tone at the top" that constitutes a "material weakness in internal controls." ¶¶ 42–43. But subjective characterizations that a company's executive is a "micro manager," has "his fingers in everything," or leaves "little room for mid-level managers to make decisions" do not suffice to establish scienter. *Luna v. Marvell Tech. Grp. Ltd.*, 2016 WL 5930655, at *12 (N.D. Cal. Oct. 12, 2016). Even conduct far more extreme than what is alleged here has been found inadequate. *Sakkal*, 557 F. Supp. 3d at 992, 999 (no scienter where defendant allegedly "micromanag[ed] day-to-day operations," "screamed expletives at . . . [sales] executives" with "veins popp[ing] out of [his] neck," and created "a combative environment on steroids"). Mr. Liang's management style is more likely reflective of cultural norms,[12] not a "strong" inference of fraud. *See Tellabs*, 551 U.S. at 314.

The Complaint also posits that Mr. Liang required everyone around him to be a "yes man," citing the departure of former CFO Kevin Bauer. ¶ 171. Plaintiff ignores that Mr. Bauer in fact resigned to "pursue other interests," Ex. 12; Ex. 18 at 2 (noting he "ha[d] enjoyed working with Charles and the very dedicated Supermicro team"), and insists that Mr. Bauer was "fired" for

---

[12] Mr. Liang is Taiwanese. His leadership style must be considered in the context of East Asian corporate cultural norms. *Cf. In re Chinese-Mfr. Drywall Prods. Liab. Litig.*, 2017 WL 1476595, at *24 (E.D. La. Apr. 21, 2017) (noting that "cultural values dominate the structure, organisation and behaviour of eastern enterprises" and "impose . . . codes of conduct" that place "emphasis on respect, deference to authority, and unwavering loyalty within the corporate hierarchy").

"get[ting] in the way," ¶¶ 6, 69, 114, 171. *But see In re Verifone Sec. Litig.*, 2016 WL 1213666, at *8 (N.D. Cal. Mar. 29, 2016) (rejecting allegation that CFO "was actually terminated" and not retired, as the company "disclosed"). In this vein, Plaintiff tries to allege via Mr. Luong that control deficiencies manifested only *after* Mr. Bauer's departure in February 2021. ¶¶ 69–70, 92, 113–114, 165. But that assertion is at odds with the rest of the Complaint. *See* ¶¶ 107, 114 (Mr. Luong alleges revenue was improperly recognized in 2020); ¶ 50 (FE 3 saw no "change in this revenue pressure during his tenure"); ¶¶ 3–5 (by November 2020, Defendants "maintained the same deficient internal controls" as before). Such "internally inconsistent" allegations cannot be credited—they "limit" Defendants and the Court "severely" in their ability "to address the substantive adequacy of Plaintiff's fraud claims in a meaningful way." *Kelley v. Rambus, Inc.*, 2008 WL 1766942, at *7 (N.D. Cal. Apr. 17, 2008).

*(ii) Segregation of duties.* Plaintiff also alleges that Mr. Liang's "tight control" over the Company amounts to "the absence of any segregation of duties," which "enabled" Mr. Liang "to improperly modify revenue numbers in the Company's sales revenue spreadsheets." ¶¶ 60, 173. This accusation originates from FE 1, a human resources employee, who alleges that Mr. Liang "would change the sales revenue numbers" during "weekly meetings." ¶ 47. However, FE 1 does not relate his own experience, but rather that of an anonymous former "sales operations employee," who shared these recollections when FE 1 was conducting his "exit interview." *Id.* Courts must weigh FE allegations that were "informed by an unnamed person . . . against reliability when considering scienter." *Sgarlata v. PayPal Holdings, Inc.*, 409 F. Supp. 3d 846, 857 (N.D. Cal. 2019); *Cray*, 432 F. Supp. 2d at 1155 ("To the extent the statements of these [confidential witnesses] are hearsay, they cannot support any inference of scienter, much less a strong inference."). Even detailed secondhand allegations routinely fail to establish the "personal knowledge" necessary to support scienter. *See Garcia v. J2 Glob., Inc.*, 2022 WL 22717936, at *4 (C.D. Cal. Aug. 8, 2022) (discrediting hearsay attributed to a named "VP of International Marketing & GM").

*(iii) Hardware revenue.* Paraphrasing the FEs' accounts, Plaintiff claims that Mr. Liang "pressured employees . . . to improperly recognize revenue from hardware-and-services contracts before the equipment was installed and functional." ¶ 49. But the actual FE allegations fail to show that any Defendant knew he had a duty to disclose something but failed to do so.

FEs 3 and 7 allege that employees were "pushed to send orders out with missing parts" in order to "hit revenue targets." *See* ¶¶ 81–84. These instructions were allegedly conveyed by "sales directors" and "senior managers" at "open meetings," including "all-hands Monday meetings that" Mr. Liang and Mr. Weigand "attended." *Id.*[13] To the extent Plaintiff's theory is that the Individual Defendants engaged in improper revenue recognition practices and then lied about it, ¶ 50, it is absurd to suggest that Defendants would air in front of thousands of employees the very fraud they were allegedly concealing from investors. *See Nguyen v. Endologix, Inc.*, 962 F.3d 405, 408 (9th Cir. 2020) ("Allegations that are implausible do not create a strong inference of scienter."). And even in *Metzler*, where a company's senior-level meetings all but conceded "that it knew compliance problems were detrimental to the company's well-being," the court declined to find scienter. 540 F.3d at 1058–59. There, management's internal debates about compliance—even instructions arguably suggesting that employees push regulatory boundaries—failed to establish scienter. *Id.* at 1069.

The most the FEs specifically allege about either Individual Defendant is that Mr. Liang approved exceptions to pre-shipment testing requirements for certain hardware, and that some of that hardware was purportedly shipped with missing parts. *See* ¶¶ 61, 76–77, 86, 164. However, even this supposition fails to indicate that Defendants "orchestrat[ed]" a scheme to prematurely recognize the revenue from these shipments. ¶ 49; *see In re Ramp Networks, Inc. Sec. Litig.*, 201 F. Supp. 2d 1051, 1077 (N.D. Cal. 2002) (acknowledging that there are "a number of legitimate reasons for attempting to achieve sales earlier"). To plead "irregularities in revenue recognition," Plaintiff needed to allege (1) "the total amount of improperly recognized revenue," (2) "place the allegedly improperly recognized revenue in context," (3) "approximate the amount of overstated earnings and revenue," (4) "identify the products at issue[, and] set forth the dates of any transactions," and (5) "identify . . . customers involved in the revenue recognition issue." *In re REMEC Inc. Sec. Litig.*, 388 F. Supp. 2d 1170, 1176 (S.D. Cal. 2005). Neither FE 3 or FE 7 alleges they observed improper revenue recognition practices firsthand. *See* ¶ 50, 82.[14] Only Mr. Luong asserts that certain hardware

---

[13] FE 3 speculates "that Liang pushed the sales directors, who in turn pushed the sales team" but does not allege that he ever witnessed Mr. Liang do so. ¶ 50.

[14] FE 7 alleges only that it was his "understanding . . . that Supermicro was recognizing the revenue for the incomplete order." ¶ 82. He notes that he had "access" to an "internal system for the shipments [that] reflected the revenue," *id.*, but does not allege that he ever saw improperly recognized revenue recorded in this internal system.

"shipments had been improperly booked as revenue in the quarter they were delivered." ¶ 79. He purportedly "knew" this "because he saw them reflected" in "Quarterly Revenue Recognition Reports" that Mr. Liang and Mr. Weigand also received. *Id.* Apparently Mr. Luong is able to remember, years later, the granular details of revenue recorded each quarter "from at least October 2020 through October 14, 2022." ¶ 76. But despite this impressive recall, Mr. Luong provides no information about either the customers who received these shipments or the magnitude of revenue allegedly misstated. Such general allegations fail to support an inference of scienter. *Bajjuri v. Raytheon Techs. Corp.*, 641 F. Supp. 3d 735, 761 (D. Ariz. 2022) ("Merely stating that revenue figures 'were materially overstated' . . . or 'were inflated' . . . is insufficiently particular because it does not permit evaluation of whether the alleged GAAP violations were minor or isolated, or instead widespread and significant."). Without the requisite detail and particularity, these allegations are little more than disagreements with the judgment of the Company's accountants and auditors.

*(iv) Services revenue.* Plaintiff attempts to allege, exclusively through the account of Mr. Luong, that on two occasions Defendants improperly allocated revenue from services as revenue from hardware. ¶¶ 108–109.[15] But these allegations also fail to demonstrate scienter.

First, Mr. Luong describes an instance in "approximately October 2020 through December 2020" when $10 million in revenue from sales to IBM were "incorrectly allocated . . . to hardware sales rather than service."[16] ¶¶ 107, 109. Mr. Luong determined that a subordinate of "Supermicro's controller overseeing revenue recognition" was responsible, and immediately reported this to her superior. ¶ 109 Mr. Luong alleges no information to suggest that IBM revenue was improperly recognized by, or at the direction of, any Defendant. Nor does he explain how this issue was ultimately resolved. *See* ¶¶ 107, 109. This isolated incident sheds no light on Defendants' scienter.

Second, Mr. Luong alleges that Mr. Liang unilaterally implemented a change in the way that "cost of services" was calculated. ¶¶ 115–116. Previously, the Company had "allocated 7% of

---

[15] For combined hardware-and-services contracts, Mr. Luong "understood" that Supermicro recognized revenue attributable to hardware "upon delivery and installation," but had to recognize services revenue "over the entire term" of the contract—typically three years. ¶ 108.

[16] Mr. Luong alleges that at this time, 7% (approximately $700,000) of this revenue should have been allocated to services. *See* ¶ 113. Assuming that IBM had a three-year contract, only one-third of services revenue could be recognized in the first year. *See* ¶ 108. The remaining two-thirds ($466,667) that Mr. Luong alleges was prematurely recognized is 0.01% of the $3.34 billion in revenue reported for fiscal year 2020. Ex. 1 at 37.

revenue from hardware-and-services contracts to services" for all customers. ¶ 113. In February or March 2021, after consulting the Accounting department, Mr. Liang allegedly determined that Supermicro would recognize 1.4% of revenue as services for the Company's four largest customers. ¶ 116. Believing this decision to be "[im]proper," Mr. Luong "refused" to sign off on the change, and claims that he was subsequently terminated in retaliation. ¶¶ 118–119.

Although Mr. Luong's termination remains the subject of active litigation, *id.*, Plaintiff concludes that Defendants must have had sinister motivations, *e.g.*, ¶ 40. This is not borne out by Mr. Luong's allegations, which "[i]nstead of raising a strong inference of scienter . . . seem more reasonably interpreted as his disagreement with [Supermicro]'s management." *Ferreira v. Funko*, 2021 WL 880400, at *28 (C.D. Cal. Feb. 25, 2021) (dismissing); *see Downey*, 2009 WL 2767670, at *11 ("The second-guessing of management decisions . . . does not provide a basis of securities fraud.").[17] Even if the cost of services change were an accounting violation, as Plaintiff theorizes, there is nothing to indicate that Defendants knew it was material. *See In re Atlas Mining Co. Sec. Litig.*, 670 F. Supp. 2d 1128, 1142 (D. Idaho 2009) (GAAP violations support scienter only if they "are significant and widespread"). If anything, the opposite inference should be drawn: the revenue that was supposedly recognized prematurely is less than half a percent of revenue for that year.[18] *See In re Countrywide Fin. Corp. Deriv. Litig.*, 554 F. Supp. 2d 1044, 1069 (C.D. Cal. 2008) (materiality of alleged accounting misconduct weighed against "the company's overall financial position").

*(v) Inventory.* Leaning once again on Mr. Luong's allegations, Plaintiff claims that Defendants engaged in improper inventory accounting practices by failing to approve Mr. Luong's requests to "write-off" inventory that was "missing." ¶¶ 61, 90–93, 95–97, 152, 165, 183. These

---

[17] Because Supermicro quotes a combined, single price for hardware and services, Ex. 4 at 43, deciding how to apportion that revenue is not straightforward and requires subjective determination. Supermicro's new auditor BDO acknowledged that this process is challenging—even for auditors: "auditing of revenue recognition from contracts with customers . . . involves a *high degree of auditor effort*." *Id.* at 57; *see also Buttonwood Tree Value Partners, LP v. Sweeney*, 2012 WL 2086607, at *2 (C.D. Cal. June 7, 2012) (GAAP is "a collection of broad standards," in some cases framed in "inherently subjective terms" about which accountants "reasonably and frequently could disagree").

[18] Mr. Luong claims that 7% of the revenue associated with these customers totaled roughly "$30 million" at the time. ¶ 115 Assuming a three-year services contract, the amount of revenue allegedly misallocated to hardware under a 1.4% cost-of-services approach would total $24 million, of which $16 million (two-thirds) was prematurely recognized in the first year of the contract. This amounts to 0.45% of the $3.56 billion in revenue reported for fiscal year 2021. *See* Ex. 2 at 39.

allegations suffer from now-familiar deficiencies: Mr. Luong fails to specify the time period, customers, or amounts involved. Instead, he alleges he "observed practices" that he "understood" overstated the value of inventory, sometime between "February 2021" (the time of Mr. Bauer's resignation) and "October 2022" (when Mr. Luong "was placed on administrative leave"). ¶ 89. Namely, Mr. Luong recalls that his inventory write-off requests were left sitting unapproved in Supermicro's "electronic approval queue" on "multiple occasions," including "[a]t least twice for write-offs involving particularly large dollar amounts." ¶¶ 90–91. What constitutes "particularly large dollar amounts," we are not to know. Although these requests had to be approved by at least one other person before Mr. Liang could sign off, *id.*, Plaintiff assigns responsibility for these delayed approvals only to Mr. Liang, ¶¶ 61, 90–93, 97, 165, 183. To buttress this theory, Plaintiff relies on Mr. Luong and FE 7's recollections that they "heard" Mr. Liang "effectively threaten" that "anyone who told an employee to write equipment down should be sent to Human Resources to get disciplined." ¶¶ 93, 95. But FE 7 does not allege that he actually observed improper accounting practices. *See also supra* at 15–16. Standing alone, Mr. Luong's vague account of occasionally delayed approval fails to allege scienter. *See REMEC*, 388 F. Supp. 2d at 1177 ("Plaintiff falls short [of pleading scienter] by providing inadequate detail and context to the underlying transactions.").

  ***(vi) Cost of sales.*** Plaintiff sets forth a similar theory regarding delays in approving subcontractor invoices for a particular customer, claiming that Mr. Liang "delayed approving these invoices to delay recognition of the expenses associated with these invoices." ¶ 166. But Mr. Luong alleges only that Mr. Liang's "approval was required" before payment could be made, and that Mr. Liang "had access" to Supermicro's "electronic system for approving invoices." ¶ 102.[19] Even if Mr. Liang had deliberately "delayed" these approvals "by weeks," as Plaintiff suggests, this still does not plead scienter. The more likely explanation is an innocuous one: Mr. Liang—who allegedly had a "a line of . . . employees in front of [his] office," "on virtually every business and accounting decision"—was busy. ¶¶ 56–58. The amounts involved also undermine any strong inference. *See* ¶ 102 (the invoices "ranged from approximately $250,000 to $500,000 every month or two").

---

[19] Mr. Luong insinuates that Mr. Liang's family ties "raised red flags." ¶ 101 (his "wife" and "her brother," who both worked in Accounting, were "involved with" the invoices); ¶ 99 (subcontractor is "run by Liang's brother"). But Mr. Luong never explains what these "red flags" actually portended.

Assuming a maximum of $1.5 million invoiced per quarter, these expenses represented 0.14% of Supermicro's revenue for the fourth quarter of fiscal year 2021. *See* Ex. 19 at 1.

### B.  Plaintiff's Generic Core Operations Theory Fails to Plead Scienter

Plaintiff next resorts to the "core operations" doctrine. The Ninth Circuit dismisses this doctrine outside of "rare circumstances," absent here, "where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge" of it. *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014). Plaintiff had to allege "specific admissions" of such "detailed involvement," or "witness accounts demonstrating that executives had actual involvement in creating false reports," *id.*, but alleges neither.

*Intuitive Surgical* demonstrates the high bar that Plaintiff fails to meet. Even though executives allegedly knew "contents of the software-generated reports because the substance of the reports was discussed in meetings," there were no "allegations linking specific reports and their contents to the executives." *Id.* at 1062–63. Here, Plaintiff offers even less, with general allegations that Mr. Liang had "access" to "Supermicro systems" or recurring "reports," "approv[ed] . . . every business decision," and "was personal involved in relationships with suppliers and customers." ¶¶ 71, 162, 173–174. Equally general is the allegation that Mr. Liang and Mr. Weigand "had personal responsibility for designing and maintaining effective internal controls." ¶¶ 184–185.

Courts have already found that "micromanagement" does not suffice to plead core operations. *See Sakkal*, 557 F. Supp. 3d at 999. Allegations that a CEO "hovered over the sales department, interfering with, and sometimes overruling, leadership decisions" were no shortcut to pleading that "Defendants had 'actual access' to the relevant information," nor did this level of "involvement . . . indicate it would be 'absurd' to suggest that management was unaware of the [facts] alleged." *Id.* at 992, 999. Permitting such allegations to succeed "would eviscerate the core-operations test and turn it into an automatic presumption of [management's] comprehensive knowledge." *Browning v. Amyris, Inc.*, 2014 WL 1285175, at *15 (N.D. Cal. Mar. 24, 2014) (dismissing).

### C.  Plaintiff's Remaining Scienter Allegations Also Fail

Plaintiff attempts to infer scienter through circular reasoning. But Plaintiff cannot (1) assume Defendants acted with scienter, (2) allege a series of events that, if Defendants had scienter, would be

suspicious, and (3) conclude that these events must be indicative of scienter. Plaintiff's burden is exactly the opposite: the Complaint must *plead*, not assume, a strong inference of scienter, which requires an "extreme departure from the standards of ordinary care" or "intentional or conscious misconduct." *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 765 (9th Cir. 2023).

Instead of meeting this high bar, Plaintiff speculates that the following topics, in themselves, "strengthen" scienter: (1) EY's resignation, ¶ 168; (2) prior regulatory action and "misrepresentations," ¶¶ 159, 181, and related remediation of control deficiencies, ¶¶ 160–167, 179, 180–182; (3) Defendants' own statements about the Hindenburg Blogpost and internal controls, ¶¶ 172, 180, 183; and (4) Mr. Liang's executive compensation, ¶¶ 176–178. Even assessed holistically, these conclusory allegations provide no basis to infer scienter.

***Auditor resignation.*** EY's resignation does not in itself "strengthen[] the scienter inference," since Plaintiff has failed to point to any particular facts indicating that the resignation resulted from fraud. ¶ 168. "Auditors' resignations"—even "noisy" ones—are "by themselves are insufficient to support an inference of scienter." *Rok*, 2017 WL 35496, at *14. They do not support scienter absent "specific allegations . . . indicating that at the time of" the challenged statements, Defendants "knew that the . . . financials were not prepared in accordance with GAAP or were otherwise unsound." *SunPower*, 769 F. Supp. 3d at 1058. Here, the reasons behind EY's decision to resign were vague and nondescript, drawing no specific link between EY's departure and the particular misconduct alleged in the Complaint. *Supra* § I.A.2. Plaintiff relies heavily on EY's position that it "c[ould] not rely on management's representations," *see* ¶ 168, but that assertion "by itself does not demonstrate that management acted intentionally or recklessly, rather than" some other reason for the purported loss in confidence, *In re Maxwell Techs., Inc. Sec. Litig.*, 18 F. Supp. 3d 1023, 1039–40 (S.D. Cal. 2014) (dismissing). There are no other facts pleaded in the Complaint that tie EY's resignation to Plaintiff's theory of fraud.

***Prior events.*** Nor is the existence of regulatory action in the past, indicative of fraudulent intent in the present. Plaintiff alleges the prior SEC investigation and Nasdaq delisting themselves "strengthen[] the scienter inference." ¶ 159. But where there is "no evidence . . . to suggest that . . . past failings" associated with prior investigations "made [a Company] more likely to have internal

control problems . . . or that it should have put the individual defendants on alert with regard to internal controls," such regulatory action does not establish scienter. *Maxwell*, 18 F. Supp. 3d at 1043. Plaintiff here draws no such connection.

Plaintiff's allegations of "past misrepresentations" supporting scienter, regarding the same topics at issue in the investigations, are not meaningfully different and serve only to pad the length of the Complaint. ¶ 181. Further, Plaintiff makes a similar logical error in assuming that identification and remediation of internal control deficiencies establish that those deficiencies resulted from fraud. ¶¶ 160–167, 179, 180–182. On the contrary, "previously acknowledg[ing] a lapse in internal control mechanisms" does "not give rise to a strong showing of scienter" and "add[s] very little, if anything, to the overall calculus." *Plichta v. SunPower Corp.*, 790 F. Supp. 2d 1012, 1019 (N.D. Cal. Mar. 1, 2011). This theory "is entirely circular, and conflates alleged falsity with scienter." *In re SentinelOne, Inc. Sec. Litig.*, 2025 WL 2807321, at *4 (N.D. Cal. Oct. 2, 2025) (dismissing where plaintiff "believe[d] the . . . calculations were misleading, and therefore" assumed defendants "must have intended to mislead investors").

**Statements about controls.** Plaintiff fails to allege the requisite inference of scienter merely by noting that Defendants discussed, or rebutted allegations about, internal controls. ¶¶ 172, 180, 183. Courts regularly reject this flawed logic: "the mere fact that the Individual Defendants spoke about a topic does not provide support for a strong inference of scienter." *Joyce v. Amazon.com, Inc.*, 2023 WL 8370101, at *14 (W.D. Wash. Dec. 4, 2023) (dismissing).

**Compensation.** Nor has Plaintiff supported his assumption that Mr. Liang was motivated to make misrepresentations by Supermicro's "executive compensation structure and bonus targets." ¶¶ 176–178. This is a variation on "motive and opportunity" evidence, rejected by the Ninth Circuit as "insufficient to establish scienter at the pleadings stage." *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1069 (N.D. Cal. 2012) (citing *Lipton v. PathoGenesis Corp.*, 284 F.3d 1027, 1035, 1038 (9th Cir. 2002)) (dismissing). Specifically, Plaintiff alleges Mr. Liang's bonus compensation depended on remediation of Supermicro's internal controls, ¶ 177, and certain revenue and stock price targets, ¶ 178. These resulted in alleged bonuses to Mr. Liang of $2 million and $11.6 million, respectively. ¶¶ 177–178. Yet Plaintiff alleges nothing about Mr. Liang's

compensation relative to peer companies or executives so he clearly has alleged "nothing remarkable" about Mr. Liang's compensation "[c]ompared to industry norms." *In re Rackable Sys.*, 2010 WL 199703, at *9 (N.D. Cal. Jan. 13, 2010). The Ninth Circuit does not infer scienter "merely because a defendant's compensation was based in part on [financial] successes," but that is all Plaintiff here has alleged. *Rigel*, 697 F.3d at 884.

## III.    PLAINTIFF FAILS TO PLEAD LOSS CAUSATION

The Court should dismiss this action for the additional reason that Plaintiff fails to plead the required "causal connection" between their alleged injury and the misconduct actually alleged in the Complaint. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005).

Plaintiff claims that Defendants' statements about Supermicro's internal controls artificially inflated its stock price, ¶ 233, and that the "truth" was ultimately revealed over a series of disclosures: **(1)** the August 27, 2024 Hindenburg Blogpost, **(2)** the August 28, 2024 press release announcing Supermicro would be delayed in filing its Form 10-K report, **(3)** a September 26, 2024 article reporting that DOJ was investigating Supermicro, and **(4)** the October 30, 2024 announcement of EY's resignation. ¶¶ 127–136. But these purportedly "corrective" disclosures did not actually correct any challenged statement. *See Uber Techs.*, 998 F.3d at 407 (to be corrective, a disclosure must "rev[eal]" the alleged "fraudulent activity rather than . . . other unrelated facts" ).

***Hindenburg Blogpost.*** Hindenburg has "an admitted financial incentive to convince others to sell" and its Blogpost is "inadequate to amount to a corrective disclosure." *Ng*, 2024 WL 695699, at *17; *see supra* at 14–15. Plaintiff also neglects to demonstrate that the stock drop following publication of the short-seller attack was "statistically significant." *Eng v. Edison Int'l*, 2018 WL 1367419, at *3 (S.D. Cal. Mar. 16, 2018) (collecting cases). Courts in this District recognize that a "[d]rop in share price [that] does not appear to be statistically significant" would not "survive a . . . motion to dismiss." *In re Mercury Interactive Corp. Sec. Litig.*, 2007 WL 2209278, at *7 (N.D. Cal. July 30, 2007) (dismissal with leave to amend).

***Delayed filing.*** As Plaintiff recites, Supermicro's press release announcing that it "could not timely file" its 2024 annual report on Form 10-K stated only that "management needed to complete its assessment of the design and operating effectiveness of its internal controls over financial

reporting." ¶ 239. The fact that Supermicro needed additional time for this review in no way reveals that any deficiency actually existed, nor does it "correct" any of Supermicro's prior public statements regarding internal controls. *See Rok v. Identiv, Inc.*, 2016 WL 4205684, at *3–4 (N.D. Cal. Aug. 10, 2016) (defendant's internal investigation and late SEC filing did not allege loss causation).

**DOJ investigation.** The mere existence of a DOJ investigation, as reported by *WSJ*, ¶ 134, also fails to correct any challenged statement. As the Ninth Circuit has explained, investigations have no clear "ultimate[]" outcome, and do not, "in and of themselves, reveal . . . fraud[]." *See Loos v. Immersion Corp.*, 762 F.3d 880, 890 (9th Cir. 2014); *accord In re Maxim Integrated Prods., Inc., Sec. Litig.*, 639 F. Supp. 2d 1038, 1047 (N.D. Cal. 2009) (announcement of "SEC investigation" did "not reveal the alleged fraud"). The most that an ongoing investigation reveals is the "risk" or "potential" for fraud, such that inactionable "market speculation" causes any resulting loss. *Curry v. Yelp Inc.*, 875 F.3d 1219, 1225, 1228 (9th Cir. 2017).

**EY resignation.** Plaintiff claims that news of EY's resignation was the last corrective disclosure, after which Supermicro's purported "fraud" was fully exposed to the market. But this announcement did no such thing. Despite Plaintiff's inaccurate gloss, EY never stated that "it could not trust Liang or Weigand's representations or their integrity," or characterized its concerns as "grave." *Compare* ¶ 10 *with* Ex. 13.[20] The far more sedate language of EY's letter of resignation merely conveyed its decision not "to rely on management's . . . representations"—a decision that was not related to any public financial statements. *Id*. Despite its choice to resign, EY made clear that for fiscal years 2023 and 2024, there otherwise "were no 'disagreements'" between the Company and "EY on ***any matter of accounting principles or practices*** [or] ***financial statement disclosure***." *Id.*

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed.[21]

---

[20] And to the extent EY did have such concerns, "grave" or otherwise, they were investigated by the Special Committee and found to be baseless. *See supra* at 3–4, 8.
[21] "Without a primary violation under Section 10(b), the claim under Section 20(a) for control person liability similarly fails." *In re Mellanox Techs., Ltd. Sec. Litig.*, 2014 WL 7204864, at *5 (N.D. Cal. Dec. 17, 2014).

Dated: November 21, 2025                    FRESHFIELDS US LLP

                                            By: */s/ Boris Feldman*
                                                    Boris Feldman

                                            *Attorneys for Defendants*